```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                       CASE NO. 18-cr-20710-CMA
 3

 4     UNITED STATES OF AMERICA,        Miami, Florida

 5              Plaintiff,              August 5, 2019

 6        vs.                          8:41 a.m. to 9:44 a.m.

 7     SENTHIL RAMAMURTHY, et al.,      Courtroom 12-2

 8              Defendant.              (Pages 1 to 51)

 9     ───────────────────────────────────────────────────────

                         STATUS CONFERENCE
10           BEFORE THE HONORABLE CECILIA M. ALTONAGA,
                  UNITED STATES DISTRICT JUDGE
11

12     APPEARANCES:

       FOR THE GOVERNMENT:   KEVIN J. LARSEN, ESQ.
13                           ANA M. MARTINEZ, ESQ.
                             Assistant United States Attorney
14                           99 Northeast Fourth Street
                             Miami, FL 33132
15                           (305) 961-9001
                             (305) 961-9431
16                           kevin.larsen@usdoj.gov
                             ana.maria.martinez@usdoj.gov
17

       FOR THE DEFENDANT     GREGG L. BERNSTEIN, ESQ.
18     SENTHIL RAMAMURTHY:   Zuckerman Spaeder LLP
                             100 East Pratt Street, Suite 2440
19                           Baltimore, MD 21202-1031
                             (410) 949-1152
20                           gbernstein@zuckerman.com

21     FOR THE DEFENDANT     DAVID O. MARKUS, ESQ.
       MANGALA RAMAMURTHY:   A. MARGOT MOSS
22                           Marcus/Moss PLLC
                             40 Northwest Third Street, PH 1
23                           Miami, FL 33128
                             (305) 379-6667
24                           dmarkus@markuslaw.com
                             mmoss@markuslaw.com
25
```

```
 1    APPEARANCES CONTINUED:

 2

 3      FOR THE DEFENDANT        DANIEL L. RASHBAUM, ESQ.
        JOHN SCHOLTES:          ALLISON GREEN, ESQ.
 4                              JEFF MARCUS, ESQ.
                                Marcus Neiman & Rashbaum LLP
 5                              One Biscayne Tower
                                2 South Biscayne Boulevard, Suite 1750
 6                              Miami, Florida 33131
                                (305) 400-4260
 7                              drashbaum@mnrlawfirm.com
                                agreen@mnrlawfirm.com
 8                              jmarcus@mnrlawfirm.com

 9      FOR THE DEFENDANT        ANDREW S. FELDMAN, ESQ.
        THOMAS SAHS:            Feldman Firm, PLLC
10                              Miami Southeast Financial Center
                                200 South Biscayne Boulevard
11                              Suite 2770
                                Miami, Florida 33131
12                              (305) 714-9474
                                Afeldman@feldmanpllc.com
13

14      FOR THE DEFENDANT        MARISSEL DESCALZO, ESQ.
        RAJESH MAHBUBANI:       Tache, Bronis, Christianson and
15                              Descalzo, P.A.
                                150 Southeast Second Avenue, Suite 600
16                              Miami, FL 33131
                                (305) 537-9565
17                              mdescalzo@tachebronis.com

18      FOR THE DEFENDANT        JEFFREY H. SLOMAN, ESQ.
        ANTHONY MAUZY:          Stumphauzer & Sloman, P.L.
19                              One Biscayne Tower
                                2 South Biscayne Boulevard, Suite 2550
20                              Miami, FL 33131
                                (305) 371-9686
21                              jsloman@sfslaw.com

22      REPORTED BY:            STEPHANIE A. McCARN, RPR
                                Official Court Reporter
23                              400 North Miami Avenue
                                Twelfth Floor
24                              Miami, Florida 33128
                                (305) 523-5518
25                              Stephanie_McCarn@flsd.uscourts.gov
```

1                        **I N D E X**

2                       **WITNESSES**

3
      **WITNESSES FOR THE GOVERNMENT:**                    **Page**
4                                                            --

5

6
      **WITNESSES FOR THE DEFENDANT:**                     **Page**
7                                                            --

8

9     **EXHIBITS IN EVIDENCE**          **PRE**    **MARKED**    **ADMITTED**

10    **Government's Exhibit No.**       --       --          --

11    **Defendant's Exhibit No.**       --       --          --

12

13

14

15

16

17                      **MISCELLANEOUS**

18                                                          **Page**

19    **Proceedings........................................   4**
      **Court Reporter's Certificate......................   51**
20

21

22

23

24

25

1          (The following proceedings were held at 8:41 a.m.)

2               COURT SECURITY OFFICER:  All rise.

3               THE COURT:  Good morning.  Please be seated.

4               ALL PARTIES:  Good morning, Your Honor.

5               THE COURT:  Please state your appearances.

6               MR. LARSEN:  Good morning, Your Honor.  Kevin Larsen

7     on behalf of the United States.  Seated with me at counsel

8     table is AUSA Ani Martinez.

9               THE COURT:  Good morning.

10              MS. MARTINEZ:  Good morning, Your Honor.  I'm joining

11    this case.  Ani Martinez on behalf of the United States.

12              THE COURT:  Good morning.

13              MR. BERNSTEIN:  Good morning, Your Honor.  Gregg

14    Bernstein on behalf of Senthil Ramamurthy.  Mr. Ramamurthy is

15    participating by telephone.  He is on the line.  Thank you to

16    Your Honor for your consideration in allowing him to do that.

17              THE COURT:  Of course.

18              Mr. Ramamurthy, are you able to hear us?

19              DEFENDANT S. RAMAMURTHY:  Yes, I can hear, ma'am.

20              THE COURT:  Very good.

21              MR. MARKUS:  Good morning, Your Honor.  David Markus

22    for Mangala Ramamurthy who is also present on the telephone as

23    well as my cocounsel Margot Moss.

24              THE COURT:  Good morning.

25              MR. RASHBAUM:  Good morning --

```
1          MS. MOSS:  Good morning.

2          MR. RASHBAUM:  -- Your Honor.  Dan Rashbaum and

3   Allison Green, ah, Mr. Marcus is on the phone as well, on

4   behalf of John Scholtes, who is also on the telephone.

5          THE COURT:  All right.  And do we have Ms. Ramamurthy

6   on the phone?

7          DEFENDANT M. RAMAMURTHY:  Yes.  Good morning.  I am

8   here, Mangala Ramamurthy.

9          THE COURT:  Good morning.

10         MR. FELDMAN:  Good morning, Your Honor.  Andrew

11  Feldman on behalf of Thomas Sahs who is also present by

12  telephone.  And thank you for setting that up.

13         THE COURT:  Of course.

14         MS. DESCALZO:  Good morning, Your Honor.  Marissel

15  Descalzo on behalf of Mr. Mahbubani, and Mr. Mahbubani is also

16  present on the phone.

17         MR. SLOMAN:  Good morning, Your Honor.  My name is

18  Jeffrey Sloman on behalf of Anthony Mauzy who is present on the

19  phone as well.

20         THE COURT:  Good morning.  I think -- could I have the

21  remaining Defendants identify themselves.

22         Mr. Mauzy, are you on the phone?

23         DEFENDANT MAUZY:  Good morning.  Yes, I am.

24         THE COURT:  All right.  And do we have Mr. Sahs?

25         DEFENDANT SAHS:  Yes, Your Honor.
```

```
 1              THE COURT:  And Mahbubani?

 2              DEFENDANT MAHBUBANI:  Yes, I am here.

 3              THE COURT:  All right.  And, Mr. Scholtes?

 4              MR. SCHOLTES:  Yes, Your Honor.  John Scholtes.

 5              THE COURT:  All right.  Very good.

 6         So we have a motion for misjoinder that I think we

 7    would need to address.

 8              MS. MARTINEZ:  Your Honor, before we begin, may I

 9    provide something to the Court that I think would assist the

10    Court?  I provided it to Defense Counsel, and they have no

11    objection.

12              THE COURT:  Very well.

13              MS. MARTINEZ:  It is literally just pictures of the

14    Defendants to help us keep track of the arguments.

15              THE COURT:  Very good.  Thank you.

16         I thought we had like a pie chart showing me each

17    defendant and each conspiracy and the road map for the trial,

18    but this is a good start.

19              MS. MARTINEZ:  I could do that too orally, Your Honor.

20              MR. LARSEN:  Your Honor, just in response to the

21    question on motion for misjoinder, I did see that it came

22    through late Friday.  I've read the motion.  I have begun

23    looking at the cases.  The Government would request to have the

24    14 days to respond in writing.  We believe that we are on solid

25    legal and factual grounds, that the case is joined properly,
```

```
1    and would like the opportunity to brief that.
2            I certainly have sort of a high level argument for the
3    Court at this point why the case is properly joined, but I
4    think it would be better if the Government can fully brief the
5    case, or brief the issues.
6            THE COURT:  Well, I see the issues related to the
7    Government's own memorandum and Mangala Ramamurthy's own
8    memorandum regarding what is this case and how we are going to
9    try it.  I take this motion as sort of like another formal
10   request to separate us out, which is what your supplement
11   Docket Entry 187 sort of addressed and Mangala Ramamurthy's
12   supplement Docket Entry 184 also addressed, what is this case
13   and how are we going to try it against these six Defendants
14   with what we know are two conspiracies at different times, some
15   of which involve Defendants that are not in the other.
16           MR. LARSEN:  Your Honor, the case --
17           THE COURT:  But if we are not going to address the
18   motion, then we are not going to address your memorandum or
19   Mangala Ramamurthy's memorandum, or we are going to save it all
20   for a later date.
21           MR. LARSEN:  Well, Your Honor, I can certainly speak
22   to the Government's position on joinder.  This case started
23   with Mr. Ramamurthy at the apex of the conspiracy.
24   Mr. Ramamurthy recruited all six Defendants at various points
25   into this as it has been characterized in the latest filing
```

