UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-Cr-20710-CMA

UNITED STATES OF AMERICA

vs.

SENTHIL RAMAMURTHY,
MANGALA RAMAMURTHY,
ANTHONY MAUZY,
THOMAS SAHS,
RAJESH MAHBUBANI, and
JOHN SCHOLTES,

        **Defendants.**
_____/

## GOVERNMENT'S DISCLOSURE OF EXPERT WITNESSES

The United States of America, by and through undersigned counsel, respectfully files this Disclosure of Expert Witnesses. Pursuant to Rule 16(G) of the Federal Rules of Criminal Procedure, the government provides notice of its intent to call the following expert witnesses in its case-in-chief at trial as set forth by Rules 702, 703 and 705 of the Federal Rules of Evidence.

The expert witnesses' qualifications are described in their CVs, which are being provided to defense counsel via email. The following are summaries regarding the expert witnesses' testimony.

**A. Paul Gerrard, M.D.**

Dr. Gerrard will testify regarding Medicare's and Medicaid's rules and regulations, as set forth and encompassing the General Allegations section of the second superseding indictment. Dr. Gerrard is expected to cover the following topics: The structure of Medicare and Medicaid, including but not limited to the programs' purpose, funding

1

sources, enrollment process, and claims process; the applicable Medicare and Medicaid rules and regulations regarding reimbursement for physician and outpatient services covered by Part B of the Medicare Program as well as the reasons for payment or denial of claims.

Dr. Gerrard will testify regarding Medicare's election to cover specific categories of preventative medicine or screenings such as annual mammograms, colonoscopies, digital prostate exams and other annual "wellness" visits authorized by Congress to be covered by Medicare/ Medicaid.   Dr. Gerrard will also testify about certain routine cancer screening tests designed to detect existing malignancies such as chest X-rays, PAP smears and colonoscopies that Congress has specifically authorized the Medicare and Medicaid programs to cover.  Dr. Gerrard' testimony will contrast these routine cancer screening tests from genetic cancer screening testing, commonly called "CGx" testing, which is not diagnostic in nature, and is not generally eligible for reimbursement by Medicare/ Medicaid on the basis that such CGx testing is not reasonable and not necessary. Dr. Gerrard will explain the limited circumstances under which a claim for reimbursement for a beneficary's CGx test would be deemed reasonable and necessary and therefore eligible for reimbursement by Medicare/ Medicaid.

Dr. Gerrard examined Medicare and Medicaid claims data and generated as the result of Laboratory 1 submitting claims seeking reimbursement for CGx testing purportedly rendered by Laboratory 1 on behalf of beneficiaries referred to Laboratory 1 by Dr. Mangala Ramamurthy, and Dr. S.B.  Dr. Gerrard also examined supporting patient documentation and medical files associated with claims submitted to Medicare/ Medicaid by Laboratory 1 for patients referred by Dr. Mangala Ramamurthy and Dr. S.B.

Dr. Gerrard will opine among other things as to whether the medical records and claims data could support a finding that the tests were reasonable and necessary under applicable regulations governing reimbursement by Medicare/ Medicaid.  Moreover, Dr. Gerrard will testify regarding the conditions under which Medicare/ Medicaid would, and would not pay claims for CGx testing if predicated upon, or as a result of, kickbacks.  He would testify that Medicare/ Medicaid defines kickbacks consistent with 42 U.S.C. Section l320a-7b(b).

In essence, Dr. Gerrard's expert opinion and conclusion is that Medicare/ Medicaid would not have paid for CGx testing referred to Laboratory 1 by Dr. Mangala Ramamurthy and Dr. S.B. because: (i) there is insufficient evidence to support that beneficiaries referred to Laboratory 1 by Drs. Ramamurthy and S.B. were in treatment for cancer or exhibited any symptoms that the physicians reasonably believed could be related to a diagnosis of cancer; (ii) the lack of any objectively reasonable physician-patient relationship between Drs. Ramamurthy and S.B. related to a symptoms related to, or a diagnosis of cancer; and (iii) the lack of any objectively reasonable evidence that Drs. Ramamurthy and S.B. used the results of the CGx testing they ordered for Medicare and Medicaid beneficiaries in connection with their treatment of the beneficiaries symptoms or diagnosis of cancer.

