UNIVERSITY OF CALIFORNIA, SAN FRANCISCO

BERKELEY • DAVIS • IRVINE • LOS ANGELES • RIVERSIDE • SAN DIEGO • SAN FRANCISCO       SANTA BARBARA • SANTA CRUZ



JACK RESNECK, JR, MD

PROFESSOR and VICE-CHAIR of DERMATOLOGY

AFFILIATED FACULTY, PHILIP R. LEE INSTITUE for
    HEALTH POLICY STUDIES

1701 DIVISADERO STREET, 4ᵀᴴ FLOOR
SAN FRANCISCO, CA 94143-0316
CLINIC TEL: (415) 353-7800
ACADEMIC TEL: (415) 353-9610
FAX: (415) 353-9654
EMAIL: RESNECKJ@DERM.UCSF.EDU

September 30, 2019

Ms. Ana Maria Martinez
Assistant US Attorney
Southern District of Florida

Re:     U.S. v. Senthil Ramamurthy, et al.
        Case Number: 18-20710-CR-Altonaga/Goodman

Ms. Martinez:

The following is my report regarding this case.

In preparing this report, I reviewed a series of case-related documents including e-mails, meeting agendas, prescription forms, patient data forms, recruiting flyers, and contracts.  I also reviewed specific patient prescriptions and reports of interviews undertaken by the Office of the Inspector General of the Department of Defense with several patients.

My conclusions in this report are also based upon my education, training, experience, and review of relevant medical literature and relevant medical standards and guidelines.

I may supplement these opinions based on any additional materials provided.

**<u>My Background and Qualifications:</u>**

I am a board-certified dermatologist with a full-time appointment as Vice-Chair and Professor at the University of California, San Francisco in the department of dermatology.  My medical school training, internal medicine internship, and residency in dermatology were all completed at UCSF.  I joined the faculty in 2001, and I now direct the UCSF Dermatology Faculty Practice – leading a clinical group of about 50 board-certified dermatologists.

Approximately 40% of my professional time is spent in direct patient care, where I treat patients with a wide variety of skin diseases, including conditions that involve scars.  In my treatment of skin disorders, I

prescribe a wide variety of topical, oral, and injected therapies, sometimes including compounded topical agents. I also occasionally order targeted genetic testing for patients in whom such testing is appropriate.

The remainder of my professional time at UCSF is spent teaching, doing research, and in several leadership roles. As part of my teaching responsibilities, I served as the director of the UCSF Dermatology residency program for 8 years – overseeing the training of future dermatologists. The UCSF residency program, with 21 enrolled positions, is consistently ranked #1 or #2 in the US for dermatology training. I also previously chaired the committee which oversees the entire medical school curriculum and educational policy for the UCSF School of Medicine, ranked among the top five medical schools in the country. In these various roles, I instruct and evaluate medical students and residents in appropriate documentation, history-taking, physical examination, medical decision making, ordering of laboratory tests, diagnosis and treatment (including prescribing), informed consent for treatment, medical ethics, and many other topics.

I have held several regional and national leadership positions within my specialty and the profession of medicine. I served as President of the California Society for Dermatology & Dermatologic Surgery. I also served on the Board of Directors of the American Academy of Dermatology, where I previously spent four years as the Chair of Government Affairs, Health Policy, and Practice. I am a member of the editorial board of the Journal of the American Academy of Dermatology. I was elected to serve on the Board of Trustees of the American Medical Association, and recently chaired that Board.

In these roles, I have developed significant policy expertise related to digital health broadly, and telemedicine specifically. I testified before a US Senate Committee on the topic of telehealth promises and challenges, and have been deeply engaged in legislative, regulatory, and professional policy development on telemedicine. My own dermatology program at UCSF has been involved in delivering care via teledermatology and in formally teaching the next generation of physicians about proper care via telemedicine. I have performed research on the quality of teledermatology provided to patients which has been published in the peer-reviewed medical literature, and I served on a digital health and artificial intelligence panel at the National Academy of Medicine. I also lecture nationally on the topics of digital health and telemedicine.

