**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 18-Cr-20710-CMA**

**UNITED STATES OF AMERICA**

**vs.**

**SENTHIL RAMAMURTHY,**
**MANGALA RAMAMURTHY,**
**ANTHONY MAUZY,**
**THOMAS SAHS,**
**RAJESH MAHBUBANI, and**
**JOHN SCHOLTES,**

        **Defendants.**

_____/

## GOVERNMENT'S SUPPLEMENTAL DISCLOSURE OF EXPERT WITNESSES

The United States of America, by and through undersigned counsel, respectfully files this Supplemental Disclosure of Expert Witnesses.[1]  Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, the government provides notice of its intent to call the following witnesses in its case-in-chief at trial.  The expert witnesses' qualifications are described in their CVs, which were previously provided to defense counsel.  The following are supplemental summaries regarding the expert witnesses' testimony.

### A.  Paul Gerrard, M.D.

Dr. Gerrard will testify regarding Medicare's and Medicaid's rules and regulations, as set forth and encompassing the General Allegations section of the second superseding indictment.  Dr. Gerrard is expected to cover the following topics: The structure of Medicare and Medicaid, including but not limited to the programs' purpose, funding

---

[1] On October 18, 2019, this Supplemental Disclosure of Expert Witnesses (and attached reports) were provided to defense counsel via email.

sources, enrollment process, and claims process and well as record-keeping and documentation requirements; the applicable Medicare and Medicaid rules and regulations regarding reimbursement for physician and outpatient services covered by Part B of the Medicare Program as well as the reasons for payment or denial of claims.

Dr. Gerrard will testify regarding Medicare's coverage election(s) for specific categories of preventative medicine or screenings such as annual mammograms, colonoscopies, digital prostate exams and other annual "wellness" visits authorized by Congress to be covered by Medicare/ Medicaid. Dr. Gerrard will also testify about certain routine cancer screening tests designed to detect existing malignancies such as chest X-rays, PAP smears and colonoscopies that Congress has specifically authorized the Medicare and Medicaid programs to cover. Dr. Gerrard's testimony will contrast these routine cancer screening tests from genetic cancer screening testing, commonly called "CGx" testing, which is not diagnostic in nature, and is not generally eligible for reimbursement by Medicare/ Medicaid on the basis that such CGx testing is not reasonable and not necessary. Dr. Gerrard will explain the limited circumstances under which a claim for reimbursement for a beneficiary's CGx test would be deemed reasonable and necessary and therefore eligible for reimbursement by Medicare/ Medicaid. Finally. Dr. Gerrard will apply his knowledge of Medicare rules and regulations (described more fully below) regarding claims and reimbursement for GGx testing to the facts of this case to opine that specific claims made on Medicare for CGx testing purportedly rendered by LabSolutions, LLC. ("LabSolutions") were not covered by Part B of the Medicare Program because they were not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of malformed body member.

2

Dr. Gerrard will testify that he is a Chief Medical Officer and MoIDX Director of Clinical Science at Palmetto GBA and he will explain his principal duties and responsibilities.  Dr. Gerrard will testify that Palmetto is the Medicare Administrative Contractor for Medicare's Jurisdiction JJ, which includes Georgia, where LabSolutions, LLC. is located, Dr. Gerrard will explain Palmetto's role as an administrative contractor.

Dr. Gerrard will testify that Medicare is a federally-funded program that provides free and below-cost health care benefits to people age 65 years or older, the blind, and the disabled. The Centers for Medicare & Medicaid Services ("CMS") is responsible for the administration of the Medicare Program.  Dr. Gerrard will explain that individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."  Beneficiaries are eligible to receive a variety of services, including hospital services ("Part A"), physician services ("Part B"), and prescription drug coverage ("Part D").  Part B covers outpatient physician services, such as office visits, minor surgical procedures, and laboratory services, such as drug testing and genetic testing, when certain criteria are met.

