UNIVERSITY OF CALIFORNIA, SAN FRANCISCO



BERKELEY • DAVIS • IRVINE • LOS ANGELES • RIVERSIDE • SAN DIEGO • SAN FRANCISCO          SANTA BARBARA • SANTA CRUZ

JACK RESNECK, JR, MD

PROFESSOR and VICE-CHAIR of DERMATOLOGY

AFFILIATED FACULTY, PHILIP R. LEE INSTIUE for
    HEALTH POLICY STUDIES

1701 DIVISADERO STREET, 4TH FLOOR
SAN FRANCISCO, CA 94143-0316
CLINIC TEL: (415) 353-7800
ACADEMIC TEL: (415) 353-9610
FAX: (415) 353-9654
EMAIL: RESNECKJ@DERM.UCSF.EDU

October 18, 2019

Ms. Ana Maria Martinez
Assistant US Attorney
Southern District of Florida

Re:     U.S. v. Senthil Ramamurthy, et al.
        Case Number: 18-20710-CR-Altonaga/Goodman

Ms. Martinez:

The following is my updated report regarding this case.

In preparing this report, I reviewed a series of case-related documents including e-mails, meeting agendas, prescription forms, patient data forms, recruiting flyers, and contracts.  I also reviewed specific patient prescriptions and reports of interviews undertaken by the Office of the Inspector General of the Department of Defense with several patients.

My conclusions in this report are also based upon my education, training, experience, and review of relevant medical literature and relevant medical standards and guidelines.

I may further supplement these opinions based on any additional materials provided.

**My Background and Qualifications:**

I am a board-certified dermatologist with a full-time appointment as Vice-Chair and Professor at the University of California, San Francisco in the department of dermatology.  My medical school training, internal medicine internship, and residency in dermatology were all completed at UCSF.  I joined the faculty in 2001, and I now direct the UCSF Dermatology Faculty Practice – leading a clinical group of about 50 board-certified dermatologists.

Approximately 40% of my professional time is spent in direct patient care, where I treat patients with a wide variety of skin diseases, including conditions that involve scars.  In my treatment of skin disorders, I

prescribe a wide variety of topical, oral, and injected therapies, sometimes including compounded topical agents.  I also occasionally order targeted genetic testing for patients in whom such testing is appropriate.

The remainder of my professional time at UCSF is spent teaching, doing research, and in several leadership roles.  As part of my teaching responsibilities, I served as the director of the UCSF Dermatology residency program for 8 years – overseeing the training of future dermatologists.  The UCSF residency program, with 21 enrolled positions, is consistently ranked #1 or #2 in the US for dermatology training.  I also previously chaired the committee which oversees the entire medical school curriculum and educational policy for the UCSF School of Medicine, ranked among the top five medical schools in the country.  In these various roles, I instruct and evaluate medical students and residents in appropriate documentation, history-taking, physical examination, medical decision making, ordering of laboratory tests, diagnosis and treatment (including prescribing), informed consent for treatment, medical ethics, and many other topics.

I have held several regional and national leadership positions within my specialty and the profession of medicine.  I served as President of the California Society for Dermatology & Dermatologic Surgery.  I also served on the Board of Directors of the American Academy of Dermatology, where I previously spent four years as the Chair of Government Affairs, Health Policy, and Practice.  I am a member of the editorial board of the Journal of the American Academy of Dermatology.  I was elected to serve on the Board of Trustees of the American Medical Association, and recently chaired that Board.

In these roles, I have developed significant policy expertise related to digital health broadly, and telemedicine specifically.  I testified before a US Senate Committee on the topic of telehealth promises and challenges, and have been deeply engaged in legislative, regulatory, and professional policy development on telemedicine.  My own dermatology program at UCSF has been involved in delivering care via teledermatology and in formally teaching the next generation of physicians about proper care via telemedicine.  I have performed research on the quality of teledermatology provided to patients which has been published in the peer-reviewed medical literature, and I served on a digital health and artificial intelligence panel at the National Academy of Medicine.  I also lecture nationally on the topics of digital health and telemedicine.

I am also deeply engaged in the field of measuring quality in healthcare delivery.  As a member of the Board of Directors of the National Quality Forum, I am involved in national efforts to measure and report on the quality of healthcare delivered at the physician and intuitional level.  I was recently appointed by the US Deputy Secretary of Health and Human Services to serve on a panel at a series of Summits to improve upon the current national health care quality measurement enterprise.

A further statement of my qualifications and list of my publications are set forth in my CV which is attached.

**General Use of Telemedicine Modalities:**

Telemedicine is a growing and important part of health care delivery in the United States.  When applied to specific medical conditions well-suited to electronic communications, and when done ethically with high quality standards, telemedicine can improve access and convenience for patients seeking medical care.

Telemedicine is typically deployed for the following purposes:
- *Direct-to-patient telemedicine* involves a patient originating his/her own consultation by transmitting a medical history and images to a physician or other licensed clinician.
- *Tele-consultation* involves the review of patient cases transmitted by a referring physician or other licensed clinician and the provision of a consultative report from another licensed provider back to the referring one.  This often involves a primary care physician seeking consultation from a distant specialist.  The referring provider typically maintains responsibility for carrying out treatment recommendations and interacting with the patient.
- *Tele-triage* involves the review of patient cases transmitted by a referring provider (typically to a specialist) to determine which patients can be seen by tele-consultation, which need to be seen in-person, or which may not need referral at all.

Telemedicine is typically delivered through three broad categories of technologies:
- *Store-and-forward* telemedicine involves the transmittal of medical data (typically a robust medical history in combination with medical images) to a physician or medical specialist for assessment.  There are opportunities for additional iterative history and images as needed.
- *Real-time Interactive* telemedicine involves face-to-face interaction between a patient and provider through live audio and video technology.
- *Remote Monitoring* enables medical professionals to monitor a patient remotely using various technological devices.

Telemedicine, however, is merely a technological tool to deliver medical care.  Physicians and other providers who provide clinical services through telemedicine **must uphold the same basic legal and ethical standards expected for in-person interactions** (see Appendix A) and uphold state and federal laws governing health care delivery.  As with in-person medical encounters, diagnosing and treating patients via telehealth requires licensure of healthcare providers, transparency of credentials, establishment of a valid doctor-patient relationship, proper documentation and record-keeping, obtaining necessary elements of a patient's history, exam, and ancillary studies, selection of evidence-based treatments with informed patient consent, and proper continuity of care when appropriate.  Several aspects of this appear not only in professional standards,[1,1,2,3] but are codified in state and federal law and regulations (see examples in Appendix B).

