<pre>
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                      CASE NO. 18-cr-20710-CMA
 3

 4    UNITED STATES OF AMERICA,        Miami, Florida

 5              Plaintiff,             October 8, 2019

 6         vs.                         11:00 a.m. to 11:48 a.m.

 7    SENTHIL RAMAMURTHY, et al.,      Courtroom 12-2

 8              Defendants.            (Pages 1 to 39)

 9   ─────────────────────────────────────────────────────────
                         STATUS CONFERENCE
10            BEFORE THE HONORABLE CECILIA M. ALTONAGA,
                     UNITED STATES DISTRICT JUDGE
11

12    APPEARANCES:

      FOR THE GOVERNMENT:    KEVIN J. LARSEN, ESQ.
13                           ANA M. MARTINEZ, ESQ.
                             Assistant United States Attorney
14                           99 Northeast 4th Street
                             Miami, FL 33132
15                           (305) 961-9001
                             kevin.larsen@usdoj.gov
16                           ana.maria.martinez@usdoj.gov

17    FOR DEFENDANT          GREGG L. BERNSTEIN, ESQ.
      SENTHIL RAMAMURTHY:    Zuckerman Spaeder, LLP
18                           100 East Pratt Street, Suite 2440
                             Baltimore, MD 21202-1031
19                           (410) 949-1152
                             gbernstein@zuckerman.com
20

21    FOR DEFENDANT          DAVID O. MARKUS, ESQ.
      MANDALA RAMAMURTHY:    ANITA M. MOSS, ESQ.
22                           Markus/Moss, PLLC
                             40 NW 3rd Street, Ph 1
23                           Miami, FL 33128-1838
                             (305) 379-6667
24                           dmarkus@markuslaw.com
                             mmoss@markuslaw.com

25
</pre>

```
 1    APPEARANCES CONTINUED:

 2     FOR DEFENDANT        RYAN K. STUMPHAUZER, ESQ.
       ANTHONY MAUZY:       ERICA PERDOMO, ESQ.
 3                          Stumphauzer & Sloman
                            SunTrust International Center
 4                          One SE 3rd Avenue, Suite 1820
                            Miami, FL 33131-1704
 5                          (305) 371-9686
                            rstumphauzer@sslawyers.com
 6

 7     FOR DEFENDANT        JEFFREY D. MARCUS, ESQ.
       JOHN SCHOLTES:       DANIEL L. RASHBAUM, ESQ.
 8                          Marcus Neiman & Rashbaum, LLP
                            2 South Biscayne Blvd, Suite 1750
 9                          Miami, FL 33131-1815
                            (305) 400-4262
10                          jmarcus@mnrlawfirm.com
                            drashbaum@mnrlawfirm.com
11

12     REPORTED BY:         STEPHANIE A. McCARN, RPR
                            Official Court Reporter
13                          400 North Miami Avenue
                            Twelfth Floor
14                          Miami, Florida 33128
                            (305) 523-5518
15                          Stephanie_McCarn@flsd.uscourts.gov

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2                         WITNESSES


3     WITNESSES FOR THE GOVERNMENT:                    Page

4                                                       --

5

6     WITNESSES FOR THE DEFENDANTS:                    Page

7                                                       --

8     EXHIBITS IN EVIDENCE        PRE     MARKED   ADMITTED

9     Government's Exhibit No.     --       --       --

10    Defendants' Exhibit No.      --       --       --

11

12

13

14

15

16
                         MISCELLANEOUS
17
                                                     Page
18    Proceedings....................................   4
      Court Reporter's Certificate....................  39
19

20

21

22

23

24

25

```
 1          (The following proceedings were held at 11:00 a.m.)
 2              THE COURT:  Good morning.  United States and Mangala
 3     Ramamurthy, Senthil Ramamurthy, Anthony Mauzy, Thomas Sahs,
 4     Rajesh Mahbubani and John Scholtes.
 5              Please state your appearances.
 6              MR. LARSEN:  Good morning, Your Honor, Kevin Larsen on
 7     behalf of the United States.
 8              MR. BERNSTEIN:  Good morning, Your Honor, Gregg
 9     Bernstein on behalf of Senthil Ramamurthy, who is seated to my
10     left.
11              THE COURT:  Good morning.
12              MR. D. MARKUS:  Good morning, Your Honor, David Markus
13     and Margo Moss for Dr. Mangala Ramamurthy, who should be on the
14     line.
15              THE COURT:  Ms. Ramamurthy, are you on the phone?
16              DEFENDANT M. RAMAMURTHY:  This is Dr. Mangala
17     Ramamurthy.  Good morning.
18              THE COURT:  Good morning.
19              MR. STUMPHAUZER:  Good morning, Your Honor.  Ryan
20     Stumphauzer and Erica Perdomo on behalf of Anthony Mauzy.  I'm
21     also standing in today for Andrew Feldman and Marissel
22     Descalzo.
23              THE COURT:  Okay.  Do we have Anthony Mauzy on the
24     phone?
25              DEFENDANT MAUZY:  Yes, I'm here.  Good morning.
```

