UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-20710-CR-ALTONAGA(s)(s)

UNITED STATES OF AMERICA

vs.

SENTHIL RAMAMURTHY,

    Defendant.
_____/

## FACTUAL PROFFER

The office of the United States Attorney for the Southern District of Florida and the Defendant Senthil Ramamurthy ("Defendant") stipulate and agree that the following facts are true and correct and that such facts provide a sufficient factual basis for a plea of guilty to Count 1 and Count 39 of the Second Superseding Indictment, which counts charge Defendant with conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349, and conspiracy to defraud the United States and to receive health care kickbacks, in violation of Title 18, United States Code, Section 371.

Beginning in or around September of 2014, and continuing through in or around July of 2015, Defendant conspired and agreed with John Scholtes ("Scholtes"), Anthony Mauzy ("Mauzy"), Thomas Sahs ("Sahs"), Rajesh Mahbubani ("Mahbubani"), Mangala Ramamurthy ("Dr. Ramamurthy"), Asif Uddin ("Uddin"), Jenifer John Carbon ("Carbon") and others to commit health care fraud through the submission of false and fraudulent claims to the Tricare program. Tricare is a federal health care benefit program affecting

1

commerce, as defined in Title 18, United States Code, Section 24(b), that provides civilian health benefits for military personnel, military retirees, and military dependents. Defendant's scheme involved the submission of false and fraudulent claims (including those claims set forth in counts 2-9) to Tricare for expensive and medically unnecessary pain creams, scar creams and a multi-vitamins which were billed through Pharmacy 1, Pharmacy 2 and other pharmacies. Pharmacy 1 was a compounding pharmacy in the Middle District of Florida. Pharmacy 2 was a compounding pharmacy located in the Northern District of Oklahoma. Defendant was an owner of SKR Services and Ventures LLC, (SKR) a Florida company with its principal place of business in Miami, Florida. Through SKR, Defendant negotiated an agreement with Pharmacy 1 and Pharmacy 2 whereby Defendant and his co-conspirators received approximately 50% of the reimbursements (less a modest cost of goods sold) from Tricare for every prescription referral.

During the conspiracy, Defendant and his co-conspirators received approximately $3.4 million in kickbacks in exchange for referring Tricare prescriptions for approximately 1,066 beneficiaries to Pharmacies 1 and 2. The kickbacks were funneled through SKR. Throughout the conspiracy Defendant directly paid approximately $873,378 in kickbacks (including those kickback payments set forth in counts 12, 14, 17, 19, 21-22, and 24) to co-conspirators Mauzy, Sahs, and Mahbubani either individually or through their company MHQ Ventures LLC. The Defendant directly paid an additional $283,000 in kickbacks to co-conspirator Uddin (including those kickback payments set forth in counts 25-26, 30 and 35). Those co-conspirators in turn paid "sales reps" to target Tricare beneficiaries. The

sales reps induced Tricare beneficiaries to "sign up" for the expensive drugs without regard to any legitimate medical need and often times based on false representations and material omissions including, by way of example, claims that the drugs were custom designed for the patient or that the drugs were free when in fact Tricare charged a co-payment. In fact, the prescription formulations were not customized for individuals based on specific medical needs but developed to generate increased revenue from Tricare. Based on the claims submitted in this case, Tricare reimbursed Pharmacies 1 and 2 thousands of dollars a month for a single compounded medication product. For example, as set forth in count 4, Tricare reimbursed the approximate amount of $23,790 for a one month supply of pain cream. Tricare similarly reimbursed approximately $12,205 for a month's supply of scar cream, as set forth in count 2. Based on these referrals from the Defendant, Sahs, Mauzy, Mahbubani, Uddin, Carbon and others, Tricare paid claims to Pharmacies 1 and 2 in the approximate sum of $6,314,170.

After obtaining the beneficiaries' information, Defendant and his co-conspirators routed the beneficiary information and a pre-printed prescription to a telemedicine company for ratification. Defendant and his co-conspirators paid between approximately $75 and $90 per prescription ratified by the telemedicine companies. Often times, as in the case of Dr. Ramamurthy who ratified prescriptions, or Carbon, who forged the name of a doctor under her employ, the doctor never even examined the patient. Defendant and his co-conspirators paid the sales reps a kickback of approximately $350 to $500 for every prescription that they induced and that was adjudicated by Tricare.

During the course of this charged conspiracy Defendant paid approximately $447,000 to co-conspirator Scholtes (including those kickback payments set forth in counts 15-16, and 28), kickbacks in exchange for among other things: (1) coordinating and disseminating pre-printed prescription pads containing formulations for compounded medications devised for maximum reimbursement and not for any individual's medical need; and (2) recruiting and establishing relationships with telemedicine companies to provide doctors who ratified the pre-printed prescriptions without a valid physician-patient consultation. During the same time frame the Defendant also paid the approximate sum of $150,000 to co-conspirator Carbon (including those kickback payments set forth in counts 27, 29 and 32) as both direct and indirect kickbacks in exchange for among other things: (1) referring Tricare beneficiary prescriptions for compounded medications to Defendant; and (2) ratifying pre-printed prescriptions for compounded medications without regard to medical necessity.

