UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 18-20710-CR-ALTONAGA/GOODMAN

UNITED STATES OF AMERICA,

v.

SENTHIL RAMAMURTHY,

      Defendant.

_____/

**DEFENDANT SENTHIL RAMAMURTHY'S SENTENCING MEMORANDUM**

      The defendant, Senthil Ramamurthy, by his undersigned attorneys, submits the following sentencing memorandum to assist the Court in imposing a sentence sufficient, but not greater than necessary, to satisfy the purposes of punishment.

**Procedural History**

      On November 12, 2019, Mr. Ramamurthy pled guilty to Counts 1 and 39 of the Second Superseding Indictment charging him with violations of 18 U.S.C. § 1349, Conspiracy to Commit Health Care Fraud and Wire Fraud, and 18 U.S.C. § 371, conspiracy to defraud the United States and to Receive Healthcare Kickbacks. A presentence report has been prepared and filed with the Court, and Mr. Ramamurthy submitted objections on January 13, 2020. Sentencing is scheduled for January 31, 2019.

**Legal Standard**

      Pursuant to 18 U.S.C. § 3553, "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (a)(2), which include:

      (**2**) the need for the sentence imposed—

(**A**) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(**B**) to afford adequate deterrence to criminal conduct;

(**C**) to protect the public from further crimes of the defendant; and

(**D**) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

In determining whether these purposes have been satisfied, the Court is required to consider the following additional factors, which are pertinent here:

(**1**) the nature and circumstances of the offense and the history and characteristics of the defendant

(**4**) the kinds of sentence and the sentencing range established for—

(**A**) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

(**B**)

\* \* \*

(**6**) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(**7**) the need to provide restitution to any victims of the offense.

18. U.S.C. § 3553(a). Although "[t]o arrive at an appropriate sentence, the district court must consider all of the applicable § 3553(a) factors," the Court is not required to give each of the § 3553(a) factors equal weight. *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015) (internal citations and quotation marks omitted). The Court

may choose "to attach 'great weight' to one factor over others" and has discretion to determine "how much weight to assign a particular sentencing factor." *Id.*

Each of these factors is addressed below.

<b>Argument</b>

## I.  Nature of the Offense

Health care fraud is a serious offense that has contributed to rising healthcare costs and the quality of care and treatment received by patients. Mr. Ramamurthy acknowledges his role in the healthcare fraud schemes charged here and fully accepts his own responsibility for these serious offenses and the role he played in perpetuating the schemes. He is working hard to ameliorate the harm he has caused by cooperating with the government with respect to several other on-going prosecutions and investigations.

Without in any way minimizing the seriousness of his criminal conduct, Mr. Ramamurthy asks the Court to assess his crime against the backdrop of the entirety of his background, for while the crime that Mr. Ramamurthy committed is a serious one, it should be considered in the context of an otherwise exemplary life.

## II.  History and Characteristics of the Defendant

Senthil was born in 1981 in the Bronx, New York, to parents who had recently emigrated from India to the United States to practice medicine. His family came from humble beginnings:  his father, one of nine siblings who grew up without electricity, and his mother, raised in a small flat with her five siblings. Both had managed to graduate from medical school in India before coming to the United States to pursue America's opportunities for themselves and their future children.

Senthil's parents began their medical residencies (which were required to obtain certifications) at inner city hospitals where they developed the hands-on experience that would serve them well in the communities they would ultimately serve. Every day they treated patients with gunshot wounds, stabbings, overdoses, and AIDs, working long and demanding shifts. Fearful of the high crime in their Bronx neighborhood, they only left their home to go to work, leaving Senthil in the care of a babysitter or an Aunt who lived several hours away.

Once they finished their residencies and passed their foreign medical equivalency exams, Senthil's parents opened a small practice in Paterson, New Jersey. The practice served the local community – predominantly Hispanic and African-Americans, laborers, custodians, and low-income city workers. The area's thriving Indian community helped this young husband and wife medical duo grow a practice that could sustain a family. Their work did not make them wealthy, but they were happy to make a decent living and serve a supportive community.