1    regarding joinder into the compounding conspiracy.

2         That conspiracy began late 2014.  Some of the evidence

3    will show into early 2015.  The MHQ Defendants, as they are

4    characterized, joined early in 2015 and were so-called

5    marketers.  And I think what AUSA Martinez provided the Court

6    with shows Mr. Ramamurthy recruited Mr. Mauzy, Mr. Sahs,

7    Mr. Mahbubani into this conspiracy to help find TRICARE

8    beneficiaries.  And the overarching plan and scheme was to

9    target healthcare programs, find specifically the beneficiaries

10   of those programs that would be willing to sign up for these

11   expensive and unnecessary medications so that Mr. Ramamurthy

12   could get paid.

13        Mr. Ramamurthy needed doctors to authorize, or as the

14   Government's contention, to ratify these prescriptions, and he

15   had a real problem with that.  He didn't have doctors that

16   would approve these prescriptions.  And the evidence in the

17   case will show that that was among the reasons he brought

18   Mr. Scholtes into the scheme.  So Mr. Scholtes joined the

19   scheme in early 2015.  And he recruited his mother

20   Dr. Ramamurthy into the scheme to write and approve

21   prescriptions.  And the evidence in the case is that she

22   authorized about a million dollars in prescriptions that

23   were -- that her son received 55 -- between 50 and 55 percent

24   in kickbacks for.

25        Now, TRICARE got wise to the scheme in about mid-2015,

1    and that well dried up.  But the evidence in the case will show

2    that all of the Defendants in this case, all of the Defendants

3    in this case continued.  And there are documents that are in

4    discovery that were provided to the Government where the

5    Defendants identified what they characterize as the Holy Grail.

6    This was going to make them millions, and that's the genetic

7    cancer scheme.

8              And so together, all of the Defendants marched forward

9    in planning and preparation for this genetic cancer scheme.

10   But for a falling out, a major business falling out between the

11   MHQ Defendants which occurred in February of 2016, the evidence

12   shows that they were marching lockstep to perfect this scheme.

13             Mr. Ramamurthy and the MHQ Defendants part ways.

14             Now, in between the end of the compounding conspiracy

15   which is mid-2015 and the charged Count 39 that the Government

16   recently added, all of the Defendants were working together.

17   They were targeting labor unions, businesses.  They continued

18   as an operation and made millions of dollars.  However, they

19   were targeting businesses, labor unions, nongovernmental

20   programs.

21             Now, in February of 2016 when there is a massive

22   falling out, the allegation in the evidence will show that the

23   MHQ Defendants were not getting paid by Mr. Ramamurthy for

24   their participation in the scheme.  They parted ways.  They

25   formed their own company and continued to pursue, among other

things, genetic cancer testing, marketing compounded

medications.  It was what is the newest, biggest greatest thing

that they could find to make money.

        Meanwhile, Senthil Ramamurthy finds other individuals

who will participate in the scheme that's charged in Count 39

and moves -- and identifies -- excuse me, identifies Medicare

as the victim.  And, once again, Dr. Ramamurthy joins this

scheme, as she did in the first scheme, by authorizing, again,

about a million dollars in prescriptions for these genetic

cancer tests that the evidence will show these people didn't

even see a doctor, didn't speak to this doctor, didn't even get

the services that they thought they were going to get.

        And her son got paid, again, between 40 and 50 percent

of every test.

        And the reason this case is charged this way, Your

Honor, is because it's almost impossible to tell this story.

The evidence, the documents in this case, the document where

they are talking about the Holy Grail, all of them are on it.

There's an e-mail.  They are saying, Let's get it.  Let's get

it.  And let's move forward.

        And in their own marketing documents talk about how

they're going to do this.

        Now, just because they didn't ultimately all finish

this scheme that they were planning together does not mean that

it is a unrelated, irrelevant conspiracy, and that's why it's

 1    charged.  It's very difficult to tell that story until we go to

 2    trial.  But that's the scheme as I can lay it out for Your

 3    Honor why it's relevant.  And the Government would have a very

 4    difficult time in telling that story if the MHQ Defendants are

 5    allowed to just say, We didn't have anything to do with this.

 6    This isn't -- this is a separate, uncharged, irrelevant,

 7    prejudicial conspiracy.

 8              Because, Your Honor, it's not.

 9              THE COURT:  Well, I appreciate the explanation.  It

10    sounds like you were more prepared to answer the motion than

11    you appeared to be.  Of course, I will give you the

12    opportunity --

13              MR. LARSEN:  Thank you, Judge.

14              THE COURT:  -- to brief it in writing.

15              MR. LARSEN:  Thank you, Your Honor.

16              THE COURT:  I will hear from Defense Counsel.

17              MR. SLOMAN:  Good morning, Your Honor.  Jeffrey Sloman

18    on behalf of Anthony Mauzy, one of the MHQB Defendants.