### B. <u>Anthony Magliocco, M.D., FRCPC, FCAP</u>

Dr. Magliocco will testify to issues relevant to the allegations contained in Count 39 of the second superseding indictment.  Dr. Magliocco is expected to cover the following topics:

Cancer Genetic Testing ("CGx"), its identity and purpose, how the tests are administered, contrasting and distinguishing CGx from other forms of genetic testing

commercially available; clinically appropriate uses of CGx testing including a discussion of the risks and benefits to patients of getting CGx testing; distinguish and contrast appropriate use of CGx testing with examples of clinically inappropriate use; how CGx testing results are used in conjunction with the appropriate practice of medicine and continuing care of patients, what the results look like, how they are interpreted and how they are properly used in conjunction with the provision of appropriate medical care; contrasting and distinguishing CGx testing from diagnostic tests used in the practice of medicine to detect the existence of and to treat cancer; Dr. Magliocco will discuss his review and analysis of the manner by which CGx testing was employed in this case and render an opinion on the propriety of the same. In summary, Dr. Magliocco will testify as follows:

- CGx is a highly complex and specialized type of genetic test designed to look for errors in genes that are associated with cancer.

- CGx testing is not diagnostic in nature in that it does not identify the presence of any malignancy, but rather only whether an elevated risk for some future development of cancer exists. This is in contrast to diagnostic tests designed to identify the existence of malignancy, such as for example, colonoscopies, PAP smears and mammograms.

- Inherited cancer syndromes are different from cancers not genetic in origin. Inherited cancer syndromes are rare.

- Unlike other commercially-available forms of genetic testing that are typically delivered to patients on a self-pay and direct to consumer basis, CGx testing is not currently indicated for general use because the risks of such testing vastly outweigh the benefits.

- CGx testing results are frequently complex and inconclusive in nature such that the skills of a properly trained physician are needed to accurately interpret them in a manner that is useful to the patient. Absent involvement by a competent treating physician, there is unreasonable risk that patients could misinterpret CGx testing results which could lead them to make premature and unwarranted medical intervention decisions as well as suffer unnecessary psychological toll.

- CGx testing results can also be misleading. For example, a negative result does not mean that a particular patient will not develop cancer, nor does it mean that the patient has a reduced overall risk for the future development of cancer during the course of his or her lifetime (approximately 1 in 3 chance). Absent comprehensive genetic counseling, a patient could misinterpret a negative test result to their future detriment.

- CGx testing is appropriate in a limited number of high-risk patients such as those with a current diagnosis of cancer or those patients having multiple immediate family members with suspected inherited cancer syndromes.

- CGx testing should only be ordered by a competent physician that is treating the patient in question, and the testing should be accompanied by comprehensive pre and post testing genetic counseling. CGx testing should only be ordered in compliment to a complete care program managed by one or more physicians with the appropriate expertise to treat the patient.

- In a patient where inherited cancer syndrome is suspected, a CGx test may be indicated as a tool to assist treating physicians (*e.g.* oncologist, primary care physician), gather information, discuss treatment options and assist patients with making informed decisions about their care, *e.g.*, whether to pursue surgical intervention, radiation therapy, immunotherapy, etc.

- Patients' medical charting should thoroughly document the bases for ordering CGx testing, which CGx test was deployed (there are several types of CGx tests), as well as contain information about how the CGx testing fits into the referring physician's treatment plan for the patient.

- There is currently little or no evidence that use of GCx testing that broadly targets the general population, and especially the elderly has any clinical value. Such broad-targeted campaigns are not currently endorsed by the Association of Molecular Pathology (AMP).

- In this case marketers and/or marketing companies and one or more physicians appear to have been financially incentivized by a genetic testing laboratory to broadly target elderly and vulnerable persons in the general population for CGx testing.

- There is no evidence that the marketing agents in this case had any legitimate medical oversight in connection with targeting and administering CGx testing to elderly and indigent patients. There is also significant concern about the lack of quality controls in place for the collection, storage and transport of CGx samples by marketers to the genetic testing laboratory to assure the accuracy and integrity of the results.

- There is no evidence that physicians ordering the CGx testing for the patients targeted by the marketing agents provided any reasonable or legitimate medical oversight in connection with ordering CGx testing.

- A review of patient records associated with elderly patients along with a review of statements given by patients targeted by the marketing agents demonstrates that no legitimate doctor-patient relationship existed in connection with ordering CGx testing.

- The patient records in this case are devoid of any evidence documenting that the CGx testing was reasonable or necessary.

- Patient records also demonstrate that no reasonable effort was made by the ordering physician, the marketing agents or the CGx laboratory to provide the CGx testing results to patients or to physicians responsible for the patients' care.

- There is no evidence that patients targeted by marketers and physicians received any genetic counseling either prior to taking the CGx testing or after the results of such tests were generated.