I am also deeply engaged in the field of measuring quality in healthcare delivery. As a member of the Board of Directors of the National Quality Forum, I am involved in national efforts to measure and report on the quality of healthcare delivered at the physician and intuitional level. I was recently appointed by the US Deputy Secretary of Health and Human Services to serve on a panel at a series of Summits to improve upon the current national health care quality measurement enterprise.

A further statement of my qualifications and list of my publications are set forth in my CV which is attached.

**General Use of Telemedicine Modalities:**

Telemedicine is a growing and important part of health care delivery in the United States.  When applied to specific medical conditions well-suited to electronic communications, and when done ethically with high quality standards, telemedicine can improve access and convenience for patients seeking medical care.

Telemedicine is typically deployed for the following purposes:
- *Direct-to-patient telemedicine* involves a patient originating his/her own consultation by transmitting a medical history and images to a physician or other licensed clinician.
- *Tele-consultation* involves the review of patient cases transmitted by a referring physician or other licensed clinician and the provision of a consultative report from another licensed provider back to the referring one.  This often involves a primary care physician seeking consultation from a distant specialist.  The referring provider typically maintains responsibility for carrying out treatment recommendations and interacting with the patient.
- *Tele-triage* involves the review of patient cases transmitted by a referring provider (typically to a specialist) to determine which patients can be seen by tele-consultation, which need to be seen in-person, or which may not need referral at all.

Telemedicine is typically delivered through three broad categories of technologies:
- *Store-and-forward* telemedicine involves the transmittal of medical data (typically a robust medical history in combination with medical images) to a physician or medical specialist for assessment.  There are opportunities for additional iterative history and images as needed.
- *Real-time Interactive* telemedicine involves face-to-face interaction between a patient and provider through live audio and video technology.
- *Remote Monitoring* enables medical professionals to monitor a patient remotely using various technological devices.

Telemedicine, however, is merely a technological tool to deliver medical care.  Physicians and other providers who provide clinical services through telemedicine **must uphold the same basic legal and ethical standards expected for in-person interactions** and uphold state and federal laws governing health care delivery.  As with in-person medical encounters, diagnosing and treating patients via telehealth requires licensure of healthcare providers, transparency of credentials, establishment of a valid doctor-patient relationship, proper documentation and record-keeping, obtaining necessary elements of a patient's history, exam, and ancillary studies, selection of evidence-based treatments with informed patient consent, and proper continuity of care when appropriate.[1]

The evidence I have reviewed in this case indicates that when telemedicine was applied, **few if any of these requirements were met.**  Rather than employing telehealth to deliver appropriate medical care, those involved in this endeavor appear to have only added some phone calls or other electronic communications as an afterthought – with patients who had already been targeted for specific

prescriptions or diagnostic tests – just to gather a little cursory information and lead to a signed prescription or order that would be honored by an insurer.  **This doesn't meet any standards of telehealth, and is not how it is intended or allowed to be utilized.**

**Prescriptions in Search of Patients (Marketing and recruitment):**

The ethical practice of medicine typically involves physicians or other providers interacting with patients to solve a medical concern – whether it is for evidence-based prevention and health maintenance, appropriate surveillance for a specific condition that an individual patient is at risk of developing, or the diagnosis and treatment of an acute or chronic symptom or condition.  We are lucky to have thousands of effective treatments, but the prescription of a particular therapy is typically among the *last* parts of an encounter – selected by a medical professional, working in concert with a patient, *after* a patient's condition has been evaluated to determine whether a medication is indicated and which one might best balance risks, benefits, and side-effects.

This standard flow – evaluating a patient, making a diagnosis, and then selecting among possible therapies – allows for the application of evidence-based medicine, **selecting the right intervention for the right patient at the right time** – especially since medications and procedures sometimes carry risks for individual patients and utilize resources from private premium dollars or taxpayer-funded programs that should go to appropriate and effective medical care.