Dr. Gerrard will explain that "Providers" include clinical laboratories, physicians, and other health care providers who provide services to beneficiaries.  In order to bill Medicare, a provider must submit an enrollment application to Medicare.  The enrollment application contains certification statements that the provider must agree to before enrolling with Medicare.  Specifically, the certification statement sets forth, in part, that the provider agrees to abide by the Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, and will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

3

Dr. Gerrard will also explain what a Medicare "provider number" is.  A provider number is assigned to a provider upon approval of the provider's Medicare application.  A provider may use that provider number to file claims with, or "bill" Medicare to obtain reimbursement for services rendered to beneficiaries.  When submitting claims to Medicare for reimbursement, providers certify that: (1) the contents of the forms are true, correct, and complete; (2) the forms are prepared in compliance with the laws and regulations governing Medicare; and (3) the services purportedly provided, as set forth in the claims, are medically necessary.

Dr. Gerrard will testify that this case implicates claims submitted to Medicare for Part B laboratory services, namely, cancer genetic testing, also commonly referred to as ("CGx  testing").  Dr. Gerrard will explain that CGx tests can indicate an increased risk of developing certain cancers in the future and can help providers determine the appropriate course of treatment for a person diagnosed with hereditary cancer syndrome.  Dr. Gerrard will testify, however, that CGx tests generally do not diagnose and/or detect existing cancer.  Dr. Gerrard will explain Medicare's reimbursement policies with respect to CGx testing and he will testify that Medicare reimburses for the test at rates varying from approximately a few hundred dollars to several thousand dollars for a panel of tests.  Dr. Gerrard will explain the basis for the varying rates of reimbursement.

Dr. Gerrard will also explain Medicare's rules related to providers' record-keeping requirements and requirements related to documenting medical necessity in the patient record.  Specifically, Dr. Gerrard will explain that Medicare requires ordering/referring physicians to document medical necessity and other coverage for genetic testing.  Medicare regulations require health care providers enrolled with Medicare to maintain complete and

accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician. Dr. Gerrard will explain that one of the purposes for the requirement that providers keep complete and accurate patient medical records is to permit Medicare to verify that the services were provided as described on the claim form. These records are required to be sufficient to permit Medicare, through its contractors, like Palmetto GBA, to review the appropriateness of Medicare payments made to the health care provider. Providers are required to maintain copies of these records for seven years and to make them available upon request.

Dr. Gerrard will testify that an integral part of his duties as a Chief Medical Officer is to be familiar with The Social Security Act, Title 41, United States Code, Section 1395y(a)(1)(A). This provision states that no Medicare payment shall be made for items or services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of malformed body member." Dr. Gerrard will explain which items and services Medicare deems to be reasonable and necessary for diagnosis or treatment of illness or injury, and how Medicare makes these coverage determinations. Dr. Gerrard will testify that as a condition of Medicare payment, a physician or other Medicare provider must certify that the services performed were medically necessary as required by Title 42, United States Code, Section 1395n(a)(2)(B).

Dr. Gerrard will explain CMS's interpretation and application of the term "medically necessary," for purposes of the payment of claims for diagnostic items or services. Specifically, Dr. Gerrard will testify that as a condition of Medicare's payment

for a reasonable and necessary item or service that is diagnostic in nature, such as x-ray tests, diagnostic laboratory tests, and other diagnostic tests, such tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem.  Dr. Gerrard will testify that Medicare does not cover items and services such as those described above that are not ordered by the beneficiary's treating physician because CMS has determined that tests not ordered by the physician treating the beneficiary are not reasonable and necessary.  *See* Title 42, Code of Federal Regulations, Section 410.32(a).  Dr. Gerrard will testify that with rare exception, a single episodic consultation done by a telemedicine doctor cannot qualify as a physician treating the beneficiary for purposes of Medicare's reimbursement requirements.

Dr. Gerrard will discuss and explain that Medicare publishes guidance regarding what services it does and does not cover in a variety of publications, including National Coverage Determinations ("NCDs").