The evidence I have reviewed in this case indicates that when telemedicine was applied, **few if any of these requirements were met.**  Rather than employing telehealth to deliver appropriate medical care,

those involved in this endeavor appear to have only added some phone calls or other electronic communications as an afterthought – with patients who had already been targeted for specific prescriptions or diagnostic tests – just to gather a little cursory information and lead to a signed prescription or order that would be honored by an insurer.  **This doesn't meet any standards of telehealth, and is not how it is intended or allowed to be utilized.**

### Prescriptions in Search of Patients (Marketing and recruitment):

The ethical practice of medicine typically involves physicians or other providers interacting with patients to solve a medical concern – whether it is for evidence-based prevention and health maintenance, appropriate surveillance for a specific condition that an individual patient is at risk of developing, or the diagnosis and treatment of an acute or chronic symptom or condition.  We are lucky to have thousands of effective treatments, but the prescription of a particular therapy is typically among the ***last*** parts of an encounter – selected by a medical professional, working in concert with a patient, ***after*** a patient's condition has been evaluated to determine whether a medication is indicated and which one might best balance risks, benefits, and side-effects.

This standard flow – evaluating a patient, making a diagnosis, and then selecting among possible therapies – allows for the application of evidence-based medicine, **selecting the right intervention for the right patient at the right time** – especially since medications and procedures usually carry risks for individual patients and utilize resources from private premium dollars or taxpayer-funded programs that should go to appropriate and effective medical care.

With respect to the workup and treatment of scars, there are a number of possible etiologies, so a medical history and physical exam are a crucial part of any evaluation before determination of therapy. The first part of that workup typically involves ensuring the scars are not being caused by a medical condition unrelated to skin trauma, including medication side-effects, primary or metastatic cancers, infections, or inflammatory diseases such as lupus.  Failure to first evaluate the scar creates a risk of missing one of these important underlying conditions.  For traumatic scars, several aspects of a patient's history and exam also influence which treatment, if any, would be useful (the cause of the lesions, how long ago they formed, whether there are associated symptoms such as itch or pain, prior treatments tried, etc.).  There are a variety of treatments available, including topical silicone sheeting, steroid injections, surgical excision, laser therapy, and radiation therapy – and different patients may benefit from different treatments depending on the medical circumstances.

As with therapeutic prescriptions, laboratory tests are also typically ordered ***after*** obtaining a history and exam, with individual consideration as to whether any such diagnostic or screening test is necessary to narrow down a diagnosis, look for treatment side-effects, assess treatment efficacy, or determine risks for future disease in a patient who is found to be at particular risk.  **Tests are ordered specifically when they will usefully inform future medical decision-making.**

In this case, it appears that the end goal was to recruit patients and generate prescriptions or orders for a limited, specific list of expensive tests or compounded therapies – **turning the proper medical encounter on its head.**   Individuals were induced to recruit patients willing to receive a specific prescription or test (rather than having a licensed provider *first* evaluate an individual patient's pain, scars, or indications for genetic screening and *then* consider what testing or treatment might be useful). For example:

1. Interviews in this case indicate that some patients received pills, creams, and genetic testing orders from prescribers they never met or interacted with, without having had their medical conditions evaluated or diagnosed.[4]

2. Emails indicate goals of recruiting patients to receive specific treatments, with resulting referral payments based upon ordered prescriptions or tests:

   a. An email from Karl Voeller to Asif Uddin[5] dated 12/22/14 proposed verbiage for an advertisement on Craigslist that would state "Hiring recruiters… $400 every time you sign up a military retiree/active duty/reservist to receive free supplements."

   b. An email reply from Asif Uddin to (redacted)[6] dated 12/3/14, in response to a query about what is required "to help build the clientele" stated: "I will need you to recruit Tricare patients to see my colleague…  The idea is simple, we want patients with Tricare to be made aware of their insurance covered benefits and use them.  Such include metabolic supplements, weight loss, pain cream, scar cream, anti-aging, etc.  If a patient is interested in any of the above, I want them.  Your task will be to get me as many Tricare patients you can get and coordinate with me and I will schedule an appointment."

   c. An email reply from Asif Uddin to (redacted)[7] dated 12/4/14 offers $150 per patient referred who ultimately gets a prescription written and covered by insurance.  A subsequent email reply[8] offers $300 to $400 each and "even more if your volume comes in" and states, "I have a Friday deadline for this batch of patients."

   d. A document with a script for telemarketers in a Belize call center[9] to "contact active military market segment, cultivate lead and close sale."  The objectives list "ascertain which of the product or products would the customer like to try, since there is no cost to the member" and "getting a commitment to try the prescription" and then "inform the patient that a physician will be calling them back to answer any questions and issue the prescription."  This objective list makes it clear that telemedicine was being applied simply as an attempt to get a signed prescription rather than a methodology to diagnose and treat patients appropriately.

3. Emails and prescription forms point to treatments that were selected before medical evaluations and that were driven by reimbursement levels:

   a. An email from Med Health Quest to Asif Uddin[10] dated 12/3/14 specifically directs which combination of compounded medications to select for a given chief complaint and notes the reimbursement estimates for each (If a patient chief complaint is SCAR Select 11, 10. $24,000).  Subsequently the email instructs to "always write auto refill PRN, 6 refills on all scripts."

b. A sample prescription form included in the agenda[11] for an SKR / Med Health Quest meeting dated 3/25 shows arrows from several compounded medications to boxes indicating financial amounts ranging from $3,000 to $14,000.  It also mentions "efficiencies with new patient process (product intro – Rx fill)" and "patient retention (follow-up – Rx refills)."  While marketing to maximize distribution of products may be normal for non-prescription, over-the-counter supplements or self-pay health enhancements, this type of direct involvement in patient recruitment and retention is highly abnormal and irregular for prescribed medications billed to health insurers.

c. An email[12] from R Kumar to Asif M and Anthony Mauzy dated 1/9/15 states, "In order to maximize products for our qualified patients, these are the 2 bundles we are recommending on a single script."  The email then lists combinations of prescriptions, numbers of refills, and the amount of reimbursement each is projected to generate ($22k and $30k).

d. An email reply[13] from Asif Uddin to R Kumar dated 1/12/15 asks to "send respective reimbursements for each product in order of the highest paying."

e. Filled out and blank patient data forms[14] with patient demographics and basic medical history that don't have any place for an actual assessment or plan, but instead lead only to a series of options to check pain cream, wound cream, scar cream, or metabolic supplement and check the associated diagnosis.  There did not appear to be any accompanying medical record with an assessment and plan.

4. Handouts intended for distribution at Ft. Hood[15] advertised "customized formulas help you live pain-free" and "a positive hormone balance can guarantee proper wound healing while limiting the chance of unattractive keloids and scars."  While legitimate pharmaceutical companies do advertise products to inform patients of FDA-approved medications (under regulation by the FDA), those patients must still seek medical care from a licensed provider who would then assess the patient and consider what treatment, if any, would be most appropriate.