```
 1              THE COURT:  All right.  Do we have Mr. Sahs on the
 2  phone?  Thomas Sahs?
 3              DEFENDANT SAHS:  Yes, Your Honor, this is Thomas.
 4              THE COURT:  Thank you.
 5              And Mr. Mahbubani?
 6              DEFENDANT MAHBUBANI:  Yes, that's correct.  I'm here.
 7              THE COURT:  Very good.
 8              DEFENDANT MAHBUBANI:  Good morning.
 9              THE COURT:  Thank you.
10              And for John Scholtes?
11              MR. J. MARCUS:  Good morning, Your Honor, Jeff Marcus
12  and Dan Rashbaum on behalf of Mr. Scholtes, who is present
13  beside me in court.
14              THE COURT:  Good morning.
15              All right.  So I would ask the Government, Mr. Larsen,
16  to give me an update, please.
17              MR. LARSEN:  Thank you, Judge.  Last week, among other
18  things, the Government exchanged or provided its witness
19  summaries for -- under the Rule 16(g) expert disclosures.
20  We've noticed up two witnesses as subject matter, two witnesses
21  that are a program, and one, a fifth witness that is -- might
22  be more of a summary, but in an abundance of caution noticed up
23  the five total individuals as potential expert witnesses.  I
24  haven't had a chance to discuss those summaries with any of the
25  Counsel for Defense at this point.  I know that they were just
```

1    exchanged on the first.

2            With respect to discovery, we continue to provide

3    early *Jencks* and materials that are required under Rule 16 to

4    the various Defendants.  This morning provided to Mr. Bernstein

5    copies of all of the e-mails that were referenced -- the

6    e-mails that were referenced in last week's revocation hearing

7    as well as the other -- or, excuse me, text messages that the

8    Court -- we did not include with the submission to the Court

9    but that are relevant to the case.  So we continue to provide

10   discovery.

11           That's -- that's essentially it from the Government's

12   perspective at this point.  And I am happy to discuss any

13   questions the Court might have.

14           THE COURT:  All right.  Thank you very much.

15           Mr. Markus.

16           MR. D. MARKUS:  Thank you, Your Honor.  So if I could

17   just give some more details to the Court.  On October 1st we

18   received from the Government a list of five expert witnesses.

19   This is more than we had been told in the past but whatever.

20   Hey gave us five people they intend to call.  We received their

21   CVs, which is required.  We received one expert report for one

22   of the five but have not been provided reports for four of the

23   five; so those reports are still outstanding.

24           We did get short summaries for those other four, but

25   those summaries are very general in nature.  For example, they

1    say things like, We've reviewed patient files, without saying

2    which files or what was actually reviewed.  They say things

3    like, There were violations of Medicare rules, but we don't

4    know which rules they are referring to or what the basis of

5    that opinion is.

6         So I think what we are asking for at this hearing is

7    to be provided expert reports for the other four experts.  And

8    we'd also like to know the basis for those expert opinions,

9    what patient files have been reviewed, what materials have been

10   reviewed and so on.

11        There are in the summaries a lot of conclusions and

12   opinions, things like a dermatologist will say something like,

13   It is my opinion, therefore, that these tests were ordered for

14   financial reasons and not for medical reasons.  So there are

15   lots of opinions like that that are not appropriate for expert

16   analysis; so I think, and I'm sort of speaking -- if people

17   have additional things to say, I think what we'd like to do is

18   set up a hearing for *Daubert* so that we can question the

19   experts as to how they reached some of these conclusions,

20   whether they are based on science or what they are based on

21   because it's impossible to tell from the few paragraphs that

22   we've been provided.

23        But maybe we can do it in a step-by-step basis, which

24   is get the reports for the other four, then file our motion for

25   *Daubert*, or if the Court just wants to set it now, and then we

1    can, you know, file the motions on a briefing schedule,

2    whatever the Court prefers on that.

3            THE COURT:  All right.

4            Mr. Larsen, why don't we have reports for the other

5    four?

6            MR. LARSEN:  Well, we do have reports, Your Honor,

7    summaries of what the witnesses are going to say.  Now, in --

8    in fairness some of the summaries are more detailed than

9    others.  The experts that prepared those summaries, for

10   example, the dermatologist that Mr. Markus talks about, that

11   was the report that was very detailed.  That was the one that

12   he says they received a, quote/unquote, report for.  But there

13   are summaries provided that, I guess, I can try to answer the

14   various points raised by Mr. Markus.

15          The materials that were reviewed were provided to the

16   Defense in discovery.  I have had in -- I've engaged with them

17   when they have asked questions about what specific materials,

18   they're usually related to counts in the indictment.  I

19   certainly -- if the Court feels we should provide specific

20   information as to what specific documents in the case that

21   these experts have reviewed, but they -- they gave a summary of

22   their opinion.

23          For example, the dermatologist gave a summary of his

24   opinion.  His -- his -- one of his conclusions was that the

25   scheme was set up for financial -- for financial purposes and

```
 1    not for medical necessity.  That's -- that is the summary of

 2    his opinion.  He will testify to that.  He is at least subject

 3    to cross-examination.  They do have a detailed report.

 4            Now, with respect to the -- again, to the others, two

 5    of those are program witnesses, for example, one of which was a

 6    Medicare witness.  The summary stated that the Medicare witness

 7    looked at the claims data and will -- will talk about what the

 8    requirements are for payment of claims, what the regulations

 9    are related to the payment of claims, and ultimately will make

10    the -- render the opinion that these types of claims would not

11    have been paid for under the, for example, the requirements for

12    genetic testing.

13            The same goes for the TRICARE witness.  The TRICARE

14    witness will talk about the rules and regulations related to

15    payment of claims.  He examined the claims, looked at the

16    claims, the specific claims that are articulated in the

17    indictment, and we'll talk about what the rules and regulations

18    are with respect to the payment of claims, the use of

19    telemedicine in the TRICARE program.  So that's all

20    contained -- that's all contained in the witness summaries.