In furtherance of the conspiracy, Defendant e-mailed co-conspirator Uddin on or about October 8, 2014 a pre-printed prescription pad with instructions to have the health care provider sign it and "always 12 refils, auto refil, 240 GM [grams]." On or about December 2, 2014, Defendant texted co-conspirator Uddin to "fill out everything on the script except signature then e-mail to jenifer and I …dr. Espinosa will sign." Defendant also texted Uddin that he could send Tricare beneficiaries "[a] prepaid visa to cover their co pays." That same day, Defendant e-mailed co-conspirator Uddin introducing him to co-conspirator Sahs. On or about February 5, 2015, Defendant e-mailed co-conspirators Uddin, Sahs, Mauzy and Mahbubani instructing "everyone [to] create an LLC," because

4

"as the money amounts get larger, it is in everyone's interest that I pay ONLY corporations and not personal individuals." Later, on or about February 10, 2015, Defendant e-mailed co-conspirators Uddin, Sahs, Mauzy and Mahbubani instructing them to "switch to chronic pain #4 instead of #3, #3 no longer reimburses."

During the course of this conspiracy the Defendant and other charged co-conspirators used false pretenses to gain access to U.S. military bases where they targeted Tricare beneficiaries. On multiple occasions throughout the conspiracy the Defendant and other charged co-conspirators, including Scholtes, sent pre-printed prescription pads to telemedicine companies directing those companies which script to use and where to send patients. The Defendant and the other charged co-conspirators, including Scholtes, directed the transfer of patients between various pharmacies for the primary purpose of concealing the unlawful nature of the scheme.

After Tricare significantly curtailed its reimbursement for compounded medications in approximately June, 2015 the Defendant, Sahs, Mauzy, Mahbubani and Scholtes identified and pursued a potential new scheme in the form of targeting health care programs with claims for Cancer Genomic ("CGx"). Beginning in or around July of 2016 through at least December of 2017, Defendant, Scholtes, Dr. Ramamurthy and others conspired to defraud the United States and to receive health care kickbacks targeting Medicare beneficiaries to receive expensive and medically unnecessary CGx testing from Laboratory 1 located in the Northern District of Georgia. CGx testing is a highly complex and specialized type of genetic test designed to look for errors in genes that are associated with cancer. Medicare authorizes payment for medically necessary CGx testing only when

5

prescribed by the patient's treating physician for the purpose of managing the patient's specific medical condition, and the patient has a cancer diagnosis or a personal history of cancer. Medicare is a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b), and a Federal health care program, as defined by Title 42, United States Code, Section 1320a-7b(f).

As part of this scheme, Defendant and co-conspirator Scholtes negotiated a kickback arrangement with Laboratory 1 where the lab agreed to pay 45% (minus a modest pre-negotiated cost of goods sold) of the amount reimbursed to Laboratory 1 by Medicare for each CGx test referred by Defendant's company, Q Health Services, LLC. ("Q Health").

In furtherance of the scheme, Defendant and his co-conspirators targeted locations where Medicare and Medicaid patients were known to be in high concentration such as, for example, adult day care and senior living centers and health fairs. The Defendant through Q Health, paid "marketers" to go to these locations and collect DNA saliva samples from Medicare beneficiaries. The Defendant paid "marketers" a kickback for each adjudicated CGx test (dependent upon the type of test) submitted to and paid for by Medicare. In order to maximize the chances of payment for the CGx tests from Medicare, Defendant and his co-conspirators arranged for health care providers, including through the use of telemedicine, to ratify orders for CGx tests without conducting a legitimate examination of the patients. As part of this scheme, Ramamurthy recruited the services of Dr. Mangala Ramamurthy, to ratify orders for CGx tests for patients she had no valid doctor-patient relationship with. To conceal the lack of such valid doctor-patient

6

relationship, co-conspirators generated "medical records," which were almost identical for each of these Medicare beneficiaries. In all, Laboratory 1 paid kickbacks to the Defendant and his co-conspirators totaling approximately $1,527,590 for approximately 819 Medicare referrals during the conspiracy. Based on these referrals, Medicare paid Laboratory 1 approximately $3,322,006.

In furtherance of this conspiracy Scholtes e-mailed the CEO of Laboratory 1 on or about July 27, 2016 from the Southern District of Florida to the Northern District of Georgia, negotiating the percentage to be paid to the Defendant for each CGx referral Q Health sent to Laboratory 1. On or about September 22, 2016, Dr. Ramamurthy completed and submitted to Laboratory 1, a Provider's Preferred Order Form and provider authorization. On or about November 16, 2016 and December 14, 2016, respectively, co-conspirator Dr. Ramamurthy signed requisition forms ordering CGx testing for Medicare patients M.M. and A.C. Laboratory 1 paid Defendant a kickback in the approximate sum of $74,217 on or about February 1, 2017, and this amount included a payment for the referral of Medicare patient A.C. On or about February 20, 2017, in response to concerns about low Medicaid reimbursement for CGx samples referred by Q Health, co-conspirator Scholtes sent an e-mail from the Southern District of Florida to a principal of Laboratory 1 in the Northern District of Georgia regarding a "CGx Org. Call to review protocols and reimbursements." In addition, co-conspirator Scholtes sent text messages to one or more employees of Laboratory 1 on or about April 17, 2017, May 1, 2017 and May 15, 2017 regarding receipt of payment from Laboratory 1 in exchange for Q Health's referrals of completed CGx samples.

7

The foregoing facts do not describe all the details of the conspiracies, or Defendant's complete knowledge of the scheme, but are offered for the limited purpose of establishing a sufficient factual basis to support Defendant's plea of guilty to the charges of conspiracy to defraud the United States and to receive health care kickbacks.

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

Date: 11/12/19     By: _____
                   KEVIN J. LARSEN
                   ASSISTANT UNITED STATES ATTORNEY

Date: 11/12/19     By: _____
                   GREGG BERNSTEIN, ESQ.
                   ATTORNEY FOR DEFENDANT

                   By: _____
                   JACK FERNANDEZ, ESQ.
                   ATTORNEY FOR DEFENDANT

Date: 11/12/19     By: _____
                   SENTHIL RAMAMURTHY
                   DEFENDANT

8