When Senthil was five, his parents had a second child, —Senthil's sister, Meena. As their children grew, the Ramamurthys were determined to provide them with a quality education, but the public schools in the area were severely underfunded. The Ramamurthys scrimped and saved to send their children to private schools, which they were unable to afford, in part, because although the couple had become experienced physicians, they were never good at collecting for the services they provided, and they struggled to understand the complicated and byzantine world of medical billing. As the cost of living in New Jersey increased and reimbursement declined, the family finances were stressed. So, in 1992, when Senthil was eleven years old, his parents decided to

accept a two-year offer from a small rural Texas hospital in the Rio Grande Valley to serve its medically underserved population.

This move was quite difficult for Senthil. New Jersey's Indian community had been thriving and vibrant, and Senthil had made a core group of friends who shared his background. Approaching his teenage years, Senthil was devastated at being uprooted from his home and his peers and relocated to an agricultural border town with virtually no Indian immigrants. Most of the families in the area were poor agricultural workers of Mexican descent, which made it difficult for a pre-teen wanting to assimilate and make friends.

Worse, during his middle and high school years, Senthil's classmates regularly bullied him and teased him for being a "fat Indian." As Senthil walked from class-to-class, his classmates would pretend to be snake charmers and hum cartoonish songs and mimic offensive thick accents as he walked by. Things did not improve for Senthil when he contracted a virus that caused a temporary paralysis of his legs. Unable to go to school for months, Senthil spent his middle school years a loner with few friends seeking solace in his room at home playing music.

Despite these obstacles, Senthil exceled academically. He was far ahead of his peers at school, and he begged his parents to let him skip a grade, which allowed him to begin high school when he was just twelve.

Still busy with their practice and taking hospital calls after hours, Senthil's parents encouraged him to pursue extracurricular activities to alleviate his isolation and develop friendships. Taking their suggestion, Senthil joined the high school computer science team because of his interest in computer programming. He traveled throughout

Texas competing and winning tournaments. Even so, the age difference still made it difficult for him to connect with his classmates, so Senthil focused on making friends with his teachers. Sadly, however, the teacher who taught and traveled with Senthil targeted him for sexual abuse, which occurred during Senthil's high school years. As a result, Senthil's high school experience was frustrating and emotionally damaging.

Of course, Senthil parents dreamed Senthil would follow in their footsteps and become a physician, but his real desire was to become a musician. As several of the letters (Exhibit A) attest, Senthil developed a strong affinity for music, and he had a talent for being able to pick up any instrument and quickly learn how to play it. Senthil loved to share his gift with his family, his friends, and his sister Meena's friends.

Within a year of Senthil's entering high school, his parents' two-year contract with the rural hospital ended, and they opened a small practice, Valley Internal Medicine; however, his parents continued to struggle with the complex billing requirements needed to obtain reimbursement for the care they provided. They were good at the practice of medicine—their years treating inner-city patients had prepared them well to handle this medically compromised rural demographic—but they were bad at the business of medicine.

The Ramamurthy family was a strong one and everyone pitched in to make the practice—the "family business"—work. Senthil's parents relied heavily on Senthil and his sister to help. Every day after school, the children were expected to make their way to the office, where they would finish their homework and then help out in the practice by emptying waste baskets, opening and sorting mail, depositing reimbursement checks, and generally pitching in on the sorts of business chores they were capable of doing, and

accompanied their parents to the hospital to see patients in the evening after the practice closed for the day.

When the time came for Senthil to leave home and go to college, he applied to several out-of-state universities before being accepted by the University of Houston at age 16. But Senthil was simply too young and immature to handle college this soon. His family had prepared him academically, but he lacked the life and social skills to live on his own. And even though his grades at the University of Houston were good enough to gain him acceptance at the University of Chicago the following year, Senthil became extremely depressed and quickly returned home.

Thinking Senthil might need more structure, his parents placed him at Baylor University in Waco, a stricter, more conservative school. But this misfired too. A Christian conservative school in rural Texas was not a good fit for an introverted Indian Hindu.[1] Eventually Senthil left Baylor and returned to his parents' home in McAllen where he was finally able to obtain a business degree at the University of Texas, Pan American.