19              Judge, you know, now, for the first time, we're

20    finding out that the genetic testing conspiracy is going to

21    somehow overlap into the MHQB Defendants and -- even though

22    they are not charged in the case.  So this is the first we are

23    hearing.  We have set forth a number of practical issues in our

24    misjoinder motion, which I think makes this a potential

25    nightmare for the Court to try all these cases, all these --

```
 1    the two conspiracies together, and just to focus on some of the
 2    questions that must be resolved.  You know, where are we going
 3    to put three juries?  Where -- how are they going to be
 4    physically separated for deliberations?  How is the Court going
 5    to ensure that no jurors are seated immediately behind
 6    Defendants?  Would counsel for MHQB Defendants start closing
 7    arguments immediately after the conclusion of evidence with
 8    respect to the compounding pharmacy conspiracy?  We have a
 9    whole list of questions.  Not to mention the fact that we're
10    still in the same position with regard to discovery as we were
11    on June 6th.
12             The discovery in the electronic format that was
13    provided to us is still not searchable.  We have sent -- and
14    Mr. Feldman and Mr. --
15             THE COURT:  Two months later?
16             MR. SLOMAN:  That's correct.  So --
17             THE COURT:  It's been a slow summer.
18             MR. SLOMAN:  We are stuck in the mud.  So all of these
19    problems are extremely problematic.  All these problems --
20             THE COURT:  And I'm sorry to interrupt you,
21    Mr. Sloman, but why is the discovery that you received two
22    months ago not searchable?
23             MR. FELDMAN:  Your Honor, if I can address that.
24             THE COURT:  Yes.
25             MR. FELDMAN:  Before I do address that, I have to
```

```
 1    admit, Your Honor, I am not an -- when it comes to e-discovery
 2    and tech, I am not an expert, but I can go through this
 3    timeline with Your Honor, and hopefully it will provide some
 4    clarity.
 5            THE COURT:  Well, you are among the youngest of the
 6    lawyers here, so if you are not tech savvy, it's a pretty --
 7            MR. FELDMAN:  My wife --
 8            THE COURT:  -- sorry state of affairs.
 9            MR. FELDMAN:  My wife tells me that all the time, that
10    I am stuck in the Dark Ages and I act like I'm about a hundred
11    years old when it comes to tech.  But anyway.
12            The last time we were before Your Honor was around
13    June 6th, and that was the first time he got the discovery
14    discs and that's the first time I got the discovery discs, and
15    that was when Mr. Larsen said, you know, they have all the
16    discovery, and they will only be given a reproduction, and that
17    reproduction would be fully searchable and usable.
18            Well, the problem with that is that the reproduction
19    that we got in or around July 17th is far from usable or
20    searchable.  It was picked up and then taken through a series
21    of steps by sort of the shared IT person between my law firm
22    and Stumphauzer's law firm or Mr. Sloman's law firm, Mike
23    Russo, he's actually -- he used to be over with the Department
24    of Justice and was with Carlton Fields after that.
25            Looked at the disk, and as we were trying to upload it
```

1    into the e-discovery platform which we use -- is called

2    Logikcull --

3           THE COURT:  What is it called?

4           MR. FELDMAN:  Logikull, L-O-G-I-K-C-U-L-L.  And

5    essentially, there's about 89 gigs of data.  And these

6    companies all have different pricing systems.  But one of them

7    that I am currently using is you get charged for every uploaded

8    gig, and you also have to pay a monthly hosting fee.

9           So on top of everything else, we are going to have to

10   reupload this, and we are going to get charged twice.  And I

11   have talked to the e-discovery vendor about that, and there is

12   just no negotiation room on that.

13          But in any event, Mr. Russo goes through the data and

14   realizes that it is going to take him almost a week just to

15   export the data from the new production, the new drive to get

16   it onto a local folder and then to throw it into an e-discovery

17   platform.

18          So what he does is he goes back to the U.S. Attorney's

19   Office in or around, I want to say, July 24th or July 25th,

20   raises this with them, gives the disk back, the reproduced

21   disk.  Says, you know, You are using McAfee or some type of

22   other encryption that's way too slow.  We need to get this

23   going.

24          And gets the disk back in a different format by

25   July 26th, I believe.  And since July 26th, we have had that

1    and we are now in the process of just uploading it.  And

2    hopefully when we upload it into the e-discovery platform, it

3    will be fully searchable and reviewable.

4            The other thing about all of this chronology is that

5    if you give me a disk the first time that it has 200,000 pages

6    of discovery and you give me a disk the second time that has

7    the same amount, if they have different Bate stamp numbers,

8    Your Honor, then the first disk is no good for in terms of

9    trial prep, right?  Why -- Your Honor, can understand that.

10            THE COURT:  I know.

11            MR. FELDMAN:  So that's all I have with the issue with

12    discovery.

13            THE COURT:  Well, and the first disk and the second

14    disk contain the same universe of documents, or are there some

15    additional ones in the second disk?  Is it sort of like you

16    start off with like 200 -- wrong number, 200 and the next one

17    has 250, but they are all interspersed.  Is that what I am

18    gathering?

19            MR. FELDMAN:  I think that's accurate, Your Honor.  I

20    think there were some additional documents, in the raw data on

21    the second production.  But even if there weren't, I submit to

22    Your Honor these are still significant problems, so.

23            THE COURT:  Ms. Descalzo?

24            MR. FELDMAN:  Thank you, Your Honor.

25            THE COURT:  Thank you, Mr. Feldman.

1          MS. DESCALZO:  Just to clarify, the second production,

2    we do have additional documents, but they're just sort of

3    interspersed with the June 6th documents.

4          THE COURT:  Right.  Not like a discrete file or

5    category that you could say, Oh, these are the new ones.

6          MS. DESCALZO:  Right.

7          THE COURT:  Mr. Larsen.

8          MR. LARSEN:  But Your Honor, I can represent from the

9    very date of the last hearing, we've been in touch with

10   counsel.  The issue -- first of all, the overwhelming majority

11   of the documents that exist in this case came from these three

12   Defendants.  They produced the materials to the Government in a

13   manner that wasn't usable.  It wasn't searchable.  We asked

14   them to reproduce it.  They did reproduce it.  And we've had

15   that issue with a couple of parties producing it in native

16   format, which means it can be loaded onto Relativity.

17          We have been working with all of the Defendants to

18   reproduce it to them in a manner that is usable, searchable.

19   We are using contractors at the LTSC in South Carolina.  We

20   have been in touch with -- my paralegal, who has been actively

21   on a daily basis dealing with each of the Defendants, asking

22   them to provide us with hard -- because I know we waited for an

23   extended period of time for the Defendants to bring us hard

24   drivers.

25          I had Ms. Lamb come to me, Where is the hard drive at?

1    Have you heard from the Defendants?  Are they -- why haven't

2    they sent it over?

3              So I just think it's a little bit disingenuous when we

4    have been waiting for weeks to get the hard drives to give them

5    the data that they need for them to come in and say that there

6    has been this long delay.

7              Now, I will tell you that there has not been

8    significant additional discovery or anything like that.  It's

9    just a matter of -- and again, I am not an IT person either,

10   but my understanding is when you unzip documents, when they are

11   processed in native, it is going to look bigger because there

12   are -- for example, one of the problems we had in this case is

13   we would see like an e-mail, there would be an attachment and

14   it would look like just a PDF, but we couldn't actually see the

15   associated attachment.  So I identified that problem initially.

16             We need to be able to identify an e-mail and the

17   attachment.  And that was what we had been doing for the last

18   months is making sure that all of the e-mails and the

19   associated attachments -- so when the Government is looking at

20   the discovery and the Defendants are looking at the same

21   universe of discovery, we can say for sure that this attachment

22   belongs to this e-mail.

23             And so that's a problem -- I recognize it as a problem

24   for the Government.  I knew it would be a problem for the

25   Defendants.  We want everyone to be working from the same

1    universe.

2            I have not heard of anything from any of the

3    Defendants on any massive issue of nonsearchability,

4    nonusability.  This is the first time I have heard that.  So I

5    just want to make sure the Court aware that this has not been a

6    complaint that the Government is aware of.  As far as we are

7    aware, everybody has the discovery and has been able to review

8    it just like we have.

9            MR. MARKUS:  Good morning, Your Honor.

10           THE COURT:  Good morning.

11           MR. MARKUS:  So it's a mess, and this is one of the

12   reasons why.  Back in June, the Court ordered the Government to

13   give us a road map, much more detailed than the few minutes

14   we've heard.  And if I can just set the stage for a moment, if

15   the Court remembers, this case was first indicted back in

16   August of 2018 with one defendant, Mr. Ramamurthy.  The case

17   was set for trial to start at the beginning of this year, and

18   at the end of 2018 in December, they added my client

19   Dr. Mangala Ramamurthy, right before trial.

20           And we talked about should we still go to trial right

21   at the beginning of the year.  Should it get continued.  The

22   case ultimately got continued.  And right before the trial was

23   reset, it was superseded again with four additional Defendants.

24   And if the Court remembers, I asked -- we still wanted to go

25   forward, and there was an objection.  They wanted to be able to

 1    supersede and give all this discovery.

 2         What we found out in the superseding was that they

 3    added a new conspiracy.  What we're hearing, there may or may

 4    not be overlap.  But the Court at the last hearing said, I keep

 5    thinking you're the ones who chose to indict it this way.