- There is no evidence that the physicians ordering the CGx testing for elderly and indigent patients in this case used the results of the CGx testing in connection with any treatment provided to the patients.

- The overall pattern by which elderly and indigent patients were targeted for CGx testing by marketing agents, physicians and a genetic testing laboratory as described above demonstrates that the CGx testing was unnecessary, it was not conducted in accordance with established guidelines such as the National Cancer Center Network (NCCN), nor did it contribute in any meaningful way to the treatment, planning or care and health outcomes for the involved patients.

- In actuality, the manner by which the marketing agents, physician(s) and genetic testing laboratory operated was clearly designed to maximize volume and reimbursement from federal payers to the exclusion and detriment of elderly patients.

**C.  Jack S. Resneck, Jr., M.D.**

Jack S. Resneck Jr., M.D. is a Board Certified dermatologist and a Professor at the School of Medicine of the University of California, San Francisco.  Dr. Resneck provided a report.  It is filed as an attachment to the Government's Disclosure of Expert Witnesses.

6

### D. Don Wunderlin

Don Wunderlin is a Health Care Fraud Specialist in the Program Integrity Unit at the Defense Health Agency for the Department of Defense. He is a fact witness who will testify regarding the TRICARE program and its policies, including those referred to in the second superseding indictment. He will also testify regarding the TRICARE claims data and summaries in this case.

In addition to being a fact witness, Mr. Wunderlin, through education and experience, has expertise with respect the TRICARE program, pharmacy claims, telemedicine, health care fraud and kickback schemes, and their impact on TRICARE. To the extent that part of his testimony may be deemed expert testimony based on specialized knowledge, the government is providing this summary and Mr. Wunderlin's CV.

Mr. Wunderlin will explain what the TRICARE program is, who it covers, how it is funded and other general information about the program. He will testify about the processing of claims and Express Scripts. Mr. Wunderlin will testify about the requirements regarding co-pays and premiums for TRICARE members.

Mr. Wunderlin will testify about the pharmacy benefit that TRICARE members receive. He will testify about compounding pharmacies, prescriptions, and claims. He will testify about compounded medications, and the TRICARE requirements for claims for compounded medications. Mr. Wunderlin will also testify about the TRICARE policies regarding telemedicine.

Mr. Wunderlin will also testify regarding TRICARE's policy regarding the payment of kickbacks, and the effect kickbacks would have on the payment of TRICARE claims.

Mr. Wunderlin will testify about the effect that the fraud and kickback schemes in this case have on the TRICARE program.

### E. Elizabeth Martin

Elizabeth Martin is an Investigative Analyst in the Economic and Environmental Crimes Section of the U.S. Attorney's Office for the Southern District of Florida. She is a fact and summary witness who will testify regarding her review of medical records in this case. In particular, Ms. Martin has reviewed the medical records of Dr. Mangala Ramamurthy, who is one of the defendants in this case.

In addition to being a fact witness, Ms. Martin, through education and experience, has expertise in the requirements for medical records for purposes of submitting claims, and the examination of medical records involving health care fraud schemes. She also has education and experience as a nurse. To the extent that part of her testimony may be deemed expert testimony based on specialized knowledge, the government is providing this summary and Ms. Martin's CV.

Ms. Martin identified patterns and irregularities in the medical records. For example, out of 242 patients, 62 or 26% only had one or two office visit notes in the medical record. Those visit notes were essentially cloned, with few if any variations. There were no physical exams. Medications were not listed. The limited assessment related to a family history of cancer. Also, the medical records reflected multiple dates with a high volume of patients getting genetic testing on the same dates.

Also, the medical records of many patients have a notation of treatment with compounded creams. However, there is minimal if any documentation.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY


By: /s/ Ana Maria Martinez
  ANA MARIA MARTINEZ
  ASSISTANT U.S. ATTORNEY
  Florida Bar No.0735167
  99 N.E. 4th Street
  Miami, FL 33132
  Phone: (305) 961-9431
  Fax: (305) 536-5321
  Email: Ana.Maria.Martinez@usdoj.gov


By: /s/ Kevin J. Larsen
  KEVIN J. LARSEN
  ASSISTANT U.S. ATTORNEY
  Special Bar No. A5501050
  99 NE 4 Street
  Miami, FL 33132
  Tel: (305) 961-9356
  Email: Kevin.Larsen@usdoj.gov


## CERTIFICATE OF SERVICE

I hereby certify that, on October 1, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record for all parties.

  s/Ana Maria Martinez
  Ana Maria Martinez
  Assistant United States Attorney