With respect to the workup and treatment of scars, there are a number of possible etiologies, so a medical history and physical exam are a crucial part of any evaluation before determination of therapy. The first part of that workup typically involves ensuring the scars are not being caused by a medical condition unrelated to skin trauma, including medication side-effects, primary or metastatic cancers, infections, or inflammatory diseases such as lupus.  For traumatic scars, several aspects of a patient's history and exam also influence which treatment, if any, would be useful (the cause of the lesions, how long ago they formed, whether there are associated symptoms such as itch or pain, prior treatments tried, etc.).  There are a variety of treatments available, including topical silicone sheeting, steroid injections, surgical excision, laser therapy, and radiation therapy – and different patients may benefit from different treatments depending on the medical circumstances.

As with therapeutic prescriptions, laboratory tests are also typically ordered *after* obtaining a history and exam, with individual consideration as to whether any such diagnostic or screening test is necessary to narrow down a diagnosis, look for treatment side-effects, assess treatment efficacy, or determine risks for future disease in a patient who is found to be at particular risk.  **Tests are ordered specifically when they will usefully inform future medical decision-making.**

In this case, it appears that the end goal was to recruit patients and generate prescriptions or orders for a limited, specific list of expensive tests or compounded therapies – **turning the proper medical encounter on its head.**  Individuals were induced to recruit patients willing to receive a specific

4

prescription or test (rather than having a licensed provider *first* evaluate an individual patient's pain, scars, or indications for genetic screening and *then* consider what testing or treatment might be useful). For example:

1. Interviews in this case indicate that some patients received pills, creams, and genetic testing orders from prescribers they never met or interacted with, without having had their medical conditions evaluated or diagnosed.
2. Emails indicate goals of recruiting patients to receive specific treatments, with resulting referral payments based upon ordered prescriptions or tests:
   a. An email from Karl Voeller to Dr. Asif Uddin dated 12/22/14 proposed verbiage for an advertisement on Craigslist that would state "Hiring recruiters… $400 every time you sign up a military retiree/active duty/reservist to receive free supplements."
   b. An email from Dr. Asif Uddin to "CA     " dated 12/3/14 stated, "I will need you to recruit Tricare patients to see my colleague… The idea is simple, we want patients with Tricare to be made aware of their insurance covered benefits and use them. Such include metabolic supplements, weight loss, pain cream, scar cream, anti aging, etc. If a patient is interested in any of the above, I want them. Your task will be to get me as many Tricare patients you can get and coordinate with me and I will schedule an appointment."
   c. An email from Dr. Asif Uddin to "CA     " dated 12/4/14 offers $150 per patient referred who ultimately gets a prescription written and covered by insurance. Subsequent emails offer higher amounts "if your volume comes in" and states, "I have a Friday deadline for this batch of patients."
   d. A document with a script for telemarketers in a Belize call center to "contact active military market segment, cultivate lead and close sale." The objectives list "ascertain which of the product or products would the customer like to try, since there is no cost to the member" and "getting a commitment to try the prescription" and then "inform the patient that a physician will be calling them back to answer any questions and issue the prescription." This objective list makes it clear that telemedicine was being applied simply as an attempt to get a signed prescription rather than a methodology to diagnose and treat patients appropriately.
3. Emails and prescription forms point to treatments that were selected before medical evaluations and that were driven by reimbursement levels:
   a. An email from Dr. Asif Uddin to Med Health Quest dated 12/3/14 specifically directs which combination of compounded medications to select for a given condition and notes the reimbursement estimates for each (If a patient chief complaint is SCAR Select 11, 10. $24,000). Subsequently the email instructs to "always write auto refill PRN, 6 refills on all scripts."
   b. A sample prescription form included in the agenda for an SKR / Med Health Quest meeting dated 3/25 shows arrows from several compounded medications to boxes indicating financial amounts ranging from $3,000 to $14,000. It also mentions "efficiencies with new patient process (product intro – Rx fill" and "patient retention