Dr. Gerrard will testify that Medicare communicates to providers that it does not reimburse for genetic screening services conducted to determine the likelihood that a beneficiary will develop cancer in the future. *See* 42 C.F.R. 411.15.  Medicare will, however pay for genetic testing performed to aid in the treatment of a beneficiary with a personal diagnosis of cancer.  More specifically, Dr. Gerrard will explain that Medicare does not pay for genetic cancer testing unless (i) a beneficiary has a personal history of cancer or signs or symptoms of cancer, (ii) the test is ordered by a physician who is treating the beneficiary, and (iii) the test results are used by the physician in the management of the

6

beneficiary's specific medical problem.  It does not pay for screening tests in beneficiaries who exhibit no symptoms of cancer.

Dr. Gerrard will explain and contrast the difference between two types of genetic testing; germline testing and somatic testing.  Germline testing is done on cells that do not have cancer.  It is done to see if a person has a gene mutation that is known to increase the risk of developing cancers.  Germline tests use cells (such as blood or skin cells) that do not necessarily have any cancer cells, since these mutations are present in every cell in the body.  Somatic testing, usually done after a person is diagnosed with cancer looks for genetic mutations in tumor or cancer cells.  Somatic mutations are changes that happen to the genetic information in cells after a person is conceived – they are not passed down from a parent.  Dr. Gerrard will testify that the Medicare claims data he reviewed in this case strongly suggests that LabSolutions only conducted germline testing.  Dr. Gerrard will explain that Medicare reimbursement for CGx (germline) testing is typically a one-time benefit in the life of any given beneficiary.

Dr. Gerrard examined Medicare claims data for LabSolutions CGx testing purportedly rendered by on behalf of beneficiaries referred by providers including Dr. Mangala Ramamurthy, and Dr. S.B.  Dr. Gerrard also examined supporting patient documentation and medical files associated with claims submitted to Medicare/ Medicaid by LabSolutions for patients referred by Dr. Mangala Ramamurthy and Dr. S.B.[2]

Dr. Gerrard will opine that the patient documentation and claims data he reviewed could not support a finding that the tests were reasonable and necessary under the

---

[2] A list of names for the patient documentation and files examined by Dr. Gerrard which form the bases for his opinions will be provided to defense counsel via encrypted email.

applicable rules and regulations governing reimbursement by Medicare/ Medicaid described herein.  Moreover, Dr. Gerrard will testify regarding the conditions under which Medicare/ Medicaid would, and would not pay claims for CGx testing if predicated upon, or as a result of, kickbacks.  He would testify that Medicare/ Medicaid defines kickbacks consistent with 42 U.S.C. Section 1320a-7b(b).

In essence, Dr. Gerrard's expert opinion and conclusion is that Medicare/ Medicaid would not have paid for CGx testing referred to LabSolutions by Dr. Mangala Ramamurthy and Dr. S.B. because: (i) there is insufficient evidence to support that beneficiaries referred to LabSolutions by Drs. Ramamurthy and S.B. were in treatment for cancer or exhibited any symptoms that the physicians reasonably believed could be related to a diagnosis of cancer; (ii) the lack of any objectively reasonable physician-patient relationship between Drs. Ramamurthy and S.B. related to symptoms of, or a diagnosis of cancer; and (iii) the lack of any objectively reasonable evidence that Drs. Ramamurthy and S.B. used the results of the CGx testing they ordered for Medicare and Medicaid beneficiaries in connection with their treatment of the beneficiaries symptoms or diagnosis of cancer.  Dr. Gerrard will also opine that to the extent that any of the LabSolutions claims referred by Drs. Ramamurthy and S.B. were predicated upon kickbacks as defined by 42 U.S.C. Section 1320a-7b(b), those claims would not be covered.

**B.  Anthony Magliocco, M.D., FRCPC, FCAP**

Dr. Magliocco will testify to issues relevant to the allegations contained in Count 39 of the second superseding indictment.  Dr. Magliocco is expected to cover the following topics:

Dr. Magliocco will testify that he is a medical doctor, with special focus in the clinical areas of cancer laboratory testing, use of cancer tests, precision oncology, cancer research, cancer genetics, cancer clinical trials, cancer epidemiology. He has over 30 years experience as a medical doctor and cancer specialist. Dr. Magliocco has been head of the pathology laboratory at Moffitt Cancer Center for 8 years. He is a professor of oncology and of pathology at 2 universities (Calgary and USF).  He has published over 200 articles on cancer research. He founded the Hereditary Cancer Program in Saskatchewan and received special recognition from the Canadian Cancer Society to support this project.  He runs a genetic testing facility Called Protean BioDIagnostics. This facility provides comprehensive testing services for cancer doctors including cancer genetic testing services. This is a CAP CLIA licensed laboratory. The mission is to make high quality cancer testing available to all patients for whom it is appropriate regardless of where they live to accelerate precision medicine especially in underserviced areas and in disadvantaged patients.