**Prescribing without Establishing a Valid Patient-Physician Relationship:**

Diagnosing and treating disease, whether in person or via telehealth, requires a **licensed healthcare provider.**  Physicians, nurse practitioners, and physician assistants must have an active license in the state or jurisdiction where the patient is located – and must abide by that state's medical practice laws and regulations.  Even with telemedicine, patients must have the opportunity to know the name and qualifications of the clinician who is providing their care – this is considered part of informed consent for diagnosis and treatment.  Diagnosing and treating disease is the practice of medicine, and licensed providers are expected to have meaningful involvement and oversight in assessing patients, giving diagnoses, and ordering treatment.

The materials I have viewed related to this case indicate that some patients received prescriptions and orders for genetic testing without meeting their prescribing provider in person or via accepted

telemedicine modalities.  It also appears that for some patients whose rudimentary medical history was obtained, this was done without the appropriate involvement of licensed medical personnel.  Signing prescriptions and orders for patients under these circumstances is highly concerning and abnormal.

**Basic Medical Documentation:**

Contemporaneous medical records documenting clinical encounters and any prescriptions are required for both in-person care and telemedicine.  State and federal regulations typically require these records (whether printed or electronic) to be maintained for several years in a secure location that is compliant with patient data privacy requirements.

There appear to be no medical records related to several patients in this case – despite the fact that those patients were given prescriptions, and those prescriptions were billed to insurers.  In other instances where there was a cursory patient information sheet that led to compounded prescriptions, the form used for medical documentation appears to have no place for a chief complaint, history of the present illness, or an assessment of the likely diagnosis or potential diagnoses.  The form also just gives four prescription options to choose from, rather than the open-ended possibility to determine what therapy is appropriate.  In other instances where there was a telemedicine encounter that led to genetic testing orders, most of the expected medical history, exam, discussion of medical reasoning, plan targeted to appropriate testing, and documentation of counseling are all missing from the brief medical records.[16]  Instead, there is simply a cursory family history element which appears targeted to generating a diagnosis code to obtain payment for testing.

**Elements of a Medical Encounter (Histories, Physical Exams, Diagnostic testing, medical decision-making, counseling):**

When treating patients, physicians and other providers must obtain the data necessary to plan a work-up if needed, make a diagnosis or a list of possible diagnoses, and order treatment.  This ensures that clinicians have the information they need to make well-grounded clinical recommendations.

Medical encounters, especially for new patients, involve a patient evaluation.  Even when utilizing telemedicine, this typically includes:

    a.  **History**:  The patient's relevant medical history must be collected as part of the encounter.  This would typically include a chief complaint, history of present illness, review of systems, medication list, allergies, and relevant past medical/social/family history.  Just as they would in person, telemedicine providers need opportunities for two-way communication to ask iterative follow-up questions when obtaining a history.

    b.  **Physical Exam**:  When physicians are using telehealth, in lieu of an in-person physical examination, any needed physical exam elements must be performed by:

        i.  Having another health care professional at the patient site conduct the exam, or

        ii.  Using live interactive audio-video to examine the patient, or

iii.   Using store and forward photographs/images to examine the patient
There should be a backup plan in place for those instances where an in-person exam is ultimately required to make a diagnosis.

c.  **Ancillary Studies**:  Just as with in-person care, some diagnostic telehealth evaluations will require additional lab tests, radiologic procedures, or other studies.  Those providing telehealth should have procedures in place to obtain these studies when needed, just as they would for in-person care.

Many of the patients in this case appear to have received prescription medications or genetic testing orders without undergoing any medical evaluation.  Others appear to have had very cursory data collected, but this was done in a way that doesn't resemble real medical care.  **This leaves patients at substantial risk of missing important diagnoses** – for example, if their scar was actually the result of a malignancy, infection, or important inflammatory disease such as lupus, rather than a simple traumatic scar.  **It also leaves them at risk of receiving the wrong therapy** even if their scar was simply traumatic, since proper therapeutic selection depends on knowing the cause, duration, symptoms, and prior treatments of a scar.

Pain is even far more complex to work up, as the number of possible diagnoses leading to pain is extensive (including many diagnoses under each broad category of neuropathic, musculoskeletal, inflammatory, mechanical, malignancy-induced, etc.).  Simply prescribing creams for pain without an appropriate history, physical, and workup is dangerous and falls below the standard of care – as important underlying conditions can be missed, leading to delayed diagnosis and patient harm.

With respect to genetic testing, such an evaluation is also critically important so that any testing is appropriate and properly targeted to support informed decision-making about personal health risks and care options as well as reproductive choices.  Unnecessary genetic testing is not only expensive, but can lead to unintended consequences, including emotional, social, and financial risks.  That is why Medicare, Medicaid, and other payers have specific criteria related to which tests are covered depending on a patient's personal medical history and family history.

Once a diagnosis has been made, **patients have the right to receive information and ask questions about recommended treatments so that they can make well-considered decisions about care.[17]**  This should include information about the diagnosis, the nature and purpose of recommended interventions, and the risks, benefits, and side-effects of treatment options.  **This discussion is absolutely central to a patient's right for informed consent to treatment.**

This type of counseling is equally important for the ordering of genetic tests.  Since these tests can have **profound implications** for a patient's future prognosis and future medical decision making, implications for their genetic offspring, and risks of genetic discrimination in employment and insurance, physicians begin anticipatory counseling before testing occurs, and then have a plan in place for further counseling

once test results are available so that a patient can fully understand their results and begin to consider whether any changes in medical care or additional interventions are necessary.

The records I have reviewed in this case suggest that patients received prescription medications without informed consent or essential counseling (several reported no contact at all with a licensed provider).  It also appears that patients underwent genetic testing without appropriate preparatory counseling about its implications or follow-up counseling about their results and appropriate next steps.

### Follow-Up Care and Care Coordination:

When physicians order treatment for a patient, we typically include a follow-up plan.  This may include additional visits to determine whether their condition is improving or whether we need to consider an alternative diagnosis or treatment option.  That follow-up also allows us to consider when it might be appropriate to stop a treatment or evaluate whether there are any concerning side-effects occurring.  It is also appropriate to coordinate a patient's care with other members of their existing healthcare team to avoid fragmented care – this coordination may include obtaining outside records to help evaluate a patient, and then sharing any diagnoses made or treatments initiated with the primary care provider or other physicians involved in a patient's care.

In this case, I saw no evidence that the prescribing physicians sought existing medical records on any patients, or that any medical records or prescribing information was forwarded to existing primary care physicians or specialists.

### Use and Selection of Compounded Skin Medications:

Most of the conditions we see in dermatology can now be treated with commercially available topical, oral, or injected products that have gone through the FDA approval process to demonstrate safety and efficacy, are made under tightly regulated conditions, and can be obtained at ordinary pharmacies.  There are occasional circumstances, however, in which compounded medications, including compounded creams and ointments, can be a useful part of the armamentarium.  This particularly comes up when a patient hasn't responded to available therapies, and we think they might benefit from a compound that isn't produced as a commercially available pill or cream.