21            The fourth witness was the genetic testing expert, and

22    there was a summary again.  This is a summary of what the --

23    each of the witnesses were going to say.  We disagree that it's

24    not --

25            THE COURT:  So if you are going to be receiving --
```

```
 1   first of all, you can't file Daubert motions without conferring
 2   with the Government.
 3              MR. D. MARKUS:  Of course.
 4              THE COURT:  The conferral requirement applies to those
 5   as well.
 6              MR. D. MARKUS:  Of course.
 7              THE COURT:  But assuming the Daubert motions are
 8   filed, are you prepared to rest on those summaries to defend
 9   any forthcoming Daubert motions?  Because I don't have to give
10   a Daubert hearing.  I'm sure the Defendants would like to have
11   the experts here and be able to cross-examine them.  And I'm
12   sure you would rather that they not do that.
13              So in responding to forthcoming Daubert motions, are
14   you prepared simply to rest on these summaries and tell me that
15   they withstand a Daubert challenge only on the basis of what
16   you have given the Defendants, or would you need to draw upon
17   something more to explain methodologies or analyses or how they
18   arrived at certain conclusions?
19              MR. LARSEN:  I don't believe that there is an -- there
20   are additional methodologies that need to be explored.  I
21   believe that the witnesses will be -- obviously be subject to
22   cross-examination and --
23              THE COURT:  No, because I don't need to give a Daubert
24   hearing.  I can resolve Daubert motions on paper.  So can I
25   resolve these on paper is my question.
```

1          MR. LARSEN:  Certainly, with respect to the two

2    subject matter experts.  The -- I believe the Court can on

3    paper look at -- on paper their qualifications and the summary

4    of what they are going to testify to resolved to whether or not

5    an actual official *Daubert* hearing is necessary.  The other

6    two, again, we noticed these up as -- out of an abundance of

7    caution based on some Eleventh Circuit precedent.  We don't

8    believe that they are actual experts; they are subject matter

9    experts and only in the -- in terms of what they will report as

10   to program requirements.  But they are in a different category

11   of witnesses than, say, the two subject matter, the genetic

12   testing expert, the dermatologist and the telemedicine expert.

13          Nevertheless, CVs for all of the witnesses were

14   provide to the Defense and a summary, an accurate summary of

15   the essential nature and basis of their conclusions were

16   provided.

17          THE COURT:  See, at trial you would be limited to

18   eliciting that which you supplied in writing.  You understand,

19   you can't go beyond that.

20          MR. LARSEN:  Understood.

21          THE COURT:  You can't add to it.

22          MR. LARSEN:  Understood, Your Honor.

23          THE COURT:  So the question is, you're all going to be

24   conferring about these before any *Daubert* motions are filed.

25   And when and if they're filed, the Government has to be able to

1    tell me based upon these written summaries, that's all we've

2    got, and that's all they're going to talk about on the stand,

3    and that's all we need to defend these *Daubert* motions.

4           MR. LARSEN:  Your Honor, I would just respectfully

5    request an opportunity to confer with Counsel.

6           THE COURT:  Oh, of course.

7           MR. LARSEN:  I haven't had an opportunity to actually

8    do that on this specific issue.  In fact, this week I did speak

9    with -- I spoke with Mr. Markus yesterday, and he said, well,

10   what's the point of tomorrow's hearing; do you know?  So we

11   didn't have a chance to talk about that.  We didn't confer.

12          I had a similar -- similar conversations.  I don't

13   think -- what I said was I think that the point was to talk

14   about our submissions, but we didn't have any substantive

15   discussions about those submissions.  So I would like the

16   opportunity before committing to answering the Court's --

17          THE COURT:  All right.

18          MR. LARSEN:  To at least confer with Counsel.  Because

19   we did not --

20          THE COURT:  All right.  So if the Defense thinks the

21   reports are incomplete and would like something more, you can

22   all discuss that with Mr. Larsen.  And if you're going to be

23   providing any different or more fulsome reports, do that.  And

24   when and if a *Daubert* motion is filed after you are unable to

25   reach agreement, I may not set it for hearing, Mr. Markus.

1    I'll resolve it on paper.

2            MR. D. MARKUS:  Totally understand, Your Honor.  And

3    I --

4            THE COURT:  With the understanding that that's all the

5    Government's going to be eliciting from those witness on the

6    stand, nothing more.

7            MR. D. MARKUS:  I get it, and I totally understand

8    what the Court has said.  I'm not sure I understand what

9    Mr. Larsen said for the last couple minutes, but I will read to

10   the Court just so the Court understands what the summaries are

11   that we've received just so you have a sense.

12           Here's one summary.  "Dr. Gerard will opine, among

13   other things, as to whether the medical records and claims data

14   could support a finding that the tests were reasonable and

15   necessary under the applicable regulations governing

16   reimbursement by Medicare."

17           That's not -- that's not --

18           THE COURT:  But that's all he can say.  So you might

19   like that.  You might want just that because I won't allow more

20   than that.

21           MR. D. MARKUS:  Understood.  I understand where the

22   Court's coming from; so we will confer then with the

23   Government, and if appropriate, we will file motions on

24   *Daubert*.  Should we set a briefing schedule or just we can

25   address that?

```
 1              THE COURT:  Well, I think you have the -- the motions
 2    deadline is November 8th, right?
 3              MR. D. MARKUS:  Very good.
 4              THE COURT:  I don't want to see separate Daubert
 5    motions.  I want to see one Daubert motion that challenges any
 6    and all experts.
 7              MR. D. MARKUS:  Understood.  And so that's one issue I
 8    will confer with Mr. Larsen about and then file motions
 9    appropriate, we will as the Defense.  The other issue that just
10    comes up from the report is that a lot of these witnesses
11    purport to summarize data without -- and we haven't been
12    provided with those summary charts of the summary; so I will
13    confer with Mr. Larsen about that as well.  But we'll need to
14    file motions by that November date, and I take it that if we
15    don't have the summary charts or summary data --
16              THE COURT:  Then that -- how helpful will their
17    testimony be to the jury when they can't be talking about
18    summaries or charts that aren't coming hand in hand with these
19    reports?
20              MR. D. MARKUS:  Understood.  Thank you, Your Honor.
21              MR. J. MARCUS:  Thank you, Your Honor.
22              Your Honor, I think your position makes a lot of
23    sense.  I just want to make sure that it's firm because we have
24    expert deadlines coming up at the end of the month.  If they're
25    going to -- if we're travelling on this filing, this nine-page
```