By the time Senthil returned home though, the financial picture at Valley Internal Medicine had become bleak because of the same inefficiencies and collections issues that had always plagued it. His parents' time was stretched thin just caring for the volume of patients, and the practice was in serious debt from having taken out loans to hire specialists and equipment bought in desperate efforts to boost revenue. Billing was

---

[1] It was during this period that Senthil met Anthony Mauzy, Thomas Sahs, and Rajesh Mahbubani. Never having completely suppressed his musical passions, Senthil would occasionally travel to Austin, two hours away, to try and insinuate himself into its music scene. Sahs, Mauzy, and Mahbubani were part of that scene and the four men became fast friends.

becoming even more complex and more closely scrutinized, and they had become no better at it.

Senthil, with his newly minted business degree, and his sister, who had recently graduated from college, set out to help untangle the practice's financial issues. They researched using a professional billing company, implemented better accounting software, and consolidated their parents' debt. Senthil worked on growing the patient base by reaching out to local health care business owners who provided services to elderly, low-income patients in the area. Little by little, their efforts resulted in greater financial security for the family.

Once Senthil and his sister felt comfortable that their parents' practice could be self-sufficient, they felt free to leave. Senthil's sister left to pursue a career in filmmaking, but Senthil struggled to figure out his next steps. He desperately wanted to try a career in music, but he felt he had lost too much time during his college failures. He felt the pressure to prove to his parents that he could succeed in a stable career path, so he completed the course prerequisites for medical school and was accepted to Ross Medical School in Dominica.

In Dominica, Senthil found purpose studying medicine, connecting with other students, and caring for the underserved population. Senthil spent his time off volunteering at the island's medical clinics and hosting study sessions and creating tutoring videos for his classmates. As described by one of his classmates:

> As physicians in training, we felt a duty to provide any resources we could. One such difference we made was to raise funds through our medical school club, Physicians for Human Rights (PHR). Alongside Mr. Ramamurthy, we brainstormed active approaches to collect funds so that a local citizen could receive urgent surgery. Through teamwork, dedicated effort, and persistence we were able to match and actually surpass our goal of funds raised. Mr.

> Ramamurthy proved instrumental in providing sound insight, clear judgement, and was reliable to see this project to the finish line.

*See* Exhibit A, at Letter of Pawan Suri, M.D.

In 2014, Senthil began a third-year psychiatric rotation at Compass Medical Clinic, a nationwide network of psychiatric clinics headquartered in Miami owned by Dr. Scott Segal and managed by co-defendant John Scholtes. It is difficult to overstate the effect Miami had on Senthil. After several reclusive years in a rural Texas community where Senthil was an "other" and an outsider, in Miami, Senthil rubbed shoulders with peers who had backgrounds as exotic as his, and he was surrounded by friends who were flush with money. The scene was seductive and glamorous, far from the hardscrabble Rio Grande Valley lifestyle where he had grown up, and he was part of a successful nationwide chain of psychiatric clinics that was infinitely more successful than the little medical practice his family was always struggling to keep afloat.

Scholtes and Dr. Segal took a shine to this student, and they suggested Senthil join them in the "C Suite" where Senthil became privy to the operation of the Compass Health business. Senthil leaped at the opportunity to become involved in the business of medicine and he became friends with John Scholtes whose job at Compass, in part, had been to develop business opportunities. Senthil was placed under his tutelage and spent the next few months of his rotation at Compass identifying potential business opportunities in the healthcare field for Segal and Scholtes to consider. He stopped doing psychiatric rotations altogether based on an implicit promise that after Senthil received his medical degree, he would join Compass as an executive or a psychiatry resident.

Senthil was eager to find any way to impress Scholtes and Dr. Segal. He called any contact he knew in healthcare. Among the many business opportunities Senthil and

Scholtes explored was reimbursable genetic testing. Scholtes was an account executive for a genetics company and offered to introduce Senthil to Jennifer Carbon, who ran a small clinic in the Little Haiti part of Miami. The three of them, Scholtes, Carbon, and Senthil, discussed the genetic testing business, but at that point decided that it was not viable and so they rejected this idea.