 6    You're the ones who chose to put this group of Defendants

 7    together in one indictment and in one case.  So I am going to

 8    have you lay out for all of us your trial plan, how you plan to

 9    try it, and how they would be present or not present.  And I

10    want you to give me and them a road map of how to do that.

11         And the Court went on to explain that you have to go

12    through the witnesses and explain which witnesses apply to

13    which Defendants.  And we have not gotten that.  And the Court

14    also wanted an understanding of what documents were out there

15    and what applied.  So that would address some of the issues

16    that we are having with this massive amount of discovery and

17    with trying to figure out what's appropriate in terms of are we

18    going to have two, three juries?  Are we going to have

19    different trials?

20         The Government basically filed a pleading about

21    joinder and gave us the law and a couple paragraphs about the

22    general theory of the case which we heard again this morning.

23    That's not a road map.  That doesn't help us understand what's

24    applicable.  It doesn't comply with the Court's order.

25         I have to say, I am petrified when I get ordered to do

1    something by the Court that I'm doing the right way.  And if I

2    don't, I try to overcomply.

3         The Government -- this is something the Government

4    likes to do.  They don't think they should have to do what they

5    are ordered to do, and they get away with it a lot.  And so I

6    would ask the Court to make them comply with the Court's order.

7    What they have filed is not -- does not comply, Your Honor, and

8    it's not right.

9         So that's where we are today.  That's why I asked for

10   the status conference.  I think the Government should have to

11   comply with what the Court ordered them to do.

12        MR. LARSEN:  Your Honor, I take the orders of this

13   Court very seriously.  I thought about immediately after that

14   what is it that the Court wants.  I know the issue was borne

15   out of joinder.  I wanted to explain as I have done this

16   morning the overlapping of witnesses and evidence.  And quite

17   honestly, Your Honor, at the last hearing, we had subsequent

18   discussions that we would be turning over our witness list and

19   exhibit list in December.  I wasn't in a position.  I am still

20   not in a position to know exactly which witnesses.

21        Now, I have categories of witnesses.  And as I've

22   explained for the Court, there is substantial overlap which

23   would require -- if the case is severed, I would have to bring

24   back -- for example, I identified one particular convicted

25   coconspirator Asif Uddin.  I expect him to be most likely maybe

1     our first witness, and he is going to testify for what could be

2     a couple of days.  It is lengthy testimony.  And he has

3     evidence that's relative to everything in the case, so we would

4     have to bring him back twice.  There are a number of similarly

5     situated witnesses.

6          So when I laid out our -- the filing regarding

7     joinder, I wanted to make the Court comfortable that this is

8     precisely the kind of case that should be tried together

9     because again of the overlap in the facts, overlap in the

10    evidence, and as I've described today, the overlap in the

11    issues that really intertwined.  And in the *United States v*

12    *Hill* case specifically spoke to this issue, and that's why I

13    cited that case and discussed it for the Court, that this is --

14    these are the types of cases that are properly joined and

15    should not be severed.

16          So in no way, shape or form did I take the Court's

17    order lightly or didn't think I had to comply with part of the

18    order.  I certainly made a hundred percent good faith effort to

19    give the Court comfort and to address the concerns of the Court

20    that were raised on June 6th.

21          MR. MARKUS:  Your Honor, that's exactly what he said

22    on the June 6th hearing, and you said, Okay, but you have to

23    lay it out.  For example, saying that he has Uddin and other

24    coconspirators who have been charged and not charged, we don't

25    even know who those people are and how they apply to the

22

1    Defendants.  We haven't been provided those people.

2          I understand the Government doesn't want to provide

3    that until the eve of trial.  But the Court ordered him to give

4    us a road map with that explanation.  So he is just repeating

5    now what he said on the June 6th hearing.

6          And the Court said, Okay.  I understand that.  But you

7    have to lay it out for them and for us, the Court, so that we

8    can address this joinder issue.

9          And that's where we left it.  And he just filed a

10   pleading with the law on joinder, which it's nice to read the

11   black letter law on joinder, but that is not what the Court

12   ordered.

13         THE COURT:  So here's what I would like.  Mr. Larsen,

14   you want the time -- the two weeks to respond to this motion

15   that addresses joinder once more, more formally, that was just

16   filed on Friday.  So in your response, I'd like to see in a

17   chart form -- use an Excel spreadsheet -- get your tech folks,

18   your -- the folks in your office to give us all that

19   spreadsheet that's going to show day one of trial.  You name

20   the witness, and you name and list those counts in the

21   indictment and the current indictment that that witness is

22   going to testify to so we know what Defendants are going to

23   need to prepare for that particular witness.

24         You do it for day by day by day until the trial is

25   concluded and you rest your case.  And it's not to preclude you

1   from adding other witnesses later on or subtracting from this

2   list, but it is going to show me, This is triable.  It's

3   triable in one shot and/or no, it is not.  And so as we get

4   through your trial witnesses and we see that a number of them

5   may not have anything to say about some of these Defendants, we

6   can have a better sense of whether this is triable once or it

7   is better tried twice.  Is that doable?

8          MR. LARSEN:  Is the Court asking the Government to

9   provide -- I don't know -- for example, Your Honor, I know that

10  I will be calling a number of Medicare beneficiaries, but I

11  don't know which Medicare beneficiaries as I stand here six

12  months before trial are going to be, one, capable of making the

13  trip to Miami, which of those Medicare beneficiaries are -- I

14  have identified five, six, seven of them, but I am not going to

15  necessarily need to call seven Medicare beneficiaries.  And the

16  same thing applies to the marketers in the case.

17         I mean this case is going to be about -- as I have

18  tried to lay out, there are cooperators, there are marketers,

19  uncharged coconspirators.  There are beneficiaries who will say

20  they didn't get the services, they didn't speak to the doctors.

21  And then there are some experts and some agents.  So I can

22  testify -- excuse me.  I'm sorry for the court reporter.

23         I can certainly lay out for the Court what -- the

24  categories of what those witnesses would say generally, but I

25  just don't know as I stand here today on day one -- I mean I

1    believe standing here today, in August of 2019, that in January

2    of 2020, that Asif Uddin would likely be my first witness.

3    Beyond that, I may -- and a lot of it depends on witness

4    availability.  And I mean, I just don't -- I don't want to put

5    myself in a situation where I disappoint the Court or I don't

6    comply, so I just want to avoid that.

7              THE COURT:  All right.  So assume that I advance the

8    trial and you have got to get trial ready, and you are going to

9    be trial ready for a trial in September.  So you are really

10   going to roll up your sleeves, and you're going to figure out

11   your plan.  Who are you going to present, and what are they

12   going to go to -- what are they going to testify about, so that

13   you can meet your burden of proof as to each of the counts in

14   the superseding indictment as to each of the Defendants.

15             So advance what you would be doing later on this year

16   and do it now in response to this motion from this joinder,

17   because otherwise other than giving me the law on joinder,

18   which is again what Mr. Markus referenced, there is not going

19   to be much that you will supply in your response that will be

20   of assistance to me.  And I am left with a picture presented in

21   the motion that says, Look, these are two separate

22   conspiracies, and some of us are going to be sitting in a trial

23   listening to testimony that has nothing to do with us for days.

24   And I don't want that.

25             So give me your trial plan.  You don't have to name --

1    if you have a beneficiary and you don't know who that person

2    is, you are going to know what you're going to need that

3    beneficiary to testify to.

4            MR. LARSEN:  Agreed.  Agreed.  And I can do that.

5            THE COURT:  And you're going to say, beneficiary A,

6    beneficiary B, and beneficiary C, these are the categories of

7    beneficiaries I am going to try to get trial ready, and they

8    are going to be talking about these particular Defendants and

9    this particular conspiracy.