      (follow-up – Rx refills)." While marketing to maximize distribution of products may be normal for non-prescription, over-the-counter supplements or self-pay health enhancements, this is highly abnormal and irregular for prescribed medications billed to health insurers.

    c. An email from R Kumar to Asif M and Anthony Mauzy dated 1/9/15 states, "In order to maximize products for our qualified patients, these are the 2 bundles we are recommending on a single script." The email then lists combinations of prescriptions and the amount of reimbursement each is projected to generate.

    d. An email from Asif Uddin to R Kumar dated 1/12/15 asks to "send respective reimbursements for each product in order of the highest paying."

    e. Filled out and blank patient data forms with patient demographics and basic medical history that don't have any place for an assessment or plan, but instead lead only to a series of options to check pain cream, wound cream, scar cream, or metabolic supplement.

4. Handouts intended for distribution at Ft. Hood advertised "customized formulas help you live pain-free" and "a positive hormone balance can guarantee proper wound healing while limiting the chance of unattractive keloids and scars." While legitimate pharmaceutical companies do advertise products to inform patients of FDA-approved medications, those patients must still seek medical care from a licensed provider who would then assess the patient and consider what treatment, if any, would be most appropriate.

**Prescribing without Establishing a Valid Patient-Physician Relationship:**

Diagnosing and treating disease, whether in person or via telehealth, requires a **licensed healthcare provider.** Physicians, nurse practitioners, and physician assistants must have an active license in the state or jurisdiction where the patient is located – and must abide by that state's medical practice laws and regulations. Even with telemedicine, patients should have the opportunity to know the name and qualifications of the clinician who is providing their care – this is considered part of informed consent for diagnosis and treatment. Diagnosing and treating disease is the practice of medicine, and licensed providers are expected to have meaningful involvement and oversight in assessing patients, giving diagnoses, and ordering treatment.

The materials I have viewed related to this case indicate that some patients received prescriptions and orders for genetic testing without meeting their prescribing provider in person or via accepted telemedicine modalities. It also appears that for some patients whose rudimentary medical history was obtained, this was done without the appropriate involvement of licensed medical personnel. Signing prescriptions and orders for patients under these circumstances is highly concerning and abnormal.

**Basic Medical Documentation:**

Contemporaneous medical records documenting clinical encounters and any prescriptions are required for both in-person care and telemedicine.  State and federal regulations typically require these records (whether printed or electronic) to be maintained for several years in a secure location that is compliant with patient data privacy requirements.

There appear to be no medical records related to several patients in this case – despite the fact that those patients were given prescriptions, and those prescriptions were billed to insurers.  In other instances where there was a cursory patient information sheet that led to compounded prescriptions, the form used for medical documentation appears to have no place for a chief complaint, history of the present illness, or an assessment of the likely diagnosis or potential diagnoses.  The form also just gives the provider four prescription options to choose from, rather than the open-ended possibility to determine what therapy is appropriate.  In other instances where there was a telemedicine encounter that led to genetic testing orders, most of the expected medical history, exam, discussion of medical reasoning, plan, and counseling are all missing from the brief medical records.  Instead, there is simply a cursory family history element which appears targeted to generating a diagnosis code to obtain payment for testing.

**Elements of a Medical Encounter (Histories, Physical Exams, Diagnostic testing, medical decision-making, counseling):**

When treating patients, physicians and other providers must obtain the data necessary to plan a work-up if needed, make a diagnosis or a list of possible diagnoses, and order treatment.  This ensures that clinicians have the information they need to make well-grounded clinical recommendations.