Dr. Magliocco will describe what Cancer Genetic Testing ("CGx") is, its identity and purpose, how the tests are administered, contrasting and distinguishing CGx from other forms of genetic testing commercially available; clinically appropriate uses of CGx testing including a discussion of the risks and benefits to patients of getting CGx testing; distinguish and contrast appropriate use of CGx testing with examples of clinically

inappropriate use; how CGx testing results are used in conjunction with the appropriate practice of medicine and continuing care of patients, what the results look like, how they are interpreted and how they are properly used in conjunction with the provision of appropriate medical care; contrasting and distinguishing CGx testing from diagnostic tests used in the practice of medicine to detect the existence of and to treat cancer; Dr. Magliocco will discuss his review and analysis of the manner by which CGx testing was employed in this case and render an opinion on the propriety of the same.

In summary, Dr. Magliocco will testify that a CGx test is a highly complex and specialized type of genetic test designed to look for errors in genes that are associated with cancer.  CGx testing is not diagnostic in nature in that it does not identify the presence of any malignancy, but rather only whether an elevated risk for some future development of cancer exists.  Dr. Magliocco will explain the difference between germline and somatic genetic testing including discussing how clinicians appropriately use each type of test in connection with the treatment of patients.

Dr. Magliocco will contrast CGx testing from other types of tests which are diagnostic in nature designed to identify the existence of malignancy, such as for example, colonoscopies, PAP smears and mammograms.  Unlike these tests, CGx testing is not designed to be diagnostic, but rather to identify whether a person has an increased risk for the development of certain inherited cancer syndromes.  Dr. Magliocco will testify that inherited cancer syndromes are different from cancers that are not genetic in origin, and that they are in fact quite rare.  Dr. Magliocco will explain that CGx testing, unlike other commercially-available forms of genetic testing that are typically delivered to patients on a self-pay and direct to consumer basis, is not currently indicated for general use because

the risks of such testing vastly outweigh the benefits.  CGx testing results are frequently complex and inconclusive in nature such that they require the skills of a properly trained physician or other properly trained and certified health care providers to accurately interpret them in a manner that is useful to the patient.  Absent involvement by a competent treating physician, there is unreasonable risk that patients could misinterpret CGx testing results which could lead them to make premature and unwarranted medical decisions, or conversely to take an apathetic approach to their health based upon a false sense of security. Information revealed by GCx testing can also exact psychological toll on patients absent proper management by a trained physician.  Dr. Magliocco will also testify that there is currently little or no evidence that use of GCx testing that broadly targets the general population, and especially the elderly has any clinical value.    Such broad-targeted campaigns are not currently endorsed by the Association of Molecular Pathology (AMP), of which Dr. Magliocco is a member.  Dr. Magliocco will explain that some medical systems are evaluating the economic benefit of larger scale genetic testing in a controlled way that could determine whether high risk patients can be identified before the develop cancer, and whether intervention can reduce their risk.  The costs of these programs are currently being covered by research grants.

Dr. Magliocco will explain that CGx testing results can also be misleading.  For example, a negative result does not mean that a particular patient will not develop cancer, nor does it mean that the patient has a reduced overall risk for the future development of cancer during the course of his or her lifetime (approximately 1 in 3 chance).  Absent comprehensive genetic counseling, a patient could misinterpret a negative test result to their future detriment.