Because **compounded therapies typically are less tested for efficacy and are more difficult to obtain, they tend not to be first line treatments** that physicians choose before first attempting more standard alternatives.  Public and commercial payors, for similar reasons, often require enhanced screening of prescriptions or prior authorization before approving compounded therapies.[18,19,20]  When we do select a compounded treatment option, we choose only those active ingredients which we think will help treat the condition – based on published evidence of efficacy – and then select a base for topical medications (known as a vehicle) in which to have the pharmacist mix the ingredients.

Scars are **not** typically treated with compounded medications.  Scars that are still newly forming can sometimes be partially mitigated by application of topical silicone products or just treated with emollients and/or external pressure.  More mature scars that itch, hurt, or have formed thickened keloids can be partially improved with injected steroids, surgery, laser, or radiation.  Topical steroids are not typically helpful, but can slightly reduce itch or soften scars in certain circumstances.  Therefore, the one ingredient in the topical scar cream in this case that may be of any value (though such value would be small) was the 1% fluticasone proprionate, a topical steroid.

However, fluticasone is available as both a generic and branded commercially available cream, ointment, and lotion that can be prescribed without compounding from ordinary pharmacies.  The retail price of fluticasone (even without insurance) is typically less than $50.  While the strength of fluticasone in this compounded scar cream was higher than the commercially available version, that higher potency of steroid can be achieved by a number of different FDA-approved, commercially available topical steroids (there are dozens and dozens on the market) rather than by resorting to expensive compounding.

The second ingredient used in the compounded scar creams in this case (levocetirizine) is a simple antihistamine which is available as an over-the-counter oral (known as Xyzal), and could have a theoretical benefit applied topically to dermatitis, but is not an evidence-based treatment for scars.  The third ingredient (pentoxifylline) is a prescription drug that may make red blood cells more flexible when taken orally to treat blood flow problems.  It has been tried in pressure ulcers and chronic pain, but is also not an evidence-based treatment for scars.  **I believe that the repetitive combination of these three medications (to treat patients with scars) could only have been designed to maximize financial reimbursement** rather than to best individually treat individual patient scars.

Similarly, the chronic pain and inflammation compounded formulas contained many ingredients, including anti-inflammatories, neurologic drugs, anesthetics, steroids, muscle relaxants, and other components.  There have been several studies of topical medications for pain.  Only anti-inflammatory medications such as ketoprofen and diclofenac have been shown to work (though the effect is mild), and they have only been shown to work in acute sprains or strains (rather than in chronic conditions).  A large review of all studies done on the topic concluded that, "There is no good evidence to support any other topical painkiller in any other painful condition."[21]  **A study specifically looking at topical pain creams with multiple ingredients similar to the ones in this case showed that they were "not better than placebo creams, and their higher costs compared with approved compounds should curtail routine use."**[22]  I believe that the repetitive combination of long lists of chemicals without proven efficacy (to treat patients with pain) in this case could only have been designed to maximize financial reimbursement rather than to best individually treat individual patient pain.

When physicians prescribe either commercially available or compounded topical medications, we also vary the quantity prescribed based upon the size of the area being treated, and vary the number of refills based upon the risk of the medication, the follow-up re-evaluation plan, and the expected

duration of treatments.  In this case, prescription pads were pre-populated with instructions to dispense 300 and 360 grams (five to six times the typical dermatology amount), and prescribers were specifically told in an email to include "6 refills on all scripts."  For example, if I were treating a patient with a large 4cm rash or lesion on his/her leg with a topical cream, I would typically prescribe about 15 grams for a one-month supply (whereas 360-gram jars are reserved for full-body rashes).  The repetition of large quantities and high refill counts for patients in this case not only is wasteful of resources, but also carries risk for patients who might use too much, fail to follow-up for re-evaluation, or fail to stop therapy when appropriate.

## Use and Selection of Compounded Oral Supplements:

As with topical medications, compounding may occasionally be useful for oral medications when a commercially produced, FDA-approved option is unavailable.  Again, because compounded therapies typically are less tested for efficacy and are more difficult to obtain, they tend not to be first line treatments.

The components of the compounded "Metabolic Support" formulation prescribed in this case included, at various times:

- Pyridoxal 5 Phosphate (a form of vitamin B6)
- 5-methyltetrahydrofolate (5-MTHF is a form of folate or vitamin B9)
- Methylcobalamin (a form of vitamin B12)
- Choline Bitartrate (a compound related to B vitamins)
- Ubiquinol (also known as Co-enzyme Q10, an antioxidant)
- Inositol (a vitamin-like substance found in many plants and animals)
- Alpha Lipoic Acid (an antioxidant found in many foods that is purported to help diabetic neuropathy)
- Resveratrol (an antioxidant found in grapes and other foods)
- Hyaluronic Acid (a component of skin and many other tissues involved in retaining water and lubricating joints)
- Methionine (an amino acid in meat, fish, and dairy, used medically in Tylenol overdoses)

Every one of these components is available over-the-counter at health food stores.  I was able to find a single multivitamin on Amazon (Pure Encapsulations ONE Multivitamin) that contained 7 of these ingredients, and the remaining 3 were easily available on Amazon for less than 10 cents per dose.  A bottle of 120 capsules of Best Naturals 300mg Alpha Lipoic Acid, for example, sells for $11.65.  **Taking any these supplements clearly doesn't require prescribing to a compounding pharmacy at a cost of thousands of dollars per patient prescription.**

More importantly, an increasing accumulation of **scientific evidence has failed to find benefits** for multivitamin and anti-oxidant supplementation in healthy, non-pregnant adults with varied diets, except when individual circumstances suggest high risk of a deficiency.[23,24]  The only well-established benefit of

11

folic acid supplementation is the prevention of neural tube defects in pregnant women.  The only somewhat-established benefit of lipoic acid is in the treatment of diabetic peripheral neuropathy. Studies of resveratrol and ubiquinol are mixed, and further evidence is needed to determine whether their use is warranted.  While studies have associated diets high in vegetables and fruits with a reduced risk of cancer and cardiovascular disease, randomized trials evaluating antioxidant supplements have not found a reduction in risk.[25]  Randomized trials of supplementation with vitamins B6 and B12 do not support the hypothesis that these vitamins prevent cardiovascular disease.[26]  While vitamin B12 deficiency in vegans and alcoholics can cause health problems, there is no high-quality evidence that supplemental vitamin B12 is beneficial in healthy people eating a balanced diet.

Given the **lack of evidence of benefits** except in very specific populations, prescribing them to patients without specific indications of risk or evidence of deficiency is not medically appropriate.  And given the widespread and inexpensive over-the-counter availability of these vitamins and dietary supplements and the **extremely high cost** of utilizing a compounding pharmacy to procure them, prescribing them through compounding pharmacies is unjustified in most cases.