```
1    summary that they filed and will brief the expert testimony,
2    that's fine.  But I don't want to be in a situation where they
3    get another bite at the apple, and now we have more -- and all
4    of a sudden we are having to scramble to find, like,
5    effectively experts to rebut specific testimony that's not
6    provided.
7              THE COURT:  That's a very good point.  No.  That's why
8    you have a rebuttal expert.  It's not to then let the party who
9    disclosed an expert go back and say, oops, here are all the
10   other areas that I would like my expert to talk about that I
11   did not disclose.  It behooves the Government to provide
12   complete reports.  No depositions of experts are taken.  This
13   is not a civil case where you can explore them.  Even if a
14   deposition were taken, a party should not be ambushed at
15   deposition or have to find out for the first time an opinion
16   that was not disclosed in a report.
17             So to be absolutely clear, if these are the reports
18   the Government is relying upon, the information that is
19   contained within them, that is the universe of what the
20   Government can have the jury hear from the expert's mouth at
21   trial.
22             And I don't think that's what you want, Mr. Larsen.  I
23   think you want more detail.  I think you want more
24   explanations.  I think you want to be showing charts and graphs
25   and walking that expert through to inform the jury.  But you're
```

```
 1    not going to do that for the first time at trial if you haven't
 2    given this information to Defense Counsel in these reports, and
 3    you're not allowed to supplement these reports after the
 4    Defendants have then disclosed to you their rebuttal experts.
 5    That's not the time to do it.  All right?
 6              MR. J. MARCUS:  Okay.
 7              THE COURT:  Mr. Stumphauzer.
 8              MR. STUMPHAUZER:  Good morning, Your Honor.
 9              THE COURT:  Good morning.
10              MR. STUMPHAUZER:  You know, I think the fundamental
11    problem with that, and I'll start with I might have a little
12    less of an issue or a problem than Mr. Marcus, for example,
13    because several of these experts are testifying only on the
14    genetic testing in which the three MHQB Defendants are not
15    charged.  But with that caveat, I think the prospect of the
16    Government supplementing these reports is problematic.
17              So, for example, among many other topics in this case
18    that they are proposing to offer testimony on, really what this
19    does is describe in very broad terms the subject matter but not
20    their conclusions.  So one important issue, for example, would
21    be this witness is going to describe the process by which
22    TRICARE approves claims but doesn't describe the process and
23    doesn't describe in any way what he'll say about the process or
24    how the process works.  It just says this will be included
25    within the testimony.
```

1          Now, if you --

2          THE COURT:  So then that witness at trial would say

3     there is a process by which TRICARE approves claims, period.

4          MR. STUMPHAUZER:  And that's great.

5          THE COURT:  That would be it.

6          MR. STUMPHAUZER:  And I would be comfortable with

7     that.

8          THE COURT:  That would be it.

9          MR. STUMPHAUZER:  And I think that would be fair and a

10    just outcome.  But the problem is if that nine-page summary

11    turns into a 30-page summary, and now we're in a position where

12    we have an October 29th deadline to submit our own expert

13    report.  The problem with that is I don't know what I'm

14    rebutting at this point.  And if the Court were to allow the

15    Government to supplement, I just don't see any world in which

16    we could come close to meeting that deadline.

17         THE COURT:  You can't.

18         MR. STUMPHAUZER:  Right.  And so I think what we ought

19    to do is --

20         THE COURT:  So how much time were you given originally

21    between the tendering of the reports and your own rebuttal

22    reports?

23         MR. STUMPHAUZER:  One month.  So --

24         THE COURT:  One month.  So whenever you get the

25    supplement, you'll have a month from then.

1             MR. STUMPHAUZER:  Okay.  One other issue I want to

2    bring up, Your Honor --

3             THE COURT:  If you get a supplement.

4             MR. STUMPHAUZER:  Thank you.  One other issue I wanted

5    to bring up, and I think this is more for the Court's

6    consideration for file administration purposes.  It's not very

7    clear to me because the summaries are so brief, but it appears

8    to me that there are some experts that would be offering

9    testimony, particularly about the programs, that would relate

10   both to the MHQB Defendants and would offer testimony that it's

11   only relevant to the genetic testing Defendants.  So for that

12   reason, I would just ask the Court to consider the prospect

13   of -- I actually think we'll need to divide their testimony to

14   be suitable in front of the two different juries.

15             And the issue that causes, presumably, is we also have

16   to split the cross-examinations so that they would only see the

17   portions of the direct testimony and the cross-examination

18   testimony that is relevant to those separate juries.  I think

19   it's going to create somewhat of a procedural headache.  And in

20   theory it might sound as though they can be separated, but I

21   think in practice it's going to be maybe a little bit more of

22   an issue than we can all envision right now.  So I just wanted

23   to put that on the Court's radar.

24             And I think this is most pronounced, for example,

25   there's a medical doctor that I understand is going to testify

```
 1    in very medical terms just about the genetic testing.  That to
 2    me is fairly easy.  Maybe the jury is dismissed during his
 3    testimony, you know, as to the -- MHQB jury could be dismissed.
 4    But on other experts, for example, that are going to talk about
 5    very important topics about program rules, how the program
 6    processes claims, you know, I'm not sure you can strain blood
 7    from the water.
 8            I just -- I'm not sure how that's going to work.  And
 9    I just want the Court to consider that in advance and maybe the
10    Government could consider it as well when drafting its
11    supplements if it chooses to do so.
12            THE COURT:  All right.  Thank you.  Any other issues?
13            MR. D. MARKUS:  I think that's it, Your Honor.
14            THE COURT:  Do we need a deadline for the Government
15    to supplement these reports if it chooses to do so?
16            MR. STUMPHAUZER:  Your Honor, the -- another problem I
17    did not bring up is -- yes, so their deadline was the 1st, ours
18    is the 29th.  The motion in limine deadline, I believe, is the
19    8th or the 9th.
20            THE COURT:  8th.
21            MR. STUMPHAUZER:  And so, right, that's going to
22    create a timing problem --
23            THE COURT:  Right.
24            MR. STUMPHAUZER:  -- because if they supplement at the
25    end of the month, for example, and then we have a month to file
```

1    our reports, now we've blown all the motion *in limine*

2    deadlines.

3            THE COURT:  Well, no, it's your motions, right, that

4    you are worried about.

5            MR. STUMPHAUZER:  Yeah, but doesn't that leave us in a

6    time crunch.  I mean, if there's no -- I mean, I think

7    essentially what we are going to need is extra time if those

8    reports are supplemented because let's say that he files a

9    supplement, which the Court's allowed him to do, as I

10   understand it, on the 20th or the 25th, you know, to file the

11   appropriate motions, we may need to consult with experts of our

12   own to know the appropriate arguments to make.  So I just -- I

13   think it creates a timing issue.  You know, every deadline

14   affects the others.

15           THE COURT:  Correct.

16           Mr. Larsen?

17           MR. LARSEN:  Well, the Government would be amenable

18   to -- I'm going take a closer look at these supplements.  I

19   don't have the benefit of my trial partner today.  I'm going to

20   have time later this morning to confer with her to where -- if

21   and where we need to shore up some of these -- some of these

22   summaries.

23           I would like the opportunity to reach out, too, to

24   Defense Counsel to more precisely identify, you know, to confer

25   with them to more precisely identify where we can supplement to