Eventually, in the fall of 2014, Senthil met Alex Zarzuela, who marketed compounded pharmaceuticals to Tricare patients. Zarzuela described the huge sums Tricare was paying, and he convinced Senthil that it could be a great opportunity. Senthil presented this business opportunity to Dr. Segal who rejected it, but Scholtes encouraged Senthil to pursue it further. Scholtes and Senthil returned to Jennifer Carbon to see whether the physicians in her clinic could prescribe these compounded medications to Tricare patients in return for payment to Carbon and she agreed. Senthil put together markers to capitalize on the opportunity, which included his medical school classmate, co-defendant Asif Uddin, along with his friends from the Austin music scene, co-defendants Rajesh Mahbubani, Thomas Sahs, and Anthony Mauzy, who were all enthusiastic about the opportunity.

The business took off. The reimbursement dollars astonished everyone beyond their wildest expectations. Senthil, who was basically running this business from his cellphone, quickly realized he was not equipped to handle the processing of the claims, the follow-up with marketers, the pharmacy, billing company, and Jennifer Carbon, while at the same time balancing his medical school schedule and a demanding surgery rotation that was about to begin in January 2105 in Massachusetts. It was at this point that Senthil

asked Scholtes to become even more actively engaged in running the business. Scholtes agreed and implemented controls and processes to keep the business operating.

As the number of patients increased, it became apparent Carbon could no longer manage the prescription volume. Unbeknown to Senthil, she started forging prescriptions, but even then, the volume of prescriptions coming in was so high that Carbon simply could not keep up. While Scholtes searched for a telemedicine company the business could partner with, Senthil asked his mother for help. She conducted some patient visits over the phone, but it was too much for her to continue with her own busy medical practice. By then, Scholtes had engaged CHC, a telemedicine company based in Florida.

Senthil underwent a metamorphosis during this period. No longer was he the "fat Indian" nerdy kid on the computer science team, working after school at his parents practice and hanging around elderly patients and teachers. He rebranded himself as 'Rama'– the flashy persona reflected in his over-the-top texts and staged photos of himself in front of planes, yachts, and fancy cars (none of which he actually owned). He spent a great deal of the pharmacy money on marketers, Scholtes, and telemedicine companies. But in an effort to emulate his wealthy friends, he also spent a great deal on parties, travel, rental apartments, and glitzy dinners. He ignored his family's urgings to complete medical school because he felt he had achieved more financially than his physician parents ever would and in a fraction of the time.

The sheer volume of money that was coming in quickly raised concerns with Rama and others as to the scheme's legality, and they discussed how they needed to accelerate the pace of prescriptions before Tricare stopped reimbursing. To assuage those concerns, John Scholtes engaged attorney Craig Cuden (who later died in a motorcycle

accident), a self-proclaimed health care law expert who could provide a patina of legitimacy, but everyone, including Senthil, knew this was little more than window dressing for practices everyone knew were illegal.

When Tricare stopped reimbursements, Senthil explored other pharmaceutical marketing opportunities, ultimately turning to the genetic testing business that forms the basis for Count 39. Scholtes continued to run the day to day operational aspects of the business—keeping track of the money, the labs, and the samples—while Senthil kept track of the marketing-- visiting places where he might find patients to undergo the genetic testing and, at one point, again involving his mother in the business for which he deeply regrets.

The above paints a picture of a young man desperate for attention and recognition and motivated as much by a need for acceptance as by greed. Senthil's background establishes that this crime was an aberration, which is corroborated as by the people who know him and who describe Senthil as a devout, caring, and family-oriented friend. One friend, Nayan Raina from this period in Senthil's life, describes it this way:

> Like myself, Rama was raised in an Indian immigrant, Hindu family. In the time I have known him, I have seen his respect for his culture and family first hand. His family means the world to him, and he especially holds in great reverence the service his physician parents brought to their community. Rama practiced his life with integrity and continued this service by giving back to his community and his temple. Rama has always strived for achievement as a medical student and artist, and I believe it was his naivete to reach those goals quickly, that have contributed to the circumstances which have led him before Your Honor.