10           MR. LARSEN:  Okay.

11           THE COURT:  All right?

12           MR. LARSEN:  Understood.

13           MR. MARKUS:  Your Honor, with respect to the

14   beneficiaries, just so the Court knows, there are lots and lots

15   of -- I call them patient -- patient files that both sides

16   have.  The Government has interviewed some of those patients

17   and has an idea, I think, of the universe of who they might

18   call at trial.  I think they have even provided some of those

19   files to an expert to review.  We don't know on the defense

20   side which files we should give our expert to review.  We are

21   sort of -- we are stuck in this very vague area.

22           So what Mr. Larsen I think said is he has an idea of

23   the seven or eight that he might call but he is going to narrow

24   that down.  Why not just tell us who those seven or eight are

25   so we can send our expert the same files that he is looking at,

```
 1   we can be ready for trial, so that it doesn't happen at trial
 2   where everybody is scrambling.  What's the secret here?
 3           THE COURT:  Well, you are going to get an expert
 4   report at some point, right?
 5           MR. MARKUS:  Yeah, but then we only have a couple of
 6   weeks to turn our expert around, so.
 7           THE COURT:  Right.  But I am not going to require the
 8   Government to get its work done with regard to the expert five
 9   months before trial when it's not required to.
10           MR. MARKUS:  You know, I understand that, but it's
11   already provided, those patient files.  It already knows the
12   universe.  It says they have seven or eight, but they may
13   narrow it.  Why not tell us who those seven or eight are so we
14   are not spinning our wheels with thousands of patients that
15   have been seen in this case.
16           THE COURT:  Mr. Larsen.
17           MR. LARSEN:  Your Honor, there's an indictment.  There
18   are counts in that indictment.  They can --
19           THE COURT:  The question is why can't you let them
20   know who these seven or eight are.
21           MR. LARSEN:  I don't know who the seven or eight are,
22   Your Honor.  I don't know which witnesses -- now, specifically
23   with what I have given to my expert, I -- my position is the
24   same as the Court's.  They are going to see exactly which files
25   my expert reviewed when I turn over my expert report at the
```

1    date the Court has ordered.

2         The problem here is that since this case started,

3    Mr. Markus -- you give Mr. Markus an inch and he wants a mile.

4    He wants -- I've given him -- the other day they asked for the

5    names of Medicare beneficiaries identified in the indictment by

6    initial.  I gave it to them.  I am not required to.  I gave it

7    to them.  They want more.  It's a constant -- they want to know

8    everything that I am doing way before I am required to produce

9    it, or frankly, before I know it, Your Honor.

10        I don't -- as I stand here today I do not know which

11   seven or eight.  I know there are Medicare beneficiaries.

12   There are I think seven or eight accounts charged in the

13   indictment.  I think it's reasonable to presume that we've at

14   least shown our expert the prescriptions tied to the

15   substantive healthcare fraud counts.  I mean, that's pretty

16   common sense.  So among that universe, I think they can safely

17   assume that we have to prove our healthcare fraud substantive

18   accounts, so look at those files, look at those, and they have

19   them.

20        So -- but I am just not in a position to commit

21   standing here today.  I am going to Atlanta, Georgia, later

22   this week.  I am meeting witnesses.  I don't know who my

23   witnesses are going to be yet.  That's the point.  I am taking

24   the time that I have now to interview witnesses and decide who

25   I am going to use in support of my conspiracy counts; and I

 1    just don't know who they are until I meet them.

 2            And so that's the difficulty I have, Your Honor.  I

 3    think that I can certainly comply with letting -- I know what

 4    categories of evidence these -- all these beneficiaries are

 5    going to testify to, and I can certainly tie those to the

 6    Defendants, and I think we can easily lay that out for the

 7    Court.  I just -- I don't think I can give you names at this

 8    point.  I just don't know that yet, and so I can't -- I can't

 9    do what I don't have information to do yet.

10            MR. MARKUS:  The case was already supposed to be

11    tried, Your Honor.  I mean, so I take that -- I think you need

12    to take that with a grain of salt.  The other category are --

13    he says there are coconspirators who he is going to call who

14    have not even been charged.  That -- I mean, that would be

15    *Brady* material if there is somebody out there who has not been

16    charged who is a coconspirator.  We don't know who those people

17    are.

18            So this case already should have been tried with

19    respect to the Ramamurthys.  It was indicted a year ago.  And

20    so that's why I think it's not enough to just say, We're going

21    to call beneficiaries, or, We're going to call coconspirators.

22    That's what he said on June 6th and the Court said that was not

23    enough.

24            THE COURT:  Ms. Descalzo.

25            MS. DESCALZO:  Thank you, Your Honor.  I just want to

speak to the issue of the beneficiaries.  We have thousands of patient records.  We do need to know who the patients are that are going to be discussed at trial not only so we can turn it over to our expert, but we might want to subpoena those patients' historical records.  And that takes months.  We can't subpoena one thousand or thousands of patient records.  So if we have a limited universe, the sooner we know that, the better it is to be efficient and ready for trial.  Because if they are going to bring in a beneficiary, part of that cross-examination might be their historical medical data in order to see whether or not they needed the medication or some other doctor prescribed something similar.

So I would just reiterate Mr. Markus's request to have a universal beneficiary limiting -- you know, a limitation of those patients so we are not spinning our wheels requesting thousands of patient records.  It could take years.

MR. LARSEN:  Your Honor, this is not a medical necessity case.  This is an issue of these beneficiaries will say they were marketed by someone to either take a cancer test and they were in a senior daycare center and they were promised gifts, and they never got their results, they never spoke to a doctor.  That's what these people are going to say.

This is not about whether their patient charts show a medical necessity.  I am not going to bring in doctors that they're going to say that this cancer test was -- this

1  person -- you know, it is not going to be a battle of experts.

2  This is going to be this was a scheme that was set up

3  specifically to line Senthil Ramamurthy and the other

4  Defendants' pockets with kickbacks for things that they never

5  delivered, that people never got and didn't need.

6          But again, this is not going to be -- this is not a

7  medical necessity case so I just -- that argument I just don't

8  think is relevant here.  There is not going to be a need for

9  historical medical records given what I am telling the Court

10  that these beneficiaries are going to say.  And the same thing

11  applies for the compounding conspiracy.

12          They have all the medical records.  They gave them the

13  medical records.  They gave us the medical records,

14  Dr. Ramamurthy's medical records.  We have them from

15  Dr. Ramamurthy.

16          MR. MARKUS:  We don't know which ones, Your Honor.

17  And it is a medical necessity case as it relates to the doctor.

18  She made the prescriptions.  So I don't know how he could say

19  that.  The whole question for the jury with Dr. Ramamurthy is

20  were the prescriptions medically necessary or not.  That's the

21  only question with respect to my client.

22          MR. LARSEN:  The patients are going to say, I didn't

23  speak to this doctor.  I don't know who she is.

24          That's the crux of it.  But again, Your Honor, we are

25  talking about a hundred files or a hundred and 50 files as it

1    pertains to Dr. Ramamurthy.  And those all came from

2    Dr. Ramamurthy to the Government.  Well, I don't think we have

3    gotten actually all of them yet.  But the ones, specific ones

4    that we have asked for, we have gotten.  They have them.  And

5    each file's no more than -- I think the maximum file is maybe

6    50 pages.  Many of them are --

7         THE COURT:  So you are saying in all of these files we

8    have patients who were prescribed medication by Dr. Ramamurthy

9    who never even met her.

10        MR. LARSEN:  Some of them were her patients at her

11   clinic.  A large chunk of them were patients that were sitting

12   in nursing -- adult daycare centers.  They weren't her

13   patients.  They never met her.  They don't know who she is.

14   They never saw her.  And that's what -- that's the essence of

15   this fraud, Your Honor.

16        THE COURT:  How about the ones who were her patients?

17        MR. LARSEN:  The ones that were her patients, they're

18   not -- that's not part of the Government's case and

19   certainly --

20        THE COURT:  So there are some legitimate -- according

21   to the Government, there is some legitimate work going on in

22   the midst of some -- a lot of illegitimate work.