Medical encounters, especially for new patients, involve a patient evaluation.  Even when utilizing telemedicine, this typically includes:
   a. **History**:  The patient's relevant medical history should be collected as part of the encounter.  This would typically include a chief complaint, history of present illness, review of systems, medication list, allergies, and relevant past medical/social/family history.  Just as they would in person, telemedicine providers need opportunities for two-way communication to ask iterative follow-up questions when obtaining a history.
   b. **Physical Exam**:  When physicians are using telehealth, in lieu of an in-person physical examination, any needed physical exam elements must be performed by:
      i. Having another health care professional at the patient site conduct the exam,
      ii. Using live interactive audio-video to examine the patient, or
      iii. Using store and forward photographs/images to examine the patient
      
      There should be a backup plan in place in those instances where an in-person exam is ultimately required to make a diagnosis.
   c. **Ancillary Studies**:  Just as with in-person care, some diagnostic telehealth evaluations will require additional lab tests, radiologic procedures, or other studies.  Those providing

7

>
> telehealth should have procedures in place to obtain these studies when needed, just as they would for in-person care.

Many of the patients in this case appear to have received prescription medications or genetic testing orders without undergoing any medical evaluation.  Others appear to have had very cursory data collected, but this was done in a way that doesn't resemble real medical care.  **This leaves patients at substantial risks of missing important diagnoses** – for example, if their scar was actually the result of a malignancy, infection, or important inflammatory disease such as lupus, rather than a simple traumatic scar.  **It also leaves them at risk of receiving the wrong therapy** even if their scar was simply traumatic, since proper therapeutic selection depends on knowing the cause, duration, symptoms, and prior treatments of a scar.

Pain is even far more complex to work up, as the number of possible diagnoses leading to pain is extensive.  Simply prescribing creams for pain without an appropriate history, physical, and workup is dangerous and falls below the standard of care – as important underlying conditions can be missed.

With respect to genetic testing, such an evaluation is also critically important so that any testing is appropriate and properly targeted to support informed decision-making about personal health risks and care options as well as reproductive choices.  Unnecessary genetic testing is not only expensive, but can lead to unintended consequences, including emotional, social, and financial risks.  That is why Medicare, Medicaid, and other payers have specific criteria related to which tests are covered depending on a patient's personal medical history and family history.

Once a diagnosis has been made, **patients have the right to receive information and ask questions about recommended treatments so that they can make well-considered decisions about care.**[2]  This should include information about the diagnosis, the nature and purpose of recommended interventions, and the risks, benefits, and side-effects of treatment options.  **This discussion is absolutely central to a patient's right for informed consent to treatment.**

This type of counseling is equally important for the ordering of genetic tests.  Since these tests can have **profound implications** for a patient's future prognosis and future medical decision making, implications for their genetic offspring, and risks of genetic discrimination in employment and insurance, physicians begin anticipatory counseling before testing occurs, and then have a plan in place for further counseling once test results are available so that a patient can fully understand their results and begin to consider whether any changes in medical care or additional interventions are necessary.

The records I have reviewed in this case suggest that patients received prescription medications without informed consent or essential counseling.  It also appears that patients underwent genetic testing without appropriate preparatory counseling about its implications or follow-up counseling about their results and appropriate next steps.

**Follow-Up Care and Care Coordination:**

When physicians order treatment for a patient, we typically include a follow-up plan.  This may include additional visits to determine whether their condition is improving or whether we need to consider an alternative diagnosis or treatment option.  That follow-up also allows us to consider when it might be appropriate to stop a treatment or evaluate whether there are any concerning side-effects occurring.  It is also appropriate to coordinate a patient's care with other members of their existing healthcare team to avoid fragmented care – this coordination may include obtaining outside records to help evaluate a patient, and then sharing any diagnoses made or treatments initiated with the primary care or other physicians involved in a patient's care.

In this case, I saw no evidence that the prescribing physicians sought existing medical records on any patients, or that any medical records or prescribing info was forwarded to existing primary care physicians or specialists.