Dr. Magliocco will testify that the potential benefits of CGx testing outweigh risks and is medically indicated in a limited number of high-risk patients such as those with a current diagnosis of cancer or those patients having multiple immediate family members with suspected inherited cancer syndrome.  Suggestive inherited cancer syndrome means multiple members of a family, more than one generation, cancer at a young age (i.e. less than 50) and multiple cancers in a single individual (i.e. breast *and* ovarian in a woman). Patients having a single relative with a vague history of cancer does not qualify as suggestive inherited cancer syndrome or familial cancer syndrome.[3]  In a patient where inherited cancer syndrome is suspected, a CGx test may be indicated as a tool to assist treating physicians (*e.g.* oncologist, primary care physician), gather information, discuss treatment options and assist patients with making informed decisions about their care. CGx testing should only be ordered in compliment to a complete care program managed by one or more physicians or appropriately trained health care providers with the expertise to treat the patient.  Managed by a physician treating these patients, the information obtained from CGx testing can play a meaningful role in providing quality care.

Dr. Magliocco will testify that when a treating physician decides that it is in his or her patient's best interest to receive CGX testing and subsequently orders it, the testing should be accompanied by comprehensive pre and post testing genetic counseling provided by genetic counselor, physician or a health care provider with appropriate training and experience in the area of genetics. Genetic counseling is a service provided by a properly credentialed medical provider who helps to explain the purpose of a genetic test, how the test will be done, what the results will look like, what different results might mean, and

---

[3] *See* 2016 National Cancer Care Network ("NCCN") guidelines for Multigene Testing for Inherited Cancer Syndrome.

what the implications of those results might be in terms of how they might affect treatment of a current cancer, or if screening or risk modification strategies are available, genetic counselling is also useful to explains to patients implications related to insurance reimbursement, as well as what impacts if any, GCx testing results might have on other immediate family members especially children.

Dr. Magliocco will testify that as a treating physician he is familiar with the importance of thoroughly documenting his patients' medical charts. Dr. Magliocco will testify that the purpose of a medical chart is to document the patient encounter, record the information reviewed and document a future plan of care for the patient. Proper charting is vital to continued care of patients because health care providers see patients in episodes over a period of time. When it comes to CGx testing, patients' medical charting should thoroughly document the bases for ordering CGx testing, which CGx test was deployed (there are several types of CGx tests), as well as contain information about how the decision to conduct genetic testing fits into the referring physician's treatment plan for the patient.

Description of Dr. Magliocco's Opinion(s)

In preparation for his trial testimony, Dr. Magliocco reviewed patient documentation for approximately 72 patients.[4] Dr. Magliocco also reviewed documents produced to the government (and subsequently produced by the government to the defendants) by LabSolutions and one or more telemedicine companies. Dr. Magliocco also

---

[4] Patient documentation reviewed by Dr. Magliocco includes: (1) claims data for claims submitted to Medicare by LabSolutions for patients referred to LabSolutions by Q Health in 2016-2017; (2) reports summarizing interviews of Medicare beneficiaries conducted in connection with the instant investigation; (3) patient medical charts and requisition forms produced to the government related to patients referred to LabSolutions by Q Health; (4) LabSolutions family history questionnaires purported completed in connection with Q Health's referral of Medicare patients to LabSolutions. The list of patients whose documentation was reviewed by Dr. Magliocco will be provided to defense counsel via encrypted email.

reviewed summaries of interviews given to government investigators by one or more marketing agents compensated by Q Health in connection with CGx testing.[5]  These reviewed documents form, in part, the bases for Dr. Magliocco's expert opinions.  The remaining bases for Dr. Magliocco's opinions are based on his extensive relevant training and experience as described in Dr. Magliocco's CV (previously produced to defendants)

Dr. Magliocco will opine that in this case marketers and/or marketing companies and one or more physicians were financially incentivized by LabSolutions to broadly target elderly and vulnerable persons in the general population for CGx testing.  There is no evidence that the marketing agents in this case had any legitimate medical oversight, including from the physicians referring the CGx tests to LabSolutions, in connection with targeting and administering CGx testing to elderly and indigent patients.  There is also significant concern about the lack of quality controls in place for the collection, storage and transport of CGx samples by marketers to the genetic testing laboratory to assure the accuracy and integrity of the results.