### Use and Selection of Genetic Testing:

As noted above, laboratory tests are ordered specifically when they will usefully inform future medical decision-making.  Medical genetic testing requires specific sensitivity, careful informed consent, and thorough patient counseling—while properly targeted testing can help predict disease risk, the results can also lead to unintended consequences, including emotional, social, and financial risks.  The Code of Medical Ethics states that:[27]

> Genetic testing is most appropriate when the results of testing will have meaningful impact on the patient's care. **Physicians should not encourage testing unless there is effective therapy available to prevent or ameliorate the condition tested for.** Whether a genetic test is performed to help diagnose an existing health condition, or to predict future health risks, or to provide information for managing a disease, **it is important that the patient receives appropriate counseling.**
>
> Physicians who order genetic tests (individually or as part of a multi-test panel or large-scale sequencing) or who offer clinical genetic services should:
>
> > (a) Have appropriate knowledge and expertise to counsel patients about heritable conditions, risks for disease, and implications for health management, and to interpret findings of individual genetic tests or collaborate with other health care professionals who can provide these services, such as licensed genetic counselors.
> >
> > (b) Adhere to standards of nondirective counseling and avoid imposing their personal moral values or judgment on the patient.
> >
> > (c)  Discuss with the patient:
> >
> > > 1. what can and cannot be learned from the proposed genetic test(s) and reasons for and against testing, including the possibility of incidental findings. Physicians

>should ascertain whether the patient wishes to be informed about findings
>unrelated to the goal of testing;
>
>2. medical and psychological implications for the individual's biological relatives;
>
>3. circumstances under which the physician will expect the patient to notify
>biological relatives of test findings; and
>
>4. that the physician will be available to assist in communicating with relatives.
>
>(d) Obtain the individual's **informed consent** for the specific test or tests to be performed.
>
>(e) Ensure that appropriate measures are taken to protect the confidentiality of the
>patient's and their biological relatives' genetic information.

The requirements put in place by many public and commercial insurers echo these standards.  Tricare only covers genetic testing when "the results of the test will influence the medical management of the beneficiary" and mandates genetic counseling before the testing.[28]  Medicare specifically excludes most testing specifically based solely on family history, and typically covers genetic tests only when a beneficiary has signs or symptoms that can be further clarified by diagnostic testing, has known cancer for which sequencing is appropriate (especially breast, ovarian, or colorectal cancer), or to assess an individual's ability to metabolize certain drugs.  Aetna covers genetic testing when a patient displays clinical features, or is at direct risk of inheriting the mutation; and the result of the test will directly impact treatment; and after history, physical examination, pedigree analysis, genetic counseling, and completion of conventional diagnostic studies, a definitive diagnosis remains uncertain.[29]

The genetic testing panels ordered on patients in this case were ordered with only minimal information about each patient's personal medical situation and family history, were not individualized based on whether they would have a meaningful impact on each patient's care, and were undertaken without basic, appropriate patient counseling.

**Conclusion:**

The evidence I have reviewed illustrates an endeavor that in no way resembles the provision of medical care designed to deliver quality diagnosis and treatment of scars or pain or to obtain appropriate genetic testing to inform care.  Instead, it demonstrates a clear attempt to recruit patients for the purpose of generating profitable prescriptions for compounded therapies and orders for profitable genetic testing in the absence of any goal to make accurate diagnoses or select appropriate, evidence-based treatments to prevent or relieve suffering or improve health.  This scheme also specifically sought to prescribe compounded therapies that included active ingredients with minimal or no evidence of efficacy chosen to maximize reimbursements, and to order genetic testing in the absence of a medical evaluation or appropriate counseling.  The pattern of behavior in this case is **so far outside the bounds of normal medical practice** that I can find no benign explanation for the pattern of prescribing that occurred.

Where telemedicine was used in this case, it appears to have been an afterthought to justify prescriptions or orders for genetic tests, rather than being appropriately employed by patients seeking

13

care or physicians consulting other physicians to evaluate a medical condition, make diagnoses, select treatment, and counsel patients.  The contracted use of telemedicine companies in this instance simply to obtain prescriptions or orders (when the telemedicine providers were neither consulting with a referring physician nor engaging in an independent consultation with a patient to evaluate a medical concern) does not meet the definition of telemedicine as typically deployed in the practice of medicine, and leaves out numerous critical elements of providing real health care.

While pharmaceutical manufacturers and legitimate compounding pharmacies do sometimes market prescription medications to patients (in the form of direct-to-consumer advertising under tight rules enforced by the Food and Drug Administration), those patients must then present to a treating physician who evaluates their condition and works with them to independently make a diagnosis, select a treatment, and consider risks, benefits, and alternatives.  And while pharmaceutical manufacturers and legitimate compounding pharmacies also sometimes market prescription medications to physicians (in advertisements or through sales representatives whose activities are also regulated by the Food and Drug Administration), those physicians still use their independent judgement when seeing individual patients to determine the best and most appropriate therapeutic intervention from among all options. The recruitment of patients by marketers and subsequent prescribing (exclusively) of products from those marketers by physicians who had not evaluated those patients individually is **neither normal nor ethical medical practice**.

Furthermore, the sharing of profits or fees from the compounding of prescription medications and performance of genetic tests with clinicians, telemedicine companies, or marketers who "recruited" these patients is abhorrent to the medical profession and runs counter to our most basic professional norms.  Our code of medical ethics calls on us to prescribe based solely on medical considerations and patient needs, avoid influence on prescribing directions, and not accept cash payments from an entity that has a direct interest in our treatment recommendations.[30]

Submitted by,

Jack Resneck, Jr, MD

---

[1] Practice Guidelines for Teledermatology, American Telemedicine Association, Updated 2016.
[1] AMA Code of Medical Ethics, Opinion 1.2.12
[2] Position Statement on Teledermatology, American Academy of Dermatology, Updated March 7, 2016.
[3] American Medical Association Telemedicine Policies, H480.968, H480.946, H480.969, H160.937.
[4] See case documents labelled GOV02-000014, GOV02-000058, GOV02-000139, GOV02-000154, GOV02-000155.
[5] See case document labelled UE000393.

[6] See case document labelled UE000243.

[7] See case document labelled UE000263.

[8] See case document labelled UE000276.

[9] See case document labelled GOV08-009848.

[10] See case document labelled UE000242.

[11] See case document labelled UE002380.

[12] See case document labelled UE000966.

[13] See case document labelled UE000991.

[14] See case documents labelled SRK-0001657, SKR-0003348, SKR-0003359, SKR-0003349, SKR-0003347.

[15] See case document labelled GOV08-063340.