```
 1    better assist them.  We would be amenable to some flexibility
 2    on -- if the Court, if it pleases the Court on motions in
 3    limine.
 4            I don't anticipate that this -- the summary process or
 5    the supplement process, if the Government chooses to pursue
 6    that avenue, would take an extended period of time.  I -- with
 7    respect to the program witnesses, I mean, I think when we're
 8    talking about reasonable and necessary, that's language in the
 9    regulations.  So when the witness is saying they are going to
10    opine about whether this is a reasonable and necessary claim,
11    it's not necessarily -- it's not a medical expert type
12    analysis.  It is would Medicare deem this?  What are the rules
13    for payment of genetic testing?  Would Medicare determine that
14    these are medically reasonable and necessary to the payment of
15    the claim?
16            And we don't need to get into the minutia here, but
17    certainly I would like to take a closer look at each of their
18    reports, confer with Counsel within the next week or so.  If
19    the Court could give us until the end of next week to confer
20    with Counsel and provide supplements, that might give the
21    parties additional time.  I don't -- I'd have to look at my
22    calendar, but I could certainly confer with Counsel this week,
23    and we could get to working on providing any supplements by the
24    end of next week, which would be the 18th.  I know Monday is a
25    holiday, but certainly we can --
```

1          THE COURT:   That would give Defendants three weeks to

2    file any motions related to these experts.

3          MR. D. MARKUS:   That's not a problem, Your Honor.   The

4    filing of our motions, I don't think that's the issue.   It's

5    finding our experts.   So if we have a month from the

6    supplement --

7          THE COURT:   Correct.

8          MR. D. MARKUS:   -- that's not a problem.   Three weeks

9    to file our motions on *Daubert*, that's not a problem.

10         THE COURT:   All right.   So any supplements to these

11   reports have to be provided by October 18.

12         MR. STUMPHAUZER:   One other issue, Your Honor, that

13   occurs to me, and as you may recall we have a -- what, in my

14   opinion anyhow, is a very unusual 404(b) issue.   I think

15   normally when making a determination about whether, you know,

16   404(b) evidence comes in, it's just an analysis of prejudice

17   and its probative value.   Here is the only circumstance I'm

18   aware of where the issue is completely different, and that is

19   that the evidence that the Government proposes to put in, I

20   don't believe is illegal.

21         To help frame this up, we asked the Government to

22   identify what was related to separate behavior in California.

23   And what the Government noticed up is that they believe it is

24   illegal under California law.   If you were, you know, in a gun

25   case or drug case talking about at prior robbery or conviction,

whether it's illegal is very clear.  Here it's not.  California

has got laws that are analogous to, for example, the federal

antikickback statute, the federal Stark law, the Florida

anti-patient *[sic]* brokering act.  But all of those laws have

many exceptions and safe harbors.

So to help, kind of, narrow this issue, we had asked

the Government previously to identify what laws they were

alleging were broken.  To Ms. Martinez's credit, you know, I

think she wanted to do some reach out.  But, I guess, what I

wanted to flag for the Court is, I think it's a very unusual

404(b) issue and one that could create quite a sideshow at

trial because depending on what exactly the Government intends

to put in, we may seek to put on an expert that actually says

the conduct was not illegal at all.  And we might also have to

seek jury instructions about the safe harbors and exceptions to

see if any of them apply.

So I guess I just wanted to flag that it's a very

unusual 404(b) issue and one on which we might actually seek a

hearing, because if the Court were to conclude, for example,

that the behavior was not unlawful, that there is a safe harbor

that arguably applies, I think that would be a legitimate basis

to keep it out.  Or if the Court decides that there would be so

much testimony about whether or not it's lawful, I think the

Court could clearly keep it out because it would just

complicate the trial and confuse the jury.  But I have never

```
 1    had a 404(b) issue where the actual issue was whether it's

 2    illegal or not.

 3             MR. LARSEN:  Your Honor, I think, as I stated at the

 4    last status conference, it's not the -- Rule 404(b) pertains to

 5    crimes, wrongs or other acts.  And we certainly -- it's the

 6    Government's contention that certain provisions of California,

 7    substantive California law with relation to kickback or

 8    referral arrangements were violated.  But as I stated at the

 9    last status conference, it's also the Government's position

10    that this is a continuation of inextricably intertwined

11    evidence of violation of federal law as well, the healthcare

12    fraud.  So I don't think that it's necessary for us to get into

13    an expert about whether or not there are applicable safe

14    harbors that apply.  Again, it's our -- it's our position that

15    these are -- not only are they crimes, but they are other acts

16    and that they are -- we are offering them to probe -- to show

17    motive, opportunity, intent.

18             You know, so I don't think -- respectfully to

19    Mr. Stumphauzer, I don't think we need to go down the rabbit

20    hole of looking at California law, whether it's illegal there

21    and legal -- and it's not a federal crime because of the

22    applicability of safe harbors.  I think this is all very much

23    cleaned up by this is other evidence, and the federal

24    healthcare fraud statute does apply.