*See* Exhibit A, Letter of Nayan Raina.  Brittany Rico, a lifelong family friend, highlights Senthil's "devotion to family" as one of his qualities that she most admires. *See* Exhibit A, Letter of Brittany Rico. Throughout his life, Senthil has readily offered support and

encouragement to family and friends at every opportunity. Senthil's friend from medical school, Benjamin Richlin, explains how Senthil "never [gave] up" on him: "As a person with special needs, often passed over by my peers, Rama always stressed my positive points, and encouraged me to follow my dream of becoming a practicing physician." *See* Exhibit A, Letter of Benjamin Richlin, MD. Indeed, Senthil's "infectious optimism" and "unconditional support" are hallmarks of his character. *See id.*

### III.        Other Sentencing Factors

In crafting a sentence for Mr. Ramamurthy, the Court must consider several other factors, including the need for the sentence imposed to "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), and "to protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(C). As he sits in FDC Miami contemplating his life, Senthil would happily trade places with the young, third-year medical student who hoped to one day rescue his family's practice as a health care businessman or a successful Miami doctor. But Senthil knows he has forfeited that hope and has disgraced himself and his family, and worse, he has involved his mother in his criminal conduct. He is extremely remorseful.

As evidence of his remorse and acceptance of responsibility, Senthil was the first to plead guilty in this case and he continues to cooperate with the government in other investigation. He has agreed to full restitution.

Mr. Ramamurthy has committed a crime that can only be described as an aberration in an otherwise exemplary, family-oriented life lived in difficult circumstances. Senthil's father, now disabled and retired from the medical profession, will be elderly when Senthil

is ultimately released from prison, and Senthil's mother will be a convicted felon and no longer practicing medicine. In the words of Senthil's father:

> Although he went down this path, he remained my loving son. During my heart surgery, he stayed at my bedside caring for me and praying for my recovery. As a spiritual person, I know my son always strives to do good and it was not his intention to hurt anyone, especially his mother.
>
> In the months since the investigation and his incarceration, I have seen my son learn the lesson to be more cautious in his life and his judgment. He has accepted responsibility for his actions and wants to do whatever he can to right his wrongs for himself, his family, and his community.

*See* Exhibit A, Letter of Kannan Ramamurthy, MD. This now-disgraced family faces a hard and bleak future and Senthil's assistance will be critical to his parents' survival in their old age. Senthil's sister, Meena, describes the transformation that she has seen in her brother:

> In the past few months, I have seen true remorse in my brother. As his sister, I often feel like his harshest critic. But in truth, I have seen him become a person of strong resolve and character. No longer is he focused in self-interested pursuits; he wants nothing more than to help our mother and family in whatever way he can. We are extremely close, and at times not having him in my life feels like my whole heart and world are ripped apart. When I got married recently and my brother could not attend, we both felt the pain and loss of liberty his actions had caused; he could not be apart of a milestone for his only sister. As he broke down and congratulated me that day on the phone, he told me he was determined to be a better brother to me.

*See* Exhibit A, Letter of Meenakshi Ramamurthy. There is little doubt that Senthil will not engage in criminal conduct again.

Finally, the Court must also consider the need for the sentence imposed to "avoid unwarranted sentence disparities among defendants with similar records who have been

found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Three of Senthil's codefendants have pled guilty to charges that carry ten-year maximum sentences and his mother has pled guilty to a crime carrying a five-year maximum sentence. Scholtes, the healthcare professional who brought his business acumen, strategic expertise, and professional connections to the scheme, was the last co-defendant to plead guilty and pled to charges that carry ten and five-year maximum sentences respectively. Jennifer Carbon, who had twenty years of experience in the health care field and admitted to forging physician signatures received a sentence of thirty-three months. Asif Uddin, who was Senthil's medical school peer and who was less involved that Senthil, also remains to be sentenced, and has pled guilty to a crime carrying a five-year maximum sentence. Mr. Ramamurthy was the first indicted defendant to plead guilty and his cooperation undoubtedly played a large role in the other defendants' decisions to plead guilty. Mr. Ramamurthy respectfully requests that the Court consider the contemplated sentences of these other defendants in deciding on an appropriate sentence here.