23        MR. LARSEN:  Your Honor, I don't know that I would

24   characterize it as legitimate, but there are certainly patients

25   that she actually saw that were actually her patients.  And we

```
 1    would bring in -- and in this case, I think the Medicare --

 2    among the Medicare rules are you have to be the doctor that's

 3    treating this patient and you can't -- you can't just prescribe

 4    genetic cancer tests for someone that isn't your patient.

 5           And we're going to bring in witnesses -- not only are

 6    we going to bring in witnesses that say they never spoke to

 7    this doctor, but we are going to bring in people that worked

 8    for her that said, Go tell these people in adult daycare

 9    centers, that I'm not going to be their doctor.

10           MR. MARKUS:  Sure sounds like he knows who the

11    witnesses are, Your Honor.

12           MR. LARSEN:  I know some of them.  I don't know all of

13    them.  I don't know about the beneficiaries.  That's the

14    biggest issue, Your Honor.  I don't know.

15           THE COURT:  All right.  But in that spreadsheet, you

16    will write down the ones whom you do know.

17           MR. LARSEN:  Yes.

18           THE COURT:  And that's the ones that you're still

19    interviewing and deciding on.  You're just going to

20    characterize them.

21           MR. LARSEN:  That's fine, Your Honor.  I can do that.

22           THE COURT:  Mr. Feldman.

23           MR. FELDMAN:  Well, I just want to reiterate a couple

24    of things that counsel said that I think absolutely have to do

25    with medical necessity charged in the indictment and it just
```

1    is.

2           As for everything that Mr. Larsen has represented to

3    Your Honor, this is the reason that we filed this motion for

4    misjoinder.  All of this evidence that he refers to that he is

5    going to, you know, bring before the jury, it really has

6    nothing to do with the marketing Defendants.  Calls it an

7    overarching conspiracy.  It really has nothing to do with us.

8           Furthermore, there's been several references, and

9    Mr. Sloman referred to it when he was by the podium.  There's

10   been several references to note how all of a sudden the MHQB

11   marketing Defendants who are not charged in Count 39 -- they

12   are not charged -- and the case agent on this case, Special

13   Agent King, would have to testify under oath that they had

14   nothing to do with that conspiracy.  He would just have to.

15          All of a sudden we are somehow part of that.  And

16   that's just not true.  That's just not accurate.  It's not a

17   historically accurate fact or basis for what happened in the

18   case.

19          There is a lab in Georgia.  That's why Mr. Larsen is

20   potentially going to Georgia, in Atlanta, his interview with

21   respect to Count 39 is in the Medicare conspiracy.  We were

22   never involved in that, and that's just not going to be part of

23   our -- that shouldn't be a part of anything that the jury has

24   to sit and listen to with respect to our clients over here.

25   That's a big problem in this case and one of the main issues

1   for Your Honor in considering the motion for misjoinder.  Thank

2   you.

3            THE COURT:  That's why I want to see -- I want to

4   visualize what the trial's going to look like, and legal

5   argument and pages and pages of legal argument and factual

6   argument don't help me do that.

7            So I want that Excel spreadsheet, and I want it day by

8   day, and I want it -- which conspiracy the witness is going to

9   talk about and what Defendants they pertain to.  And then we

10  can discuss whether we're going to need two or three juries to

11  sit through this trial and what days some defense counsel and

12  Defendants can be excused from even being here, if that's the

13  way it looks like.  But you know what it's going to look like

14  more than I do.

15           Ms. Martinez.

16           MS. MARTINEZ:  Your Honor, I would just like --

17  obviously I am new to this case so I am looking at it from

18  30,000 feet.

19           THE COURT:  Well, welcome.

20           MS. MARTINEZ:  Thank you.  I'd just like to ask the

21  Court to -- and essentially consider and pause for a moment.  I

22  believe that what we are doing is a little bit premature, and

23  we are going to do as much as we can, but let me just frame it

24  this way.  This is a typical healthcare fraud case in that it's

25  large.  The Court has done everything it can by setting a

schedule with expert discovery due early October for the
Government, late October for the Defense.  The Government's
witnesses are due a month and a half, almost two months before
the trial date.  Trial date is January 22nd or 23rd.  We have
our witnesses due December 2nd, so it's almost two months ahead
of time which is extraordinary in terms of trial preparation
and the work that is done.  So we have that schedule.

Now we have this concern, which is understandable.
These Defendants have come in.  Everybody has a concern
regarding severance.  I understand that.  I think we can really
simplify that because we are really at a premature stage I
think on that.

First of all, with respect to the mother and son,
which was an earlier ruling of Your Honor's, to make sure that
there wasn't -- that you -- you expressed confidence that we
could resolve the issue with a second jury.  In that order you
found without -- you assumed without ruling that the son had
made a sufficient showing that he would actually testify for
the mom.  You assumed that.

In reality, if we ever came to it, I would request
that the Court not consider a second jury unless it's
absolutely necessary.  In other words, unless we really have a
finding with respect to the mother and son that they really --
that they need all of the requirements for a severance, and
that therefore that second jury is needed.  In other words, I

1    don't think we should do it unnecessarily or just with an

2    assumption that the Defendant could meet it.

3            And in this situation, now the facts are entirely

4    different because we have the other Defendants in.  So what the

5    Defendant -- the son would have to testify with respect to the

6    mom would now have to be with respect to the compounding

7    pharmacy, and in addition, with respect to the cancer testing

8    so it would be completely different.

9            We would really have to revisit that.  So I really do

10   believe we are premature on the need for a second jury with

11   respect to the mother and son.  With respect to the other

12   Defendants, we are completely premature to be considering these

13   complicated issues of second and third juries.

14           The severance motion by the three Defendants in the

15   bottom which are the ones that we're referring to as the

16   marketing Defendants, that severance motion is argued based on

17   a case that's over 30 years old, based on a statement that you

18   look at the face of the indictment.

19           11th Circuit cases from at least 2000 on make clear

20   that you look beyond the face of the indictment to the evidence

21   in the case.  There was a case involving drugs and mortgage

22   fraud.  And the Court of Appeals of the 11th Circuit said that

23   the Court was correct in listening to the Government's

24   explanation as to their connection between the two, and no

25   severance was required.

1    So I think we are way premature to even be thinking

2    that we don't -- that there's a need for a severance or this

3    concern.

4    Both on the law, but also on the facts, what

5    Mr. Larsen explained in his pleadings and I think has gotten

6    lost here is that with respect to the cancer conspiracy,

7    there's just a few witnesses that would testify as to things

8    that do not relate to the marketing Defendants.  He could

9    present that in two to three days he said in his pleadings.  So

10   out of a trial that is several weeks long, possibly a month and

11   a half, two to three days would be all.

12   Now, there was some -- I will tell the Court,

13   honestly, there was some suggestion about possibly some

14   Defendants being not here during that.  I strongly would advise

15   against that.  I think it's a very short time.  This happens

16   all the time in cases, and you never know what could happen in

17   a trial.  I would take great pause before I would have any

18   defendant outside of the courtroom during any part of a trial

19   so -- but I don't think that's necessary.

20   Likewise, what has been explained to me with respect

21   to the connection between the two, these facts that are outside

22   of the face of the indictment that the Court of Appeals just

23   said we can consider.

24   And I understand the Defense attorneys.  They have

25   moved very quickly, and they have tried to do the best to

represent their clients, but it's premature because they
haven't really looked at the discovery and they don't
understand why it is connected.

          It is connected because what happened simply is that
you have the TRICARE scheme which is these very expensive
screens.  You're grabbing these TRICARE beneficiaries, anybody
who you can get to bill for these expensive creams.  TRICARE
realizes it, closes the spigot; and this happens in other
healthcare fraud cases.

          These folks have to continue living their lifestyle.
They have to continue making a living.  They look for another
way.  And they are still friends.  The way that they look
together, all of the Defendants in this room, the way they look
to, now, where are we going to go to next.