**Use and Selection of Compounded Skin Medications:**

Most of the conditions we see in dermatology can now be treated with commercially available topical, oral, or injected products that have gone through the FDA approval process to demonstrate safety and efficacy, are made under tightly regulated conditions, and can be obtained at ordinary pharmacies.  There are occasional circumstances, however, in which compounded medications, including compounded creams and ointments, can be a useful part of the armamentarium.  This particularly comes up when a patient hasn't responded to available therapies, and we think they might benefit from a compound that isn't produced as a commercially available pill or cream.

Because **compounded therapies typically are less tested for efficacy and are more difficult to obtain, they tend not to be first line treatments** that physicians choose before first attempting more standard alternatives.  When we do select a compounded treatment option, we choose only those active ingredients which we think will help treat the condition – based on published evidence of efficacy – and then select a base for topical medications (known as a vehicle) in which to have the pharmacist mix the ingredients.

Scars are **not** typically treated with compounded medications.  Scars that are still newly forming can sometimes be partially mitigated by application of topical silicone products or just treated with emollients and/or external pressure.  More mature scars that itch, hurt, or have formed thickened keloids can be partially improved with injected steroids, surgery, laser, or radiation.  Topical steroids are not typically helpful, but can slightly reduce itch or soften scars in certain circumstances.  Therefore, the one ingredient in the topical scar cream in this case that may be of any value (though such value would be small) was the 1% fluticasone proprionate, a topical steroid.

However, fluticasone is available as both a generic and branded commercially available cream, ointment, and lotion that can be prescribed without compounding from ordinary pharmacies.  The retail price of fluticasone (without insurance) is typically less than $50.  While the strength of fluticasone in this compounded scar cream was higher than the commercially available version, that higher potency of steroid can be achieved by a number of different FDA-approved, commercially available topical steroids (there are dozens and dozens on the market) rather than by resorting to expensive compounding.

The second ingredient used in the compounded scar creams in this case (levocetirizine) is a simple antihistamine which is available as an over-the-counter oral (known as Xyzal), and could have a theoretical benefit applied topically to dermatitis, but is not an evidence-based treatment for scars.  The third ingredient (pentoxifylline) is a prescription drug that may make red blood cells more flexible when taken orally to treat blood flow problems.  It has been tried in pressure ulcers and chronic pain, but is also not an evidence-based treatment for scars.  **I believe that the repetitive combination of these three medications (to treat patients with scars) could only have been designed to maximize financial reimbursement** rather than to best individually treat individual patient scars.

Similarly, the chronic pain and inflammation compounded formulas contained many ingredients, including anti-inflammatories, neurologic drugs, anesthetics, steroids, muscle relaxants, and other components.  There have been several studies of topical medications for pain.  Only anti-inflammatory medications such as ketoprofen and diclofenac have been shown to work (though the effect is mild), and they have only been shown to work in acute sprains or strains (rather than in chronic conditions).  A large review of all studies done on the topic concluded that, "There is no good evidence to support any other topical painkiller in any other painful condition."[3]  **A study specifically looking at topical pain creams with multiple ingredients similar to the ones in this case showed that they were "not better than placebo creams, and their higher costs compared with approved compounds should curtail routine use."**[4]  I believe that the repetitive combination of long lists of chemicals (to treat patients with pain) in this case could only have been designed to maximize financial reimbursement rather than to best individually treat individual patient pain.

**Use and Selection of Genetic Testing:**

As noted above, laboratory tests are ordered specifically when they will usefully inform future medical decision-making.  Medical genetic testing requires specific sensitivity, careful informed consent, and thorough patient counseling—while properly targeted testing can help predict disease risk, the results can also lead to unintended consequences, including emotional, social, and financial risks.  The Code of Medical Ethics states that:[5]

> *Genetic testing is most appropriate when the results of testing will have meaningful impact on the patient's care.* ***Physicians should not encourage testing unless there is effective therapy available to prevent or ameliorate the condition tested for.*** *Whether a genetic test is performed to help diagnose an existing health condition, or to predict future health risks, or to provide*