Based upon the review of patient documentation described herein as well as on Dr. Magliocco's training and experience, no legitimate doctor-patient relationship existed in connection with ordering CGx testing, and as such, the CGx tests cannot have been properly deemed by the referring physician to be medically necessary.  Moreover, the supporting patient documentation described herein and reviewed by Dr. Magliocco confirms that the CGx testing was neither reasonable nor necessary.  The patient charts appear to be substantially the same from patient to patient and demonstrate that the referring physician made no reasonable effort to document the chart according to the

---

[5] Dr. Magliocco reviewed reports of summarizing the interviews of marketing agents L.C., R.C., A.T These reports have been produced to the defendants by the government in discovery.

individualized need(s) of the patient(s). The patient documentation reviewed by Dr. Magliocco described herein also demonstrates that no reasonable effort was made by the referring physician, the marketing agents or the CGx laboratory to provide the CGx testing results to patients or to physicians responsible for the patients' care. This conclusion was confirmed by statements of specific patients who confirmed that they were never asked anything about the identity of a primary care physician.

A review of the patient documentation discussed herein also demonstrates that the CGx tests referred by Q Health to LabSolutions were not reasonable or necessary for the appropriate treatment of patients because there is no evidence that patients targeted by marketers and physicians received any genetic counseling either prior to taking the CGx testing or after the results of such tests were generated. Moreover, the patient documentation described herein supports the conclusion that no evidence exists for the fact that physicians ordering the CGx testing for elderly and indigent patients in this case used the results of the CGx testing in connection with any treatment provided to those patients. For example, the patient documentation discussed herein shows only evidence of the physician referral for CGx testing and no evidence that the referring doctor had any relationship with the patient prior or subsequent to the CGx testing.

Based upon the review of the patient documentation discussed herein as well as based upon Dr. Magliocco's relevant training and experience, it is evident that the overall pattern by which elderly and indigent patients were targeted for CGx testing by marketing agents, physicians and Labsolutions as described above demonstrates that the CGx testing was unnecessary, it was not conducted in accordance with established guidelines such as the NCCN, nor did it contribute in any meaningful way to the treatment, planning or care

and health outcomes for the involved patients.  Dr. Magliocco will explain and opine that the NCCN guidelines are the recognized standard for clinical policy in cancer care and are the most thorough and most frequently updated clinical practice guidelines available in any area of medicine.  In actuality, based on his review of the patient documentation discussed herein, it is Dr. Magliocco's opinion that the manner by which the marketing agents, physician(s) and LabSolutions operated was designed and executed to maximize volume and financial reimbursement from insurance payers and to the exclusion and detriment of elderly patients.

Simply put, Dr. Magliocco's overall conclusion based upon a review of the patient documentation and other records described herein is that the CGx testing conducted in this case did not constitute an appropriate practice of medicine, nor was it medically necessary. Rather, it is apparent that the manner by which the marketers, physicians and LabSolutions targeted elderly patients *en masse,* conducted CGx testing without regard to actual medical necessity, and isolated patients from their bona fide health care providers constitutes nothing more than a predatory medicine scheme designed to enrich the players and ignore the patients' needs.

**C.   Jack S. Resneck, Jr., M.D.**

Jack S. Resneck Jr., M.D. is a Board Certified dermatologist and a Professor at the School of Medicine of the University of California, San Francisco.  Dr. Resneck provided an updated report.[6]  It is filed as an attachment to the Government's Supplemental Disclosure of Expert Witnesses.

---

[6] Dr. Resneck's report describes the categories of materials that he reviewed and cites specific documents.  The materials have been previously provided in discovery, and the particular items provided to Dr. Resneck will be provided to defense counsel.

### D. **Don Wunderlin**

Overview

Don Wunderlin is a Health Care Fraud Specialist in the Program Integrity Unit at the Defense Health Agency for the Department of Defense.  He is a fact witness who will testify regarding the TRICARE program and its policies, including those referred to in the second superseding indictment.  He will also testify regarding the TRICARE claims data and summaries in this case.[7]

In addition to being a fact witness, Mr. Wunderlin, through education and experience, has expertise with respect the TRICARE program, pharmacy claims, telemedicine, health care fraud and kickback schemes, and their impact on TRICARE.   To the extent that part of his testimony may be deemed expert testimony based on specialized knowledge, the government previously provided Mr. Wunderlin's CV, and is also providing this supplemental summary.