[16] For example, see case documents labelled LabSolutions001817, LabSolutions002177, LabSolutions00605, LabSolutions001670, MOCD-0008662, MyOnCallDoc-MR-000726, MyOnCallDoc-MR-000726, etc.

[17] AMA Code of Medical Ethics, Opinion 2.1.1

[18] DHA Determination on TRICARE Pharmacy Benefits Program Coverage for Prescriptions for Compounded Pharmaceuticals.

[19] Prior Authorization Criteria, Compounded Drug Products, CVS Caremark, updated 2016.

[20] UnitedHealthcare Clinical Pharmacy Program Guidelines for Compounds and Bulk Powders, Prior Authorization Program, Issued 2013, updated 2018.

[21] Derry S et al.  Topical analgesics for acute and chronic pain in adults – an overview of Cochrane Reviews. Cochrane Database of Systematic Reviews 2017, Issue 5. Art. No.: CD008609.

[22] Brutcher RE et al.  Compounded Topical Pain Creams to Treat Localized Chronic Pain: A Randomized Controlled Trial.  Annals of Internal Medicine. Vol. 170 No. 5.  5 March 2019.   Cochrane Database Syst Rev. 2012.

[23] UpToDate, Vitamin Supplementation in Disease Prevention, Updated 5/21/19.

[24] Guallar E, Stranges S, Mulrow C, Appel LJ, Miller ER 3rd.  Enough is enough: Stop wasting money on vitamin and mineral supplements.  Ann Intern Med. 2013;159(12):850.

[25] Bjelakovic G, Nikolova D, Gluud LL, Simonetti RG, Gluud C.  Antioxidant supplements for prevention of mortality in healthy participants and patients with various diseases.

[26] Martí-Carvajal AJ, Solà I, Lathyris D, Salanti G.  Homocysteine lowering interventions for preventing cardiovascular events.  Cochrane Database Syst Rev. 2009.

[27] AMA Code of Medical Ethics, Opinion 4.1.1

[28] Tricare Policy Manual, Chapter 6, Section 3.1, Diagnostic Genetic Testing, Updated 2010.

[29] Genetic Testing Medical Clinical Policy Bulletin, Aetna, Effective 1996, Reviewed 2019.

[30] AMA Code of Medical Ethics, Opinions 9.6.2 and 9.6.6

**Appendix A:  Expectations for proper practice of telehealth:**

Telehealth is merely a technological tool to deliver medical care.  Physicians who provide clinical services through telemedicine must uphold the same standards expected for in-person interactions and uphold laws governing health care delivery.

### Components of Ethical Provision of Telemedicine

1. **Licensure**:  Diagnosing and treating disease via telehealth requires a licensed healthcare provider.  Physicians, PAs, and NPs providing telehealth must have an active license in the state or jurisdiction *where the patient is located* – and must abide by that state's medical practice laws and regulations.

2. **Transparency**:  Patients being treated by telemedicine should have access to the licensure and board certification qualifications of the health care practitioners who are providing their care.  This is considered part of informed consent for diagnosis and treatment.

3. **Establishing a valid relationship**:  Physicians and PAs providing telehealth must establish a valid patient-physician relationship prior to delivering services via telemedicine.  This is straightforward if the patient and physician have previously had an in-person medical encounter.  Most states also allow for the establishment of such a relationship via live interactive audio-visual visits.  In many places, this can also be done via asynchronous, store-and-forward technologies where the patient provides a medical history and digital images to the clinician.

4. **Documentation and Records**:  Contemporaneous medical records documenting the clinical evaluation and any prescriptions are required for telehealth, and must be maintained in a secure, HIPAA-compliant form and location.

5. **Patient Evaluation:** Providers must obtain the data necessary to plan a work-up if needed, make a diagnosis or differential diagnosis, and order treatment.  This ensures that clinicians have the information they need to make well-grounded clinical recommendations.
   a. History:  The patient's relevant medical history should be collected as part of the provision of telemedicine services.  This would typically include a chief complaint, history of present illness, review of systems, medication list, allergies, and past medical/social/family history.  Just as they would in person, providers need opportunities for two-way communication to ask iterative follow-up questions when obtaining a history.
   b. Physical Exam:  When physicians are using telehealth, in lieu of an in-person physical examination, any required physical exam elements must be performed by:
      i. Having another health care professional at the patient site conduct the exam,
      ii. Using live interactive audio-video to examine the patient, or
      iii. Using store and forward photographs/images to examine the patient
      There should be a backup plan in place in those instances where an in-person exam is ultimately required to make a diagnosis.
   c. Ancillary Studies:  Just as with in-person care, some diagnostic evaluations will require additional lab tests, radiologic procedures, or other studies.  Those providing telehealth

should have procedures in place to obtain these studies when needed, just as they would for in-person care.

6. **Evidence-based Treatment**:  The delivery of telemedicine services, including therapeutic interventions, should follow evidence-based practice guidelines, to the degree they are available, to ensure patient safety, quality of care, and positive health outcomes.

7. **Informed Consent for Treatments**:  Patients have the right to receive information and ask questions about recommended treatments so that they can make well-considered decisions about care.  This should include information about the diagnosis, the nature and purpose of recommended interventions, and the risks, benefits, and side-effects of treatment options.

8. **Continuity of Care**:
   a. Clinicians providing telehealth should have mechanisms in place for follow-up care and referrals for urgent or emergency services (if patients are found to have an urgent condition, have a side-effect from a medication, etc.).
   b. Data gathered, treatments prescribed, and medical records should be made available to the patient's existing care team, including their primary care provider, so that care is coordinated.

**Appendix B:  Relevant Samples of State and Federal Telehealth Requirements** (bolded text added to most relevant sections):

Selected Sections From TRICARE Policy Manual, Chapter 7, Telemedicine:

2.1.4  All prescriptions for pharmaceuticals must conform to TRICARE regulation(s) and states law(s) at both the originating site and the distant site. **Prescription(s) for pharmaceutical(s) must be medically appropriate and prescribed by a licensed clinician who is directly involved in the patient's current telemedicine episode of care.**

2.2.3.1  The contractor shall instruct providers rendering telemedicine services to follow telemedicine-specific regulatory, licensing, credentialing and privileging, malpractice and insurance laws and rules for their profession in both the jurisdiction (site) in which they are practicing as well as **the jurisdiction (site) where the patient is receiving care**, and shall ensure compliance as required by appropriate regulatory and accrediting agencies. For services provided outside of the United States (US), this would include all applicable TRICARE Overseas Program (TOP) and host nation requirements.

2.2.3.2  The contractor shall instruct providers rendering telemedicine services to **follow professional discipline and national practice guidelines when practicing via telemedicine**, and any modifications to applicable clinical practice guidelines for the telemedicine setting shall ensure that clinical requirements specific to the discipline are maintained. In addition, **arrangements for handling emergency situations should be determined at the outset of treatment** to ensure consistency with established local procedures. In particular, for mental health services, this should include processes for hospitalization or civil commitment within the jurisdiction where the patient is located if necessary.