25             THE COURT:  Except you also labelled it as other
```

crimes.  You are saying it's other crimes as well as other

acts.

          MR. LARSEN:  Correct.

          THE COURT:  And to the extent that you're trying to

present or thinking about presenting this as evidence of other

crimes, the Defense is entitled to defend and show they are not

crimes, in fact, but lawful conduct in the state where they

were being conducted and performed.

          MR. LARSEN:  We can --

          THE COURT:  Which also prolongs the trial, so.

          MR. LARSEN:  We certainly can -- and certainly that is

not -- the intent is not to prolong the trial, but the intent

is also to answer some of the Court's earlier inquiries about

the nature of these, sort of, the bookend conspiracies.  But

it's the Government's position that this isn't a situation of

bookend conspiracies.  This is a -- this was a conspiracy that

started in 2014 and continued -- it starts with TRICARE and

ends with Medicare, but in the mid -- the middle of the this

period of time, there is a continuation of a scheme which -- we

can certainly supplement our 404(b) notice, but a continuation

of a scheme that violates the federal healthcare fraud statute,

which is a scheme that can target federal programs or private

programs.  And in that case, the $10 million that are at issue,

at least $10 million that are at issue targeted a labor union,

the California Longshoremen --

1           THE COURT REPORTER:  I'm sorry.  Can you slow down,

2    please.

3           MR. LARSEN:  Oh, sorry.  Excuse me.

4           -- targeted a long -- a union.  Now, all of this

5    evidence has been provided to Defense.  In fact, much of the

6    evidence with respect to the California Longshoremen was

7    provided to the Government by the Defense.  So there isn't an

8    issue of, you know, surprise on respect to what the evidence

9    is, but I certainly take the Court's point, and we can -- and I

10   want to make sure that the record is clear that it isn't the

11   Government's intention that this is just an issue of violation

12   of a narrow antikickback law in California, but it violates the

13   healthcare fraud, the federal healthcare fraud statute as well

14   as it's evidence of other acts.

15           And certainly we can file an amended -- or a amended

16   404(b) notice to better lay that out if the Court feels

17   necessary.

18           MR. STUMPHAUZER:  Your Honor, I guess my immediate

19   reaction to that is they are putting that evidence in, whether

20   they want to label it a crime or another act or something just

21   to show a continuance.  What I want to show through an expert

22   is that was an act that was not illegal.  So act, crime,

23   continuation, all the same from my perspective.  And I think

24   what they are trying to show is, you know, sort of, and he just

25   said it this ongoing nature of the conspiracy and the bookends,

1    and you have already ruled that they are separate conspiracies,

2    and so therefore we have to have separate juries.

3         And so I think that's, kind of, already been decided

4    upon.  And all I would emphasize is no matter which -- what are

5    those words they are traveling under under Rule 404(b), my

6    perspective on it would be the same, which is that I would want

7    to call someone to talk about why it's not illegal.

8         THE COURT:  All right.

9         MR. STUMPHAUZER:  And the fact that they actually

10   sought legal advise.  And, by the way, to be clear, yeah, they

11   did turn over the evidence, and a lot of it came from us.  So

12   this is not an issue of surprise.  I'm not claiming a lack of

13   discovery on the issue.  Instead, I'm -- what I'm saying is I

14   need an opportunity to rebut it.

15        THE COURT:  Well, to rebut the Government's intended

16   use of it, right?

17        MR. STUMPHAUZER:  Correct, yes.

18        THE COURT:  All right.  All right.  Any other issues?

19        MR. J. MARCUS:  Just very small point, Your Honor, on

20   this pretrial motion.  If, in fact, they do file the supplement

21   on the 18th, does our motions to exclude their experts, that

22   would be -- that would move back, I mean --

23        THE COURT:  No, you'd have three weeks.  You would

24   have until November 8th.

25        MR. J. MARCUS:  To me that's a little tight usually

1    because I usually consult with experts to work on -- I think

2    the rest of the pretrial motions are not an issue, but I would

3    just have our rebuttal reports and our motions to exclude their

4    experts, I would just move that deadline.

5           THE COURT:  Why -- first of all, let's not assume

6    you're going to move to exclude every expert.  Let's assume

7    that the Government is going to give you fulsome reports that

8    can withstand a *Daubert* challenge, all right?  I mean, you're

9    all assuming all five of these folks are susceptible to a

10   Daubert challenge because the reports are not in the nature of

11   true expert reports.

12          So let's give the Government a chance to clean it up,

13   and let's assume that some of these are sufficient.  And as to

14   the ones that you are going to be challenging, you have three

15   weeks.  You already have a sampling of what it is the

16   Government wants to present.  Start showing that to your

17   experts and putting together whatever challenge you think

18   you're going be mounting.  And you're going to be conferring

19   with the Government before you file those motions.  You're

20   going to be pointing out deficiencies you see in the report and

21   ways in which you think you're going to be challenging that

22   expert.

23          You are not going to present that challenge for the

24   first time in the motion.  You're going say to the Government,

25   here are the problems I have with expert X, and this is the

aspect of *Daubert* that I don't think expert X satisfies.  And

you'll have that discussion because I don't want to see it for

the first time in the motion.

And don't assume you're going to file *Daubert* motions

to then get a *Daubert* hearing.  My intention is to resolve

these on paper because the Government will be limited to

whatever is on paper to defend the methodology and to defend

the experts' conclusions and opinions.  Otherwise it's just a

way to take an expert's deposition.

MR. J. MARCUS:  Okay.  Very well.

MR. D. MARKUS:  We just don't want to extend the trial

with questions under a process which come up under *Daubert*, but

we understand where the Court's coming from, and we'll file the

appropriate motions when we get their supplement; so we get it.

THE COURT:  Okay.  Anything else?

Ms. Martinez, I know you arrived late.  Any issues or

concerns?

MS. MARTINEZ:  Well, number one, Your Honor, I had

Mr. Larsen cover because I had a medical appointment.

THE COURT:  That's all right.

MS. MARTINEZ:  That's really too difficult to switch.

And I want to be all together for this team.  Well, yeah, I --

and apologize, again, that I missed a little bit of it.  I just

want to clarify what the Court wants in addition.  My

understanding, of course, of criminal -- I've worked both

civil -- large, very large civil healthcare fraud cases, and

I've done very large criminal cases, and what we do in them are

different, although it's all in the discretion of the Court

what you wish.

Obviously, we try to aim at the criminal rules with

respect to summaries, et cetera, that we provided.  But I want

to make sure that I understand that I think I missed is what

would you like additional.

THE COURT:  Right.  What I told Mr. Larsen is an

expert summary or report is the testimony and evidence you

intend to have that expert provide at the time of trial.  It's

not, sort of, like a condensed version, it's not like bullet

points.  So you can't then have the expert on the stand giving

descriptions and background and lengthy foundation for opinions

that you didn't disclose in that report, no different than in a

civil case.  So there are no depositions taken.  But by the

same token, a defendant should not be hearing from the expert's

mouth for the first time at trial that which should have been

revealed in the report.

Now, Mr. Markus began today's status conference by

commenting on some of the issues with these expert summaries.

One of them, for example, says, Expert X will opine among other

things and so on.  Well, no, the "among other things" is left

to the imagination of the reader, and that's not what an expert

report does.

1          And the Defendants began by talking about a *Daubert*

2    hearing and setting these experts for *Daubert* hearing.  I'm not

3    necessarily going to have a *Daubert* hearing.  So I told

4    Mr. Larsen when you -- when and if, after conferring with

5    Defense Counsel, *Daubert* motions are in fact filed, are you

6    prepared to defend those *Daubert* motions based solely on the

7    expert summaries/reports that you've provided?  And are you

8    prepared to go to trial limiting yourself and your experts to

9    that which was disclosed in those expert summaries and reports?

10         So to the extent at expert summary or report talks

11   about graphs or charts and they are not accompanying the

12   report, well, golly, the jury is not going to see that graph or

13   chart at the time of trial, right?  So the report needs to be a

14   substitute for that which your expert is going talk about at

15   the time of trial.  It needs to be thorough and complete.

16         MS. MARTINEZ:  It's helpful to hear.

17         THE COURT:  There is no deposition of an expert can be

18   taken, and I am not going to sit here while you all take a

19   deposition under the guise of a *Daubert* hearing.

20         MS. MARTINEZ:  It's helpful to hear what you envision.

21   It sounds to me closer from summary to -- closer to what a

22   civil expert report, which is fine, if you would like us to do

23   that here, and also closer to actual trial testimony, which we

24   have not prepared these witnesses for trial.  And one of the

25   challenges, and I am looking forward to bringing you another