## IV. Guidelines Calculation

The Sentencing Guidelines calculation is only one factor for the Court to consider in determining a sentence that it is "sufficient, but not greater than necessary," to satisfy the purposes of punishment. 18 U.S.S.G. § 3553(a); *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). The Guidelines calculation is merely advisory, *United States v. Booker*, 543 U.S. 220, 245-46 (2005), and the sentencing court "may not apply a presumption of reasonableness to the sentencing guideline range." *United States v. Stagner*, 782 F. App'x 823, 828 (11th Cir. 2019) (unreported), *cert. denied*, No. 19-6341, 2019 WL 6107899 (U.S. Nov. 18, 2019)." (citing *Nelson v. United States*, 555 U.S. 350,

352 (2009)). Instead, the Court should apply all of the relevant factors identified in Section 3553 before imposing a sentence. *Id.*

Here, the parties have agreed that U.S.S.G. § 2B1.1 (health care fraud) is the appropriate Guideline provision, and pursuant to U.S.S.G. § 2B1.1(a), the base offense level is 6. Presentence Investigation Report (PSR), par. 114. The parties also have agreed that the intended loss was between $9,500,000 and $25,000,000, which results in a 20-level increase. *Id.*, par. 115. Additionally, the PSR applies a three-level increase for a loss to the government health care program of more than $7,000,000. *Id.*, par. 116. The PSR includes a two-level reduction based upon Senthil's "clearly demonstrated acceptance of responsibility for the offense," *Id.*, par. 123, and the government has also agreed to "make a motion stating that [Senthil] assisted authorities in the investigation of his own misconduct by timely notifying authorities of his intention to plead guilty" for Senthil to receive an additional one-level reduction, *Id.*, par. 124. Senthil has zero criminal history points, therefore, his criminal history category is I.[2]

The probation officer has recommended an adjustment of 2 levels pursuant to § 2B1.1(b)(10)(C) for conduct constituting sophisticated means and an additional 4 levels pursuant to § 3B1.1(a) for Senthil's alleged leadership role in the offense. *See* PSR, pars.117, 119. The facts, however, do not support these adjustments, and should not be applied in calculating Mr. Ramamurthy's Guideline range.

---

[2] The PSR concludes that Mr. Ramamurthy's pre-departure total offense level is 32. *See* PSR, par. 28. Accordingly, the Probation Office has calculated a pre-departure sentencing guideline range of 121 to 151 months.

### A.   The Defendant's conduct does not constitute "Sophisticated Means"

U.S.S.G.  §2B1.1(b)(10)(C)  provides  for  a  two-level  increase  if  the  offense "involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." Sophisticated means is defined as, "*especially complex* or *especially intricate* offense conduct pertaining to the execution or concealment of an offense," U.S.S.G. § 2B1.1, Application Note 9(B) (emphasis supplied), and requires more than simply that a scheme is "complex" or "intricate"; rather, it "must be 'especially' so." *United States v. Hulse*, 989 F. Supp.2d 1224, 1226 (M.D. Ala. 2013); *United States v. Cooper*, No. 02-40069-01-SAC, 2006 WL 288704, at *16 (D. Kan. Jan. 24, 2006) (citing *United States v. Montano*, 250 F.3d 709, 714-15 and n.6 (9th Cir. 2001) ("Thus, this enhancement should be reserved for those defendants who employ more complex or intricate *means than those typically used in an ordinary Medicare fraud scheme*" or in "common business practices.") (emphasis supplied).

Thus, the sophisticated means enhancement is intended to apply to situations where, "the crime uses legally or financially complex means to conceal and evade," because it makes enforcement more difficult. *Hulse*, 989 F. Supp.2d at 1226. *See* Application Note 9(B) (examples of "especially complex" conduct include, "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts."); *see also United States v. Elbeblawy*, 899 F.3d 925, 939 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 1322 (2019) (applying sophisticated means enhancement "in light of [the defendant's] efforts at concealment" where he attempted to avoid detection by paying doctors kickbacks in cash, creating sham contracts to inflate rates and

disguise services, and using ex-wife to open an new home health agency when Medicare suspended defendant's payments).