          And this is relevant.  We might have to do some
briefing as to these Defendants as to the admissibility of the
inextricably intertwined evidence.  But it is completely
relevant that those Defendants continue.  They're the ones in
the bottom there, the marketing Defendants.  They continue
that -- they plan with Ramamurthy, his mom.  They continue the
plan to, Now let's try to do a different type of billing.
What's the best idea now?  Now that we can't do expensive
creams, the best idea now is these cancer tests.  Let's do
that.

          They are proceeding on that from July 2015 to February

1    2016.  I just learned those dates today.  But they are

2    proceeding on that, together, they have a falling out.

3    Business partners have a falling out.  They still want to do

4    it.  They still want to continue.

5         Now that we didn't charge that, that we didn't

6    continue and try to investigate everything on earth doesn't

7    mean that it wasn't relevant continuing plan of the two of

8    them -- of the six of them, and then the way it worked out and

9    the facts and the way it was charged is that the Scholtes and

10   the mom and son continue on billing Medicare.  That -- and

11   that's what's charged is a short additional time.

12        And there is only, like I said, two to three days of

13   witnesses that would testify only to that.  Why?  Because you

14   have to explain Medicare.  Because you have to have an expert

15   with respect to those issues.  But it is a small amount.

16        But my main concern is that we are here in a premature

17   stage.  They still need to look at discovery.  They need to

18   understand this.  I mean, we can brief it, of course, but

19   it's -- it's premature.

20        And I am also very concerned about this.  I understand

21   the Court asking Mr. Larsen for the witnesses, and of course I

22   understand the very, very, very, very able David Markus wanting

23   to do every bit of investigation that he can.  I understand

24   that.  The problem is that now we are getting into the mental

25   impressions of the Government.  We are also getting into the

day-to-day where we are really truly trying to figure out --

even meeting with people.  Obviously, we put on a witness,

we -- there is a lot that the Government takes on.  There's a

responsibility when you put on a witness.  That, he needs to

meet the witnesses.  He needs to figure out what he is doing.

          And to try to even -- my concern is that we can guess

at it now, but between now and then, all kinds of things could

happen.  People could get sick, people -- all kinds of things

could happen.  Some of the Defendants right here, the plea

deadline has not expired.  What do you think is the first thing

I would want to do in this case?  Is meet with them to see who

wants to plead guilty.  That's going to change the whole trial

term.

          So my point is we can do what the Court needs as best

we can, but please with all kinds of disclaimers that this is

extremely a preliminary, and it could change entirely, I mean,

really change.  And then what would the situation be then?

They have gone down a path following what they think we were

doing because it was our early mental presentation.  And then

we change course.

          How many times have I think I thought that I'm going

to present the witness first.  Comes in my cocounsel, meets the

witness and slaps me silly and says, Ani, you can't put that

person first.

          So I just -- that -- two months ahead of time of trial

1    is a really -- that's a good amount of time to have an exact

2    witness list.  We can help them as much as possible, but it is

3    going to be preliminary with the Court's permission.

4         THE COURT:  Well, and I appreciate your arguments.

5    They are all excellent arguments.  And what I told -- and I

6    want to make clear is I'm not -- you are not wedded to this,

7    this spreadsheet that I'm envisioning.  You are going to give

8    me categories.  You don't even have to name them.  Like I said,

9    beneficiary A, B and C, and they are going to go to prove the

10   various elements as to these various counts against these

11   several Defendants.  And then I can see is this truly a case of

12   misjoinder as the Defendants have presented.

13        The problem is the issue is front and center because

14   we have a pending motion, so you have to respond to it.  So

15   whether you would like to be engaged in this discussion three

16   months from now, that might be a better time, the motion has

17   been presented.  You have a deadline under the rules to answer

18   it, respond.  I will give you the two weeks that you are

19   entitled to, but in that response I don't need some academic

20   discussion of joinder; and I don't need sort of a general

21   paragraph or two about how the case is sort of connected or the

22   conspiracies are connected.

23        Show me, visualize it, so that I can see in your

24   estimation at this point, these many months before trial, you

25   anticipate that of this two- or three-week long trial, these

```
 1    particular days will be taken up with testimony and witnesses

 2    concerning this particular count that has nothing to do with

 3    these particular Defendants and that that's okay; but let's see

 4    it.

 5              And you are not revealing your mental impressions.

 6    You are just saying, I know I am going to have to have certain

 7    proof as to each count, as to each Defendant, so here is how I

 8    would do it, assuming I find the right witness after I've

 9    interviewed him or her, to be able to fill it -- put it into

10    that slot.  And to the extent you already know some of these

11    coconspirators who are cooperating, just put them out.  I mean,

12    it's not going to be any great mystery.  I assume the

13    Defendants know who they are as well.  They were all involved,

14    were they not?  Otherwise they wouldn't have anything to say.

15    They wouldn't have any meaningful factual information to relay

16    if they're not folks who are known to the Defendants, right?

17              MS. MARTINEZ:  Yes, Your Honor.  What -- I may

18    have missed it.  Is the timing for the specification regarding

19    that the same as the timing of the briefing of the motion?

20              THE COURT:  That's how I would find the response most

21    helpful, not some academic exercise.

22              MR. LARSEN:  Your Honor, could we have a little bit

23    more time?  I am going to meet witnesses this week out of the

24    district.  That takes me out of the district.  I can do my best

25    to -- could we have an additional week to respond, to get the
```

1   Court what it wants to respond to the motion and to provide

2   what the Court's requested?

3           MR. MARKUS:   Judge, we were here on June 6, and you

4   ordered it in 30 days and they didn't comply, and now he is

5   asking for more time.   This is a way to delay getting us the

6   information that we need.   So the Court already ordered it due

7   on July 6th, and we didn't get it; and so we had to file this

8   motion to come before the Court saying they didn't comply.   Now

9   the Court's saying, You have to comply and file the

10  spreadsheet.   You are giving him two weeks.   He should have had

11  the information, and it sounds like he does have the

12  information.

13          THE COURT:   Well, there was conferral on the motions

14  and --

15          MR. LARSEN:   There was.   On the motion, yes.   There

16  was on the motion.   Not on any motion that was filed by

17  Mr. Markus.   Never conferred, never --

18          THE COURT:   He didn't file a motion.   Mr. Markus just

19  filed a memorandum.   But the actual motion says that you all

20  conferred and talked about it, so this issue has been brewing

21  since you superseded to add these Defendants.   It's not a

22  mystery.   And like I say, I'm not -- it's not information that

23  you are going to be confined to.   It's this is your best

24  estimate now and this is how you envision it would play out

25  over the many days of trial.

1           You have to -- you gave an estimate of the length of

2    the trial.  What is it?  Three weeks?

3           MR. LARSEN:  I think the case would -- could be tried

4    in two to three weeks.  It just -- the number of defendants is

5    why I think the case is a longer case because of the number of

6    cross-examine --

7           THE COURT:  Correct.

8           MR. LARSEN:  -- defendants to be cross-examined,

9    but --

10          THE COURT:  All right.  So let's see what it's like.

11   To the extent you don't have names, you don't have to give

12   names.

13          MR. LARSEN:  Okay.

14          THE COURT:  All right.

15          Anything else?

16          MR. BERNSTEIN:  Your Honor, Gregg Bernstein on behalf

17   of Mr. Ramamurthy.  Perhaps I was confused, but I thought Your

18   Honor had asked the Government that if they did have names of

19   patients/beneficiaries who they were anticipating as being

20   possible witnesses that that should go into the chart --

21          THE COURT:  Correct.

22          MR. BERNSTEIN:  -- with the proviso that if for some

23   reason that changes, the witness can't come, we certainly

24   understand that; but if there are people who they have actually

25   identified at this point in time, that should go into the

1    spreadsheet.  Maybe I misunderstood, but I thought you had said

2    that.

3            MR. LARSEN:  Your Honor, I have not a hundred percent

4    decided on any single Medicare beneficiary or TRICARE

5    beneficiary except for the ones that are charged in the

6    substantive counts that I have to bring in.  So I will follow

7    the Court's order.  I will provide categories of the witnesses

8    and how we will meet our burden of proof.