10

> *information for managing a disease,* **it is important that the patient receives appropriate counseling.**
>
> *Physicians who order genetic tests (individually or as part of a multi-test panel or large-scale sequencing) or who offer clinical genetic services should:*
>> *(a) Have appropriate knowledge and expertise to counsel patients about heritable conditions, risks for disease, and implications for health management, and to interpret findings of individual genetic tests or collaborate with other health care professionals who can provide these services, such as licensed genetic counselors.*
>> *(b) Adhere to standards of nondirective counseling and avoid imposing their personal moral values or judgment on the patient.*
>> *(c) Discuss with the patient:*
>>> *1. what can and cannot be learned from the proposed genetic test(s) and reasons for and against testing, including the possibility of incidental findings. Physicians should ascertain whether the patient wishes to be informed about findings unrelated to the goal of testing;*
>>> *2. medical and psychological implications for the individual's biological relatives;*
>>> *3. circumstances under which the physician will expect the patient to notify biological relatives of test findings; and*
>>> *4. that the physician will be available to assist in communicating with relatives.*
>> *(d) Obtain the individual's* **informed consent** *for the specific test or tests to be performed.*
>> *(e) Ensure that appropriate measures are taken to protect the confidentiality of the patient's and their biological relatives' genetic information.*

The genetic testing panels ordered on patients in this case were undertaken with only very minimal information about each patient's personal and family history, were not individualized based on whether they would have a meaningful impact on each patient's care, and were undertaken without basic appropriate patient counseling.

**Conclusion:**

The evidence I have reviewed illustrates an endeavor that in no way resembles the provision of medical care designed to deliver quality diagnosis and treatment of scars or pain or to obtain appropriate genetic testing to inform care.  Instead, it demonstrates a clear attempt to recruit patients for the purpose of generating profitable prescriptions for compounded therapies and orders for profitable genetic testing in the absence of any goal to make accurate diagnoses or select appropriate, evidence-based treatments to prevent or relieve suffering or improve health.  This scheme also specifically sought to prescribe compounded therapies that included active ingredients with minimal or no evidence of efficacy chosen to maximize reimbursements, and to order genetic testing in the absence of a medical evaluation or appropriate counseling.

Where telemedicine was used in this case, it appears to have been an afterthought to justify prescriptions or orders for genetic tests, rather than being appropriately employed by patients seeking care or physicians consulting other physicians to evaluate a medical condition, make diagnoses, select treatment, and counsel patients.  The contracted use of telemedicine companies in this instance simply to obtain prescriptions or orders (when the telemedicine providers were neither consulting with a referring physician nor engaging in an independent consultation with a patient to evaluate a medical concern) does not meet the definition of telemedicine as deployed in the practice of medicine, and leaves out numerous critical elements of providing real health care.

The sharing of profits or fees from the compounding of prescription medications and performance of genetic tests with clinicians, telemedicine companies, or marketers who "recruited" these patients is abhorrent to the medical profession and runs counter to our most basic professional norms.  Our code of medical ethics calls on us to prescribe based solely on medical considerations and patient needs, avoid influence on prescribing directions, and not accept cash payments from an entity that has a direct interest in our treatment recommendations.[6]

Submitted by,

Jack Resneck, Jr, MD

---

[1] American Telemedicine Association, Practice Guidelines for Teledermatology, Updated 2016.
[2] AMA Code of Medical Ethics, Opinion 2.1.1
[3] Derry S et al.  Topical analgesics for acute and chronic pain in adults – an overview of Cochrane Reviews.  Cochrane Database of Systematic Reviews 2017, Issue 5. Art. No.: CD008609.
[4] Brutcher RE et al.  Compounded Topical Pain Creams to Treat Localized Chronic Pain: A Randomized Controlled Trial.  Annals of Internal Medicine. Vol. 170 No. 5 • 5 March 2019
[5] AMA Code of Medical Ethics, Opinion 4.1.1
[6] AMA Code of Medical Ethics, Opinions 9.6.2 and 9.6.6