TRICARE

Mr. Wunderlin will explain what the TRICARE program is, who it covers, how it is funded and other general information about the program.  He will testify about the processing of claims and Express Scripts.   Mr. Wunderlin will testify about the requirements regarding co-pays for TRICARE members.

TRICARE is a health care insurance program of the United States Department of Defense.  It is funded by federal taxpayer money, which is appropriated by the U.S. Congress.  TRICARE is a "health care benefit program," as defined by Title 18, United

---

[7] The claims summaries are being prepared and will be provided as trial exhibits.

States Code, Section 24(b) and a "Federal health care program," as defined by Title 42, United States Code, Section 1320-7b(f).

TRICARE provides civilian health benefits for military personnel, military retirees, and military dependents all around the world.  The TRICARE program provides medical coverage for uniformed service members including those who are on active duty, reservists and their families, survivors and former spouses ("TRICARE beneficiaries").

TRICARE contracted with Express Scripts, Incorporated (ESI) to administer the TRICARE program, specifically for the processing and payment of claims.

In order to pay a claim for medical benefits, TRICARE requires that the item or service billed must be medically necessary, properly prescribed by a licensed physician, with proper documentation, and actually provided to a TRICARE beneficiary.  As an additional prerequisite to paying a claim, TRICARE requires health care providers to collect co-payments from the beneficiary unless specifically excepted by law or regulation.  Co-payments may not be waived.  Requiring beneficiaries to pay for part of the services they receive discourages beneficiaries from accepting services they do not need.

Telemedicine

Mr. Wunderlin will also testify about the TRICARE policies regarding telemedicine.[8] TRICARE has strict regulations regarding the use of telemedicine as a method of treating TRICARE patients. TRICARE does not consider telemedicine a substitute for face-to-face health care except in certain limited situations.  One proper use of a telemedicine "visit" is when the patient cannot not meet a medical professional face to face because they are in a

---

[8] TRICARE Policy Manual, Chapter 7.  It will be provided to defense counsel.

remote location.  Another proper use of a telemedicine "visit" is a situation in which there is a need for continuity of care with a specific medical professional.

In addition, the originating site where the beneficiary is located for the telemedicine "visit" must be a location where an authorized TRICARE provider normally provides medical services to TRICARE beneficiaries.  A patient's home is not a proper originating site for a telemedicine "visit."  In addition, proper telemedicine service requires the use of some form of video technology in which the patient and the medical professional can see each other and visually interact with each other.

Pharmacy benefit

Mr. Wunderlin will testify about the pharmacy benefit that TRICARE members receive.[9]  He will testify about compounding pharmacies, prescriptions, and claims.  He will testify about compounded medications, and the TRICARE requirements for claims for compounded medications.

Pharmacy compounding is a practice in which a licensed pharmacist or a licensed physician combines, mixes or alters ingredients of a drug to create a medication tailored to the particular needs of an individual patient.

Compounding pharmacies, such as the ones in this case, at times enter into agreements with Pharmacy Services Administrative Organizations (PSAOs), which in turn handle the arrangements with ESI for the filing of TRICARE claims.  The requirements for the pharmacies as providers and recipients of TRICARE payments are included in the agreements entered into with ESI.[10]  These requirements include verifying eligibility, meeting professional standards, safeguarding health and safety, proper dispensing of

---

[9] TRICARE Policy Manual, Chapter 8.  It will be provided to defense counsel.
[10] Those agreements will be provided to defense counsel.

medications, proper submission of claims, collecting co-payments, compliance with quality, and maintaining proper documentation and medical records.

Pharmacy claims may be submitted by a third party biller on behalf of the pharmacy. The claims are submitted electronically and processed within seconds. Several items are confirmed, such as beneficiary eligibility and that the drugs are covered. In the case of compounded medications, there is a payment for each individual ingredient. The claim status is made available to the pharmacy, and the amount of the co-pay that must be collected. The pharmacy then dispenses the medication. The TRICARE payments to the pharmacies are sent every two weeks.