2.2.3.3  For synchronous telemedicine services, the contractors shall instruct providers rendering telemedicine services to implement means for **verification of provider and patient identity**. For telemedicine services where the originating site is an authorized institutional provider, the verification of both professional and patient identity may occur at the host facility. For telemedicine services where the originating site does not have an immediately available health professional (e.g., the patient's home), **the telemedicine provider shall provide the patient (or legal representative) with the provider's qualifications, licensure information**, and, when applicable, registration number (e.g., National Provider Identification (NPI)). The patient shall provide two-factor authentication.

2.2.3.4  For synchronous telemedicine services, the contractor shall instruct providers that **provider and patient location must be documented in the medical record** as required for the appropriate payment of services. Documentation will include elements such as city/town, state, and zip code (or country for overseas services).

3.3  Telephone Services

**Audio-only telephone services excluded by 32 CFR 199.4(g)(52) do not meet the definition of interactive telecommunications systems and are excluded**.

From Florida Administrative Code, Standards on Telehealth, passed 3-12-14, version in effect 3/7/16 to 10/14/19:

**64B8-9.0141 Standards for Telemedicine Practice.**

(1) "Telemedicine" means the practice of medicine by a licensed Florida physician or physician assistant where patient care, treatment, or services are provided through the use of medical information

exchanged from one site to another via electronic communications. **Telemedicine shall not include the provision of health care services only through an audio only telephone, email messages, text messages, facsimile transmission, U.S. Mail or other parcel service, or any combination thereof.**

(2) The standard of care, as defined in Section 456.50(1)(e), F.S., shall remain the same regardless of whether a Florida licensed physician or physician assistant provides health care services in person or by telemedicine.

(3) Florida licensed physicians and physician assistants providing health care services by telemedicine are responsible for the quality of the equipment and technology employed and are responsible for their safe use. Telemedicine equipment and technology must be able to provide, at a minimum, the same information to the physician and physician assistant which will enable them to meet or exceed the prevailing standard of care for the practice of medicine.

(4) Controlled substances shall not be prescribed through the use of telemedicine except for the treatment of psychiatric disorders. This provision does not preclude physicians or physician assistants from ordering controlled substances through the use of telemedicine for patients hospitalized in a facility licensed pursuant to Chapter 395, F.S.

(5) **Prescribing medications based solely on an electronic medical questionnaire constitutes the failure to practice medicine with that level of care, skill, and treatment which is recognized by reasonably prudent physicians as being acceptable under similar conditions and circumstances,** as well as prescribing legend drugs other than in the course of a physician's professional practice.

(6) **Physicians and physician assistants shall not provide treatment recommendations, including issuing a prescription, via electronic or other means, unless the following elements have been met:**

(a) **A documented patient evaluation, including history and physical examination to establish the diagnosis for which any legend drug is prescribed.**

(b) **Discussion between the physician or the physician assistant and the patient regarding treatment options and the risks and benefits of treatment.**

(c) **Maintenance of contemporaneous medical records** meeting the requirements of Rule 64B8-9.003, F.A.C.

(7) The practice of medicine by telemedicine does not alter any obligation of the physician or the physician assistant regarding patient confidentiality or recordkeeping.

(8) A physician-patient relationship may be established through telemedicine.

(9)(a) Nothing contained in this rule shall prohibit consultations between physicians or the transmission and review of digital images, pathology specimens, test results, or other medical data by physicians or other qualified providers related to the care of Florida patients.

(b) This rule does not apply to emergency medical services provided by emergency physicians, emergency medical technicians (EMTs), paramedics, and emergency dispatchers. Emergency medical services are those activities or services to prevent or treat a sudden critical illness or injury and to provide emergency medical care and prehospital emergency medical transportation to sick, injured, or otherwise incapacitated persons in this state.

(c) The provisions of this rule shall not apply where a physician or physician assistant is treating a patient with an emergency medical condition that requires immediate medical care. An emergency medical condition is a medical condition manifesting itself by acute symptoms of sufficient severity that the absence of immediate medical attention will result in serious jeopardy to patient health, serious impairment to bodily functions, or serious dysfunction of a body organ or part.

(d) The provisions of this rule shall not be construed to prohibit patient care in consultation with another physician who has an ongoing relationship with the patient, and who has agreed to supervise the

patient's treatment, including the use of any prescribed medications, nor on-call or cross-coverage situations in which the physician has access to patient records.

Rulemaking Authority 458.331(1)(v) FS. Law Implemented 458.331(1)(v), 458.347(4)(g) FS. History–New 3-12-14, Amended 7-22-14, 10-26-14, 3-7-16.


From Texas Occupations Code, Chapter 111 on Telemedicine and Telehealth, version updated May 27, 2017:

Sec. 111.002.  INFORMED CONSENT.  A treating physician or health professional who provides or facilitates the use of telemedicine medical services or telehealth services **shall ensure that the informed consent of the patient, or another appropriate individual authorized to make health care treatment decisions for the patient, is obtained before telemedicine medical services or telehealth services are provided.**

Sec. 111.003.  CONFIDENTIALITY.  A treating physician or health professional who provides or facilitates the use of telemedicine medical services or telehealth services shall ensure that the confidentiality of the patient's medical information is maintained as required by Chapter 159 or other applicable law.

Sec. 111.004.  RULES.  The Texas Medical Board, in consultation with the commissioner of insurance, as appropriate, may adopt rules necessary to:

(1)  ensure that patients using telemedicine medical services receive appropriate, quality care;

(2)  prevent abuse and fraud in the use of telemedicine medical services, including rules relating to the filing of claims and records required to be maintained in connection with telemedicine medical services;

(3)  ensure adequate supervision of health professionals who are not physicians and who provide telemedicine medical services; and

(4)  establish the maximum number of health professionals who are not physicians that a physician may supervise through a telemedicine medical service.

Sec. 111.005.  PRACTITIONER-PATIENT RELATIONSHIP FOR TELEMEDICINE MEDICAL SERVICES.  (a)  For purposes of Section 562.056, a valid practitioner-patient relationship is present between a practitioner providing a telemedicine medical service and a patient receiving the telemedicine medical service as long as the practitioner complies with the standard of care described in Section 111.007 and the practitioner:

(1)  **has a preexisting practitioner-patient relationship with the patient** established in accordance with rules adopted under Section 111.006;

(2)  communicates, regardless of the method of communication, with the patient pursuant to a call coverage agreement established in accordance with Texas Medical Board rules with a physician requesting coverage of medical care for the patient; or

(3)  **provides the telemedicine medical services through the use of one of the following methods**, as long as the practitioner complies with the follow-up requirements in Subsection (b), and the method allows the practitioner to have access to, and the practitioner uses, the relevant clinical information that would be required in accordance with the standard of care described in Section 111.007:

(A)  **synchronous audiovisual interaction** between the practitioner and the patient in another location;

(B)  **asynchronous store and forward technology**, including asynchronous store and forward technology in conjunction with synchronous audio interaction between the practitioner and the patient in another location, **as long as the practitioner uses clinical information from**:

(i)  clinically relevant **photographic or video images**, including diagnostic images; or

20

(ii)  the patient's **relevant medical records**, such as the relevant medical history, laboratory and pathology results, and prescriptive histories; or

(C)  another form of audiovisual telecommunication technology that allows the practitioner to comply with the standard of care described in Section 111.007.