```
 1      visual to summarize the -- to summarize the magnitude of this
 2      case.  But one of the challenges that both of us had in working
 3      with these experts is, again, the magnitude of the case.  So we
 4      could not bombard in a -- at this disclosure stage these
 5      experts with everything that could possibly come up at the
 6      trial.  But if you want us to do a lot closer to that, we can.
 7              THE COURT:  I mean, the other option is to sit them
 8      down for deposition.  That way you don't have to put together
 9      these detailed reports.
10              MR. D. MARKUS:  No objection.
11              MR. J. MARCUS:  No objection.
12              THE COURT:  Right?  But I'm not going to be hearing at
13      the time of trial, objection, Your Honor, that's not in the
14      report.  Sidebar.  Is it in the report?  Well, the report said
15      the expert's going to talk about among other things; so among
16      other things, Judge, that's what we now have.
17              MR. D. MARKUS:  And, Judge, just so we're clear, I've
18      never -- this is the first time I'm hearing that civil reports
19      are different than criminal.  The Federal Rules of
20      Evidence 703, they're the same.  So the requirements for what
21      the expert report look like are the same in criminal and civil.
22      And, like you say, we don't get depos in criminal court.  So
23      typically the expert reports in criminal cases need to be more
24      fulsome so that we all understand the parameters.
25              MS. MARTINEZ:  With all respect to you, Mr. Markus,
```

```
 1    civil procedure is different, and what happens in civil cases
 2    is different.  That doesn't mean that we can't do something
 3    more similar to it here if that's what's helpful to everyone
 4    because what -- so I absolutely have no objection to it.
 5           I would like everyone -- let me give you an example of
 6    some of the struggle with this.  Mr. Resneck -- Dr. Resneck who
 7    provided a fuller report -- he just happens to be a good
 8    writer, which is what helped there.
 9           One struggle, an example of a detail.  He has a
10    section on follow-up, for example, that follow-up of patients
11    is something that you would do, that is a normal medical thing.
12    I -- in my own mind, I thought, obviously, he's going to talk
13    about, obviously, the fact that the amounts of medication,
14    these compounding creams, it was enough to fill your entire
15    body.  The amounts of medications that were prescribed first in
16    the first instance and then in the refills was huge.
17           So subsumed in that paragraph regarding follow-up,
18    which is not explicit, would be that the amount prescribed
19    initially was huge and that you would have to follow up and see
20    how is this going for you.  It's the first time you used this
21    cream.  Is it something that you want to continue?  Any side
22    affects?  Any pain?  Has it interacted wrongly with any of your
23    other medications?  Because the report was already detailed and
24    it was about eight pages, I decided not to be so nit-picky and
25    say, well, follow-up is covered in a sense -- the idea the
```

1    amount prescribed was not -- was rather huge and is -- could be

2    followed up by the -- could be included in the follow-up

3    section.  But I am just giving you an example --

4              THE COURT:  Right.

5              MS. MARTINEZ:  -- of how difficult this is because

6    there are so many details that are going to come up, both in

7    direct and in cross.  And it really -- again, it's -- I have

8    been challenged by this case.  It is really rather large for a

9    criminal case, indicted correctly, I believe, just that the

10   conduct of the Defendants is large.  And it's -- so -- but the

11   long and the short of it is that that is the challenge.

12   Sometimes we lawyers are blamed for being too thorough, as

13   Mr. Stumphauzer will never accuse me of not being thorough,

14   correct?

15             MR. STUMPHAUZER:  That's true.

16             MS. MARTINEZ:  Okay.  So sometimes we're blamed for

17   being too thorough, and sometimes we are just trying to get the

18   job done without overburdening everybody.  So I'm just giving

19   you an explicit example, and I would hope that the Court would

20   not hold us, for example, to that kind of minutia of detail, or

21   maybe you want to the tell me that you would want that in

22   there.

23             THE COURT:  I've been in trials where, Objection, Your

24   Honor, that's beyond the scope of what was revealed in the

25   expert report.  Come sidebar, let's look at the expert report.