Here, at its core, the scheme involved connecting patients with providers, billing for services, and paying kickbacks. There were no efforts to hide the identities of the individuals involved, the use of offshore accounts, or otherwise to conceal assets. And while the defendants at one point, used more than one pharmacy for the submission of Tricare claims,  there is nothing "financially complex" or otherwise intricate about this scheme beyond "an ordinary Medicare fraud scheme," *Cooper*, 2006 WL 288704, at *16, that would justify application of this enhancement. *C.f., e.g., United States v. Armas*, 712 F. App'x 923, 927 (11th Cir. 2017) (unreported) (applying sophisticated means enhancement because the defendant "had created billings to Medicare for fraudulent prescriptions, created false invoices to attempt to cover up the scheme from auditors, made false statements to the auditors, and made cash withdrawals of $4,000,000 to attempt to conceal his fraud").

Further, Section 2B1.1(b)(10)(C) makes clear that it is the sophistication of *Senthil's* conduct that is at issue, not that of his co-defendants. The enhancement requires that "the *defendant* intentionally engaged in or caused the conduct" that was "especially complex," thereby "narrow[ing] the focus…[to] the *defendant's* personal conduct, not the scheme as a whole." *United States v. Mangano*, 749 F. App'x 910, 913-14 (11th Cir. 2018)(unreported) (citing *United States v. Presendieu*, 880 F.3d 1228, 1248 (11th Cir. 2018)) (emphasis supplied). To this end, the enhancement seeks to punish individual defendants who are "more cunning and scheming," and "who employ complex and

involved means so as to avoid or delay being found out." *Cooper*, 2006 WL 288704, at *16 (citing *Montano*, 250 F.3d at 714-15 and n.6).

Far from "cunning," as the text messages between Senthil and co-defendant Uddin demonstrate, Senthil started this scheme in motion from his cellphone with a medical school classmate. But to succeed, the scheme required the participation of people with a more sophisticated understanding of the business and practice of medicine, beginning with codefendant Jennifer Carbon, who owned a medical clinic and had more than twenty years' experience in the healthcare industry, *See* Defendant Jennifer Carbon's Sentencing Memorandum, No. 18-20690-CR-UNGARO, ECF No. 24 at 1, and including co-defendant John Scholtes who performed nearly every operational aspect of the business. Scholtes selected the laboratories; decided which pharmacies to use and when to change pharmacies to avoid overloading claims from one pharmacy; and he hired the lawyers, obtained the prescription pads, and as the PSR correctly notes, "coordinated and directed" the methods employed and "designed and implemented" systems to maximize the effectiveness of the scheme. *See* PSR, par. 103.

Senthil's role was limited to recruiting marketers, and even in this aspect of the business, his actions were unsophisticated. The "marketing team" consisted of his friends from medical school or the music business and a few other individuals he met, none of whom had a particle of health care management experience between them. And Senthil himself was a third-year medical student who had never even heard of compounding or genetic testing until he showed up as a medical student doing rotations at Compass Medical. Senthil's conduct was not "especially intricate" in nature, nor was it legally or financially complex to evade enforcement, *Hulse*, 989 F. Supp.2d at 1225-26. A

sophisticated means enhancement is not warranted for Senthil Ramamurthy on these facts.

### B. The PSR Improperly Applied an Enhancement for Senthil's Role in the Offense

The PSR increases the offense level by 4 levels for Mr. Ramamurthy's role in the offense. Under § 3B1.1(a), a sentencing court may apply a 4-level enhancement if the defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." A leadership enhancement "requires *both* a leadership role *and* an extensive operation." *United States v. Martinez*, 584 F.3d 1022, 1026 (11th Cir. 2009) (emphasis in original) (internal quotation marks omitted) (quoting *United States v. Alred*, 144 F.3d 1405, 1421 (11th Cir. 1998)). "Without proof of the defendant's leadership role, evidence of the operation's extensiveness is insufficient as a matter of law to warrant the adjustment." *Id.* at 1421.

In determining whether a defendant had a "leadership role," courts consider several factors, including the defendant's "exercise of decision-making authority" and "the degree of control and authority [he] exercised over others." Application Note 4 to U.S.S.G. § 3B1.1; *see also United States v. Diaz-Rosado*, 615 F. App'x 569, 575-77 (11th Cir. 2015); *United States v. Glover*, 179 F.3d 1300 (11th Cir. 1999) (holding that role enhancement not available for defendant who managed only asset of conspiracy); *United States v. Lalley*, 257 F.3d 751 (8th Cir. 2001) (vacating sentence because the district court failed to make the essential finding that the defendant exercised the necessary control). Application Note 4 makes clear that a leadership enhancement "does not apply to a defendant who merely suggests committing the offense."