9            THE COURT:  Correct.

10            Anything else?  Any other issues?

11            MR. MARKUS:  I understand that there has to be names

12    given for the cooperators who he knows now and will call.

13            THE COURT:  Correct.

14            MR. MARKUS:  Yes.

15            MR. LARSEN:  Your Honor.  Your Honor, the

16    cooperators -- I just want to make sure -- I want to make sure

17    I understand exactly what the Court wants.  There are charged

18    cooperators.  They have been -- they've pled so we can name

19    those.

20            THE COURT:  All right.

21            MR. LARSEN:  I don't want to use the word

22    "cooperators" or "coconspirators" loosely.  There are certainly

23    people with -- that are fact witnesses that I would call them,

24    some that may have -- one person might call them a

25    coconspirator, but they certainly have relevant factual

information about the scheme without necessarily being charged.
There are a number of people in that category of witnesses.  I
don't know which of those people.

Again, I would just like the ability to illustrate for
the Court what this trial will look like without having to
specifically identify names of witnesses, so I just don't know
which in that category I am going to use.  I just would like
that, a leeway from the Court as well.  As long as I provide
illustrations to witness A, belongs to this category and will
say generally this, is that acceptable to the Court?

MR. BERNSTEIN:  Your Honor, again, Mr. Bernstein.
Again, maybe I misunderstood, but it sounds like we are
backtracking a little bit.  I thought, maybe incorrectly, that
for even those categories of witnesses that Mr. Larsen
referenced, call them what you will, cooperators or not, that
if he has identified them as factual witnesses who would
testify as to one of the conspiracies against one or more of
the Defendants, that that would be a personal -- day four, day
five, day ten, whatever, that would testify.

Certainly, if he doesn't know, he doesn't know.  But
if he has got somebody that he -- and I take Mr. Larsen at face
value, who he has a reasonable basis to believe is going to
testify, that's a person that would have to go into the chart.
Again, maybe I misunderstood the Court, but I thought you were
pretty clear about that.

1          THE COURT:  Let me try to clarify.  To the extent you

2   do not know what beneficiary you would call, you put them by

3   category.  To the extent you do know who will be a witness at

4   trial to substantiate the charged conduct, then you identify

5   that person.  I assume many of these folks are named in all of

6   the discovery that the Defendants already have anyway, and they

7   are aware of who the folks are that have information that they

8   can give the Government.  So name them.

9          If later on you decide not to call them, you don't

10   call them.  You are not limited to that.

11          MR. LARSEN:  Your Honor, to the extent that we

12   identify, again, witnesses -- I just want to make sure that if

13   a witness shows up later that falls into one of those

14   categories, and there is still many, many months and we

15   continue to investigate and prepare our trial, that we are not

16   cabined --

17          THE COURT:  You are not.

18          MR. LARSEN:  Okay -- where I don't -- I am not going

19   to be accused of not -- violating the Court's order if there's

20   some -- I may find a great witness in three weeks after I file

21   my response, so I just want --

22          THE COURT:  And you might want to replace the one that

23   you listed by the greater one that you just found three weeks

24   later.  That's fine.  And you don't have to supplement this at

25   all.

```
1              MR. LARSEN:  Okay.  Thank you.
2              MR. MARKUS:  Of course, if he found someone three
3   weeks later, we're not going to say gotcha.  But if he knows
4   someone now, I think that's what the Court is saying.
5              THE COURT:  Correct.
6              MR. MARKUS:  I guess the only other question I would
7   have for the Court is it sounds like we probably need another
8   status conference in this case in 30 days to see where we are
9   with discovery, the chart, hear this motion.  So it may be
10  prudent just to set it now while we are all here so that we can
11  address whatever issues are outstanding.
12             MR. LARSEN:  Your Honor, just one more point of
13  clarification.  The concern that I have with naming witnesses,
14  when I meet trial witnesses, I inform them that we are creating
15  a report and under what circumstances that report will be
16  turned over.  Obviously, there is Jencks and Brady and Giglio,
17  and we are aware of our obligations to turn that over.  But I
18  always make sure that a witness knows, look, we are not here
19  broadcasting to the world that you are speaking to us.  Because
20  a lot of them don't necessarily want to speak to us or want us
21  to know that they are speaking to us.  So I'm concerned about a
22  public filing.  I don't know if the Court is amenable to us
23  filing something under seal.  I think certainly the Defendants
24  would be entitled to that there is a protective order in the
25  case.  I --
```

```
 1            THE COURT:  Identify the person by initials, and if
 2   the Defendants don't know who those initials refer to, they
 3   will be calling you and you can talk to them about it.  I don't
 4   want sealed filings if we can avoid them.
 5            MR. LARSEN:  Okay.  If the Court is amenable -- if the
 6   Court believes that bringing everybody back here in 30 days,
 7   the Government will certainly be here and prepared.  I mean, we
 8   are going to focus our effort on getting this written
 9   submission to the Court.  And hopefully there won't be -- I
10   think the next time there may be an issue to be taken up is
11   whether or not the law and the facts support the requested
12   severance.
13            THE COURT:  Correct.  And I would love to give you a
14   date.
15            Patricia, I need you out here because the computer is
16   not on so I can't see my calendar.  If you can come out,
17   please.
18            I need a date in September.
19            THE COURTROOM DEPUTY:  A date in September for 30
20   days?
21            THE COURT:  Can I hold onto this chart, Ms. Martinez?
22   Can I hold onto this --
23            MS. MARTINEZ:  Oh, yeah.  I found that very helpful so
24   I thought you would too.
25            THE COURT:  I do.  Thank you.
```

1          MS. MARTINEZ:  Yeah.  I gave you my best copy.

2          THE COURT:  Maybe we can also put photos of the

3     attorneys, little ones underneath the photo.

4          MS. MARTINEZ:  I don't think we have their driver's

5     licenses.

6          MR. MARKUS:  After we get their chart we can make one

7     of their witnesses too for the Court.

8          THE COURT:  Exactly.

9          MR. MARKUS:  Yeah.

10         THE COURT:  Mr. Rashbaum, you've been very quiet.

11         MR. RASHBAUM:  Yeah, I try to save my voice for trial.

12         THE COURT:  All right.

13         MR. RASHBAUM:  Plus, I mean, it's pretty obvious,

14    right?  I mean, if their chart doesn't have a lot of

15    information, you are probably going to grant the motion for two

16    separate trials.

17         THE COURT:  Exactly.  With many, many juries.

18         MR. RASHBAUM:  And if their chart has a lot of

19    information, then you'll see that it all belongs together.

20         THE COURT:  Exactly.

21         MR. RASHBAUM:  So it behooves them to put as much

22    information on it as they can.

23         THE COURT:  That's right.

24         Do you all like -- we have the Defendants out in

25    California; is that right?

```
 1              ALL PARTIES:  Correct.

 2              THE COURT:  So you prefer afternoon settings.  How is

 3    Friday, September 6th, at -- we could do it at 1 p.m.  Does

 4    that work?

 5              MR. MARKUS:  That works for us, Your Honor.

 6              MR. FELDMAN:  I'm available that day, Your Honor.

 7              MR. BERNSTEIN:  Yes, Your Honor.

 8              MS. DESCALZO:  Yes, Your Honor.

 9              MR. SLOMAN:  That works.

10              THE COURT:  Mr. Rashbaum?

11              MR. RASHBAUM:  Yes, Your Honor.

12              THE COURT:  Very good.  We'll see you then.

13              MR. MARKUS:  Thank you, Your Honor.  Have a nice week.

14              THE COURT:  You too.

15         (The proceedings concluded at 9:44 a.m.)

16

17                        C E R T I F I C A T E

18         I hereby certify that the foregoing is an

19    accurate transcription of the proceedings in the

20    above-entitled matter.

21

22
      _08/11/19_          [signature]
23        DATE            STEPHANIE A. McCARN, RPR
                          Official United States Court Reporter
24                        400 North Miami Avenue, Twelfth Floor
                          Miami, Florida 33128
25                        (305) 523-5518
```