In this case, Mr. Wunderlin, working in conjunction with ESI, obtained the claims data for Pharmacy 1 and 2. With respect to Pharmacy 1, Mr. Wunderlin and ESI were provided the name of a doctor whose prescriptions were forged by Jennifer Carbon in exchange for payments from Senthil Ramamurthy. The claims of that doctor were segregated. With respect to Pharmacy 2, Mr. Wunderlin and ESI were provided spreadsheets maintained by Pharmacy 2, tracking payment for compounded medications which were associated with SKR Services and Ventures (Senthil Ramamurthy's company), as the "marketing group."[11] The TRICARE claims associated with SKR will be segregated and further summarized by Mr. Wunderlin. In this case, TRICARE made payments to Pharmacy 1 and Pharmacy 2 of approximately $6.3 million.

---

[11] Included in the Pharmacy 2 claims are claims based on prescriptions by Dr. Mangala Ramamurthy. There were no claims found for Dr. Mangala Ramamurthy as a treating physician of TRICARE beneficiaries.

Following a large increase in volume and cost of compounding pharmacy claims, TRICARE made a determination to institute a prior authorization requirement. The large volume of compounding claims to TRICARE then was significantly reduced.[12]

Kickbacks

Mr. Wunderlin will also testify regarding TRICARE's policy regarding the payment of kickbacks,[13] and the effect that fraud and kickback schemes have on the payment of TRICARE claims, and on the TRICARE program. Mr. Wunderlin will testify that TRICARE would not pay claims that are based on fraud or the result of kickbacks.

### E. Elizabeth Martin

Elizabeth Martin is an Investigative Analyst in the Economic and Environmental Crimes Section of the U.S. Attorney's Office for the Southern District of Florida. She is a fact witness who will testify regarding her review of medical records in this case, and regarding summaries of those records.[14] In particular, Ms. Martin has reviewed the Medicare claims data regarding genetic testing ordered by Dr. Mangala Ramamurthy, the medical records of Dr. Mangala Ramamurthy relating to those patients, as well as records from Lab Solutions relating to those patients.

In addition to being a fact witness, Ms. Martin, through education and experience, has expertise in the requirements for medical records for purposes of submitting claims, and the examination of medical records involving health care fraud schemes. She also has education and experience as a nurse. To the extent that part of her testimony may be

---

[12] The Defense Health Agency (DHA) Determination and the Prior Authorization Form are publicly available. They will be provided to defense counsel in this case.
[13] 32 C.F.R. § 199.9.
[14] Ms. Martin's summaries are summary trial exhibits. The ones she has created thus far may have further updates; still they will be provided via encrypted email shortly following this filing. Also, Ms. Martin may create additional summaries which will be provided as trial exhibits.

deemed expert testimony based on specialized knowledge, the government previously provided Ms. Martin's CV.   A report prepared by Ms. Martin is attached to the Government's Supplemental Disclosure of Expert Witnesses.   The filing is redacted because it contained patient names as well as names of individuals who are not charged. An unredacted copy will be provided to defense via encrypted email.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY


By:  /s/ Ana Maria Martinez
ANA MARIA MARTINEZ
ASSISTANT U.S. ATTORNEY
Florida Bar No.0735167
99 N.E. 4th Street
Miami, FL 33132
Phone: (305) 961-9431
Fax: (305) 536-5321
Email: Ana.Maria.Martinez@usdoj.gov


By:/s/ Kevin J. Larsen
KEVIN J. LARSEN
ASSISTANT U.S. ATTORNEY
Special Bar No. A5501050
99 NE 4 Street
Miami, FL 33132
Tel: (305) 961-9356
Email: Kevin.Larsen@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 18, 2019, I sent to defense counsel via email the Government's Supplemental Disclosure of Expert Witnesses and the attached reports.  I further certify that on October 21, 2019, I electronically filed these documents with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record for all parties.

<u>/s/Ana Maria Martinez</u>
Ana Maria Martinez
Assistant United States Attorney