(b)  A practitioner who provides telemedicine medical services to a patient as described in Subsection (a)(3) shall:

(1)  **provide the patient with guidance on appropriate follow-up care**; and

(2)  if the patient consents and the patient has a primary care physician, **provide to the patient's primary care physician within 72 hours** after the practitioner provides the services to the patient a medical record or other report containing an explanation of the treatment provided by the practitioner to the patient and the practitioner's evaluation, analysis, or diagnosis, as appropriate, of the patient's condition.

(c)  Notwithstanding any other provision of this section, a practitioner-patient relationship is not present if a practitioner prescribes an abortifacient or any other drug or device that terminates a pregnancy.

Sec. 111.006.  COORDINATION TO ADOPT RULES THAT DETERMINE VALID PRESCRIPTION.  (a)  The Texas Medical Board, the Texas Board of Nursing, the Texas Physician Assistant Board, and the Texas State Board of Pharmacy shall jointly adopt rules that establish the determination of a valid prescription in accordance with Section 111.005.  Rules adopted under this section must allow for the establishment of a practitioner-patient relationship by a telemedicine medical service provided by a practitioner to a patient in a manner that complies with Section 111.005(a)(3).

(b)  The Texas Medical Board, the Texas Board of Nursing, the Texas Physician Assistant Board, and the Texas State Board of Pharmacy shall jointly develop and publish on each respective board's Internet website responses to frequently asked questions relating to the determination of a valid prescription issued in the course of the provision of telemedicine medical services.

Sec. 111.007.  STANDARD OF CARE FOR TELEMEDICINE MEDICAL SERVICES AND TELEHEALTH SERVICES.

(a)  A health professional providing a health care service or procedure as a telemedicine medical service or a telehealth service is **subject to the standard of care that would apply to the provision of the same health care service or procedure in an in-person setting.**

(b)  An agency with regulatory authority over a health professional may not adopt rules pertaining to telemedicine medical services or telehealth services that would impose a higher standard of care than the standard described in Subsection (a).


From the Georgia Administrative Code, Chapter 360-3, Adopted 1/13/2014:

**Rule 360-3-.07 Practice Through Electronic or Other Such Means**

(a)  Under O.C.G.A. §§ 43-34-8 and 43-1-19, the Board is authorized to take disciplinary action against licensees for unprofessional conduct, and in connection therewith, to establish standards of practice. Except as otherwise provided, in order for a physician to practice within the minimum standards of practice while providing treatment and/or consultation recommendations by electronic or other such means, **all the following conditions must be met:**

(1) All treatment and/or consultations must be done by Georgia licensed practitioners;

(2) **A history of the patient shall be available** to the Georgia licensed physician, physician assistant or advanced practice registered nurse who is providing treatment or consultation via electronic or other such means;

(3) A Georgia licensed physician, physician assistant or advanced practice registered nurse **either**:

a. **Has personally seen and examined the patient** and provides ongoing or intermittent care by electronic or other such means; **or**

b. Is providing medical care by electronic or other such means **at the request of a physician, physician assistant or advanced practice registered nurse licensed in Georgia who has personally seen and examined the patient; or**

c. Is providing medical care by electronic or other such means at the request of a Public Health Nurse, a Public School Nurse, the Department of Family and Children's Services, law enforcement, community mental health center or through an established child advocacy center for the protection or a minor, and the physician, physician assistant or advanced practice registered nurse is able to examine the patient using technology and peripherals that are equal or superior to an examination done personally by a provider within that provider's standard of care; or

d. **Is able to examine the patient using technology and peripherals that are equal or superior to an examination done personally by a provider within that provider's standard of care.**

(4) The Georgia licensed physician, physician assistant or advanced practice registered nurse providing treatment or consultations by electronic or other means **must maintain patient records** on the patient and **must document the evaluation and treatment** along with the identity of the practitioners providing the service by electronic or other means, and if there is a referring practitioner, a copy of this record must also be provided to the referring physician, physician assistant or advanced practice registered nurse;

(5) To delegate to a nurse practitioner or to supervise a physician assistant doing telemedicine, the physician must document to the board that that the provision of care by telemedicine is in his or her scope of practice and that the NP or PA has demonstrated competence in the provision of care by telemedicine.

(6) Patients treated by electronic or other such means or patient's agent **must be given the name, credentials and emergency contact information for the Georgia licensed physician, physician assistant and/or advanced practice registered nurse providing the treatment or consultation**. Emergency contact information does not need to be provided to those treated within the prison system while incarcerated but should be provided to the referring provider. For the purposes of this rule, "credentials" is defined as the area of practice and training for physicians, and for physician assistants and advanced practice registered nurses, "credentials" shall mean the area of licensure and must include the name of the delegating physician or supervising physician;

(7) The patient being treated via electronic or other means or the patient's agent **must be provided with clear, appropriate, accurate instructions on follow-up in the event of needed emergent care** related to the treatment. In the case of prison patients, prison staff will be provided this information if the consult is provided to an inmate; and

(8) The physician, physician assistant or nurse practitioner who provides care or treatment for a patient by electronic or other such means **must make diligent efforts to have the patient seen and examined in person** by a Georgia licensed physician, physician assistant or nurse practitioner **at least annually**.

(b) This rule should not be interpreted to interfere with care and treatment by telephonic communication in an established physician-patient relationship, call coverage for established physician-patients relationships, or telephone and internet consultations between physicians, nurse practitioners, physician assistants, other healthcare providers or child protection agencies.

(c) This rule does not authorize the prescription of controlled substances for the treatment of pain or chronic pain by electronic or other such means. All treatment of pain or chronic pain must be in compliance with Rule 360-3-.06.

(d) Nothing in this rule shall excuse a physician, nurse practitioner or physician assistant from ordering appropriate laboratory or other diagnostic tests needed to make diagnoses within the minimum standard of care.

(e) Nothing in this rule shall supersede any requirements provided for by other rules or laws.

(f) Licensees practicing by electronic or other means **will be held to the same standard of care** as licensees employing more traditional in-person medical care. A failure to conform to the appropriate standard of care, whether that care is rendered in person or via electronic or other such means, may subject the licensee to disciplinary action by the Board.