```
 1    Then it's going to be up to you to say I did -- I did, in fact,
 2    reveal that this expert was going talk about X.  Well, where is
 3    it in the report?  Well, you can sort of glean from it.  Do you
 4    want to be in that position?  Or do you want to be able to say
 5    I told them, I disclosed it.  Because if it's not in the report
 6    and it wasn't disclosed, it's not coming in at trial, and you
 7    would want it in at trial.
 8          So the providing -- eight pages is not a long expert
 9    report.  I have seen longer reports in civil cases where we're
10    talking about money.  This is a big case.  You indicted this
11    big case because the Defendants, according to the Government,
12    engaged in a lot of bad acts over a long period of time.  And
13    that doesn't mean that you then get a two to eight-page report
14    just because.  If it's that extensive and if you want your
15    expert to be up here for a good two, three hours explaining
16    something, then you don't -- I don't think you can capture it
17    with a two to eight-page report or summary.  So it's in your
18    best interest, quite frankly, to provide more detail because
19    then at the time of trial you're going to be able to say I did,
20    I disclosed it, Judge, so I can ask that question.
21          MS. MARTINEZ:  May I add one more thing?  And just
22    that this is something that I caught.  With respect to
23    Mr. Stumphauzer's, it sounded like he was asking for an expert
24    regarding the law.  And just I would absolutely be moving to
25    exclude any expert regarding the law and I have done so
```

```
 1    successfully in other cases which Mr. Stumphauzer had
 2    supervised.  So and the reason is because the -- we can brief
 3    the law, and the Court will find on the law.
 4            So it's appropriate for briefing.  The whole 404(b)
 5    issue is completely appropriate for briefing, but certainly not
 6    for an expert.  And I could brief that if needed.
 7            MR. D. MARKUS:  All their experts are on the law; so I
 8    am surprised to hear that from the Government.  They are
 9    calling experts to talk about Medicare regulations, what's
10    required, what's required of, you know -- their experts are law
11    based; so maybe we should confer on this first, Your Honor.
12            THE COURT:  It seems like there is a lot of talking
13    you all need to do.
14            MS. MARTINEZ:  Your Honor, just to reply to that, in
15    particular, the case that I'm referring to, we of course had an
16    expert from Medicare in the case, and I don't mean an expert,
17    someone from Medicare because at least with respect to TRICARE,
18    it was disclosed as a TRICARE witness who also may have
19    expertise.  But the way that I see the Medicare and TRICARE
20    folks is that, in fact, there are facts about a program in
21    which you work where they make -- they have policies, they have
22    coverage decisions.  Will this claim be covered?  Will it not
23    be covered?  Is that communicated to people?  And it relates to
24    the facts.  It relates to whether it's a fraudulent claim on
25    Medicare or not.  It's that sort of thing.  I mean, to me
```

1    saying is this the telemedicine policy of TRICARE or not is

2    more of a fact, not necessarily something that you have to have

3    expertise in.

4           The one area where I think possibly there could be

5    some expertise is by knowing the workings of the program, you

6    realize how this would impact the program, how would it impact

7    the program.  Now, that is something that is unique to someone

8    within the program.  I don't think the Court could opine -- I

9    mean, I don't think the Court is -- would be an expert on how

10   something would impact the Medicare program because the Court

11   hasn't worked there for 30 years to say that; so I do

12   distinguish the two but, again, appropriate for briefing or

13   discussion.

14          THE COURT:  Or when and if Mr. Stumphauzer goes there.

15   We'll wait to see what he does on this issue of California regs

16   or policies or whatever these other acts are.

17          MS. MARTINEZ:  And my view on the conduct in the

18   middle, is it is that -- it is the most typical inextricably

19   intertwined conduct possibly of, you know, many cases that have

20   come before the Court.  It is literally in the middle.  It is

21   literally in the middle, and it is -- and the documents in this

22   case, they're all intertwined.  In other words, the same

23   documents that say "compounding" say "genetic testing" because

24   they are all looking for -- and they have multiple healthcare

25   programs, multiple victims and multiple strategies because all

1   they're trying to do with the scheme is let me find something

2   that will get paid by an insurance.  Let me find a beneficiary

3   who will let me use their number.  Now let me throw a doctor

4   into the mix, get the doctor to sign and let me get half, half

5   of that reimbursement.  It is an extremely large kickback.

6   This is not a small kickback case.  It's an obvious type of

7   conduct, and all of the players were the same in the middle.

8   So it is absolutely inextricably intertwined.

9          And looking into this issue, there are also, in

10  addition, cases that talk about conduct not needing to be a

11  crime.  An example is cases saying that the legal possession of

12  a gun is admissible as 404(b) to prove lack of mistake, to

13  prove identity, et cetera, in a case of illegal possession of a

14  gun.

15          THE COURT:  Mr. Larsen, made the point, it's also

16  other acts not just other crimes.  I understand -- or bad acts.

17          MS. MARTINEZ:  Thank you, Your Honor.

18          THE COURT:  All right.  So any remaining questions?

19          All right.  Well, I thank you all and look forward to

20  the next time.

21          ALL PARTIES:  Thank you, Your Honor.

22      (The proceedings adjourned at 11:48 a.m.)

23

24

25

## C E R T I F I C A T E

    I hereby certify that the foregoing is an

accurate transcription of the proceedings in the

above-entitled matter.


_10/10/19__
   DATE

STEPHANIE A. McCARN, RPR
Official United States Court Reporter
400 North Miami Avenue, Twelfth Floor
Miami, Florida 33128
(305) 523-5518