Certainly, Senthil had a significant role. He was involved in the initial formation of the business, he formed a marketing team, and he distributed money according to instructions from John Scholtes. But this conduct falls short of what is required for a 4-level leadership enhancement. *See United States v. Williams*, 755 F. App'x 926, 933–34 (11th Cir. 2018) (unpublished) (determining that recruitment alone is insufficient to support a leadership enhancement). *Cf. Martinez*, 584 F.3d at 1026-28; *see also Diaz-Rosado*, 615 F. App'x at 575-78 (determining that hiring a crew for transportation vessels and directing an informant (who was not a participant) to purchase engines for one of the vessels and "not to say anything" did not demonstrate the requisite degree and control over other participants because he had not done more than merely "orchestrate[]" the scheme).

Moreover, in determining whether a leadership role is appropriate, Senthil's actions should be "compared to that of other participants," *United States v. De Varon*, 175 F.3d 930, 940-41 (11th Cir. 1999), and decisions made with co-defendants are not "independent decision making authority," to support a leadership enhancement. *See United States v. Dominguez*, 616 F. App'x 905, 907-09 (11th Cir. June 17, 2015) (unreported) (determining that a three-level leadership role enhancement was erroneous where the defendant decided with co-defendants which patient recruiters to use and the amount of kickbacks, paid recruiters, and oversaw the submission of fraudulent claims, because the defendant did not exercise independent decision-making authority over another participant in the criminal activity). As the PSR notes, Scholtes "designed and implemented" the tracking system for the compounding medication scheme to calculate the amount of kickbacks that each defendant, including Senthil, would receive. PSR, par.

103. Scholtes "coordinated and directed the movement of Tricare beneficiaries' prescriptions between one or more compounding pharmacies in an effort to maximize the amount of kickbacks." *Id.* Scholtes established the methods used to employ the compounding medication scheme, such as the use of pre-printed prescriptions for reimbursement purposes. *Id.* And to fill-in the medical expertise needed to carry out the scheme, Senthil looked to the pharmacies and medical providers, like Ms. Carbon. *Compare, e.g., Mangano*, 749 F. App'x 910, 913-14 (unpublished) (three-level role enhancement for pharmacy owner, who was also a licensed pharmacy technician, "maintained exclusive control over the pharmacy where the fraud took place and all of the profits from the scheme, which he used to direct and facilitate the acts of other criminal participants). These facts demonstrate that while Senthil maintained some managerial authority, his conduct is not sufficient to warrant a 4-level increase as an organizer or leader of the criminal activity.

## CONCLUSION

Mr. Ramamurthy respectfully asks the Court to impose a sentence that is consistent with the purposes of sentencing in Section 3553.

Dated:  January 24, 2020                     Respectfully submitted,

/s/ Jack E. Fernandez
Jack E Fernandez
Fla. Bar No. 843751
Zuckerman Spaeder LLP
101 E. Kennedy Blvd., Suite 1200
Tampa, FL 33602
Tel:  (813) 221-1010
Fax:  (813) 223-7961
jfernandez@zuckerman.com

<u>/s/ Gregg L. Bernstein</u>
Gregg L. Bernstein
*Pro hac vice*
Zuckerman Spaeder LLP
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202
Tel:  (410) 332-0444
Fax:  (410) 659-0436
gbernstein@zuckerman.com

*Attorneys for Defendant*
*Senthil Ramamurthy*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on this 24th day of January, 2020 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. The Clerk of Court will serve a notice of electronic filing on all counsel of record. The foregoing document will be served electronically and by first-class mail on:

Richard DeAguiar
Legal Department, Federal Bureau of Prisons
15801 SW 137th Avenue
Miami, FL 33177
rdeaguiar@bop.gov

Warden G. Ramirez
Federal Detention Center, Miami
33 NE 4th Street
Miami, FL 33132
c/o Acting Executive Assistant
Adam Messinger
amessinger@bop.gov

/s/ Jack E. Fernandez