**H** KeyCite history available

712 Fed.Appx. 923
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S. Ct. of App. 11th Cir.
Rule 36-2.
United States Court of Appeals, Eleventh Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
Andy ARMAS, a.k.a. Andy Armas Nunez,
Defendant-Appellant.

No. 17-10837
|
Non-Argument Calendar
|
(October 24, 2017)

**Synopsis**
**Background:** Defendant was convicted, upon a guilty
plea, in the United States District Court for the Southern
District of Florida, of conspiracy to commit health care
fraud, wire fraud, and mail fraud, four counts of mail
fraud, and conspiracy to defraud the United States and
pay health care kickbacks, and was sentenced to an
87-month prison term. Defendant appealed.

**Holdings:** The Court of Appeals held that:

[1] imposition of two-level leadership role sentencing
increase was not warranted

[2] two-level leadership role sentencing increase for use of
sophisticated means was warranted; and

[3] defendant waived argument on appeal that the
sentencing court plainly erred in assessing the total loss
amount.

Affirmed in part, vacated in part, and remanded.

West Headnotes (3)

[1] **Sentencing and Punishment**
 Organizers, leaders, managerial role

 350H Sentencing and Punishment
 350HIV Sentencing Guidelines
 350HIV(C) Adjustments
 350HIV(C)2 Factors Increasing Offense Level
 350Hk752 Organizers, leaders, managerial role

 Imposition of two-level leadership role
 sentencing increase was not warranted for
 defendant who pled guilty to conspiracy to
 commit health care fraud, wire fraud, and mail
 fraud, four counts of mail fraud, and conspiracy
 to defraud the United States and pay health care
 kickbacks, absent finding that there was at least
 one other criminal participant in the criminal
 scheme who was under defendant's control.
 U.S.S.G. § 3B1.1(c).

[2] **Sentencing and Punishment**
 Sophistication in commission or concealment

 350H Sentencing and Punishment
 350HIV Sentencing Guidelines
 350HIV(B) Offense Levels
 350HIV(B)3 Factors Applicable to Several Offenses
 350Hk727 Sophistication in commission or
 concealment

 Imposition of two-level leadership role
 sentencing increase for use of sophisticated
 means was warranted for defendant who pled
 guilty to conspiracy to commit health care fraud,
 wire fraud, and mail fraud, four counts of mail
 fraud, and conspiracy to defraud the United
 States and pay health care kickbacks; evidence
 showed that defendant's scheme involved the
 creation of billings to Medicare for fraudulent
 prescriptions, the creation of false invoices to
 attempt to cover up the scheme from auditors,
 and cash withdrawals to conceal the scheme.
 U.S.S.G. § 2B1.1.

United States v. Armas, 712 Fed.Appx. 923 (2017)

[3]   **Criminal Law**
🔑Estoppel or Waiver

110Criminal Law
110XXIVReview
110XXIV(L)Scope of Review in General
110XXIV(L)11Parties Entitled to Allege Error
110k1137Estoppel or Waiver
110k1137(1)In general

Defendant who pled guilty to conspiracy to commit health care fraud, wire fraud, and mail fraud, four counts of mail fraud, and conspiracy to defraud the United States and pay health care kickbacks waived his argument on appeal that the sentencing court plainly erred in assessing the total loss amount because it failed to grant him credit for his legitimate prescriptions billed to Medicare; defendant invited any error in calculating the loss amount, since he did not object to the calculated loss amount set forth in the presentence investigation report, he stated that he accepted the amount and the applicable Sentencing Guidelines range, and he affirmatively indicated both that he would not challenge the government's calculation of the amount of the loss. U.S.S.G. § 2B1.1.

Appeal from the United States District Court for the Southern District of Florida, D.C. Docket No. 1:16-cr-20474-DMM-1

**Attorneys and Law Firms**

Lisa Tobin Rubio, Eloisa Delgado Fernandez, Wifredo A. Ferrer, Laura Thomas Rivero, Emily M. Smachetti, U.S. Attorney's Office, Miami, FL, Stephen Cincotta, Aleza Remis, U.S. Department of Justice, Criminal Division, Washington, DC, Phillip Drew DiRosa, U.S. Attorney's Office, Fort Lauderdale, FL, for Plaintiff-Appellee

Manuel Arthur Mesa, Mesa & Associates, PA, Miami, FL, for Defendant-Appellant

Before HULL, MARCUS and WILSON, Circuit Judges.

**Opinion**

PER CURIAM:

**\*925** Andy Armas appeals his total 87-month sentence after pleading guilty to one count of conspiracy to commit health care fraud, wire fraud, and mail fraud, in violation of 18 U.S.C. § 1349; four counts of mail fraud, in violation of 18 U.S.C. § 1341; and one count of conspiracy to defraud the United States and pay health care kickbacks, in violation of 18 U.S.C. § 371. On appeal, Armas argues that: (1) the district court clearly erred when it applied a two-level role enhancement because it failed to make a factual finding that there was at least one other participant in Armas's offenses and under his control; (2) the district court clearly erred when it applied a two-level enhancement for use of sophisticated means because his conduct was not complex or especially intricate and he did not create his pharmacies for the sole purpose of committing fraud; (3) the district court plainly erred in assessing the total loss amount because it failed to grant him credit for his legitimate prescriptions billed to Medicare; and (4) he provided ineffective assistance of counsel during the sentencing and plea phases, which rendered the sentencing hearing unfair. The government concedes that the district court clearly erred when it applied the two-level role enhancement. After careful review, we affirm in part, vacate in part and remand for re-sentencing without the role enhancement.

Challenges to the application of the Sentencing Guidelines are mixed questions of law and fact. United States v. Mandhai, 375 F.3d 1243, 1247 (11th Cir. 2004). The district court's findings of fact are reviewed for clear error while its application of the Guidelines to the facts is reviewed de novo. Id. We review the district court's determination that a defendant is subject to a § 3B1.1 role enhancement for clear error. United States v. Martinez, 584 F.3d 1022, 1025 (11th Cir. 2009). The district court's decision to apply an enhancement for sophisticated means is a question of fact that we review for clear error. United States v. Robertson, 493 F.3d 1322, 1329-30 (11th Cir. 2007). A clearly erroneous factual finding occurs when we "after reviewing all of the evidence" are "left with a definite and firm conviction that a mistake has been committed." United States v. Foster, 155 F.3d 1329, 1331 (11th Cir. 1998). "Where the evidence has two possible interpretations, the district court's choice between them cannot be clearly erroneous." Id.

We review for plain error a sentencing challenge raised for the first time on appeal. United States v. Henderson,

409 F.3d 1293, 1307 (11th Cir. 2005). In addition, we consider arguments raised for the first time in an appellant's reply brief to be abandoned. United States v. Nealy, 232 F.3d 825, 830 (11th Cir. 2000).

[1]We begin with Armas's claim—and the government's concession—that the district court clearly erred in applying a two-level role enhancement. A defendant receives a four-level enhancement if the district court determines that he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). A two-level enhancement applies if the defendant was otherwise an "organizer, leader, manager, or supervisor" in "any criminal activity." Id. § 3B1.1(c). To qualify for either enhancement, the defendant must be an organizer or leader of at least one other participant. Id. § 3B1.1, comment. (n.2). A participant is defined as a person who is "criminally responsible for the commission of the offense, but need not have been convicted." Id. § 3B1.1, comment. (n.1). In order to apply a two-level enhancement for a defendant's leadership role, the district court *926 must find by a preponderance of the evidence that the criminal activity involved at least two persons, the defendant and a participant. United States v. Williams, 527 F.3d 1235, 1248–49 (11th Cir. 2008).

In Williams, we held that the evidence presented to the district court was insufficient as a matter of law to justify a two-level role enhancement under § 3B1.1, and instructed the district court on remand to re-sentence the defendant without the enhancement. Id. at 1248-49, 1252. In Martinez, we held that the district court clearly erred when it imposed a role enhancement based on disputed facts from the PSI without hearing any evidence from the government. 584 F.3d at 1026-30. We instructed the district court on remand to allow the government to present evidence that the enhancement was applicable to the defendant. Id.

Although the Guidelines are no longer mandatory, the district court is still required to consult, consider, and correctly calculate the applicable guideline range when imposing a sentence. Id. at 1025. If the district court erred when calculating the guideline range during sentencing, we may vacate the defendant's sentence and remand for re-sentencing. Id. The only time a remand is not appropriate is when we determine that the error did not impact the district court's sentence. See United States v. Keene, 470 F.3d 1347, 1348-49 (11th Cir. 2006).

When a defendant objects to a fact contained in the PSI, the government bears the burden of proving that fact by a preponderance of the evidence. Martinez, 584 F.3d at

1027. After the government presents evidence, the district court must either make an explicit factual finding or determine that no finding is necessary because the disputed fact will not be used to sentence the defendant. Id.

Here, the government concedes that the district court clearly erred when it applied a two-level role enhancement without finding that there was at least one other criminal participant in Armas's scheme and under his control. We agree. At the sentencing hearing, a special agent with Health and Human Services testified that the two pharmacies owned by Armas had been under investigation for billing services to Medicare for prescription drugs never purchased. As part of his investigation, the agent spoke with Dr. Carlos Ramirez, who revealed that he had received kickbacks from Armas for writing prescriptions for unnecessary drugs and said that patients were involved in the scheme. Thus, the government presented some evidence at the hearing that the Medicare beneficiaries and Ramirez participated in Armas's scheme. Nevertheless, the district court never made an explicit factual finding that there was another participant who was criminally responsible and under Armas's control, only that Armas was an organizer and that he relied on his employees. Williams, 527 F.3d at 1248-49; U.S.S.G. § 3B1.1, comment. (n.2). Notably, the district court also rejected the government's argument that the Medicare beneficiaries were knowingly complicit as participants. Because the district court was required to make an explicit factual finding that there was at least one other willing participant involved in Armas's scheme and under his control in order to apply the two-level role enhancement, and because it did not do so when it applied the enhancement, it clearly erred. Williams, 527 F.3d at 1248-49; Martinez, 584 F.3d at 1025, 1027; see also U.S.S.G. § 3B1.1, comment. (n.2).

Nor can we say that this error is harmless. Not only was Armas sentenced based on an incorrect guideline range, but there is nothing to suggest that the sentence would have been the same without the two-level *927 role enhancement. See Martinez, 584 F.3d at 1025; Keene, 470 F.3d at 1348-49. Accordingly, we are compelled to vacate and remand to the district court for re-sentencing without the two-level role enhancement. See Williams, 527 F.3d at 1248-49, 1252. On remand, the parties may raise their arguments regarding the § 3553(a) factors and Armas's alleged aggravating conduct.

[2]We are unpersuaded, however, by Armas's remaining arguments. First, the district court did not clearly err when it applied a two-level sophisticated means enhancement. A defendant receives a two-level enhancement if the

district court determines that a fraud offense "otherwise involved sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C). This is defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Id. § 2B1.1, comment. (n.9(B)). The district court is required to focus on the offense conduct as a whole when evaluating whether the defendant qualified for the enhancement, instead of the individual steps the defendant took. United States v. Moran, 778 F.3d 942, 977 (11th Cir.), cert. denied sub nom. Huarte v. United States, —— U.S. ——, 136 S.Ct. 268, 193 L.Ed.2d 196 (2015).

We've upheld a sophisticated means enhancement where the defendants laundered proceeds while defrauding Medicare, using kickbacks and false group therapy notes. Id. We also upheld the enhancement when a defendant's company falsified test results to demonstrate that Medicare beneficiaries required oxygen tanks, and used the test results to conceal that an independent entity had not done the testing. See United States v. Bane, 720 F.3d 818, 825-27 (11th Cir. 2013).

Here, the district court did not clearly err when it applied a two-level enhancement for use of sophisticated means. Although the court noted that Armas's fraud was "typical" and "rampant" in South Florida, it also found that Armas had created billings to Medicare for fraudulent prescriptions, created false invoices to attempt to cover up the scheme from auditors, made false statements to the auditors, and made cash withdrawals of $4,000,000 to attempt to conceal his fraud. See U.S.S.G. § 2B1.1, comment. (n.9(B)). Even if the creation of invoices and cash withdrawals may be conducted in the ordinary course of business and may be simple methods if examined in isolation, it was not clearly erroneous for the court to look at the offense conduct as a whole and find that Armas used complex and intricate means to both carry out and conceal his fraud. See Moran, 778 F.3d at 977; Foster, 155 F.3d at 1331. Further, like the defendants in Moran and Bane, Armas used false records and kickbacks to conceal his fraud. See Moran, 778 F.3d at 977; Bane, 720 F.3d at 825-27. Accordingly, the district court did not clearly err when it applied the two-level enhancement for use of sophisticated means.

We also find no merit to Armas's claim that the district court plainly erred in assessing the total loss amount because it failed to grant him credit for his legitimate prescriptions billed to Medicare. Under plain error review, we may only grant a defendant relief when, at the time of the appeal, there is: (1) an error in the district court's determination; (2) the error is plain or obvious; (3) the error affects the defendant's substantial rights in that it

was prejudicial and not harmless; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. United States v. Clark, 274 F.3d 1325, 1326 (11th Cir. 2001). An error is plain if it is clearly contrary to settled law at the time of sentencing or at the time of appellate consideration. *928 United States v. Shelton, 400 F.3d 1325, 1330-31 (11th Cir. 2005). Plain means contrary to the applicable statute, rule, or on-point precedent. See United States v. Lejarde-Rada, 319 F.3d 1288, 1291 (11th Cir. 2003). A plain error affects substantial rights if it was prejudicial, meaning that the error "actually did make a difference" in the defendant's sentence. Shelton, 400 F.3d at 1332 (quotation omitted). The defendant has the burden to prove that there would be a "reasonable probability of a different result" without the error. Id. (quotation omitted).

We've said that an incorrect calculation of a sentencing guideline range affects a defendant's substantial rights. Molina-Martinez v. United States, —— U.S. ——, 136 S.Ct. 1338, 1349, 194 L.Ed.2d 444 (2016). Moreover, a miscalculation of a guideline range can implicate the fairness and integrity of the sentencing proceedings. United States v. Chisholm, 73 F.3d 304, 307–08 (11th Cir. 1996) (holding that equating crack-cocaine and powder-cocaine was plain error that "seriously implicates the fairness and integrity of sentencing" because of the base offense level disparity).

When a defendant expressly consents to or affirmatively seeks a district court's decision, he is deemed to have invited any error the court may have made and to have waived appellate review for plain error. United States v. Brannan, 562 F.3d 1300, 1306 (11th Cir. 2009). We've held that when a defendant withdraws his objection and "fully comprehends the error the court is going to commit and nonetheless agrees to be bound by it," he has invited error. United States v. Masters, 118 F.3d 1524, 1526 (11th Cir. 1997). We've previously held that a defendant invited error when he told the district court to ignore other issues at re-sentencing and focus only on correcting the sentence that exceeded the statutory maximum penalty, and then challenged two other sentences on appeal. See United States v. Haynes, 764 F.3d 1304, 1307-08, 1310 (11th Cir. 2014). The invited error doctrine is not triggered by ambiguous statements or representations. United States v. Hayes, 762 F.3d 1300, 1310 n.6 (11th Cir. 2014).

An 18-level enhancement applies if the district court decides that the total loss of an offense exceeds $3,500,000, but does not exceed $9,500,000, whereas a 14-level enhancement applies if the total loss exceeds $500,000, but does not exceed $1,500,000. U.S.S.G. § 2B1.1(b)(1)(H), (J). Loss can be calculated by looking at

certain factors, like "the scope and duration of the offense and revenues generated by similar operations." Id. § 2B1.1, comment. (n.3(C)). The estimation of loss is granted substantial deference because the "sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence." Id. The court only needs to make a "reasonable estimate of the loss." Id.

The loss must be reduced by "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." Id. § 2B1.1, comment. (n.3(E)(i)). This credit accounts for the fact that "value may be rendered even amid fraudulent conduct." United States v. Campbell, 765 F.3d 1291, 1305 (11th Cir. 2014) (quotation omitted). However, where "a defendant's conduct was permeated with fraud, a district court does not err by treating the amount that was transferred from the victim to the fraudulent enterprise as the starting point for calculating the victim's pecuniary harm." Id. While the government must prove the total loss amount by a preponderance of the evidence, this does not require that the district court begin at *929 zero or that it "sift through years of bank records and receipts to ascertain itemized proof of every single transaction that should be chalked up as a loss to the victim." Id. at 1304. "Where detailed information is not available, a detailed estimate is not required." United States v. Orton, 73 F.3d 331, 335 (11th Cir. 1996).

[3]Here, we decline to review Armas's challenge to the loss assessment because he invited the district court's alleged error. See Brannan, 562 F.3d at 1306. As the record reveals, he did not object to the calculation of losses in the PSI. Rather, he said he accepted "the amount and the guideline range that is applicable here," and told the district court that he would not challenge the government's calculation and would instead ask for a downward variance because it was a mitigating factor that the calculation of losses was "not an exact science." See Masters, 118 F.3d at 1526. Armas also admitted that there was potentially an error in the government's calculation of losses, but expressly elected not to challenge it, unambiguously stating that he was "not contesting the amount" and would not "argue to get one level down on the amount when this is a hit-and-miss type of calculation." See Hayes, 762 F.3d at 1310 n.6. The district court also inquired twice if Armas would object to the amount of losses, and Armas expressly refused to do so while acknowledging that there were potential problems and that he would receive a heightened enhancement for the amount of loss, similar to the defendant in Hayes who acknowledged that there were potentially other issues to

address at re-sentencing but informed the district court to ignore them. Id. at 1307-08, 1310. In short, Armas invited any error in the calculation of the loss amount, and we decline to review his challenge. Brannan, 562 F.3d at 1306.

Finally, we decline to consider Armas's claim of ineffective assistance of counsel. Generally, we will not consider ineffective-assistance-of-counsel claims raised on direct appeal, because these claims are more properly considered in a motion to vacate under 28 U.S.C. § 2255. Massaro v. United States, 538 U.S. 500, 504–05, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003). This is especially true when the district court has not considered the claims and there has been no opportunity to develop a factual record about counsel's performance. United States v. Bender, 290 F.3d 1279, 1284 (11th Cir. 2002). However, if the record has been sufficiently developed, we may consider a defendant's ineffective assistance of counsel claims, subject to de novo review. Id.

Criminal defendants have a constitutional right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To succeed on an ineffective-assistance-of-counsel claim, a defendant must show that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced his defense. Id. at 687, 104 S.Ct. 2052. Under the first prong, counsel's performance is deficient only if it falls below the wide range of competence demanded of attorneys in criminal cases. Id. at 688-89, 104 S.Ct. 2052. As for the prejudice prong, the defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. 2052.

In this case, we decline to consider Armas's ineffective-assistance-of-counsel claim because there is no factual record regarding counsel's performance. Bender, 290 F.3d at 1284. Although all of Armas's arguments on appeal reference his sentencing proceedings, no record has been sufficiently developed that would allow us to determine whether Armas's counsel acted *930 deficiently or if his performance was prejudicial to the outcome. Id.; see also Strickland, 466 U.S. at 687-69, 694, 104 S.Ct. 2052. For example, we do not have testimony from counsel regarding why he did or did not do the things that Armas now challenges. See Bender, 290 F.3d at 1284. Armas's ineffective-assistance-of-counsel claim is more properly brought in a 28 U.S.C. § 2255 motion to vacate where a sufficient record can be developed regarding counsel's performance. Thus, we will not consider it on direct

**United States v. Armas, 712 Fed.Appx. 923 (2017)**

appeal.

Accordingly, we affirm in part, and vacate and remand in part to the district court for re-sentencing without applying the two-level leadership role enhancement.

**VACATED AND REMANDED IN PART,**

**AFFIRMED IN PART.**

**All Citations**

712 Fed.Appx. 923

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

U.S. v. Cooper, Not Reported in F.Supp.2d (2006)

KeyCite history available

2006 WL 288704
Only the Westlaw citation is currently available.
United States District Court, D. Kansas.

UNITED STATES OF AMERICA, Plaintiff,
v.
Terence COOPER, Frank D. Heck, and Paige A.
Heck, Defendants.

No. 02–40069–01–SAC, 02–40069–02–SAC,
02–40069–03–SAC.
|
Jan. 24, 2006.

**Attorneys and Law Firms**

Melody J. Evans, Office of Federal Public Defender U.S.
Post Office Bldg., Mark L. Bennett, Jr., Bennett, Hendrix
& Moylan, L.L.P., Stephen W. Kessler, Topeka, KS, for
Defendants.

Tanya J. Treadway, Office of United States Attorney,
Topeka, KS, for Plaintiff.

MEMORANDUM AND ORDER

CROW, Senior J.

**\*1** The case comes on for sentencing of the three
defendants following the jury's guilty verdict returned
November 24, 2003. At the request of the parties, the
court continued this sentencing until after the Supreme
Court's anticipated decisions in the *Booker* and *Fanfan*
appeals concerning the applicability of *Blakely v.
Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d
403 (2004), to the United States Sentencing Guidelines.
With the issuance of *United States v. Booker,* 543 U.S.
220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the court
scheduled dates for the filing of sentencing memoranda
and for a sentencing hearing. The parties filed voluminous
and extensive sentencing memoranda in support of their
numerous objections to the PSRs. Based on those filings,
the court expected the sentencing hearing would include
the parties' supplementing their positions with lengthy
presentations of evidence and argument. For those

reasons, the court did not follow its usual practice of
filing proposed rulings or findings in advance of the
hearing. At the sentencing hearing, the parties offered
streamlined presentations of testimony, statements and
arguments which completed the sentencing record.
Taking all these matters under advisement, the court
pored over the parties' contentions and evidence, the
circuit precedent emerging from *Booker,* the trial record,
and the post-*Booker* climate of sentencing in fraud cases.
The court now issues the following as its decision on the
unresolved objections to the presentence reports ("PSR")
pursuant to Fed.R.Crim.P. 32(i)(3) and as its statement of
reasons pursuant to 18 U.S.C. § 3553(c).

*BOOKER/BLAKELY* ISSUES AND CONCERNS
In *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738,
756, 160 L.Ed.2d 621 (2005), the Court "reaffirm[ed its]
holding in *Apprendi:* Any fact (other than a prior
conviction) which is necessary to support a sentence
exceeding the maximum authorized by the facts
established by a plea of guilty or a jury verdict must be
admitted by the defendant or proved to a jury beyond a
reasonable doubt." Thus, the Court determined that the
mandatory enforcement of the United States Sentencing
Guidelines violates the Sixth Amendment "when
judge-found facts, ..., are employed to enhance a
sentence." *United States v. Gonzalez–Huerta,* 403 F.3d
727, 731 (10th Cir.) (*en banc* ), *cert. denied,* 546 U.S.
967, 126 S.Ct. 495, 163 L.Ed.2d 375 (2005). To keep this
unconstitutional scenario from recurring, the Court
severed, in part, the provision of the Sentencing Reform
Act (18 U.S.C. § 3553(b)(1)) which made the guidelines
mandatory. *Booker,* 125 S.Ct. at 756. The sentencing
guidelines now are "effectively advisory ." 125 S.Ct. at
757. The Act still "requires a sentencing court to consider
Guidelines ranges, *see* 18 U.S.C.A. § 3553(a)(4)
(Supp.2004), but it permits the court to tailor the sentence
in light of other statutory concerns as well, *see* 3553(a)
(Supp.2004)." *Id.* Put another way, sentencing courts,
"while not bound to apply the Guidelines, must consult
those Guidelines and take them into account when
sentencing. *See* 18 U.S.C.A. §§ 3553(a)(4), (5)
(Supp.2004)." *Id.* at 767.

**\*2** The wake of *Blakely* left the federal district courts
tossing about the uncertain waters of guideline sentencing
and looking for moorings to ride out the gathering storms.
Now with *Booker* in hand, the district courts have, at
least, a compass, for their ongoing passage through waters
and territories in which many serious and substantial
issues are lurking just below the surface. Fortunately,

U.S. v. Cooper, Not Reported in F.Supp.2d (2006)

other courts have begun charting those waters and it is on the paths coursed by their work that this court will set its procedural compass and navigate its rulings.

By the terms of 18 U.S.C. § 3553(a), the court must arrive at and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth" here:

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). In doing so, the court is called upon by statute to consider these other relevant factors:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

....

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ...;

(5) any pertinent policy statement ... [issued by the Sentencing Commission);

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). Thus, § 3553(a) instructs a sentencing court to consider the established guideline sentencing range, listed as (4), as one of the statutory factors relevant in arriving at sentencing. "Henceforth,

courts are still required to consider the Guidelines in determining sentences, but they are not required to impose a sentence within the Guidelines range." *United States v. Gonzalez–Huerta,* 403 F.3d at 731 (citation omitted).

The defendants raise several issues concerning the application of *Booker* to their sentencings. First, they argue that the Sixth Amendment as applied in *Booker* requires that their sentences be predicated exclusively on the facts as were decided by the jury and reflected in its verdict. Because the offenses were committed when the guidelines were being applied as mandatory, the defendants contend their right to due process would be violated if sentenced to a term of imprisonment exceeding the mandatory guideline range as calculated in conformance with their Sixth Amendment right. If the court resorts to consulting the guidelines as advisory, the defendants ask for a standard of proof of beyond a reasonable doubt for any guideline enhancement or adjustment advocated by the government.

**\*3** The defendants lodge general and specific objections to any increase in their advisory guideline sentencing ranges based on judge-found facts as a violation of their Sixth Amendment right. The defendants' position requires nothing less than reading and applying *Booker's* Sixth Amendment ruling and ignoring *Booker's* remedial ruling. The defendants are attempting to resuscitate the very Sixth Amendment problem uniquely put to rest by the Court's remedial opinion in *Booker.* Without the provisions that make the guidelines "mandatory and impose binding requirements on all sentencing judges—the statute falls outside the scope of *Apprendi's* requirement." 125 S.Ct. at 764 (quotation marks and citation omitted). "In imposing this remedy, the Court specifically rejected defense suggestions that the Sixth Amendment holding be engrafted on the Sentencing Guidelines, or that provisions of the Sentencing Guidelines allowing judicial factfinding be excised." *United States v. Lynch,* 397 F.3d 1270, 1272 (10th Cir.2005) (citing *Booker,* 125 S.Ct. at 768–69). That the defendants were not charged with the different loss figures and sentencing enhancements and that the jury was not asked to decide these same matters do not bar this court from engaging in judicial factfinding for purposes of determining the advisory guideline sentencing range. The Supreme Court in *Booker* made it unmistakably clear that not only its Sixth Amendment ruling but also its remedial opinion is to be applied retroactively "to all cases on direct review" or those cases not yet final. 125 S.Ct. at 769. The defendants' general and specific objections to applying *Booker's* remedial opinion are overruled.

The defendants' next attempt at evading *Booker's* remedial opinion is by a constitutional challenge based on *ex post facto* principles inherent in the Due Process Clause. The defendants rely on Supreme Court precedent which hold that unforeseeable judicial enlargement of a criminal statute, applied retroactively, violates the Due Process Clause, *see Bouie v. Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), and *Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). The premise to their argument is that *Booker's* remedial opinion by eliminating the mandatory features of the Act judicially enlarged the guidelines and effectively increased the maximum sentence that may be imposed for a federal offense. In the defendants' opinion, the maximum sentence is not the top of the guideline range calculated using the mandatory guidelines and judicial factfinding as before *Booker's* Sixth Amendment ruling but rather the top of the guideline range calculated using the mandatory guidelines without judicial factfinding in conformity with *Booker's* Sixth Amendment ruling. In short, the defendants again seek the benefit of *Booker's* Sixth Amendment ruling unencumbered by *Booker's* remedial ruling.

The court rejects the defendants' argument. First, the defendants would have this court presume it has the authority to ignore the Supreme Court's direct statement in *Booker* which plainly spelled out the retroactive reach of its holding.[1] Second, underpinning the *Ex Post Facto* clause as incorporated into the Due Process Clause is the "right to fair warning of that conduct which will give rise to criminal penalties," *Mark v. United States,* 430 U.S. 188, 191–92, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977),[2] *see Rogers v. Tennessee,* 532 U.S. 451, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001),[3] the defendants, however, fail to articulate how the retroactivity of *Booker's* remedial opinion violates their right to fair warning of what conduct is criminal or of what penalties could be imposed for engaging in such conduct. When they committed their offenses, the defendants were on notice that the United States Code set the maximum terms of imprisonment for the offenses, that these statutory references were considered the legal maximum sentences regardless of guideline calculations, that the mandatory sentencing guidelines required judicial factfinding, and that every circuit court had considered *Apprendi* rights applicable only to statutory maximums not guideline calculations. *See United States v. Duncan,* 400 F.3d 1297, 1307–08 (11th Cir.), *cert. denied,* 546 U.S. 940, 126 S.Ct. 432, 163 L.Ed.2d 329 (2005); *United States v. Gray,* 362 F.Supp.2d 714, 728 (S.D.W.Va.2005); *cf. United States v. Rines,* 419 F.3d 1104, 1107 (10th Cir.2005) ("The only difference between the *Booker* regime under which his sentence is determined and the regime he would have anticipated at

the time of his offense is that the guidelines are not mandatory."), *cert. denied,* 546 U.S. 1119, 126 S.Ct. 1089, 163 L.Ed.2d 905, 2006 WL 37744 (U.S. Jan. 9, 2006) (No. 05–7719). Unlike the defendants in any of the Supreme Court cases cited by them, the defendants had been fairly warned at the time of their offenses of the potential penalties for their conduct. "Even prior to the Sentencing Reform Act, the Supreme Court held that a sentencing court had broad discretion to consider information concerning the defendant's life and characteristics, including conduct on which he had not been convicted." *United States v. Magallanez,* 408 F.3d 672, 684 (10th Cir.) (the adoption of the Sentencing Guidelines did not change the sentencing court's discretion, nor does the Supreme "Court's partial invalidation of the Guidelines in *Booker"* alter this discretion) (citing *Williams v. New York,* 337 U.S. 241, 247, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949) and *United States v. Watts,* 519 U.S. 148, 149, 152, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997)), *cert. denied,* 125 S.Ct. 468 (2005). On the facts of this case, the claimed surprise over the Guidelines becoming advisory does not rise to the constitutionally protected surprise of engaging in conduct that has since become criminal or become punishable in excess of anticipated penalties.

**\*4** Due process arguments similar to what the defendants have advanced here have not enjoyed successes before other courts. The Tenth Circuit and other courts have squarely and firmly rejected these challenges. *United States v. Rines,* 419 F.3d at 1106–07 (the panel did "not tarry long" in rejecting this due process argument); *see, e.g., United States v. Dupas,* 419 F.3d 916, 919–921 (9th Cir.2005); *United States v. Lata,* 415 F.3d 107, 110–12 (1st Cir.2005); *United States v. Duncan,* 400 F.3d at 1306–08 ("We conclude that Duncan had sufficient warning to satisfy the due process concerns."); *United States v. Gray,* 362 F.Supp.2d at 725–28 ("[T]he defendants in the instant case had fair warning of the potential consequences of their conduct by virtue of the statutory maximums set by the United States Code." "[T]he surprise that the defendants may have experienced when learning that the Guidelines were no longer a mandatory system is not analogous to the surprise experienced by the defendants in *Bouie* and *Marks* ...."). The court finds the reasoning in these decisions sound and convincing.

The defendants' last constitutional objection to post-*Booker* procedures concerns the standard of proof. From the premise that *Booker's* Sixth Amendment ruling recognized the right to trial by jury on sentencing enhancements and the concomitant obligation on the government to prove those matters beyond a reasonable

doubt, the defendants again want a narrow reading of *Booker's* remedial opinion as addressing the Sixth Amendment source for the right to a jury trial but not the Fifth Amendment source for the standard of proof. The defendants quote the following footnote six from the dissent of Justice Thomas to *Booker's* remedial opinion:

> The commentary to § 6A1.3 states that "[t]he Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case." The Court's holding today corrects this mistaken belief. The Fifth Amendment requires proof beyond a reasonable doubt, not by a preponderance of the evidence, of any fact that increases the sentence beyond what could have been lawfully imposed on the basis of facts found by the jury or admitted by the defendant.

125 S.Ct. at 798. The defendants observe that some district courts have moved to this heightened standard of proof for all judicial factfinding of sentencing enhancements.

In 1997 the Supreme Court observed that, "The Guidelines state that it is 'appropriate' that facts relevant to sentencing be proved by a preponderance of the evidence, U.S.S.G. § 6A1.3, comment., and we have held that application of the preponderance standard at sentencing generally satisfies due process." *United States v. Watts,* 519 U.S. 148, 156, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (citing in part *McMillan v. Pennsylvania,* 477 U.S. 79, 91–92, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986)). The remedial opinion in *Booker* did not excise this provision from the guidelines, nor did it overrule this precedent with regard to the operation of the advisory guideline system.[4] For that matter, there is a convincing basis to believe that by making the guidelines advisory the Court also cured the constitutional objection over the standard of proof, because the maximum punishment now is set by statute. *United States v. Gray,* 362 F.Supp.2d at 722. Consistent with Supreme Court precedent, recent controlling Tenth Circuit decisions, and persuasive case law from other circuits, this court will continue to employ the same preponderance of evidence standard in making the required judicial findings under the advisory sentencing guidelines. *See United States v. Magallanez,* 408 F.3d at 685 ("Applying the logic of *Watts* to the Guidelines system as modified by *Booker,* we conclude that when a district court makes a determination of sentencing facts by a preponderance test under the now-advisory Guidelines, it is not bound by jury determinations reached through application of the more onerous reasonable doubt standard. In this respect, the prior Guidelines scheme is unchanged by the seeming

revolution of *Booker.*" ); *United States v. Serrata,* 425 F.3d 886, 920 (10th Cir.2005) (quoting *Magallanez* ); *United States v. Mares,* 402 F.3d 511, 519 (5th Cir.) (Because U.S.S.G. § 6A1.3(b) (2004) remains effective, "[t]he sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guideline sentencing range." This same standard governs the determination of "all facts relevant to ... a non-Guidelines sentence."), *cert. denied,* 546 U.S. 828, 126 S.Ct. 43, 163 L.Ed.2d 76 (2005); *McReynolds v. United States,* 397 F.3d 479, 481 (7th Cir.) ("The remedial portion of *Booker* held that decisions about sentencing factors will continue to be made by judges, on the preponderance of the evidence, an approach that comports with the sixth amendment so long as the guideline system has some flexibility in application."), *cert. denied,* 545 U.S. 1110, 125 S.Ct. 2559, 162 L.Ed.2d 285 (2005); *but see United States v. Huerta–Rodriguez,* 355 F.Supp.2d 1019 1028 (D.Neb.), *aff'd,* 2005 WL 3440785 (8th Cir.2005). The court, however, shares Judge Goodwin's assessment in *Gray* that the reasonable doubt standard may be one useful tool in assessing the relative weight of an advisory guideline sentencing range in cases, particularly those which turn largely on the determination of underlying contested factual issues. 362 F.Supp.2d at 723–24.

OBJECTIONS TO GENERAL MATERIAL IN PSRGovernment's Objection to Inclusion of Ten Investigative Summaries and of Paige Heck's Responses in her co-defendants' PSRs.

**\*5** The government complains that these summaries are a small percentage of the interviews conducted and that the PSR does not explain its selection of certain interviews. The government questions the reliance on these summaries over the testimony introduced at trial or before the grand jury. The government does not take issue with the accuracy of the information found in the PSR but reserves its right to assert work product protection. The government also complains that the PSR for a defendant should not include the related comments or responses made by co-defendants. The PSR writer responds that these interviews were selected to furnish the court with a basic background of the facts and elements relevant in guideline sentence determinations and that co-defendants' comments were included so the court would have a complete picture of the different loss theories and approaches when reading each PSR.

Ruling: Rule 32(i)(3)(B) states that "for any disputed portion of the presentence report or other controverted matter" during sentencing, the court must "rule on the dispute or determine that a ruling is unnecessary either

because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." This provision makes clear that "controverted matters at sentencing only require a ruling if the disputed matter will affect the eventual sentence." *United States v. Darwich,* 337 F.3d 645, 666 (6th Cir.2003). The court determines that no ruling is necessary, as the government's objection addresses matters and procedures that will not affect the eventual sentence.

Government's Objection to Co–Defendant's Verification of Family Data
The government summarily objects to the PSR of Paige Heck for relying on the interview of Frank Heck to verify personal and family data and objects to the PSR of Frank Heck for relying on the interview of Paige Heck in a similar way.

Ruling: The court summarily overrules the objection.

Defendant Terence Cooper's Objections to PSR's Statement of Offense Conduct
The defendant generally objects to the totality of paragraphs ¶¶ 69–257 and specifically objects to the PSR omitting certain matters relevant to his good faith defense advanced at trial. These matters include the defendants' use of other companies for billing and consulting, the defendants' reliance on manufacturers to provide the proper codes for their products, the defendants' reliance on Medicare insofar as the defendants submitted claims that accurately identified and described the products being billed, and the defendants' reliance on Midwest's attorney particularly with regard to financial decisions. The defendant Cooper also complains that part of the blame for what he describes as inaccurate coding rests with Medicare and its failure to offer a coherent coding system that could account for the obvious qualitative ranges among the different products.

Ruling: "[G]eneralized, perfunctory objections are not specific allegations of factual inaccuracy and are insufficient to controvert a matter such that the district court's fact-finding obligation under Rule 32(c)(1)[5] is invoked." *United States v. Brown,* 314 F.3d 1216, 1226 (10th Cir.) (quotation and citation omitted), *cert. denied,* 537 U.S. 1223, 123 S.Ct. 1338, 154 L.Ed.2d 1083 (2003). The defendant's general objection to the PSR's findings on offense conduct does not trigger any fact-finding requirements.

**\*6** Not only during trial but at sentencing, the defendant

has been afforded opportunities to present the court with evidence concerning his reliance on others in billing Medicare. The defense of good faith reliance was presented at trial, and the jury returned a guilty verdict notwithstanding this defense. In finding the defendant Cooper guilty on all counts, the jury necessarily found beyond a reasonable doubt that at one or more of the times charged in the indictment the defendant did not act on an erroneous or mistaken belief honestly held but acted with the intent to defraud. A jury's verdict and "the facts necessarily implied by that verdict are binding on a court for sentencing purposes." *United States v. Merlino,* 349 F.3d 144, 159 (3rd Cir.2003) (citation omitted), *cert. denied,* 541 U.S. 965, 124 S.Ct. 1726, 158 L.Ed.2d 409 (2004); *see United States v. Bradstreet,* 135 F.3d 46, 55 (1st Cir.), *cert. denied,* 523 U.S. 1122, 118 S.Ct. 1805, 140 L.Ed.2d 944 (1998). On the other hand, the court understands the jury's verdict does not speak directly to some of the issues critical under the Guidelines and at sentencing. Moreover, the court appreciates after *Booker* the defendant's restored opportunity to present and argue the other § 3553(a) factors in mitigation of his sentence and the court's restored discretion to weigh the same. Consequently, the court will consider the issues and evidence argued at sentencing and those matters presented at trial in support and refutation of the good faith defense insofar as they are shown to be relevant under the different 18 U.S.C. § 3553(a) factors.

Defendant Frank Heck's Objection to ¶ 251
The defendant denies offering Lisa McNish a paycheck without any federal or state withholdings and objects that such a statement is irrelevant to the sentencing.

Ruling: Because the government has not referred to any trial testimony by McNish consistent with this statement, has not offered proof of this statement at the sentencing hearing, and has not established the relevance of this fact to this sentencing, the court sustains the objection.

Defendant Frank Heck's Objection to Using the 1998 Sentencing Guidelines
Though conceding that the conspiratorial acts charged in the indictment continued through December of 1998, the defendant Frank Heck argues that the conduct underlying the substantive charges occurred before December of 1998 and that the 1998 Guidelines Manual added enhancements for mass marketing and sophisticated means which, if applied, would result in ex post facto violations.

U.S. v. Cooper, Not Reported in F.Supp.2d (2006)

Ruling: Generally, a sentencing court is to apply the Guidelines Manual effective on the date of sentencing rather than the Manual effective at the time of the offense. U.S.S.G. § 1B1.11(a)(2004). " 'The Ex Post Facto Clause, however, prohibits retroactive application of an amended guideline provision if the amendment disadvantages the defendant" ' by inflicting a greater punishment for an offense than the law allowed when the offense was committed. *United States v. Swanson,* 360 F.3d 1155, 1166 (10th Cir.2004) (quoting *United States v. Orr,* 68 F.3d 1247, 1252 (10th Cir.1995), *cert. denied,* 516 U.S. 1064, 116 S.Ct. 747, 133 L.Ed.2d 695 (1996)). Thus, if the use of the Guidelines Manual effective on the date of sentencing would violate the ex post facto clause, a court must use the Guidelines Manual effective when "the offense of conviction was committed." U .S.S.G. § 1B1.11(b)(1)(2004). Under the "one-book" rule, a defendant may not select provisions from different Guideline Manuals in order to secure the lightest sentence. *United States v. Aptt,* 354 F.3d 1269, 1276 (10th Cir.2004).

**\*7** The defendant Heck does not dispute that using the current Guideline Manual would violate the ex post facto clause, but she does challenge the conclusion that it is the 1998 Guidelines Manual rather than the 1997 Guidelines Manual that was effective when "the offense of conviction was committed." Application Note 2 to § 1B1.11 clarifies that "[u]nder subsection (b)(1), the last date of the offense of conviction is the controlling date for ex post facto purposes." U.S.S.G. § 1B1.11, comment. (n. 2). More specifically, the last date of the offense alleged in the indictment of which a defendant is convicted is the controlling date for ex post facto purposes. U.S.S.G. § 1B1.11, comment. (n.2); *see United States v. Gary,* 291 F.3d 30, 36 (D.C.Cir.2002); *United States v. Broderson,* 67 F.3d 452, 456 (2d Cir.1995). If a defendant is convicted of more than one crime, with one or more committed before a revised edition of the Guidelines becomes effective and the rest occurring after the effective date, the revised edition is applied to all of the offenses. *See* U.S.S.G. § 1B1.11(b)(3); *United States v. Sullivan,* 255 F.3d 1256, 1260 (10th Cir.2001) (upholding the validity of this Guideline provision as applied), *cert. denied,* 534 U.S. 1166, 122 S.Ct. 1182, 152 L.Ed.2d 124 (2002). Conspiracy is a continuing offense, "the ending date of which determines the applicable sentencing guidelines." *United States v. Sullivan,* 255 F.3d at 1263.

Count one of the first superseding indictment charges the defendants with a conspiracy that continued through December of 1998 and further alleges certain unlawful transfers of monies as occurring after November 1, 1998. Because it became effective November 1, 1998, the 1998

Guidelines Manual was effective when "the offense of conviction was committed." The defendant's objection to using the 1998 Guidelines Manual is overruled, and his other ex post facto objections will be addressed, if necessary, in the court's discussion of the specific enhancements.

**Defendant Paige Heck's Objections to Paragraphs 69, 76, 79, and 84**

She objects to ¶ 69 for omitting a reference to the jury's finding of not guilty on counts 2, 3, 4, 5, 6, 17 and 18. She objects to ¶ 76 for describing the wheelchairs provided in the upcoding scheme as "inexpensive" rather than less expensive. She objects to ¶ 79 and denies involvement in Infinity Medical Supply or Infinity Medical Products. She objects to ¶ 84 for not mentioning that the defendants hired consulting services to advise them on Medicare rules and regulations.

Ruling: Only the defendant's objection to ¶ 79 controverts a statement found in the PSR, but it is not a controverted matter that will affect the sentencing here or will be considered in sentencing. Thus, no ruling is necessary. The defendant's other objections also do not require a ruling. The court is mindful of not only the jury's verdict but also the evidence admitted at trial. The court also agrees that Midwest provided wheelchairs which were less expensive rather than inexpensive.

CALCULATION OF LOSS OBJECTIONS
**\*8** All four parties have filed numerous and varied objections to the loss calculations appearing in the PSR. Rather than extending the length of this order by laying out each of the different objections and responses thereto and then ruling separately on each objection, the court will focus principally on the common issues advanced in the different objections and decide the issues accordingly. The parties should be able to discern the court's treatment of the specific objections from its general rulings and the principals endorsed in them.

Under the Sentencing Guidelines, the offense level for a crime of fraud is driven by the dollar value of the loss caused by the criminal conduct. The purpose of the loss calculation is to reflect "the magnitude of the crime at the time it was committed" and thereby the defendant's culpability. *United States v. Nichols,* 229 F.3d 975, 979 (10th Cir.2000). Application Note 8 to § 2F1.1 of the 1998 Sentencing Guidelines provides that "loss" is "the value of the money, property or services unlawfully taken" but "if an intended loss that the defendant was

attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." From what is generally argued, the parties apparently agree that loss here should be determined under the concept of actual loss, that is, " 'the amount of money the victim has actually ended up losing at the time of sentencing, not what it could have lost." ' *United States v. Schild,* 269 F.3d 1198, 1201 (10th Cir.2001) (citation and quotation omitted), *cert. denied,* 535 U.S. 944, 122 S.Ct. 1333, 152 L.Ed.2d 238 (2002).

In determining loss under U.S.S.G. § 2F1.1(b)(1), the sentencing court "is not necessarily limited to the funds identified with the crime charged in the indictment, or which resulted in a judgment of guilty." *United States v. Yarnell,* 129 F.3d 1127, 1137 (10th Cir.1997) (quoting *United States v. Kunzman,* 54 F.3d 1522, 1532 (10th Cir.1995)). The sentencing guidelines include as relevant conduct that which was reasonably foreseeable and in furtherance of the jointly undertaken criminal activity. U.S.S.G. § 1B1.3(a)(1). The Tenth Circuit recently summarized:

> A defendant convicted of conspiracy is accountable for reasonably foreseeable conduct in furtherance of the jointly undertaken criminal activity. *See* U.S.S.G. § 1B1.3(a)(1)(A). However, a defendant's accountability only extends to the criminal activity that he agreed to undertake. *See id.* § 1B1.3 n. 2. This means "proper attribution at sentencing requires ... particularized findings about, the scope of the specific agreement the individual defendant joined in relation to the conspiracy as a whole." *United States v. Melton,* 131 F.3d 1400, 1404 (10th Cir.1997) (internal quotation marks omitted). In the context of a conspiracy to defraud, we have held that a defendant is accountable for the entire loss created by a fraudulent organization if the defendant played a major role in the organization and the losses were reasonably foreseeable. *See United States v. Osborne,* 332 F.3d 1307, 1311–12 (10th Cir.2003). If the defendant's role in the conspiracy was less substantial, then particularized findings about the defendant's agreement to join the conspiracy must support the scope of the defendant's role in the conspiracy. *See Melton,* 131 F.3d at 1406. Moreover, a defendant is not accountable for the conduct of members of a conspiracy "prior to the defendant joining the conspiracy, even if the defendant knows of that conduct." U.S.S .G. § 1B1.3 n. 2.

**\*9** *United States v. Dazey,* 403 F.3d 1147, 1176–1177 (10th Cir.2005).

The burden of proving the amount of loss rests with the government which is seeking this sentencing enhancement. *United States v. Nichols,* 229 F.3d at 979. This burden entails offering proof of the enhancement by a preponderance of the evidence. *United States v. Keifer,* 198 F.3d 798, 800 (10th Cir.1999). As a general rule, the government bears the burden of proof for a sentence increase, and the burden shifts to the defendant to prove any decrease in sentence. *United States v. Rice,* 52 F.3d 843, 848 (10th Cir.1995); *United States v. Rutter,* 897 F.2d 1558, 1560 (10th Cir.1990). Thus, if the government meets its burden of proof on a sentence enhancement or increase, the burden shifts to the defendant to disprove the same as inapplicable or inappropriate. *United States v. Maldonado,* 216 F.3d 1089, 2000 WL 825717 at \*3 (10th Cir.2000).

The court may rely on facts appearing in the PSR to which no objection is lodged and on those facts subsequently proved by the government. *United States v. Keifer,* 198 F.3d at 800. When there has been a trial, the government may rely on the trial evidence and need not present any new evidence at the sentencing hearing. *United States v. Albers,* 93 F.3d 1469, 1487 (10th Cir.1996). Having presided over the trial, the court is familiar with the evidence admitted at trial and will rely on its recollection and impression of the same without disturbing the general findings embodied in the jury's verdict. *cf. United States v. Diaz,* 189 F.3d 1239, 1250 (10th Cir.1999), *cert. denied,* 529 U.S. 1031, 120 S.Ct. 1448, 146 L.Ed.2d 334 (2000). The determination of loss is not one that requires precision, for a reasonable estimate based on available evidence is sufficient. *United States v. Wells,* 127 F.3d 739, 748 (8th Cir.1997).

Section 2F1.1 of the 1998 Guidelines identifies different factors related to the kind of fraud that will influence the determination of the loss in a particular case. "[W]here the commentary to the applicable section of Chapter Two includes several application notes that describe alternative methods of computing the offense level depending on the particular facts of the case, the sentencing court should choose the "most applicable" application note." *United States v. Wells,* 127 F.3d at 745. For fraud involving the misrepresentation of the value of an item or product, application note 8(a) provides:

> A fraud may involve the misrepresentation of the value of an item that does have some value (in contrast to an item that is worthless). Where, for example, a defendant fraudulently represents that stock is worth $40,000 and the stock is worth only $10,000, the

loss is the amount by which the stock was overvalued (*i.e.,* $30,000). In a case involving the misrepresentation concerning the quality of a consumer product, the loss is the difference between the amount paid by the victim for the product and the amount for which the victim could resell the product received.

**\*10** For fraud involving loan applications, application note 8(b) provides:

> In fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan. However, where the intended loss is greater than the actual loss, the intended loss is to be used.

As discussed below, the court finds these two application notes to be the most applicable here in calculating the health fraud loss and the mail fraud loss, respectively.

*Health Care Fraud Losses*

The government posits that the losses attributable to the defendants' health care fraud exceed $5.6 million combining the $3,504,520.23 used in the PSR as representing the documented[6] fraud loss and the $2,187,843.84 not used in the PSR but representing the undocumented[7] fraud loss. According to the government's investigation, when Midwest was in business it submitted billings that totaled $10,124.703.57 of which Medicare paid $4,725,083.62 for claims for power wheelchairs, power wheelchair accessories, and wheelchair cushions or

eighty percent of $5,906,354.52. The government proposes as its theory that the health care fraud loss is the total amount of all submitted claims which either contain an upcoded item or lack the supporting documentation required by Medicare regulations. The government premises this theory on Medicare's practice and procedure of denying an entire claim if it knows that any part of the claim was false or upcoded or if it learns that supporting documentation does not exist. In support of this position that loss equates most nearly with the total of Midwest's submitted claims, the government points to Medicare audits first done while Midwest was in business and again conducted following the convictions in this case and to the one hundred percent denial rates consistently recommended in each.

The defendants repeat several of their *Booker*-type challenges to the loss calculations, all of which are denied for the same reasons discussed above. The defendants further contend the loss calculations adopted in the PSR and those loss calculations also advocated by the government are contrary to the net loss approach followed in this circuit for the 1998 version of the Sentencing Guidelines. Since Midwest's patients received durable medical equipment, the defendants say that a net loss approach is appropriate and that this loss should include only what Medicare overpaid as result of the unlawful upcoding of wheelchairs and wheelchair cushions. Relying on the government's spreadsheet and what is alleged in the indictment, the defendants begin with the overpaid amount of $642,973 and then assert the deletion of some categories from this amount. The defendant Cooper wants to exclude the overpayments for the 98 P7E wheelchairs provided between September of 1996 through October of 1997, because Medicare did not publish a code for this wheelchair in its manuals and did not tell the wheelchair manufacturer of an assigned code until September of 1997. As the jury's verdict does not include any specific finding that Midwest's billing of the P7Es during this period was fraudulent, the defendant Cooper asks the court to treat this overpayment loss as attributable to possibly civil or regulatory violations but not criminal in character. The defendant points to some overpayments as attributable to billing companies' errors rather than Midwest's alleged criminal conduct but admits these documented instances of error are negligible and would not affect base offense level determinations.[8] The defendant Paige Heck seeks to reduce the amount of overpayments by the loss amounts charged in those counts of which she was acquitted.

**\*11** As spelled out in application note eight to U.S.S.G. § 2F1.1, "loss is the value of the money, property, or services unlawfully taken." The principal allegation of

U.S. v. Cooper, Not Reported in F.Supp.2d (2006)

fraud on which this case was prosecuted was that the defendants coded less expensive wheelchairs and wheelchair cushions as if they were the more expensive versions.[9] In other words, the defendants were charged with and convicted of fraudulently misrepresenting the value or quality of these delivered products by submitting claims with codes reserved for the more expensive versions of the same products. Application note eight to § 2F1.1 identifies an analogous situation of determining loss when the value of an item has been fraudulently misrepresented:

A fraud may involve the misrepresentation of the value of an item that does have some value (in contrast to an item that is worthless). Where, for example, a defendant fraudulently represents that stock is worth $40,000 and the stock is worth only $10,000, the loss is the amount by which the stock was overvalued (*i.e.* $30,000).

This method for determining loss is not unlike the net loss approach adopted by the Tenth Circuit in *United States v. Smith,* 951 F.2d 1164 (10th Cir.1991):

Our approach thus distinguishes between naked fraudulent takings, and exchanges of property where the wrongdoer merely misrepresents the value of the consideration advanced. If a fraud is a naked taking of property, the net and gross loss are the same since the victim got nothing of value in return for the property given up. However, if the fraud consists of an unequal exchange of property, the loss or taking consists only of the *difference* in value between what was given and what was obtained. In any event, it is a *net* value that must be used to measure loss. Any other approach ignores reality.... A thief who steals $100,000 is more culpable than a salesman who obtains $100,000 by selling a victim an $80,000 house he fraudulently represents as being worth $100,000. In the latter case, it makes no sense to suggest that $100,000 is the accurate measure of the victim's

loss.

951 F.2d at 1167 (citations omitted). Other than some allegations of isolated instances when Medicare may have been billed twice for equipment, the evidence at trial did not prove that Midwest submitted claims for equipment that was never delivered to Medicare beneficiaries.

Citing a decision from Fifth Circuit,[10] the government contends the net loss approach advocated by the defendants was a substantive amendment to the Guidelines first adopted in 2001 which cannot be applied retroactively without violating the "one book" rule. The weight of Tenth Circuit case law[11] eviscerates the government's position, for the net loss or net value approach was consistently followed in this circuit for pre–2001 versions of the Guidelines. The Tenth Circuit precedent is emphatic on this point: "Any other approach ignores reality." *United States v. Smith,* 951 F.2d at 1167.

**\*12** The government attempts to distinguish this precedent arguing that the net loss approach arose from the bank fraud context and that the defendants cite "no health care fraud cases that adopt" this net loss approach. By the same token, the government does not cite any cases that limit the net loss approach to the bank fraud context or that refuse to apply this approach to government benefit fraud case subject to pre–2001 versions of the Guidelines.[12] The government makes the sweeping allegation that the defendants "submitted no legitimate claims to Medicare" but bases its allegation of illegitimacy not on whether defendants provided anything of value but on whether the defendants complied with Medicare's numerous regulations for submitting claims. As discussed in footnote nine, this court believes the government's allegations and arguments on loss are not narrowly focused on measuring the defendants' criminal culpability but seek to hold the defendants' criminally accountable for ineptitude and carelessness in preparing, documenting and submitting claims in compliance with Medicare's complex regulatory requirements. Of the different methods for determining loss outlined in the application notes to U.S.S.G. § 2F1 .1, the misrepresentation of value is the most appropriate method as this is what the defendants did in upcoding the equipment sold to Medicare beneficiaries. The government advocates using the approach "involving the diversion of government program benefits" with loss being "the value of the benefits diverted from intended recipients or uses." The government's authorities are distinguishable and not persuasive.[13] On the facts unique to this case and on the weight of Tenth Circuit precedent governing the use of the pre–2001 Guidelines, the court

concludes the net loss approach is applicable and appropriate here and sustains the defendants' objection in part.

The court, however, overrules the defendants' objection to including the upcoding attributable to the 98 P7E wheelchairs billed prior to Medicare's publication of a code assignment for this particular model of wheelchair. The defendants argue that "one cannot upcode when there is no code." The defendants' own testimony at trial refutes the argument that Medicare's delay in publishing a code assignment caused them to upcode the P7Es. *See* (Dk. 341, Cooper Testimony, pp. 54–57). The record at trial and the arguments in the defendants' sentencing memoranda do not convince the court that the defendant's coding decision on the P7Es was the result of the delayed code assignment. This reason is not a persuasive basis for excluding the loss attributable to the 98 P7Es.

The defendant Paige Heck objects to including the loss alleged in counts two through six of which she was acquitted. In a conspiracy to defraud, the court may hold a defendant accountable "for the entire loss created by a fraudulent organization if the defendant played a major role in the organization and the losses were reasonably foreseeable." *United States v. Dazey,* 403 F.3d at 1176 (citation omitted). The evidence at trial fully sustains a finding by a preponderance of the evidence that Paige Heck's role was substantial in the fraudulent organization and that the losses alleged in those counts were reasonably foreseeable to her. While each defendant was principally responsible for different aspects of Midwest's business, they frequently met together, discussed each other's operations, and jointly decided the more important matters involving Midwest's business. The evidence at trial establishs that Paige Heck knew of the upcoding and despite her role and authority in the business permitted it to continue. The court overrules Paige Heck's objection to including the losses alleged in counts two through six.

**\*13** Thus, the court finds that the net loss to Medicare from the health care fraud is the $642,972.82 alleged in the indictment and proved at trial by the government. Of course, this figure represents only eighty percent of the billed purchase price, and the court must include in that loss the additional twenty percent billed to patients or third-party insurers who were liable for this amount under the Medicare program and contracts with Midwest. This calculated loss is $803,716.02. The court believes this figure fairly and adequately represents the harmfulness and seriousness of the defendants' conduct. The court does not find an upward departure warranted by the government's allegation of a loss of confidence in the Medicare system created by the defendants' criminal conduct.

### Wire Fraud Loss

The government here seeks a total loss of $2,141,774.37 corresponding to Midwest's consent to judgment that resolved the civil lawsuit brought by Invacare Corporation. As there can be any number of circumstances and factors that drive parties to reach a settlement, some of which would have nothing to do with the actual loss sustained by the fraud victim, the court declines the government's proposal simply to accept the settlement amount as a reliable measure of the actual loss resulting from the defendants' wire fraud for which they were convicted in counts fourteen and fifteen.

Count fourteen charged the defendants with wire fraud against Invacare in executing and transmitting personal guaranties on May 4, 1998. Loss is that amount of money lost by the victim which is "attributable to" a defendant's fraud. *United States v. Haddock,* 12 F.3d 950, 961 (10th Cir.1993). According to the testimony of Invacare representatives, these personal guaranties did not influence Invacare's decision to open Midwest's credit line or to extend it on any number of occasions even when it reached $1.6 million just before May of 1998. After receiving the guaranties, Invacare released Midwest's open order, took Midwest's accounts off of credit hold, and completed negotiations on the commercial purchase agreement # 9558. The parties have not pointed the court to evidence with which to quantify the value of the product released as a result of the personal guaranties, and the record does not suggest that it was a significant amount of product, over $100,000.00. As far as count fifteen, the defendants were convicted of wire fraud against Invacare in executing and transmitting the commercial purchase agreement # 9558. The face amount of this short term note was nearly $600,000. Thus, the court determines the actual loss for the wire fraud committed in these two counts is $600,000 and accordingly sustains the defendants' objections and overrules the government's objections.[14]

Totaling the fraud loss for counts one through fifteen, the court arrives at approximately $1.4 million ($803,716.02 plus $600,000) for an offense level of 17 (base offense level of 6 plus an enhancement of 11 levels for a loss of more than $800,000 but less than $1.5 million).

### Money Laundering Loss

**\*14** The court sustains the defendants' objections to any money laundering loss in excess of the loss calculated

above as resulting from the health care fraud. Thus, the court reduces the loss from $1,515,440.02 to $803,716.02 and reduces the loss enhancement from five to four.

OBJECTIONS TO OTHER ENHANCEMENTSGovernment's Objection to Omission of Mass Marketing Enhancement

The government objects that the defendants should receive a two-level enhancement for mass marketing pursuant to § 2F1.1(b)(3) based on their advertising of Midwest's products in newspapers across the country. The government points to sample newspaper advertisements for a "Senior Wheels Program" with a toll-free number for a "mobility needs" visit that connected callers to Midwest's offices. Information obtained during those calls was forwarded to area sales representatives who then made sales visits to the callers' homes. The government also cites Midwest's own description of its marketing program which touted that "the vast majority of Midwest's customer base (approximately 90%) contact the company's office or a local representative in response to nationwide print media campaigns." (Dk.354, p. 34). The defendant Frank Heck objects that the government has not proved the defendants ran any of the newspaper advertisements after November 1, 1998, the effective date of the guideline amendment that added the mass-marketing enhancement.

Ruling: Section 2F1.1(b)(3) provides for a two-level increase "[i]f the offense was committed through mass-marketing." The guidelines commentary defines mass-marketing as "a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (A) purchase goods or services; (B) participate in a contest or sweepstakes; or (C) to invest for financial profit." U.S.S.G. § 2F1.1 comment. (n. 3). The enhancement reaches passive advertising of goods or services through such mass-marketing means as the Internet or newspapers that reach a large number of persons in order to solicit or induce them to become customers/victims in the scheme to defraud. *See, e.g., United States v. Magnuson,* 307 F.3d 333, 335 (5th Cir.2002) (advertisement in a tabloid newspaper), *cert. denied,* 537 u.S. 1178 (2003); *United States v. Blanchett,* 41 Fed. Appx. 181, 182–83, 2002 WL 511745 (10th Cir. Apr.5, 2002) (advertisements on eBay); *United States v. Pirello,* 255 F.3d 728, 732 (9th Cir.), *cert. denied,* 534 U.S. 1034, 122 S.Ct. 577, 151 L.Ed.2d 448 (2001) (advertisements on Internet bulletin board). Some of the concerns underlying this enhancement may be to measure the scope of a defendant's fraudulent scheme and to protect the integrity of these mass-marketing means. *United States v. Fredette,* 315 F.3d 1235, 1244 (10th Cir.), *cert. denied,* 538 U.S. 1045, 123 S.Ct. 2100, 155 L.Ed.2d 1084 (2003). The defendants placement of Midwest advertisements in newspapers around the nation constitutes mass-marketing intended to induce Medicare beneficiaries to purchase durable medical equipment from Midwest as part of a scheme to defraud Medicare and the beneficiaries through upcoding.

**\*15** The mass-marketing enhancement was added to the Sentencing Guidelines in amendments that became effective November 1, 1998. U.S .S.G.App. C, Vol. II, amend. 577 (2003). The defendant Frank Heck objects that the application of this enhancement essentially would violate the Ex Post Facto Clause. A sentencing court generally applies the Guidelines Manual effective on the date of sentencing unless their application would violate the Ex Post Facto Clause of the United States Constitution. *United States v. Svacina,* 137 F.3d 1179, 1186 (10th Cir.1998). "The Ex Post Facto Clause is violated if the court applies a guideline to an event occurring before its enactment, and the application of that guideline disadvantages the defendant 'by altering the definition of criminal conduct or increasing the punishment for the crime." ' *Id.* (quoting *Lynce v. Mathis,* 519 U.S. 433, 441, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997)). If a conspiracy commences under one set of Guidelines and continues operating into the effective period of the Guideline amendments, "there is no violation of the ex post facto clause in applying the Guidelines in effect at the time of the last act of the conspiracy." *United States v. Stanberry,* 963 F.2d 1323, 1327 (10th Cir.1992) (citing in part *United States v. Shewmaker,* 936 F.2d 1124, 1130 (10th Cir.1991), *cert. denied,* 502 U.S. 1037, 112 S.Ct. 884, 116 L.Ed.2d 788 (1992)). Because the evidence at trial proves that the defendants committed acts in furtherance of the conspiracy to defraud after November 1, 1998, it is immaterial to the proper application of this enhancement whether the defendants continued to engage in mass-marketing after that date. *See United States v. Cassidy,* 48 Fed. Appx. 428, 446, 2002 WL 2022520 at *13 (4th Cir.2002).

The court sustains the government's objection and will apply the mass-marketing enhancement.

Government's Objection to Omission of Sophisticated Means Enhancement

The government objects that the PSR fails to recommend a two-level enhancement pursuant to U.S.S.G. § 2F1.1(b)(5)(C) for sophisticated means. The government alleges the sophisticated means used to perpetrate and

conceal the defendants' fraud includes the falsification of numerous documents, use of billing companies, use of sales persons, hiring inexperienced and submissive staff, duping physicians to sign certificates of medical necessity, exploiting Medicare beneficiaries' desires for power wheelchairs, exploiting the vulnerability of the Medicare system, concealing the true owners from Invacare, laundering proceeds to prevent Invacare from seizing accounts payable, and making repeated false statements to Invacare. The defendants oppose this enhancement denying that the allegations of fraud on which they were convicted entail sophisticated means.

Ruling: The discussion in application note 15 lays out the intended parameters for this enhancement:

> For purposes of subsection (b)(5)(C), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction would ordinarily indicate sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore bank accounts also ordinarily would indicate sophisticated means.

*16 In short, the intent of this enhancement is to punish the more cunning and scheming defendants who employ complex and involved means so as to avoid or delay being found out. Thus, this enhancement should be reserved for those defendants who employ more complex or intricate means than those typically used in an ordinary Medicare fraud scheme. *Cf. United States v. Montano,* 250 F.3d 709, 714–15 (9th Cir.2001).

As summarized above, the government offers a litany of what it argues are sophisticated means. Most of the examples require an independent finding of a fraudulent intent sweeping through the defendants' entire business, some seem to be nothing more than common business practices of durable medical equipment providers, and others fall into the category of means used in ordinary Medicare fraud cases. Just as it did in prior sections of this order, the court rejects government's arguments for finding that the defendants' fraud permeated nearly every aspect of Midwest's business. The court remains convinced that the defendants were careless and inexperienced business people whose greed for greater profit margins began their quick descent into criminal fraud. Their method of upcoding was hardly sophisticated, and the evidence at trial did not prove that their decision to use billing companies was related to the upcoding. As evidenced by their decision to sign personal guaranties for Midwest's debt, the defendants' dealings with Invacare were not sophisticated. The government's objection is overruled.

Government's Objection to Omission of Obstruction of Justice Enhancement

The government argues that all three defendants should receive this enhancement for committing perjury in their trial testimony. For each defendant, the government cites portions of his or her trial testimony and says each portion was contradicted by exhibits or testimony from other witnesses. The defendants have not responded to the government's objections.

Ruling: Perjury, in the context of § 3C1.1, occurs when "a witness testifying under oath or affirmation ... gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Hawthorne,* 316 F.3d 1140, 1145 (10th Cir.) (quoting *United States v. Dunnigan,* 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993) (citing the federal perjury statute, 18 U.S.C. § 1621)), *cert. denied,* 540 U.S. 884 (2003). It is well established that a criminal defendant has a right to testify, but that right does not include the right to commit perjury. *LaChance v. Erickson,* 522 U.S. 262, 266, 118 S.Ct. 753, 139 L.Ed.2d 695 (1998). "An automatic finding of untruthfulness, based on the verdict alone, would impinge upon the constitutional right to testify on one's own behalf." *United States v. Markum,* 4 F.3d 891, 897 (10th Cir.1993) (citation omitted). Thus, not every defendant who takes the stand and is later convicted deserves a § 3C1.1 enhancement. *Hawthorne,* 316 F.3d at 1145 (citing *Dunnigan,* 507 U.S. at 95). For example, the court should deny an enhancement when the defendant gives inaccurate testimony caused by "confusion, mistake or faulty memory" or when a defendant testifies about " 'matters such as lack of capacity, insanity, duress, or self-defense" and the jury simply finds " 'the testimony insufficient to excuse criminal liability or prove lack of intent." ' *Id.* (quoting

*Dunnigan,* 507 U.S. at 95).

**\*17** In imposing a contested enhancement based upon perjury of trial testimony, the sentencing " 'court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same," ' using the perjury definition furnished in *Dunnigan. Id.* (quoting *Dunnigan,* 507 U.S. at 95). The Supreme Court offers that "it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding" but that a general finding encompassing the different elements will suffice when the trial record offers so many instances of contradicted testimony that the defendant could not have been just confused or mistaken at trial. *Dunnigan,* 507 U.S. at 95–96. The Tenth Circuit requires more for this enhancement, namely an explicit finding of at least the substance of the defendant's perjurious testimony. *Hawthorne,* 316 F.3d at 1146.

The court finds that Terence Cooper testified falsely about the advice he received from Invacare sales representative, Mark Hill, in the fall of 1997 about the proper coding of the Power 9000 wheelchairs as K12. Hill testified that he met with the defendants at their office in the fall of 1997 and told them it would be upcoding to bill the Power 9000 wheelchairs as K11 instead of K12. The defendant Cooper first testified that Hill told them in the fall of 1997 to call Invacare headquarters about the proper coding of the wheelchairs and that during their call they were told by someone employed by Invacare to bill the Power 9000 wheelchairs as K11. (Dk. 341 at pp. 139–41). Cooper also testified that Hill never told him in the fall of 1997 to bill the Power 9000 wheelchairs as K12. (Dk. 341 at p. 241). Cooper's false testimony concerns the material issue of his knowledge of the proper codes and of his direct responsibility for the upcoding. Cooper acted willfully in falsely denying that Hill advised him on the proper coding of Invacare wheelchairs.

The court also finds that the defendant Frank Heck falsely testified denying Mark Hill had told him that the Power 9000 and P7E wheelchairs should be coded as K12, that Midwest was using the wrong codes for these wheelchairs, and that Midwest was upcoding these wheelchairs. Frank Heck also falsely denied saying to Hill that because of the commissions paid its sales representatives Midwest could not afford the lower profit margins that came with buying the more expensive models that carried the higher codes. Frank Heck's testimony in this regards goes to the material element of his knowledge of the upcoding of wheelchairs and divulges a material motive for risking such criminal conduct. The court is convinced that the defendant acted

willfully in providing this false testimony.

The court finds that the defendant Paige Heck falsely testified denying that Mark Hill had told her that the Power 9000 and P7E wheelchairs should be coded as K12. As with the other defendants, this testimony goes to the critical element of her knowledge that the wheelchairs were being upcoded. The court finds that the defendant acted willfully in providing this false testimony.

**\*18** Based on these findings, the court imposes two-level enhancements for obstruction of justice to each of the defendants for falsely denying they had been told by Mark Hill, Invacare's sales representative, about the proper codes to use for the Power 9000 and P7E wheelchairs.

Government's Objection to the Omission of Laundered Funds Enhancement
The government objects that the PSR fails to recommend a two-level enhancement pursuant to U.S.S.G. § 2S1.2(b)(1)(B). The defendants do not respond to this objection.

Ruling: This guideline requires an enhancement for a section 1957 violation "if the defendant knew that the funds were not merely criminally derived, but were in fact the proceeds of a specified unlawful activity." U.S.S.G. § 2S1.2, comment. (backg'd.); *see also United States v. Lowder,* 5 F.3d 467, 473 (10th Cir.1993). The defendants were charged and convicted with laundering proceeds from health care fraud and conspiracy to commit health care fraud. Health care fraud and conspiracy to commit health care fraud qualify as "Federal health care offenses" specified in 18 U.S.C. § 1956(c)(7)(F). The evidence at trial fully established that the defendants knew the proceeds were not merely criminally derived but were the result of their unlawful upcoding. The court sustains the government's objection.

Government's Objection to Frank Heck's Criminal History Category
The PSR for Frank Heck correctly scores two criminal history points pursuant to U.S.S.G. § 4A1.1(c) for the convictions described in paragraphs 323 and 324 and accordingly recommends a criminal history category of two. Paragraph 359 mistakenly reports that the defendant's criminal history category is one, and the court sustains the government's objection to the error appearing in that paragraph.

Defendants' Objection to the Enhancement Pursuant to U.S.S.G. § 2F1.1(b)(2)
The defendant Cooper objects to this enhancement disputing the proof of more than minimal planning, the defendant Paige Heck objects that its application violates *Booker* and *Blakely,* and the defendant Frank Heck does not object to the enhancement.

Ruling: Section 2F1.1(b)(2) creates a two-level enhancement for an offense involving "(A) more than minimal planning, or (B) a scheme to defraud more than one victim." The defendant Cooper does not object to the PSR's finding at ¶ 300 "that there is more than one victim in this matter." The court determines that no ruling on the defendant Cooper's objection is necessary because this enhancement remains fully applicable based on the number of victims. *See* Fed.R.Crim.P. 32(i)(3)(B). Prior sections of this order address the defendant Paige Heck's objections on *Blakely* and *Booker* grounds. The defendants' objections to this enhancement are overruled.

Defendants' Objections to Role Enhancement
The PSR recommends that all three defendants receive two-level enhancements as organizers or leaders based on their respectively significant and essential roles in Midwest's business. The defendant Cooper argues that the government alleged and argued that the defendants were equally culpable and that the defendants' employees were not criminally liable. Thus, Cooper challenges that he was not the organizer, leader, manager, or supervisor of any other criminally responsible participant for purposes of U.S.S.G. § 3B1.1(c). The defendant Frank Heck generally denies that he qualifies as a leader and argues the evidence fails to prove that he recruited accomplices, received a larger share of profits, participated or planned more than his co-defendants, or exercised greater control over employees than his co-defendants. The defendant Paige Heck contends her co-defendants were responsible for the decisions related to coding and billing and denies involvement in those matters. She emphasizes testimony from former Midwest employees that Paige Heck instructed them to do what was right and comply with Medicare regulations. She also argues that this testimony combined with the jury's verdict finding her not guilty of seven counts (five of the twelve health care fraud counts and two of the fourteen money laundering counts) justifies a mitigating role adjustment.

**\*19** Ruling: "If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels." U.S.S.G. §

3B1.1(c). The burden of proving this enhancement by a preponderance of the evidence rests with the government. *United States v. Anderson,* 189 F.3d 1201, 1211 (10th Cir.1999). The PSR recommends the enhancement based on a finding of either a leader or organizer. This enhancement is intended to address "either the exercise of control over other participants or the organization of others for the purpose of carrying out the crime." *United States v. Tagore,* 158 F.3d 1124, 1131 (10th Cir.1998) (citations omitted). "There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1, comment. (n. 4); *see United States v. Knox,* 124 F.3d 1360, 1364 (10th Cir.1997).

Courts should weigh and consider facts bearing on "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, comment. (n. 4); *see United States v. Baez–Acuna,* 54 F.3d 634, 638–39 (10th Cir.1995). These are only factors to consider, "and the guidelines do not require that each be satisfied for § 3B1.1 to apply." *United States v. Lacey,* 86 F.3d 956, 967 (10th Cir.) (citation omitted), *cert. denied,* 519 U.S. 944, 117 S.Ct. 331, 136 L.Ed.2d 244 (1996). "In considering these factors, the sentencing court should remain conscious of the fact that the gravamen of this enhancement is control, organization, and responsibility for the actions of other individuals because § 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential figures." *United States v. Anderson,* 189 F.3d at 1211 (quoting *United States v. Torres,* 53 F.3d 1129, 1142 (10th Cir.), *cert. denied,* 515 U.S. 1152, 115 S.Ct. 2599, 132 L.Ed.2d 845 (1995)).

The enhancement applies to one serving as an organizer in "devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy." *United States v. Valdez–Arieta,* 127 F.3d 1267, 1272 (10th Cir.1997). " 'An organizer arranges a number of people engaged in separate activities into an essentially orderly operation." ' *United States v. Hutching,* 75 F.3d 1453, 1458 (10th Cir.) (quoting *United States v. Smith,* 24 F.3d 1230, 1233 (10th Cir.), *cert. denied,* 513 U.S. 905, 115 S.Ct. 270, 130 L.Ed.2d 188 (1994)), *cert. denied,* 517 U.S. 1246 (1996). "It is not necessary to find the defendant exercised control over other participants to qualify for an organizer enhancement." *United States v. Tagore,* 158 F.3d at 1131

(citing *United States v. Valdez–Arieta,* 127 F.3d at 1272).

**\*20** The evidence at trial was replete with proof that the defendants, Terence Cooper, Frank Heck and Paige Heck, held roles as organizers and leaders in the conspiracy to commit health care fraud through upcoding. Their own testimony establishes the decision-making authority that each held and exercised individually and jointly in planning and organizing others to carry out the scheme for upcoding the wheelchairs and cushions. In addition, there was convincing testimony at trial from former Midwest employees who said they knew wrong codes for wheelchairs and cushions were being used and even had confronted the defendants about this practice being wrong. The government's opinion on the criminal responsibility of these former Midwest employees does not prevent the court from finding they meet the definition of participant under the guidelines. For these reasons, the defendants' objections to the role enhancements are overruled.

The other objection concerning role in the offense is the defendant Paige Heck's request for a role reduction pursuant to U.S.S.G. § 3B1.2. This guideline provision "provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." U.S.S.G. § 3B1.2, comm. (backg'd). The court's inquiry must "focus upon the defendant's knowledge or lack thereof concerning the scope and structure of the enterprise and of the activities of others involved in the offense." *United States v. Calderon–Porras,* 911 F.2d 421, 423–24 (10th Cir.1990). The defendant has the burden of proving her minor participation. *United States v. Harfst,* 168 F.3d 398, 401–02 (10th Cir.1999).

A defendant does not earn a role reduction under § 3B1.2 "simply because [s]he is the least culpable among several participants in a jointly undertaken criminal enterprise." *United States v. Lockhart,* 37 F.3d 1451, 1455 (10th Cir.1994) (citing *United States v. Caruth,* 930 F.2d 811, 815 (10th Cir.1991)). Though a defendant may be "comparatively less culpable than" her cohorts in crime, a court also must look at whether when the defendant was actively engaged in the criminal enterprise, was compensated for her involvement, and knew or understood "the scope and structure of the enterprise and ... the activities of others." *Id.* In doing so, the court compares the "defendant's conduct with that of others in

the same enterprise, but also with the conduct of an average participant in that type of crime." *United States v. Caruth,* 930 F.2d at 815. In short, a role reduction is appropriate only when the defendant is "substantially less culpable" than an average participant and not required just because multiple participants with differing levels of culpability are involved.

The defendant Paige Heck has not carried her burden of proving she is entitled to a minor role reduction. From all the evidence at trial, including her own testimony, the court finds that Paige Heck participated actively in the administration of Midwest's business, appeared to possess decision-making authority equal to that of her co-defendants, knew generally about the coding practices being followed and discussed them with the co-defendants and others, concurred with coding practices as explained to her, and financially benefitted from Midwest's unlawful coding practices. On the other side of the scale, Paige Heck was not directly responsible for the billing, she told the employees under her supervision to comply with Medicare regulations, and was acquitted by the jury on some counts. While it certainly believes Ms. Heck is less culpable than her co-defendants, the court cannot find under the terminology and definitions employed in the Guidelines that she is "substantially less culpable" than the average participant in this offense, as she knew about the unlawful practices, did not use her authority to stop them, and financially benefitted from them. Paige Heck's request for a role reduction is denied.

SUMMARY OF GUIDELINE CALCULATIONS
**\*21** As the most applicable guideline for the conspiracy conviction in count one, U.S.S.G. § 2X1.1 directs reliance on the guideline provisions governing the substantive offense. The guideline provision for fraud is § 2F1.1 which also governs counts two through fifteen. Thus, counts one through fifteen are grouped pursuant to § 3D1.2(d) and subject to the terms of § 2F1.1. Counts sixteen through twenty-nine are grouped separately as required by *United States v. Hargus,* 128 F.3d 1358, 1364 (10th Cir.1997), *cert. denied,* 523 U.S. 1079, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998), and are subject to the terms of § 2S1.2.

*Counts 1–15 Group–Offense Level Calculations*—**Conspiracy/Fraud**

—Base offense level from § 2F1.1(a)                                              6

—Specific Offense Characteristic for a total fraud loss of

approximately $1.4 million (health care fraud loss of

$803,716.02 and wire fraud loss of $600,000)                                     11

§ 2F1.1(b)(1)(L)

—Specific Offense Characteristic for a scheme to defraud                         2

more than one victim § 2F1.1(b)(2)(B)

—Specific Offense Characteristic for Mass Marketing                              2

§ 2F1.1(b)(3)

—Adjustment for Leader or Organizer § 3B1.1(c)                                   2

| | |
|---|---|
| —Adjustment for Obstruction of Justice § 3C1.1 | 2 |
| —Adjusted Offense Level | 25 |

***Counts 16–29 Group—Offense Level Calculations—*Money Laundering**

| | |
|---|---|
| —Base offense level from § 2S1.2 | 17 |
| —Specific Offense Characteristic for value of laundered funds | |
| of $803,716.02 § 2S1.2(b)(2) and § 2S1.1(b)(2)(E) | 4 |
| —Specific Offense Characteristic for knowing funds were | |
| health care fraud proceeds § 2S1.2(b)(1)(B) | 2 |

| | |
|---|---|
| —Adjustment for Leader or Organizer § 3B1.1(c) | 2 |
| —Adjustment for Obstruction of Justice § 3C1.1 | 2 |
| —Adjusted Offense Level | 27 |
| *Greater Adjusted Offense Level* | 27 |
| *Multiple Count Adjustment* | 2 |
| *Total Offense Level* | 29 |
| CRIMINAL HISTORY CATEGORY (Cooper & P. Heck) | I |

| GUIDELINE RANGE (Months) | 87 to 108 |
|---|---|

| CRIMINAL HISTORY CATEGORY (F.Heck) | II |
|---|---|

| GUIDELINE RANGE (Months) | 97 to 120 |
|---|---|

**RESTITUTION**

The last group of objections to the PSRs concerns the matter of restitution. The government objects that Invacare is not identified as a victim and that the court should order the defendants to be jointly and severally liable for a total loss of $7,834.138.44. The defendants object to a restitution amount in excess of the actual net loss, and Paige Heck submits no restitution should be ordered for those counts of which she was acquitted.

**\*22** Ruling: To the listing of Invacare as a victim, the court sustains the government's objection and will add it to the list of victims. In determining the amount of restitution, the court has considered the following. It is uncontroverted that this case is subject to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A–3664, which makes restitution a mandatory part of the defendants' sentences. A court must award "the full amount of each victim's losses ... without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A). The government bears the burden of proving the amount of loss, and the court is to resolve any disputes over the amount of loss by a preponderance of the evidence. 18 U.S.C. § 3664(e).

"A restitution order must be based on actual loss." *United States v. Quarrell,* 310 F.3d 664, 680 (10th Cir.2002) (citation omitted). A restitution order must account for any benefits received by the victim and limit restitution to the actual losses. *See* 18 U.S.C. § 3663A(b); *United States v. Guthrie,* 64 F.3d 1510, 1516 (10th Cir.1995). Restitution is limited to "only those actual losses ...

directly related to and proximately caused by the" defendant's commission of the offense of conviction. *United States v. Sundstrum,* 221 F.3d 1354, 2000 WL 1005267, at \*2 (10th Cir.2000); *see United States v. Brewer,* 983 F.2d 181, 183–84 (10th Cir.), *cert. denied,* 508 U.S. 913, 113 S.Ct. 2348, 124 L.Ed.2d 257 (1993); 18 U.S.C. § 3663A(a)(2). If the offense of conviction included "as an element a scheme, conspiracy or pattern of criminal activity," then restitution may compensate "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). Because "[a] conspiracy participant is legally liable for all reasonably foreseeable acts of his or her coconspirators in furtherance of the conspiracy," a court may order restitution of "the losses caused by the entire conspiracy, not just the losses caused by those acts committed by the defendant." *United States v. Brewer,* 983 F.2d at 185; *see also United States v. Osborne,* 332 F.3d 1307, 1314 (10th Cir.2003); *United States v. Nichols,* 169 F.3d 1255, 1278 (10th Cir.) ("[A] criminal defendant who participates in a conspiracy is liable in restitution for all losses flowing from that conspiracy.") (quotation and citation omitted)), *cert. denied,* 528 U.S. 934, 120 S.Ct. 336, 145 L.Ed.2d 262 (1999). "[A] district court may order a restitution amount for the relevant conduct of others that may be attributed to" the defendant. *United States v. Osborne,* 332 F.3d at 1314 (citation omitted).

Echoing its prior analysis, discussion and findings used in the actual loss calculations under the sentencing guidelines, the court adopts those calculations and orders restitution in the same amounts. These calculations represent the actual losses directly related to and

proximately caused by the defendants' commission of the offenses of conviction. These actual losses flow from and were caused by the entire conspiracy such that all three defendants are jointly and severally liable for the total amount of loss. Thus, the court orders restitution in the amount of $642,972.82 for the Centers of Medicare and Medicaid Services and $600,000 for Invacare Corporation. At the time of sentencing, the court will specify a payment schedule for restitution.

POST-*BOOKER* DISCRETIONARY REGIME

**\*23** After *Booker,* sentencing courts no longer mandatorily apply the guidelines but rather consult them and "take them into account" along with the other factors set forth in 18 U.S.C. § 3553(a) when sentencing. The discretion of sentencing courts is now not restricted to fashioning sentences within the Guideline ranges. *United States v. Gonzalez–Huerta,* 403 F.3d at 731. Sentencing courts still must determine first the appropriate sentencing range under the Guidelines and make the factual findings necessary to that determination. *United States v. Serrata,* 425 F.3d 886, 920 (10th Cir.2005). If after considering this range and the other factors described in 18 U.S.C. § 3553(a), a sentencing court decides on a sentence that is outside the range under the Guidelines, then it must explain its reasons for the departure, as required by 18 U.S.C. § 3553(c)(2). *See United States v. Serrata,* 425 F.3d at 920. In short, sentencing "courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before. The only difference is that the court has latitude, subject to reasonableness review, to depart from the resulting Guideline range." *United States v. Magallanez,* 408 F.3d at 685 (citations omitted).

A sentencing court must consider the following factors under § 3553(a): the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with needed correctional treatment; the sentencing range established under the applicable Sentencing Guidelines; the pertinent policy statements; the need to avoid unjustified sentence disparities among defendants with similar criminal histories and found guilty of similar conduct; and the need to provide restitution. *See United States v. Contreras–Martinez,* 409 F.3d 1236, 1242 n. 3 (10th Cir.2005). To the extent there is tension or incongruity among the statutes and guidelines about these sentencing factors and their consideration, the significance of it after *Booker* "diminishes as sentencing judges are encouraged to

exercise their discretion." *United States v. Serrata,* 425 F.3d at 919. These " 'sentencing factors articulated in § 3553(a), which the mandatory application of the Guidelines made dormant, have a new vitality in channeling the exercise of sentencing discretion.' " *United States v. Delacruz–Soto,* 414 F.3d 1158, 1166–67 (10th Cir.2005). The courts in sentencing need not expressly consider "individually each factor listed in § 3553(a) before issuing a sentence," nor must they "recite any magic words to show" they were "mindful" of these factors. *United States v. Contreras–Martinez,* 409 F.3d 1236, 1242 (10th Cir.2005).

*Nature and Circumstances of the Offense.* This health care fraud case is unique in several regards. First, the manner in which the defendants set up and operated their business is hardly typical of those whose principal goal is to defraud customers and the government. The defendants started their business where they and their family had been raised and lived. They hired employees, some of whom were experienced in this field. They also brought in other family members to work for them. They invested their own money and even signed personal guaranties in an effort to keep their operations in business. They retained billing companies and looked to them for advice and consultation. They communicated with manufacturers in an effort to determine the product billing codes. They exposed their business books and practices to screening and review by a third party, Sunrise Medical. They sought and received legal advice about operating their business and even applied for separate financing to satisfy their long-term debt obligations. On the paperwork submitted to the billing companies, they plainly identified the actual products sold, and they received Medicare payments for nearly two years despite the erroneous codes. The defendants invested their earnings into purchasing and starting up other businesses, such as a video rental store and a fitness club. Such business decisions and conduct lack the surreptitious, transient and suspicious character more typical of fraudulent business schemes.

**\*24** As was made quite evident at trial, Medicare's regulation of this field is complex, confusing, and arguably incoherent at times. The defendant Cooper calls the court's attention to two recent reports regarding Medicare's reimbursement of power wheelchairs that are relevant insofar as the defendants' improper coding of the Power 9000 as K11 or K10, instead of the lower reimbursement code of K12.[15] These reports contain several noteworthy findings and conclusions. A wide variety of models of power wheelchairs are reimbursed under the single code of K11, and in 2002, 97% of Medicare's payments towards power wheelchairs were for those coded K11. In fact, the defendants aptly observe

that what they made in coding the Power 9000 as a K11 was not out of line with the lawful profit margin determined under the median Medicare reimbursement rate and the median supplier cost for a K11 as reported. The government report recommended changing the coding system to account for wheelchair variety and prices. The other report researched a sample of K11 reimbursement claims and found that most claims did not meet Medicare's coverage criteria. The reports plainly demonstrate that Medicare's regulatory shortcomings contribute to the practices endemic to this industry. While these circumstances do not legally excuse the defendants' criminal conduct, they are a contributing factor to the grey areas in compliance and reimbursement and, more importantly, a relevant context in which to evaluate the defendants' knowledge and understanding of their business, the motives behind their initial business decisions, and the seriousness of their criminal activity.

It is the court's judgment that the defendants' billing practices, at least in the beginning, were largely due to their own lack of knowledge and experience in this field, to the advice they were wrongly given or misunderstood, and to their poor judgment in recognizing and handling their responsibilities as providers in a heavily-regulated industry. Of course, from the beginning, the defendants cut corners on their compliance with Medicare requirements giving themselves the benefit of almost every doubt existing by reason of their own limited knowledge and interpretation of those requirements. Over time from their own experience in the field and through contact with others obviously more knowledgeable of and directly involved with such matters, the defendants learned they were incorrectly coding wheelchairs and cushions, and they did not stop. Reluctant to change and to accept the lower profit margins, they ignored the truth and continued to upcode but now with the knowledge and intent to defraud. Thus, the court believes that the offense levels as calculated under the Guidelines overstates the seriousness of the defendants' criminal intent and offenses and that the sentence should be accordingly fashioned to reflect these circumstances. Finally, the evidence at trial showed that Paige Heck was less responsible for the coding decisions and that she frequently stressed to the co-defendants and other employees the need for complying with Medicare requirements. Consistent with this evidence, the jury acquitted Ms. Heck of five health care fraud counts and of two money laundering counts.

**\*25** *History and Characteristics of the Defendants.* After *Booker,* sentencing courts have a renewed freedom to consider this sentencing factor. Prior to the offenses in question, all three defendants maintained lawful

continuous employment and financially supported their families. None of them have been prosecuted or accused of prior fraudulent conduct. All three defendants have fully complied with the conditions of pretrial release.

*Terence Cooper*
He is married with two young children, and as the record demonstrates he has a supportive extended family. Due to his conviction and impending sentence, the defendant's employment opportunities are limited, so his wife now works full time and Mr. Cooper cares for their children at home, but he is otherwise employable. Terence's personal family relationships have grown closer and stronger while he has endured this prosecution. He has no criminal history. He is actively involved in a church. Mr. Cooper has submitted numerous letters from family and friends vouching to his good character. In short, Mr. Cooper's history and personal characteristics, in particular the harm to his family, the strong support of his extended family and the absence of any criminal history, mitigate against the substantial sentence calculated under the guidelines.

*Frank Heck*
Mr. Heck recently separated from his wife, and he has two young children. He served in the United States Marine Corps for over four years until he was medically discharged for a leg injury. Mr. Heck's criminal history is limited to two prior misdemeanor convictions involving conduct not indicative of the convictions on which he is now being sentenced. Letters from family, friends and business acquaintances attest to Frank's good character and to the love and support he enjoys from his family. Mr. Heck's history and personal characteristics weigh against a sentence longer than five years.

*Paige Heck*
Ms. Heck is a 64–year–old female, and this is her first criminal conviction. She obtained a nursing degree in 1962 and worked as a nurse for over fifteen years before selling life and health insurance with her husband for over a decade and then went into the durable medical equipment supply business with the other defendants. She and most of her immediate family have spent their lifetimes in the eastern Kansas area. She is actively involved in the lives of her family, community, and church. She has impressed others as someone of good character who is genuinely concerned with doing the right thing. Considering Ms. Heck's age, employment history, and other personal characteristics, a sentence in excess of

three years imprisonment would be unreasonable.

*Sentencing Goals and Needs: Seriousness of the Offense, Just Punishment, Adequate Deterrence, Public Protection, and Correctional Treatment.* As applied to this case, these sentencing purposes counsel definite periods of incarceration, but sentences that are shorter than the sentencing ranges recommended by the Guidelines. It should go without saying then that the statutory maximum sentences advocated by the government are plainly greater than necessary to comply with these sentencing purposes. While the loss figures generated by the government overstate the seriousness of the offense, they cast an impressive shadow. The amounts of loss and the aggravating factors reflected in the Guideline enhancements connote intermediate terms of incarceration, and such sentences fairly fit these crimes of conviction. Based on its personal impression of the defendants, the court believes there is little possibility of them repeating their offenses or posing a threat to public safety. The general deterrence of the kind of criminal conduct being punished here requires imprisonment, particularly to offset the financial gains from upcoding and to promote respect for the law on billing Medicare for power wheelchairs. A sentence in excess of five years, however, would be greater than necessary to deter avaricious business persons from continuing billing practices they learn are unlawful. None of the defendants present a need for educational or vocational training.

**\*26** *Kinds of Sentences Available.* The court is mindful that shorter sentences, even probation, could be imposed, if the other factors and circumstances warranted such sentences.

*Guideline Range.* Though relegating the Guidelines to an advisory or discretionary status, the Supreme Court in *Booker* expressed its hope that the new sentencing approach would "maintain[ ] a strong connection between the sentence imposed and the offender's real conduct-a connection important to the increased uniformity of sentencing that Congress intended its Guidelines system to achieve." *United States v. Booker,* 125 S.Ct. at 757. Apparently building on this expressed hope, the circuit panel in an unpublished opinion in *United States v. Hopkins,* 128 Fed. Appx. 51, *56 (10th Cir. Apr.11, 2005), said "it is clear from *Booker,* 125 S.Ct. at 757, that the now-discretionary Guidelines will be a vital barometer of reasonableness on appellate review." Plainly, the Guidelines remain "important to the overall reasonableness of any sentence imposed by a court post-*Booker,*" *United States v. Taylor,* 413 F.3d 1146, 1152 (10th Cir.2005) (citation omitted), to the point of "exert[ing] gravitational pull on all sentencing decisions,"

*United States v. Trujillo–Terrazas,* 405 F.3d 814, 819 (10th Cir.2005). Because the Guidelines were designed to offer a desirable uniformity in sentencing, courts should pay particular attention to the calculated sentencing range in settling on a reasonable sentence.

The court repeatedly has observed that the enhancements for the amount of loss in this case overstate the seriousness of the defendants' offenses. The base offense levels also fail to account for the money laundering activity being only rudimentary and incidental to the health care fraud offenses. Because the amount of pecuniary loss is the driving consideration of economic offenses under the Guidelines, the court accordingly has tempered its reliance on the calculated sentencing ranges.[16] In sentencing the defendants to intermediate terms of incarceration, the court believes it has fulfilled the Guidelines' goal of "a short but definite period of confinement for a larger proportion of ... white collar cases."[17] Indeed, the sentences here exceed the average sentences imposed on fraud offenders largely as a result of the significant pecuniary loss.

The Guidelines do not account for the unique punishment already experienced by these defendants from this lengthy and expensive prosecution and their convictions. All three defendants have endured personal hardships from a prosecution delayed by several years, from a trial that was hard fought, and from a sentencing that was delayed in anticipation of *Booker* and by this court's deliberation. All three defendants were financially ruined by their business venture and the civil judgment stemming from it. Following their release from prison, their felon statuses will close some doors leading back to the business world.

**\*27** *Need to Avoid Unwarranted Sentence Disparities.* This factor addresses "disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The court has not received evidence or arguments meeting the criteria relevant under this factor. The court believes the sentences to be imposed will not result in unwarranted sentence disparities.

*Need to Provide Restitution.* Restitution is being ordered in this case. Consequently, the defendants' ability to pay the same will resume sooner with shorter sentences.

IMPOSITION OF SENTENCE
After giving careful consideration to the Guideline sentencing range and the other factors under § 3553(a), this court determines that sentences of forty-eight months imprisonment for Terence Cooper, sixty months

U.S. v. Cooper, Not Reported in F.Supp.2d (2006)

imprisonment for Frank Heck, and thirty-six months imprisonment for Paige Heck to comply with purposes in § 3553(a)(2). These sentences capture the seriousness and harm of the offenses without being greater than necessary. While all three sentences are less than the calculated Guideline sentencing ranges, they are justified by the different sentencing factors identified and fully discussed above. In fashioning these sentences, the court also took into account Terence Cooper's post-offense conduct and lack of criminal history, Frank Heck's criminal history and decision-making role, and Paige Heck's age and limited culpability. The court believes these sentences are consistent with the persuasive weight of the evidence at trial and the sentencing hearing. Finally, the court reasonably tailored these sentences in consideration of the unique nature of these offenses and of each defendant's circumstances.

IT IS THEREFORE ORDERED that on January 31, 2006, at 9:30 a.m., the court intends to sentence the defendant Terence Cooper to a term of imprisonment of 48 months;

IT IS FURTHER ORDERED that on January 31, 2006, at 10:00 a.m., the court intends to sentence the defendant Frank D. Heck to a term of imprisonment of 60 months;

IT IS FURTHER ORDERED that on January 31, 2006, at 10:30 a.m., the court intends to sentence the defendant Paige A. Heck to a term of imprisonment of 36 months;

IT IS FURTHER ORDERED that this memorandum and order shall constitute the court's determinations pursuant to Fed.R.Crim.P. 32(i)(3) and its statement of reasons pursuant to 18 U.S.C. § 3553(c).

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 288704

Footnotes

1    The defendants' arguments disregard the Supreme Court's direct statement in *Booker* which spelled out the retroactive reach of its holding:

As these dispositions indicate, we must apply today's holdings—both the Sixth Amendment holding and our remedial interpretation of the Sentencing Act—to all cases on direct review. *See Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) ("[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases ... pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past"). *See also Reynoldsville Casket Co. v. Hyde,* 514 U.S. 749, 752, 115 S.Ct. 1745, 131 L.Ed.2d 820 (1995) (civil case); *Harper v. Virginia Dept. of Taxation,* 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) (same).

125 S. Ct. at 769. This holding necessarily and directly impacts all defendants who would have been convicted of offenses before *Booker.* Because the defendants here make no effort to distinguish themselves from any other defendant in this situation, the defendants would have this court essentially hold that following the Supreme Court's direct ruling would violate not only their due process rights as well as the due process rights of every such defendant who committed their offenses prior to *Booker.* This is not an instance where one should interpret the Court's retroactivity language narrowly upon the speculation that the due process question uniquely escaped the Court's attention and was not considered in fashioning the chosen remedy. Throughout the *Blakely* and *Booker* opinions, the justices have discussed openly and concisely the actual and potential ramifications and consequences presented by the different remedies for this constitutional dilemma. If due process necessarily foreclosed a maximum sentence greater than that sustained by the jury's verdict, then the Supreme Court had no cause for remanding Fanfan's sentence, for Fanfan had received a sentence lower than that authorized by the guidelines but consistent with the jury's verdict. The Court instead held that the government and even the defendant could "seek resentencing under the system set forth in today's opinions." As the Tenth Circuit concisely observed in response to this very same argument, "[w]e decline Defendant's invitation to hold that the Supreme Court ordered us to violate the Constitution." *United States v. Rines,* 419 F.3d 1104, 1106 (10th Cir.2005) (citation omitted).

2    In *Marks,* the defendants on appeal argued that the trial court erred in not instructing on the more favorable definition of obscenity which was the law when they were transporting the allegedly obscene materials and in instructing instead on the definition of obscenity which had been formulated more recently by the Supreme Court in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). The Court held that the Due Process Clauses barred retroactive application of *Miller's* obscenity standards if it resulted in criminal liability for conduct not previously punishable but that constitutional principles found in *Miller* and beneficial to the defendants must be applied. 430 U.S. at 196–97.

3    Tracing the outline of this due process right back to *Bouie v. City of Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), the Court emphasized:

"Our decision in *Bouie* was rooted firmly in well establish notions of *due process.* (citation omitted). Its rationale rested on core due process concepts of notice, foreseeability, and, in particular, the right to fair warning as those concepts bear on the constitutionality of attaching criminal penalties to what previously had been innocent conduct. (citation omitted).... Contrary to

U.S. v. Cooper, Not Reported in F.Supp.2d (2006)

the petitioner's suggestion, nowhere in the opinion did we go so far as to incorporate jot-for-jot the specific categories of *Calder* into due process limitations on the retroactive application of judicial decisions.
Nor have any of our subsequent decisions addressing *Bouie*-type claims interpreted *Bouie* as extending so far. Those decisions instead have uniformly viewed *Bouie* as restricted to its traditional due process roots."
*Rogers,* 532 U.S. at 459.

4 The *Booker* remedial opinion even cites the *Watts* decision as authority for the assumption that the guideline system in which judges look to the real conduct underlying the conviction would continue. "That is why the Court, for example, held in *United States v. Watts,* 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (per curiam), that a sentencing judge could rely for sentencing purposes upon a fact that a jury had found unproved (beyond a reasonable doubt). *See id.,* at 157." *Booker,* 125 S.Ct. at 760.

5 This fact-finding obligation is now found at Fed.R.Crim.P. 32(i)(3).

6 The PSR states that agents located 860 Midwest patient files representing 1,240 claims for power wheelchairs and wheelchair cushions. The agents documented that all of these claims were upcoded, that is, included billings for more expensive items than actually provided. These claims were accompanied by additional line items for accessories. All of these claims represent $4,124,801.63 billed to Medicare. Medicare paid $2,803,616.19 on these claims which is 80% of $3,504,520.23. Thus, the PSR calculates loss to be the total amount of those claims documented as containing an upcoded item.

7 This figure represents the billings for power wheelchairs and cushions to Medicare that total $2,777,583.56 of which Medicare paid $2,187,843.84. The government represents that agents did not find patient files or found only incomplete patient files for these claims and that Medicare should not have paid these claims because the documentation maintained by the defendants was not sufficient to support a claim.

8 Because a finding on the amount of upcoding attributable to billing company errors would not affect the base offense level, the court determines that its ruling is unnecessary. *See* Fed.R.Crim.P. 32(i)(3)(B).

9 It is quite true that the government alleged additional fraudulent schemes in its lengthy indictment and offered some evidence with regard to those billing practices in an effort to paint Midwest as a sham durable medical equipment provider. At the conclusion of the evidence, no party asked the court for a verdict form that would have required the jury to make specific findings on the different offenses that were the subject of the conspiracy or on the different manner or means that were charged as part of the scheme to defraud for the individual health care fraud counts. Indeed in both contexts, the jury was instructed that the government need not prove each of the alleged alternatives and that the jury need only agree unanimously on at least one such alternative. Thus, in the absence of these findings or a specific finding of loss from the jury, one cannot reasonably infer from the verdict that the defendants were necessarily found guilty of having engaged in the full range of health care fraud as charged.
The government would have the court decide that the defendants engaged in all of the alleged manner and means and submitted no legitimate claims for reimbursement and then hold the defendants accountable by concluding that the total amount of submitted claims represent the losses attributable to this alleged conduct. The court, however, declines to do so for several reasons. The government's proof has not persuaded the court that Medicare was unwilling to pay for the durable medical equipment supplied because Midwest's patients were not intended beneficiaries under the Medicare program. *See United States v. Frost,* 281 F.3d 654, 659–60 (7th Cir.2002). The government's proof has not persuaded the court that the defendants acted with the intent to defraud when they engaged in such alleged manner and means as mishandling the certificates of medical necessity, billing of equipment prior to delivery, and billing separately for wheelchair batteries. In the government's judgment, all regulatory violations committed by Midwest can be assumed to have resulted from the defendants' same fraudulent intent behind their upcoding. The court's impression of the evidence is different. While the evidence certainly showed that the defendants at some point in time did intentionally upcode the wheelchairs and wheelchair cushions and billed for certain cushions which were unnecessary for certain wheelchairs, the evidence was also quite convincing in showing that the defendants were not careful business people and were uninformed or ill-informed in some instances about what they could or could not do under what plainly is a myriad of complex and confusing governmental regulations. The court's impression comes from its consideration of all the evidence admitted at trial and believes its impression is confirmed by the audits done on Midwest's submitted claims and the multitude of technical grounds identified there for denying Midwest's different claims. In addition, the defendants cite a recent government report that a significant number of suppliers' claims fail to comply with all of Medicare requirements. Nor was the court persuaded by the evidence at trial that the defendants repeatedly billed for products without concern for patients' needs. The court rejects as unproved the government's allegations of a criminal intent sweeping through all of the defendants' sloppy business practices when these same defendants enjoyed long and close ties to their community, employed friends and family, and later opened their books to third parties trying to secure additional capital and to expand and diversify their business involvement in the community. The defendants' actions do not bespeak of widespread fraud for which this court should summarily reject all of Midwest's claims as illegitimate submissions from a so-called "Medicare Mill." In the exercise of its discretion and based on the evidence at trial, the court finds that the loss calculations for health care fraud should be limited to the upcoding of wheelchairs and wheelchair cushions

*U.S. v. Cooper, Not Reported in F.Supp.2d (2006)*

and the unnecessary billing of certain cushions for wheelchairs with cushioned seats. Thus, the court will limit the loss calculations for health care fraud to this criminal activity. *See United States v. Abud–Sanchez,* 973 F.2d 835, 838–39 (10th Cir.1992); *cf. United States v. Jaramillo,* 98 F.3d 521, 525–26 (10th Cir.), *cert. denied,* 519 U.S. 1000, 117 S.Ct. 499, 136 L.Ed.2d 391 (1996). As will be discussed later in this order under the different § 3553(a) considerations, the court believes that even this loss figure may overstate when the defendants' upcoded billings were actually the result of a criminal intent.

10    *United States v. Caldwell,* 302 F.3d 399, 418 (5th Cir.2002).

11    For "fraud-type offenses" governed by U.S.S.G. § 2F1.1, sentencing courts in calculating loss "should use 'the net value, not the gross value, of what was taken." ' *United States v. Gennuso,* 967 F.2d 1460, 1462 (10th Cir.1992) (quoting *United States v. Smith,* 951 F.2d 1164, 1167 (10th Cir.1991)). The Tenth Circuit cases calculated "net loss by subtracting the value of what was given to the victim(s) *during the course of the transaction* from the value of what was fraudulently taken." *United States v. Pappert,* 112 F.3d 1073, 1079 (10th Cir.1997). The court in *Pappert* cited the following in support of that rule:
    "*See, e.g., Smith,* 951 F.2d at 1167 (subtracting security interest given in exchange for fraudulently attained loans); *Gennuso,* 967 F.2d at 1462 (subtracting value received from amount victim paid in a fraudulent marketing scheme); *United States v. Reddeck,* 22 F.3d 1504, 1513 (10th Cir.1994) (remanding to district court to subtract value, if any, of education from tuition paid, where students were fraudulently informed about accreditation of university).
    112 F.3d at 1079 *cf. United States v. Frost,* 281 F.3d 654, 659 (7th Cir.2002) ("The Guidelines call for the use of net rather than gross loss (for example, a defendant receives credit for the value of goods delivered, if the fraud entails overcharging).") (applying 2000 Guidelines and citing U.S.S.G. § 2F1.1 Application Note 8).

12    Applying pre–2001 versions of the guidelines, other circuit courts have recognized the net loss approach in calculating loss for fraud convictions involving government benefit programs. *See, e.g., United States v. Frost,* 281 F.3d 654, 659 (7th Cir.2002); *United States v. Rutgard,* 116 F.3d 1270, 1294 (9th Cir.1997). In *Frost,* the court observed:

        "When one party sets out to benefit another, then the net loss is the cost to the payor less the benefit delivered to the intended recipient. So in a food stamp case, where the grocer accepts stamps for both breach (allowed) and liquor (prohibited), the net loss to the United States is the amount of stamps redeemed, less the value of eligible items delivered to the beneficiaries. *United States v. Hassan,* 211 F.3d 380 (7th Cir.2000); *United States v. Barnes,* 117 F.3d 328 (7th Cir.1997). The same principle allows educators to deduct from the gross loss the value of any education for which the United States was willing to pay."

    281 F.3d at 659.

13    While Medicare certainly is a government benefit program, this is not a case in which the government has proved that the supplied devices were "medically unnecessary" and, therefore, nothing of value was conveyed, *see, e.g., United States v. Aginsky,* 165 F.3d 15, 1998 WL 777759 (2nd Cir.1998) (unpublished), nor is this a case in which the defendants were disqualified from participating in Medicare and Medicaid programs but received benefits under those programs that were fraudulently diverted from qualified providers, *see, e.g., United States v. Nastasi,* 2002 WL 1267995, at *3–*4 (S.D.N.Y. Apr.17, 2002) (unpublished), nor is this a case in which the defendant billed for services fraudulently certifying that it had performed services which were actually performed by another billing supplier, *United States v. NHML, Inc.,* 225 F.3d 660, 2000 WL 420683 (6th Cir.), *cert. denied,* 531 U.S. 827, 121 S.Ct. 75, 148 L.Ed.2d 39 (2000).

14    The government here again alleges the defendants opened the doors of Midwest with the intent to defraud all with whom they would do business. "[T]he defendants' scheme against Invacare started from the beginning of their business relationship. This was the government's theory and its proof." (Dk.354, pp. 30–31). That was the government's theory but its evidence did not prove these sweeping allegations. The court believes the evidence more accurately shows inexperienced business persons who were overwhelmed with their immediate and unexpected growth and who were looking to expand and diversify their business holdings. When their investments left them overextended and exposed, the defendants engaged in a scheme to defraud Invacare through several misrepresentations about their intentions and ability to repay. The court believes a loss figure based on the last commercial purchase agreement fairly represents the harm attributable to the defendants' fraudulent misrepresentations.

15    "A Comparison of Prices for Power Wheelchairs in the Medicare Program," Dept. of Health and Human Services, Office of Inspector General, April 2004 (OEI–03–02–00460); "Medicare Payments for Power Wheelchairs," Dept. of Health and Human Services, Office of Inspector General, April 2004 (OEI–03–02–00600).

16    Assuming for the sake of argument that the court had accepted the government's position on calculating loss and the other

U.S. v. Cooper, Not Reported in F.Supp.2d (2006)

Guideline enhancements, the court would not have imposed sentences longer than the terms imposed herein because of the other sentencing factors fully discussed above.

17      "Fifteen Years of Guidelines Sentencing," United States Sentencing Commission, p. 56 (Nov.2004).

**End of Document**                                                                 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite citing references available

615 Fed.Appx. 569
This case was not selected for publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also U.S. Ct. of App. 11th Cir. Rule 36-2.
United States Court of Appeals, Eleventh Circuit.

UNITED STATES of America, Plaintiff–Appellee,
v.
Jose R. DIAZ–ROSADO, a.k.a. Chiqui, a.k.a. Alvaro Diaz, a.k.a. Jose Raul Diaz, a.k.a. Raul Diaz Rosado, a.k.a. Jose Rosado, Defendant–Appellant.

No. 14–10746
|
Non–Argument Calendar.
|
June 25, 2015.

**Synopsis**
**Background:** Defendant pled guilty to one count of conspiracy to possess with intent to distribute five kilograms or more of cocaine and was sentenced by the United States District Court for the Southern District of Florida, No. 1:13–cr–20607–KMM–1, to life imprisonment. Defendant appealed conviction and sentence.

**Holdings:** The Court of Appeals held that:

[1] guilty plea was valid despite defendant's contention that district court failed to establish factual basis for plea and to explain elements of offense;

[2] district court erred in applying four-level, aggravated role enhancement to defendant's offense level based on finding he was an organizer or leader of the conspiracy; and

[3] on remand, district court would have to reconsider its denial of two-level downward adjustment for acceptance of responsibility.

Conviction affirmed; sentence vacated and case remanded.

West Headnotes (4)

[1]   **Criminal Law**
      Requisites and Proceedings for Entry

      110 Criminal Law
      110XV Pleas
      110k272 Plea of Guilty
      110k273 In General
      110k273(4) Requisites and Proceedings for Entry
      110k273(4.1) In general

      Government offered sufficient factual basis for defendant's guilty plea to one count of conspiracy to possess with intent to distribute five kilograms or more of cocaine, notwithstanding defendant's contention that government's summary of evidence supported only finding that goal of conspirators was to import cocaine, not distribute it. Fed.Rules Cr.Proc.Rule 11(b)(3), 18 U.S.C.A.; Comprehensive Drug Abuse Prevention and Control Act of 1970, §§ 401(b)(1)(A)(ii), 406, 21 U.S.C.A. §§ 841(b)(1)(A)(ii), 846.

      1 Cases that cite this headnote

[2]   **Criminal Law**
      Ascertainment by court; advising and informing accused

      110 Criminal Law
      110XV Pleas
      110k272 Plea of Guilty
      110k273.1 Voluntary Character
      110k273.1(4) Ascertainment by court; advising and informing accused

      District court adequately explained elements of offense during plea colloquy before accepting his guilty plea to one count of conspiracy to possess with intent to distribute five kilograms or more of cocaine; charge in case was simple, involving no concept more complex or esoteric

than "conspire" or "distribute." Fed.Rules Cr.Proc.Rule 11, 18 U.S.C.A.; Comprehensive Drug Abuse Prevention and Control Act of 1970, §§ 401(b)(1)(A)(ii), 406, 21 U.S.C.A. §§ 841(b)(1)(A)(ii), 846.

2 Cases that cite this headnote

**[3]** **Sentencing and Punishment**
👈Organizers, leaders, managerial role

350HSentencing and Punishment
350HIVSentencing Guidelines
350HIV(C)Adjustments
350HIV(C)2Factors Increasing Offense Level
350Hk752Organizers, leaders, managerial role

In sentencing defendant to life imprisonment for conspiracy to possess with intent to distribute five kilograms or more of cocaine, district court erred in applying four-level, aggravated role enhancement based on finding he was organizer or leader of drug-trafficking conspiracy because he hired crew for vessels and coordinated their activities and because he directed confidential informant to purchase engines that would be used on one of the vessels; no evidence was provided to support defendant's leadership role over crewmen, and informant could not be considered participant in conspiracy as he was "innocent third party" who had initially been told that vessels were being used as part of music promotion and contacted law enforcement as soon as defendant told him about conspiracy. U.S.S.G. § 3B1.1(a), 18 U.S.C.A.; Comprehensive Drug Abuse Prevention and Control Act of 1970, §§ 401(b)(1)(A)(ii), 406, 21 U.S.C.A. §§ 841(b)(1)(A)(ii), 846.

3 Cases that cite this headnote

**[4]** **Criminal Law**
👈Sentence

110Criminal Law
110XXIVReview
110XXIV(U)Determination and Disposition of Cause
110k1181.5Remand in General;  Vacation

110k1181.5(3)Remand for Determination or Reconsideration of Particular Matters
110k1181.5(8)Sentence

On remand for resentencing, district court would have to reconsider its denial of two-level downward adjustment for acceptance of responsibility, which drug conspiracy defendant argued was result of its failure to read two-page statement in which he laid out his acceptance of responsibility. U.S.S.G. § 3E1.1, 18 U.S.C.A.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*570** Wifredo A. Ferrer, Yvonne Rodriguez–Schack, Kathleen Mary Salyer, Miami, FL, for Plaintiff–Appellee.

**\*571** Richard Carroll Klugh, Jr., Miami, FL, for Defendant–Appellant.

Appeal from the United States District Court for the Southern District of Florida. D.C. Docket No. 1:13–cr–20607–KMM–1.

Before JORDAN, JULIE CARNES, and JILL PRYOR, Circuit Judges.

**Opinion**

PER CURIAM:

Jose Diaz–Rosado ("Defendant") was sentenced to life imprisonment after pleading guilty to one count of conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A)(ii) and 846. He appeals, challenging both his conviction and his sentence. We find no merit in the challenge to his conviction, but do reverse his sentence and remand for resentencing by the district court.

**I. BACKGROUND**
Defendant was a participant in an extensive drug-trafficking conspiracy that transported large quantities of cocaine from Venezuela, through the Caribbean, to the United States. On August 6, 2012, a

two-crewman vessel registered to Defendant was seized off the coast of Puerto Rico by United States agents, who found on board approximately 1,032 kilograms of cocaine. Later that year, on December 30, 2012, another two-crewman vessel was seized, this time off the coast of St. Croix in the United States Virgin Islands, and it contained 1,157 kilograms of cocaine. The serial numbers on that vessel's outboard motors matched ones purchased by confidential informant Walter Abreu ("Abreu"), at the request of Defendant.

Defendant agreed to speak to law enforcement officers about the incidents, and the latter offered Defendant the opportunity to cooperate. These negotiations came to nothing, in part because the officers concluded that Defendant had been dishonest with them, and, in particular, that he had hidden the fact that he was then planning, yet again, to assist in the transport of cocaine. Defendant was arrested and indicted by federal authorities ("the Government") in August 2013 in the Southern District of Florida for his alleged role in the cocaine transport uncovered by the December 2012 seizure. He was also indicted in the District of Puerto Rico in August 2013 for his role in the cocaine importation scheme leading to the August 2012 seizure.

Defendant pled guilty in November 2013 in the Southern District of Florida to the charge arising from the December 2012 seizure. Although he had numerous convictions in the 1990s for property crimes,[1] his criminal history under the United States Sentencing Guidelines ("Guidelines") was only a category I, due to the age of these prior convictions. Because of the very large quantity of drugs involved in the December seizure (2,189 kilograms), his base offense level under the Guidelines was 38. The district court applied two additional enhancements. Finding that Defendant had exercised leadership over other criminal participants, the court applied a four-level § 3B1.1(a) enhancement for aggravated role. Based on its conclusion that Defendant had lied to the Government during the investigation and had encouraged the confidential informant to do the same, the court also applied a two- **\*572** level § 3C1.1 enhancement for obstruction of justice. Even though Defendant had pled guilty, the court denied his request for a § 3E1.1 acceptance-of-responsibility reduction. Adding all these enhancements together, Defendant's total offense level would have been 44, except that the Guidelines top out at 43. The Guidelines range for an offense level of 43 is life imprisonment, no matter the criminal history category, and the district court imposed a life sentence.

In this appeal, Defendant challenges his conviction by contesting the validity of his guilty plea. He also challenges two rulings by the district court in calculating his Guidelines: the court's application of the four-level aggravated-role enhancement and its denial of Defendant's request for a two-level acceptance-of-responsibility adjustment. We find error only in the district court's imposition of the aggravated role enhancement.

## II. VALIDITY OF DEFENDANT'S GUILTY PLEA

Defendant entered his guilty plea on the day that trial was set to begin and without a plea agreement. He contends now that this guilty plea was invalid because the district court failed to establish a factual basis for the plea and to explain the elements of the offense, both of which are required by Federal Rule of Criminal Procedure Rule 11. We find no error by the court.

### A. Guilty Plea Colloquy

During the change-of-plea hearing, the district court went over with Defendant all those matters that Rule 11 requires to be discussed before a court can accept a defendant's plea of guilty.[2] As to the factual basis for the plea, the court directed the prosecutor to summarize the evidence that would have been presented at trial. In response, the prosecutor stated that the Government could prove beyond a reasonable doubt:

That on December 30th, 2012, the Coast Guard interdicted a vessel approximately 15 miles southwest of St. Croix, U.S. Virgin Islands. Aboard that vessel were two individuals. Also aboard the vessel was recovered 1,157 kilograms of cocaine.

It should be noted that further investigation revealed that this Defendant was the organizer and leader of a drug-trafficking organization that would facilitate the importation of cocaine from South America, specifically, Colombia and Venezuela, and then would organize a maritime boat-to-boat transfer of bales of cocaine.

He would obtain the vessels used to import the cocaine to the United States. He would purchase these vessels from various places, including a company in Broward County called Boats 4 Less. He would take those vessels and then stage them in various places, specifically in this instance in either Puerto Rico or St. Croix, and would have those vessels **\*573** staged there, ready for a maritime transfer of cocaine.

In this case, there was seized, as indicated, on December 30th 1,157 kilograms.

The Government's evidence would also show that this Defendant was also involved as a related conduct [sic] on an August 6th, 2012, seizure of also [sic] cocaine, a maritime seizure off the coast of Puerto Rico. And in that case, there was 1,032 kilograms of cocaine seized.

Defendant confirmed to the court that the information provided by the prosecutor was correct, with one exception: Defendant denied that he was the leader of the organization at issue. Government counsel then summarized the evidence he would have presented at trial to prove that Defendant was a leader, which evidence consisted of audio recordings in which Defendant discusses the smuggling activities and his role in them.

At this point, the court interrupted, saying, "Mr. Rosado, let me discuss this for a moment, because I want you to make sure that you're aware of the consequences of the dispute." The court explained that, although disagreement as to Defendant's leadership role would not bar entry of the guilty plea, Defendant's insistence on denying his leadership role could have implications for the sentence to be imposed. Specifically, the court advised that, at the sentencing hearing, the Government would only have to prove by a preponderance of the evidence that Defendant was a leader of the conspiracy in order to justify the role enhancement. In addition, efforts to dispute that characterization could potentially affect the likelihood of Defendant receiving an acceptance-of-responsibility reduction under the Guidelines. Defendant confirmed that he understood.

Finally, the court asked Defendant about the reasons behind his last-minute decision to change his plea, and particularly whether Defendant and his counsel had sufficient time to make that decision. Defendant explained that he wanted to plead guilty all along, and that he had thoroughly considered that decision. The court concluded the proceedings by reading the charges contained in the indictment and asking how Defendant wished to plead, to which Defendant responded, "Guilty, sir." The court accepted the plea and set a sentencing date.

## B. Factual Basis for Plea

[1] As noted, Defendant argues that his guilty plea is invalid because the Government offered an insufficient factual basis. Specifically, he contends that the Government's summary of the evidence supported only a finding that the goal of the conspirators was to import the cocaine, not distribute it. In addressing this contention, we

note at the outset that because Defendant did not raise before the district court this objection, we review it for plain error, only. To obtain a reversal of the conviction under this standard, Defendant must show that there is error and that the error (1) is plain, (2) affects substantial rights, and (3) compromises the fairness, integrity, or public reputation of the proceedings. *United States v. Moriarty,* 429 F.3d 1012, 1018–19 (11th Cir.2005); Fed.R.Crim.P. 52(b).

Under Rule 11(b)(3), the plea must have a factual basis, meaning that there must be evidence presented to the court that could reasonably resulted in the defendant's conviction at trial. *See United States v. Frye,* 402 F.3d 1123, 1128 (11th Cir.2005) (holding that factual basis for plea was met by the defendant's agreement to facts articulated at plea hearing by prosecution, which facts satisfied the elements of the offense). To prove that Defendant had conspired to possess with intent to distribute a controlled substance, **\*574** the Government would have to prove that there was an illegal agreement to distribute the controlled substance, that Defendant knew about it, and that he knowingly and voluntarily joined in it. *United States v. Isnadin,* 742 F.3d 1278, 1305 (11th Cir.2014), *cert. denied,* —— U.S. ——, 135 S.Ct. 161, 190 L.Ed.2d 117 (2014).

The Government's summary of its case against Defendant accomplished this task. The prosecutor noted that the interdiction and seizure of the cocaine-laden vessels and their crew on August 6 and December 30, 2012 demonstrated the existence of a conspiracy to distribute cocaine. Further, evidence that Defendant had purchased and prepared the vessels that were used for the transfer and planned importation of cocaine demonstrated his participation in the conspiracy. Most significantly, Defendant admitted the accuracy of the above assertions by the Government, denying only that he was a leader in the venture.

Defendant argues that the Government's proffer was inadequate because it did not include any reference to a conspiracy to *distribute* the cocaine. This argument is unpersuasive because the conduct alleged to have been committed by Defendant implies his knowledge of a wider plan to distribute the cocaine once it had been imported into the United States. After all, there can be no rational purpose behind transporting over a million grams of cocaine except to ultimately transfer the drugs to others. "It is by now axiomatic that 'participation in a criminal conspiracy need not be proved by direct evidence; a common purpose or plan may be inferred from a development and collocation of circumstances.' " *United States v. Reeves,* 742 F.3d 487, 497 (11th

Cir.2014) (brackets removed) (quoting *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942)). Further, "where there are repeated transactions between participants buying and selling large quantities of illegal drugs, that may be sufficient to find the participants were involved in a single conspiracy to distribute those drugs." *Id.* (citing *United States v. Brown,* 587 F.3d 1082, 1089 (11th Cir.2009)). Defendant's participation in multiple purchases and preparations of vessels for cocaine transportation supports a conclusion that he was involved in a conspiracy to distribute the drug.

## C. The Court's Explanation of the Offense

[2] Under Rule 11, the district court is required to determine that a defendant pleading guilty has not been coerced and that he understands the nature of the charge and the consequences of the plea. *United States v. Stitzer,* 785 F.2d 1506, 1513 & n. 2 (11th Cir.1986). If the charges do not involve "esoteric terms or concepts unfamiliar to the lay mind," then reading the indictment and granting the opportunity for the defendant to ask questions may suffice to inform the defendant of the charges. *United States v. James,* 210 F.3d 1342, 1344–45 (11th Cir.2000) (quoting *United States v. DePace,* 120 F.3d 233, 237 (11th Cir.1997), *cert. denied,* 522 U.S. 1153, 118 S.Ct. 1177, 240 L.Ed.2d 185 (1998)). Even a complex charge can be understood adequately when (1) the defendant is reasonably educated, (2) the court reads the indictment and lists its essential elements, (3) the court confirms that the defendant and counsel have reviewed the indictment, (4) the defendant admits to the conduct, and (5) the defendant does not have any questions. *Id.* at 1345 (citing *DePace,* 120 F.3d at 238).

The charge in this case was simple, involving no concept more complex or esoteric than "conspire" or "distribute." These are surely concepts the lay mind can grasp. Further, Defendant confirmed at **575 the hearing that his attorney had discussed the indictment with him and that he understood it. In addition, the district court read the charge in the indictment verbatim to Defendant before accepting his plea. Given these facts, it is clear that Defendant understood the charge against him.

Thus, Defendant cannot meet the requirements for plain-error review because his allegations reveal no error, plain or otherwise, in the proceeding at which he entered his plea of guilty. We therefore affirm Defendant's conviction.

## III. AGGRAVATED–ROLE ENHANCEMENT

[3] In challenging his sentence, Defendant argues that the district court erred in finding that he was an organizer or leader of the conspiracy and therefore in applying a four-level, aggravated-role enhancement pursuant to U.S.S.G. § 3B1.1(a).

"A district court's determination as to a defendant's role in the offense is a finding of fact subject to a clearly erroneous standard of review." *United States v. Yates,* 990 F.2d 1179, 1182 (11th Cir.1993); *United States v. Rothenberg,* 610 F.3d 621, 624 (11th Cir.2010) (finding of facts at sentencing reviewed for clear error). A clear error is one that gives this Court the "definite and firm conviction that a mistake has been committed." *Id.* Any contested fact relied upon in sentencing a defendant must be proved by a preponderance of the evidence standard, which requires "reliable and specific evidence." *United States v. Bernardine,* 73 F.3d 1078, 1080 (11th Cir.1996). A party's mere factual assertion does not constitute reliable, specific evidence unless those facts have been admitted. *United States v. Washington,* 714 F.3d 1358, 1361 (11th Cir.2013).

Although we review the district court's factual findings for clear error, "[w]hether a particular provision of the guidelines applies to a given set of facts is a question of law reviewed de novo." *Yates,* 990 F.2d at 1182 (citing *United States v. Kirkland,* 985 F.2d 535, 537 (11th Cir.1993); *United States v. Williams,* 527 F.3d 1235, 1249 (11th Cir.2008) (questions of law, including the application of U.S.S.G. § 3B1.1, reviewed *de novo* )).

Under the Guidelines, the court is instructed that "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase [the offense level] by 4 levels." U.S.S.G. § 3B1.1(a). For this enhancement to apply, we require "evidence that the defendant exerted some control, influence or decision-making authority over another participant in the criminal activity." *United States v. Martinez,* 584 F.3d 1022, 1026 (11th Cir.2009); U.S.S.G. § 3B1.1, comment. (n. 2) ("the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants").

With regard to the applicability of § 3B1.1 in this case, the extensiveness of the criminal organization is not contested. Rather, the key legal questions are (1) what suffices to make a person a leader and (2) when can someone who helps a conspirator be deemed a participant. On the first point,

Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

**\*576** U.S.S.G. § 3B1.1, comment. (n. 4). On the second point, "[a] 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense ... is not a participant." U.S.S.G. § 3B1.1, comment. (n. 1). The commentary gives as an example of a non-participant "an undercover law enforcement officer." *Id.*

Initially, the Presentence Investigative Report ("PSR") prepared by the Probation Office had not recommended that Defendant be considered a leader in the conspiracy. But after the Government's objections to the absence of a role enhancement, the probation officer revised the PSR to recommend the four-level enhancement for aggravating role. This revised PSR provided general information concluding that Defendant exercised a supervisory role over other participants in the cocaine trafficking conspiracy because he hired crew for the vessels and coordinated their activities and because he directed Abreu to purchase engines that would be used on one of the vessels.[3] From the outset, Defendant contested the Government's characterization of him as a leader in the conspiracy: first in the change-of-plea hearing; then in response to the Government's objections to the original PSR's lack of a leadership enhancement; then in response to the revised PSR that included the enhancement; and finally at the sentencing hearing. As noted, imposition of the leadership enhancement is based on Defendants' interaction with (1) the vessel crews and (2) with Abreu. Because those relationships are factually discrete and raise different legal issues, we discuss them separately.

**A. Leadership of the Crews**
As to the August 2012 shipment (which was indicted in the District of Puerto Rico), the Government stated that recordings made of Defendant's conversations indicate that he had supplied the vessel used in that shipment, had

supplied telephones to the crew of the vessel, and had communicated with the crew to coordinate their activities with others "higher up in the food chain." As for the December 2012 shipment that gave rise to the offense of conviction in the present case, the Government stated that Defendant had performed similar supply and oversight duties, and had even helped recruit the crew in the Dominican Republic.

At the sentencing hearing, Defendant denied that he had in any way supervised the two crewmen involved in the August seizure, but he did not want to comment further, given that the indictment charging this transaction was still pending in Puerto Rico. As to any leadership role with respect to the two crewmen involved in the December seizure, he disputed that characterization and cited evidence to support his position that he did not fit the crewmen's description of the man who had **\*577** hired them.[4] Defendant also stated that his communications with other participants in the conspiracy had been limited to relaying information between them.

Because Defendant disputed the facts articulated by the Government in support of the requested enhancement, it became the Government's burden at sentencing to prove those facts by a preponderance of the evidence. *See Martinez,* 584 F.3d at 1027 ("[O]nce a defendant objects to a fact contained in the PS[R], the government bears the burden of proving that disputed fact by a preponderance of the evidence.") The district court recognized this to be the case with these objected-to facts and seemingly acknowledged the thinness of the Government's evidence, stating at one point, "The Eleventh Circuit is going to say, where's the beef?" Although the Government offered to put on audio recordings to support its allegations about Defendant's conduct toward Abreu, it never offered to do the same with regard to the crew. This is despite the fact that the PSR states that the Government had audio recordings that proved that Defendant exercised leadership over the crew. Instead, from the sentencing transcript, it seems apparent that the Government had decided to focus on Defendant's interaction with Abreu in its efforts to prove that Defendant had exercised leadership authority during the conspiracy. In short, despite Defendant's clear denial of the accuracy of allegations about his conduct toward the crewmen, the Government failed to provide the necessary evidence to prove those allegations.

It is true that Defendant did admit to certain conduct involving the crewmen, but none of it is sufficient for § 3B1.1 purposes. Specifically, the Government cites Defendant's admission that he helped the December 2012 crewmen put the vessel in the water, provided them with

phones, and passed messages between them and others during the operation. But there is nothing in these facts that suggests a leadership role. Section 3B1.1 "requires the exercise of some authority in the organization." *United States v. Gupta,* 463 F.3d 1182, 1198 (11th Cir.2006). None of the admitted conduct reveals such authority. In *Martinez,* another drug-trafficking case, we held that the facts that the defendant "orchestrated" shipments of drugs and "utilized other individuals" in the process were "not enough" to establish his leadership role for § 3B1.1 purposes. 584 F.3d at 1027–28. Much the same is true here.

In the end, the sentencing transcript reveals that the district court accepted as proven the Government's allegations and statements in the PSR[5] regarding Defendant's role *vis a vis* the crewmen. But no evidence, much less a preponderance of the evidence, supported the existence of actions by Defendant that could have given rise to the § 3B1.1 enhancement. Without any evidence from the Government to support Defendant's leadership role over the crewmen, the court therefore erred in finding that the conduct alleged in the probation officer's response had been proved. *See Yates,* 990 F.2d at 1182 (reversing district court where there was "no evidence that [the defendant] had any control **\*578** over [the] organization"). That leaves only the conduct relating to Abreu.

**B. Leadership of Abreu**
The PSR also states that Defendant supervised Abreu. Abreu, who had become acquainted with Defendant through the latter's Latin music promotion business, informed law enforcement officers in early 2013 that Defendant was part of a drug-trafficking organization. Abreu had learned of Defendant's illegal activity after he, at Defendant's request, registered under his own business' name a vessel owned by Defendant and also purchased outboard motors for another of Defendant's vessels. When the latter boat was interdicted and seized in December of 2012, Defendant then contacted Abreu, informed him of what had happened, and advised him "not to say anything" if contacted by law enforcement. Rather than follow Defendant's advice, Abreu went to law enforcement authorities and began working as an informant. As an informant, Abreu communicated with Defendant and was again instructed by him to deny that they knew each other, should he be approached by law enforcement. Defendant also offered to involve Abreu in further cocaine-trafficking activities.

At the sentencing hearing, the Government reiterated the allegations in ¶¶ 415 of the PSR. To the extent those

paragraphs pertain to Abreu, Defendant had previously admitted most of the conduct.[6] The Government called a witness, Drug Enforcement Agency Special Agent Jesse Ricks ("Agent Ricks"), to testify about the conduct alleged in ¶ 14, the essence of which was that Defendant "repeatedly lied to law enforcement." But this allegation supported the enhancement for obstruction of justice, and based on Agent Ricks' testimony about Defendant's misstatements to interviewing officers, the court accepted as proved the conduct in ¶ 14 and applied the enhancement for obstruction of justice.

For his part, as to any role enhancement based on his interaction with Abreu, Defendant emphasized that Abreu was not part of the criminal conspiracy, pointing out that Abreu had initially been told that the vessels were being used as part of a music promotion, "to entertain artists and their family members." Defendant also cited the Government's similar position in the grand jury proceedings that Abreu "was an innocent third party." The Government did not rebut Defendant's argument on this point. Further, as the PSR itself makes clear, Abreu contacted law enforcement as soon as Defendant told him about the conspiracy.

Nevertheless, the district court concluded that the Government had met its burden of proof in establishing the conduct alleged in the PSR in support of the role enhancement, and it applied the leadership enhancement. We, however, find insufficient the evidence in support of that enhancement.

As Defendant correctly notes, before attempting to figure out whether Defendant had supervised Abreu as to requested tasks, one must first determine whether Abreu was a criminal participant at the time. Abreu cannot be considered a participant because the Government has nowhere alleged any criminal responsibility **\*579** on Abreu's part. At sentencing, the Government did point out that Defendant gave directions to Abreu prior to Abreu becoming an informant. Yet, the Government still did not contend that any of Abreu's actions at this earlier time made him responsible for any crime. *Cf. United States v. Dyer,* 910 F.2d 530, 533 (8th Cir.1990) (government informant could be counted as a participant because he criminally participated in the drug conspiracy prior to becoming an informant).

As we explained in *Williams,* neither unethical conduct nor involvement with an extensive criminal organization suffices for the enhancement, absent criminal responsibility. 527 F.3d at 1249 (citing *Yates,* 990 F.2d at 1182). Without alleging, much less proving, that Abreu's conduct made him in any way criminally responsible, the

Government provided the district court with no foundation upon which to consider Abreu a participant for purposes of § 3B1.1.

As a last-ditch argument on appeal, the Government concedes that if Abreu cannot be a participant for § 3B1.1 purposes, Defendant's conduct toward him still proves his organizational leadership "because they show his efforts to direct the conduct of another in order to prevent the detection of the smuggling operation." But that argument runs directly against *Martinez's* requirement of "evidence that the defendant exerted some control, influence or decision-making authority *over another participant* in the criminal activity." *Martinez,* 584 F.3d at 1026 (emphasis added); *see also* U.S.S.G. § 3B1.1, comment. (n. 2) ("the defendant must have been the organizer, leader, manager, or supervisor *of one or more other participants* ") (emphasis added). Thus, that argument fails.

In summary, because no evidence was provided to support Defendant's leadership role with respect to the four crewmen and because Abreu cannot be considered a participant, we conclude that the district court erred in applying the § 3B1.1(a) enhancement to Defendant's offense level. We therefore **VACATE** Defendant's sentence and **REMAND** to the district court for resentencing without the leadership enhancement. *See United States v. Canty,* 570 F.3d 1251, 1257 (11th Cir.2009) ("remand for further findings is inappropriate when the issue was before the court and the parties had an opportunity to introduce relevant evidence") (citing *United States v. Simons,* 206 F.3d 392, 399 n. 11 (4th Cir.2000)).

# IV. ACCEPTANCE OF RESPONSIBILITY ADJUSTMENT.
## A. Background
Defendant also challenges on appeal the district court's denial of a two-level downward adjustment for acceptance of responsibility. The PSR had recommended against giving Defendant this adjustment, noting as its only ground the fact that Defendant "had not provided a statement for acceptance of responsibility." At sentencing, Defendant reiterated his objection, and defense counsel explained that he had timely provided the probation officer with a two-page letter "specifically detailing everything [Defendant] did in connection with his involvement in this case. And I will submit to the Court that he was truthful in his statement as to what he did...."

In response, the Government argued that Defendant had not been truthful in his statement accepting responsibility and focused on the fact that Defendant "continues to minimize his involvement and roles...." Defense counsel

disagreed, setting out with specificity the ways in which Defendant's statement was truthful and **\*580** the fact that Defendant had expressed his regret.[7]

At this point, the district court noted that it was unaware of any statement by Defendant accepting responsibility. The probation officer explained that she had initially overlooked the statement when she wrote the PSR, but had later located the statement and referenced it in an addendum to the PSR. The officer further indicated that in this addendum, she had recommended that the court grant the two-level reduction if it found Defendant's statement to be truthful.

The district court then proceeded to rule on Defendant's objection to the absence of a reduction for acceptance of responsibility. The judge read verbatim several provisions of § 3E1.1, which addresses the acceptance provision. He mentioned both note 3, which provides that significant evidence of acceptance of responsibility can be found through a defendant's plea of guilty prior to trial, his truthful admission of the conduct supporting the offense of conviction, and the absence of a false denial of additional relevant conduct for which he is accountable. The judge also referenced note 4, which provides that conduct resulting in an enhancement for obstruction of justice does not ordinarily indicate that a defendant has accepted responsibility for his criminal conduct, but that both the obstruction enhancement and the acceptance reduction may be given in an extraordinary case. The court concluded by stating that it was satisfied based on the testimony presented at the hearing, as well as the offense conduct, that Defendant was not entitled to an adjustment for acceptance of responsibility.

After hearing from Defendant as to grounds for a variance, the court denied any variance and imposed a sentence of life imprisonment, which is what an offense level of 43 calls for. Defendant objected to the court's finding of facts, specifically as to the role enhancement for leader or organizer; to the court's enhancement for obstruction of justice; to the court not giving Defendant a reduction for acceptance of responsibility; and finally to the court not varying downward because of Defendant's military service.

## B. Discussion
[4] In appealing the district court's denial of a reduction for acceptance of responsibility, Defendant argues that because it failed to read the two-page statement in which the Defendant laid out his acceptance of responsibility, the district court procedurally erred. Because of this omission, Defendant argues, the district court could not

have properly evaluated whether a reduction for acceptance was appropriate.

As noted, because the probation officer had inadvertently omitted the statement from the original PSR, the district court was unaware of this statement until defense counsel referred to it. Nevertheless, the court heard counsel's argument on this matter and Defendant was fully able to have his say during his allocution. And had counsel thought it crucial, he could have read verbatim the letter or requested the court to stop and read the letter before ruling. Accordingly, we reject Defendant's argument that the district court's **581** failure to recess proceedings to read this statement constituted a procedural error that warrants reversal.

Nevertheless, given our earlier ruling that the district court erred in imposing a four-level enhancement based on Defendant's purported leadership role, we do remand to the court to consider again whether Defendant should receive a two-level downward adjustment for acceptance of responsibility. We find remand appropriate because the district court gave some indication that Defendant's perceived leadership role factored in the court's decision to deny Defendant a reduction for acceptance of responsibility, notwithstanding the latter's plea of guilty. Specifically, as noted, at the change-of-plea hearing, the court had emphasized to Defendant that his failure to admit at sentencing to this leadership role, should the Government be able to prove same, would put at risk any reduction for acceptance of responsibility. Further, at sentencing, in deciding against awarding Defendant this reduction, the court again referenced a note to this Guideline provision indicating, in effect, that the false denial of relevant conduct for which a defendant is accountable may undermine evidence of that defendant's acceptance of responsibility.

It is unclear from the sentencing hearing if the district court's conclusion that an enhancement for leadership role was applicable affected the court's decision to deny Defendant a reduction for acceptance of responsibility. Yet, to the extent that the court based its denial of the acceptance reduction on a conclusion that Defendant had falsely denied or frivolously contested the leadership enhancement, that inference is no longer tenable, given our ruling that the § 3B1.1 leadership enhancement should not have been given. And because Defendant must be resentenced now without application of that enhancement, the district court will have the opportunity to reconsider the appropriateness of a § 3E1.1 adjustment, taking that ruling and all other appropriate factors into account.[8]

### V. Conclusion

We **AFFIRM** Defendant's conviction. We, however, **VACATE** his sentence and **REMAND** for a new sentencing hearing at which Defendant shall be present. At that resentencing hearing, the district court shall exclude from the Guidelines' calculation any aggravated role enhancement pursuant to U.S.S.G. § 3B1.1(a) and shall consider whether a reduction pursuant to § 3E1.1 should be applied, without any consideration of Defendant's purported leadership role or challenge to that role enhancement at his original sentencing hearing.

**AFFIRMED in part; REVERSED in part; and REMANDED.**

### All Citations

615 Fed.Appx. 569

### Footnotes

[1]   Defendant was convicted of burglary and theft by taking in 1990, attempted burglary (twice) in 1994, burglary again in 1995, grand larceny in 1995, and criminal trespass in 1996. He was also arrested for assault in 1992. Because all of Defendant's sentences were imposed more than ten years before the criminal conduct at issue in this case, they did not count in his criminal history calculation. *See* U.S.S.G. § 4A1.2(e)(2).

[2]   Diaz makes passing reference to the district court's failure, as required by Rule 11(b)(1)(A), to warn him that he could be charged with perjury should he answer falsely any questions. Yet, Diaz does not pursue this contention and, as far as we can tell, no one is trying to prosecute him for perjury based on his Rule 11 colloquy. Accordingly, we conclude that this minor omission by the court did not render Defendant's plea unknowing or involuntary. *See United States v. Moriarty,* 429 F.3d 1012, 1020 (11th Cir.2005) (no plain error in failing to advise the defendant of all the information in Rule 11(b)(1) when defendant made no attempt to argue on appeal that he would not have entered the plea had he had that information).

[3]   The revised PSR's full description of Defendant's role states:
     Jose Diaz–Rosado organized the shipment of kilogram quantities of cocaine from South America Venezuela [sic], through the Caribbean, with either the Dominican Republic or Puerto Rico as the final destination. According to the Government, the

defendant hired and supervised the crew members of the vessels, staged the vessels, and coordinated and supervised the maritime transfer of cocaine and its ultimate off-loading onto land. Additionally, the defendant also directed the cooperating individual to purchase engines for a vessel. Diaz–Rosado is responsible for 2,189 kilograms of cocaine and his role as an organizer or leader of a criminal activity involving five or more participants, or which was otherwise extensive, warrants a four-level enhancement, pursuant to § 3B1.1(a).

4       The crewmen had reported that they were hired by a much younger Dominican man and their description of this Dominican's hair did not match Defendant.

5       Paragraphs 4 to 15 of the PSR, insofar as they allege leadership conduct, allege that conduct solely in relation to Abreu. The probation officer's response states that the Government claims to have audio recordings of Diaz instructing the four crewmen involved in the two vessel seizures.

6       Defendant did object to some details of those allegations at the sentencing hearing. Specifically, Defendant initially objected to ¶¶ 8, 10, 12, and 14 of the PSR. The objection to ¶ 8 was minor, as Defendant only contested the statement that the two outboard motors Abreu purchased were "for another boat [Defendant] had previously purchased." He eventually withdrew his objections to ¶¶ 10 and 12, both of which pertained to his meetings with Abreu.

7       Defendant's written statement (1) admitted that he used Abreu to acquire motors for vessels used to import drugs; (2) admitted outfitting and communicating with the crew of the drug boats; (3) stated that he notified his attorneys that he wanted to cooperate with the Government as soon as he realized that the December boat would be intercepted by authorities; and (4) apologized for "having gotten involved with these people and with drugs."

8       Defendant did not appeal the district court's imposition of an enhancement for obstruction of justice, under § 3C1.1 enhancement. Accordingly, that ruling constitutes the law of the case, and Defendant has waived his right to contest imposition of this adjustment at resentencing. *See United States v. Escobar–Urrego,* 110 F.3d 1556, 1560 (11th Cir.1997) (holding that where the defendant failed to appeal the district's calculation of his quantity of drugs, the law-of-the case doctrine barred him from challenging that finding at a subsequent sentencing proceeding on a different issue). Therefore, the district court may take into account the imposition of the obstruction of justice enhancement when deciding whether an adjustment under § 3E1.1 should be given.

---

**End of Document**                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite citing references available

616 Fed.Appx. 905
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S. Ct. of App. 11th Cir.
Rule 36-2.
United States Court of Appeals,
Eleventh Circuit.

UNITED STATES of America, Plaintiff–Appellee,
v.
Annilet DOMINGUEZ, Defendant–Appellant.

No. 14–14583
|
Non–Argument Calendar.
|
June 17, 2015.

## Synopsis
**Background:** Defendant pleaded guilty in the United
States District Court for the Southern District of Florida
to conspiracy to commit health care fraud and health care
fraud. Defendant appealed her sentence.

**Holding:** The Court of Appeals held that three-level
leadership role sentence enhancement was not warranted.

Vacated and remanded.

West Headnotes (1)

[1]    **Sentencing and Punishment**
       Organizers, leaders, managerial role

       350H Sentencing and Punishment
       350HIV Sentencing Guidelines
       350HIV(C) Adjustments
       350HIV(C)2 Factors Increasing Offense Level
       350Hk752 Organizers, leaders, managerial role

Three-level leadership role sentence
enhancement was not warranted for defendant
who pled guilty to conspiracy to commit health
care fraud and health care fraud for filing
fraudulent Medicare claims; although defendant
was administrator at home health agency where
she supervised and oversaw agency personnel,
and though she formed corporation at
codefendant's request, interacted with recruiters,
processed paperwork to facilitate filing of false
claims, and wrote checks to distribute
fraudulently obtained money, defendant had no
control over another member of the conspiracy,
there was no evidence she exercised
independent decision making authority, and her
coconspirators decided and negotiated which
patients and recruiters would be used, what
amount of kickbacks and percentages would be
paid, which employees would be hired and fired,
and what services would be billed. U.S.S.G. §
3B1.1(b), 18 U.S.C.A.

## Attorneys and Law Firms

**\*906** Wifredo A. Ferrer, Daren Grove, Kathleen Mary
Salyer, U.S. Attorney's Office, Miami, FL, Anne
McNamara, A. Brendan Stewart, U.S. Department of
Justice, Washington, DC, for Plaintiff–Appellee.

Anthony John Natale, Michael Caruso, Federal Public
Defender, Federal Public Defender's Office, Miami, FL,
for Defendant–Appellant.

Appeal from the United States District Court for the
Southern District of Florida. D.C. Docket No.
1:14–cr–20301–FAM–2.

Before WILSON, MARTIN, and ANDERSON, Circuit
Judges.

## Opinion

PER CURIAM:

Annilet Dominguez appeals her sixty-eight-month total
sentence imposed after she pleaded guilty to conspiracy to
commit, and the commission of, health care fraud. She

avers that, although she held the title of administrator at her job at Professional Medical Home Health, LLC (PMHH), there was no evidence that she exercised control or leadership within the conspiracy. She asserts that the uncontested facts demonstrate that she was not a decision maker and that the district court disregarded the relevant evidence to this effect. We find that the facts in the record are insufficient to support by a preponderance of the evidence that Dominguez played a leadership role in the conspiracy; thus, the district court erred in applying a leadership role enhancement. Accordingly, we vacate her sentence and remand the case for resentencing.

## I.

A grand jury indicted Dominguez for conspiracy to commit health care fraud (Count One), in violation of 18 U.S.C. § 1349, and health care fraud (Counts Three, Four, and Five), in violation of 18 U.S.C. § 1035(a)(1) and (2). The indictment alleged that Dominguez, along with codefendant Annarella Garcia and other coconspirators, filed fraudulent Medicare claims seeking payment for the costs of health services that were not medically necessary or were not provided. Dominguez initially entered a plea of not guilty, but she changed her plea to guilty without the benefit of a plea agreement.

**\*907** The district court conducted a change-of-plea colloquy before accepting Dominguez's guilty plea. At this hearing, the government laid out the factual basis for the plea. Dominguez held the title of administrator at PMHH, a Miami-based home health agency that served Medicare beneficiaries. Dominguez worked at PMHH, but she did not have an equity interest in the company. She and her coconspirators fraudulently billed Medicare.

Dominguez's role in the fraud scheme "involved managing and supervising personnel at [PMHH], paying kickbacks and bribes to patient recruiters, interacting with patient recruiters, and coordinating and overseeing the submission of fraudulent claims that were submitted to the Medicare program." Between December 2008 and February 2014, Medicare paid PMHH approximately $6.25 million in fraudulent reimbursements. The money Dominguez received came in the form of a salary and ten percent of any check she cashed on behalf of her codefendant. Dominguez agreed with the factual basis that the government set forth. Particularly relevant to this appeal was the following language:

> The actions taken by Dominguez were directed by, and at the instruction of, [codefendant] Garcia and other unindicted co-conspirators. Garcia and other unindicted co-conspirators were generally the ones to decide or

negotiate: which patients/recruiters would be used by [PMHH], the amount of kickbacks/percentages to be paid out to patients or recruiters, the hiring or firing of employees, or what services would be billed.

....

A portion of the funds received from Medicare were cashed by the defendants, used to pay the patient recruiters, or used to perpetrate the fraud.... Furthermore, at the instruction of [codefendant] Garcia, Quick Employee Management was established by Dominguez. The company was used, in part, as a means to distribute money from the illegal activities at [PMHH] to various individuals, including several unindicted co-conspirators. For a portion of the time that the Quick Employee Management account was utilized, Dominguez was not directly involved because she was at the hospital caring for her ill son, who received a bone marrow transplant. During this time, Dominguez was instructed by Garcia to pre-sign blank checks from this account, and [Dominguez] complied with that instruction.

A presentence investigation report (PSI) was prepared that assigned a base offense level of six pursuant to U.S.S.G. § 2B1.1(a)(2). As relevant here, it applied a three-level increase on the basis that Dominguez was a manager or supervisor in the scheme pursuant to U.S.S.G. § 3B1.1(b).[1] Dominguez had no prior convictions, so her criminal history category was I. Based on a total offense level of twenty-six and a criminal history category of I, the guideline range was sixty-eight to seventy-eight months' imprisonment.

In a supplemental sentencing memorandum and at sentencing, Dominguez argued that the three-level leadership enhancement was inappropriate. Dominguez criticized the government's failure to have **\*908** identified any individuals whom she allegedly had supervised or managed and the lack of evidence establishing that she had any control or decision-making authority. In response to the district court's questions, defense counsel stated that Dominguez had the title of administrator and processed the papers that allowed the payment of kickbacks, but did not exercise decision-making authority, recruit any accomplices, or claim a larger share of the money. The district court stated that Dominguez's admissions at the plea colloquy were enough to apply the enhancement and overruled the objection. Accordingly, the court sentenced her to a total of sixty-eight months of imprisonment, followed by three years of supervised release. Following entry of judgment, Dominguez appealed.

## II.

The district court's determination of a convicted defendant's role in the offense is a question of fact that we review for clear error, while "the application of the [Sentencing] Guidelines to the facts is a question of law that we review de novo." *United States v. Mesa,* 247 F.3d 1165, 1168 (11th Cir.2001).

When a defendant challenges one of the factual bases of her sentence set forth in the PSI, the government has the burden of establishing the disputed fact by a preponderance of the evidence. *United States v. Martinez,* 584 F.3d 1022, 1027 (11th Cir.2009). "It is the district court's duty to ensure that the [g]overnment carries this burden by presenting reliable and specific evidence." *Id.* (internal quotation marks omitted).

The sentencing court may base its findings on "evidence heard during trial, facts admitted by a defendant's plea of guilty, undisputed statements in the presentence report, or evidence presented at the sentencing hearing." *United States v. Wilson,* 884 F.2d 1355, 1356 (11th Cir.1989). Because the district court is required to calculate and consider the Sentencing Guidelines, "if the district court erred in calculating the guideline range while imposing a sentence, we may vacate the defendant's sentence and remand the case for re-sentencing." *Martinez,* 584 F.3d at 1025.

The Guidelines provide for a three-level increase "[i]f the defendant was a manager or supervisor." § 3B1.1(b). "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." *Id.* § 3B1.1 cmt. n.2. Courts consider several factors in determining whether to apply the aggravating role enhancement including:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.* § 3B1.1 cmt. n.4; *see also Martinez,* 584 F.3d at 1026. "There is no requirement that all of the considerations have to be present in any one case ... [because] these factors are merely considerations for the sentencing judge." *Martinez,* 584 F.3d at 1026 (internal quotation marks omitted). Instead, imposition of this role enhancement "requires the exercise of some authority in the organization, the exertion of some degree of control, influence, or leadership." *Id.* (internal quotation marks omitted).

## III.

Here, Dominguez objected to the imposition of a leadership role enhancement, **\*909** and the government did not present any additional evidence at the sentencing hearing. While Dominguez and the government presented a statement of stipulated facts, the court did not discuss those agreed upon facts before overruling the objection. Instead, the district court relied on Dominguez's admissions in the plea colloquy—that Dominguez was an administrator at PMHH and that she supervised and oversaw PMHH personnel—in order to impose the leadership role enhancement.

On their own, however, these admissions do not support the leadership enhancement because it is unclear from the record whether any of the personnel she supervised were members of the conspiracy. *See id.* at 1026 (holding that imposition of the leadership enhancement under § 3B1.1 requires "evidence that the defendant exerted some control, influence[,] or decision-making authority over *another participant in the criminal activity* " (emphasis added)).

The determination as to whether the leadership role enhancement applies should be based on Dominguez's actual conduct rather than her job title as administrator. However, even considering her other actions, such as forming the Quick Employee Management corporation at her codefendant's request, interacting with recruiters, processing paperwork to facilitate the filing of false claims, and writing checks to distribute the fraudulently obtained money (paying the patient recruiters), the record does not show control over another member of the conspiracy. *See id.* at 1026–29 (determining that leadership enhancement was inappropriate even where the evidence showed that the defendant orchestrated drug shipments, was directly involved in a wire transfer, and utilized others to mail and receive drug shipments, because control over resources is not the same as control over other participants). Nor can her management of the assets of the conspiracy justify the leadership enhancement. *See id.* at 1026 ("[A] defendant's

management of assets, standing alone, is insufficient to support an enhancement under Section 3B1.1.").

Further, there was no undisputed evidence that Dominguez exercised independent decision making authority, recruited accomplices, or claimed a right to a larger share of the fruits of the crime. *See id.* The agreed upon facts actually indicated that it was the other coconspirators that decided and negotiated which patients and recruiters would be utilized, what amount of kickbacks and percentages would be paid, which employees would be hired and fired, and what services would be billed. Without more evidence regarding Dominguez's role, these facts suggest that factors such as the nature of her participation in the commission of the offense and her degree of participation in planning or organizing the offense weigh against a finding that Dominguez had a leadership role in the conspiracy. *See id.*

Footnotes

Thus, we find that the government failed to present sufficient evidence that Dominguez was a manager or supervisor in the criminal activity. Accordingly, in light of the "slender record presented," the district court erred in concluding that Dominguez was a manager or supervisor under § 3B1.1(b) and imposing the three-level leadership role enhancement. *See id.* at 1023. Upon review of the record and consideration of the parties' briefs, we vacate Dominguez's sentence and remand the case for resentencing.

**SENTENCE VACATED AND CASE REMANDED.**

**All Citations**

616 Fed.Appx. 905

1    The PSI also applied an eighteen-level increase for the amount of loss, pursuant to § 2B1.1(b)(1)(J); a two-level increase because the offense involved a government health care program, pursuant to § 2B1.1(b)(7); and a three-level reduction for acceptance of responsibility, pursuant to § 3E1.1(a) and (b). This resulted in a total offense level of twenty-six.

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite citing references available

749 Fed.Appx. 910
This case was not selected for publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also U.S. Ct. of App. 11th Cir. Rule 36-2.
United States Court of Appeals, Eleventh Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
Pedro Manuel MANGANO, Defendant-Appellant.

No. 18-10123
|
Non-Argument Calendar
|
(September 27, 2018)

**Synopsis**
**Background:** Defendant was convicted on a guilty plea in the United States District Court for the Southern District of Florida, No. 1:17-cr-20408-JEM-1, Jose E. Martinez, J., of health care fraud and was sentenced to 48 months' imprisonment. Defendant appealed.

**Holdings:** The Court of Appeals held that:

[1] district court properly applied three-level "manager/supervisor" sentence enhancement, and

[2] district court properly applied two-level sophisticated-means sentence enhancement.

Affirmed.

West Headnotes (2)

[1] **Sentencing and Punishment**
 Organizers, leaders, managerial role

350H Sentencing and Punishment

350HIV Sentencing Guidelines
350HIV(C) Adjustments
350HIV(C)2 Factors Increasing Offense Level
350Hk752 Organizers, leaders, managerial role

In sentencing defendant to 48 months' imprisonment for health care fraud, district court properly imposed three-level sentence enhancement based on defendant's role as a manager or supervisor; defendant maintained exclusive control over pharmacy where fraud took place and all profits from scheme, which he used to direct and facilitate actions of other criminal participants, scheme involved at least five other criminal participants, went on for at least three years, and resulted in losses exceeding $1 million, and district court was not required to make explicit factual finding that defendant controlled another participant. U.S.S.G. § 3B1.1(b).

[2] **Sentencing and Punishment**
 Sophistication in commission or concealment

350H Sentencing and Punishment
350HIV Sentencing Guidelines
350HIV(B) Offense Levels
350HIV(B)3 Factors Applicable to Several Offenses
350Hk727 Sophistication in commission or concealment

In sentencing defendant to 48 months' imprisonment for health care fraud, district court properly imposed two-level sophisticated-means enhancement; defendant's conduct, in enrolling pharmacy in Medicare program, creating and submitting claims for fraudulent prescriptions, and misleading and deceiving insurance auditors, was intricate offense conduct made possible by his expertise as a pharmacy owner and licensed pharmacy technician. U.S.S.G. § 2B1.1(b)(10)(C).

**Attorneys and Law Firms**

Lisa A. Hirsch, John C. Shipley, Assistant U.S. Attorney, Emily M. Smachetti, U.S. Attorney Service - Southern District of Florida, U.S. Attorney Service - SFL, Miami, FL, Phillip Drew DiRosa, U.S. Attorney's Office, Fort Lauderdale, FL, Brandy Brentari Galler, U.S. Attorney's Office, West Palm Beach, FL, for Plaintiff-Appellee

Ana M. Davide, Law Office of Ana M. Davide, Miami, FL

Appeal from the United States District Court for the Southern District of Florida, D.C. Docket No. 1:17-cr-20408-JEM-1

Before WILLIAM PRYOR, FAY and ANDERSON, Circuit Judges.

**Opinion**

PER CURIAM:

Pedro Manuel Mangano appeals his 48-month sentence, imposed after pleading guilty to one count of health care fraud, in violation of 18 U.S.C. § 1347. We affirm.

**\*911 I. BACKGROUND**

Mangano owned and operated PVRX Pharmacy, Corp. ("PVRX"), where he served as the president, sole director, and sole signatory on its bank account. Mangano enrolled PVRX in the Medicare Part D health care benefit program and engaged in a scheme to defraud the Medicare Part D program through submitting false and fraudulent claims to the program. As part of the scheme, Mangano paid kickbacks to individuals for referring fraudulent prescriptions to PVRX and then submitted the claims to the Part D program to receive reimbursements without ever actually ordering many of the drugs or dispensing the drugs to the Medicare beneficiaries. Mangano paid a patient recruiter several thousand dollars cash to provide him with patients' Medicare information, which he used to submit the fraudulent claims. The Medicare beneficiaries, who were complicit in the scheme, received several hundred dollars cash each month as kickbacks.

The scheme went on for at least three years and resulted in losses to the Part D program of over $1,000,000. Numerous individuals were involved in the scheme, including beneficiaries, patient recruiters, and unknown others, such as doctors. Mangano submitted fraudulent prescriptions from at least five separate Medicare beneficiaries.

Mangano was indicted on ten counts of health care fraud, in violation of 18 U.S.C. § 1347. The indictment listed ten fraudulent prescriptions that Mangano submitted for five separate Medicare beneficiaries. Mangano pled guilty to Count I, pursuant to a plea agreement, and the remaining counts were dismissed.

In preparing the presentence investigation report ("PSI"), the probation officer applied a base offense level of six under U.S.S.G. § 2B1.1(a)(2). Mangano received a 14-level increase under section 2B1.1(b)(1)(H), as the loss was more than $550,000 but not more than $1,500,000; a two-level increase under section 2B1.1(b)(7), as the offense involved a government health care program and the loss was more than $1,000,000; a two-level increase under section 2B1.1(b)(10)(C), because the offense involved sophisticated means; and a three-level increase under section 3B1.1(b), as Mangano was a manager or supervisor of extensive criminal activity. Mangano received a three-level decrease for accepting responsibility for the offense under section 3E1.1(a) and (b), resulting in a total offense level of 24. Based on a total offense level of 24 and a criminal history category of I, Mangano's guideline range was 51 to 63 months of imprisonment. The statutory maximum was ten years of imprisonment under 18 U.S.C. § 1347.

Mangano filed objections to the PSI, arguing that the three-level manager/supervisor enhancement under section 3B1.1(b) was inapplicable, because he was not a supervisor or manager of criminal activity that was otherwise extensive, and that the two-level sophisticated-means enhancement under section 2B1.1(b)(10)(C) was inapplicable.

The district court stated that it believed 48 months was the "right sentence" in this case and that it was "not sure" whether its ruling on the enhancement mattered since it intended to impose a 48-month sentence. The court overruled Mangano's objections, stating that Medicare fraud is sophisticated by its very nature, because the participants have to do numerous things just right, and, therefore, the enhancement will apply except in "very unusual circumstances." The court imposed a below-guideline 48-month sentence.

**\*912** On appeal, Mangano argues that the district court clearly erred by applying a three-level manager/supervisor enhancement to his base offense level because there was no evidence that he managed or supervised any other criminal participant. Additionally, he argues that the district court clearly erred by applying a two-level

sophisticated-means enhancement because his offense was not sophisticated.

## II. DISCUSSION

### A. Manager/Supervisor Enhancement

Section 3B1.1 calls for an enhancement in a defendant's base offense level if he was an organizer, leader, manager, or supervisor of the offense. U.S.S.G. § 3B1.1. The government must prove the existence of an aggravating role by a preponderance of the evidence. *United States v. Alred*, 144 F.3d 1405, 1421 (11th Cir. 1998). We review for clear error a district court's decision to impose an aggravating-role increase. *United States v. Sosa*, 777 F.3d 1279, 1300 (11th Cir. 2015). Review for clear error is deferential; "we will not disturb a district court's findings 'unless we are left with a definite and firm conviction that a mistake has been committed.' " *Id.* (quoting *United States v. Clarke*, 562 F.3d 1158, 1165 (11th Cir. 2009) ). A district court's choice between two permissible views of the evidence cannot be clear error. *United States v. Ndiaye*, 434 F.3d 1270, 1305 (11th Cir. 2006).

Under section 3B1.1(b), a district court may increase a defendant's offense level by three levels if the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive. U.S.S.G. § 3B1.1(b). Section 3B1.1 requires that the defendant exercised some authority in the organization or exerted some degree of control, influence, or leadership. *United States v. Gupta*, 463 F.3d 1182, 1198 (11th Cir. 2006). To qualify for an increase under this section, the defendant need only manage or supervise one other participant in the criminal activity. *Sosa*, 777 F.3d at 1301. "However, 'a section 3B1.1 enhancement cannot be based solely on a finding that the defendant managed the assets of a conspiracy,' without the defendant also managing or exercising control over another participant." *Id.* (quoting *United States v. Glover*, 179 F.3d 1300, 1303 (11th Cir. 1999) ).

A defendant can be a manager or supervisor where he arranges criminal transactions or hires others to participate in the criminal conduct, even if he does not have the power to force others to engage in criminal acts. *See United States v. Matthews*, 168 F.3d 1234, 1249-50 (11th Cir. 1999) (stating that the management enhancement is appropriate for a defendant who arranges drug transactions, negotiates sales with others, and hires others to work for the conspiracy); *see also United States v. LaFraugh*, 893 F.2d 314, 319 (11th Cir. 1990) (concluding that the defendant was a manager or

supervisor where he recruited a codefendant, participated in negotiations, and used his residence as the base of operations). In *Sosa*, we affirmed a section 3B1.1(b) enhancement where the defendant co-ran a clinic used in the fraud, received 50% of the fraud proceeds, had signatory authority over the bank account, wrote checks to compensate at least one participant in the scheme, and had some decision-making authority and control over the pharmacy's finances. *Sosa*, 777 F.3d at 1301-02.

A "participant" in criminal activity "is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 cmt. n.1; *Sosa*, 777 F.3d at 1301. "In assessing whether an organization is 'otherwise extensive,' all persons involved during **\*913** the course of the entire offense are to be considered." Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1 cmt. n.1; *Sosa*, 777 F.3d at 1301. Although we do not employ a precise definition for the "otherwise extensive" standard, there are a number of factors relevant to the extensiveness determination, including the length and scope of the criminal activity as well as the number of persons involved. *United States v. Holland*, 22 F.3d 1040, 1046 (11th Cir. 1994).

The district court may base its factual findings on undisputed facts in the PSI. *United States v. Beckles*, 565 F.3d 832, 843 (11th Cir. 2009). Facts in the PSI are undisputed and deemed to have been admitted unless a party objects to them before the sentencing court with specificity and clarity. *Id.* at 844. In ultimately deciding the defendant's role in the offense, the sentencing court need not make any specific subsidiary factual findings. *United States v. De Varon*, 175 F.3d 930, 939 (11th Cir. 1999) (en banc) (explaining that, as long as the record supports the district court's decision and the court clearly resolves disputed factual issues, the court may simply state its conclusion). The district court is not required to make any specific findings other than the ultimate determination of the defendant's role in the offense. *Id.* at 940.

[1]Here, the district court did not clearly err in applying the three-point manager/supervisor enhancement under section 3B1.1(b), as Mangano maintained exclusive control over the pharmacy where the fraud took place and all of the profits from the scheme, which he used to direct and facilitate the actions of the other criminal participants. *Gupta*, 463 F.3d at 1198. Moreover, the scheme here either involved five or more participants, or was otherwise extensive, as the PSI indicated that there were at least five other criminal participants, and the scheme

went on for at least three years, resulted in losses exceeding one million dollars, and involved the services, either knowing or unknowing, of numerous individuals, including insurance auditors, Medicare employees, and patients. U.S.S.G. § 3B1.1(b); *Sosa*, 777 F.3d at 1301; *Holland*, 22 F.3d at 1046. Lastly, the district court did not clearly err by applying the enhancement without making an explicit factual finding that Mangano controlled another participant, as it was not required to make such an explicit factual finding when determining Mangano's role in the offense. *De Varon*, 175 F.3d at 939-40.

## B. Sophisticated-Means Enhancement

We review for clear error a district court's decision to impose a sophisticated-means enhancement. *Sosa*, 777 F.3d at 1300. Under section 2B1.1(b)(10)(C), a defendant's offense level is enhanced by two levels if the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. U.S.S.G. § 2B1.1(b)(10)(C). " 'Sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.* cmt. n.9(B). Examples of sophisticated means listed in the commentary include hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts. *Id.* However, the application notes do not limit the ways in which a defendant could use sophisticated means to conceal his crime. *Clarke*, 562 F.3d at 1165.

Section 2B1.1(b)(10)(C) was amended in 2015 to narrow the focus of the enhancement to the sophistication of the defendant's personal conduct, not the scheme as **\*914** a

whole. *United States v. Presendieu*, 880 F.3d 1228, 1248 (11th Cir. 2018). In gauging sophistication, the court must examine the totality of the defendant's conduct, as there is no requirement that each of the defendant's individual actions be sophisticated. *United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010). The use of repetitive, coordinated conduct to perpetuate and conceal a fraud scheme supports a sophisticated-means enhancement. *United States v. Bane*, 720 F.3d 818, 826-27 (11th Cir. 2013). Further, the length of time for which the conduct is not detected can reflect on the sophistication of the scheme. *United States v. Feaster*, 798 F.3d 1374, 1381 (11th Cir. 2015).

[2]Here, the district court did not clearly err in applying the sophisticated-means enhancement because Mangano's conduct of enrolling the pharmacy in Medicare Plan D, creating and submitting claims for fraudulent prescriptions, and misleading and deceiving insurance auditors was all intricate offense conduct, made possible by his expertise as a pharmacy owner and licensed pharmacy technician. U.S.S.G. § 2B1.1 cmt. n.9(B). The sophistication of Mangano's conduct was further evidenced by the scheme's endurance for three years without detection and by his utilization of repetitive and coordinated conduct, including continual cash payments to the criminal participants. *Bane*, 720 F.3d at 826-27; *Feaster*, 798 F.3d at 1381.

## AFFIRMED.

## All Citations

749 Fed.Appx. 910

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

United States v. Stagner, 782 Fed.Appx. 823 (2019)

 KeyCite history available

782 Fed.Appx. 823
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S. Ct. of App. 11th Cir.
Rule 36-2.
United States Court of Appeals, Eleventh Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
Charles Raymond STAGNER,
Defendant-Appellant.

No. 18-14239
|
Non-Argument Calendar
|
(July 26, 2019)

**Synopsis**
**Background:** Defendant was convicted in the United
States District Court for the Southern District of Alabama,
William H. Steele, Senior District Judge, of two counts of
possession with intent to distribute methamphetamine.
Defendant appealed.

**Holdings:** The Court of Appeals held that:

[1] evidence was sufficient to support conviction for
possession with intent to distribute methamphetamine;

[2] the trial court's admission of defendant's past
conviction for conspiracy to manufacture
methamphetamine was not an abuse of discretion; and

[3] the trial court's refusal to assess a two-level reduction
of offense level for acceptance of responsibility did not
constitute plain error.

Affirmed.

West Headnotes (4)

[1]  **Controlled Substances**
 ☛ Possession for sale or distribution

 96H Controlled Substances
 96HIII Prosecutions
 96Hk70 Weight and Sufficiency of Evidence
 96Hk81 Possession for sale or distribution

 Evidence was sufficient to support conviction
 for possession with intent to distribute
 methamphetamine; confidential informant
 purchased methamphetamine from defendant,
 officers searched defendant's home and found
 15 grams of methamphetamine along with razor
 blades, scales, and small plastic bags, and
 defendant admitted that he sold
 methamphetamine. Comprehensive Drug Abuse
 Prevention and Control Act of 1970 § 401, 21
 U.S.C.A. § 841(a)(1).

[2]  **Criminal Law**
 ☛ Controlled substances
 **Criminal Law**
 ☛ Limiting effect of evidence of other offenses

 110 Criminal Law
 110XVII Evidence
 110XVII(F) Other Misconduct by Accused
 110XVII(F)7 Other Misconduct Showing Intent
 110k371.33 Controlled substances
 110 Criminal Law
 110XX Trial
 110XX(C) Reception of Evidence
 110k673 Effect of Admission
 110k673(5) Limiting effect of evidence of other
 offenses

 The trial court's admission of defendant's past
 conviction for conspiracy to manufacture
 methamphetamine was not an abuse of
 discretion, during prosecution for possession
 with intent to distribute methamphetamine; the
 past conviction was relevant to prove intent, and
 the prejudicial effect of the prior conviction did
 not substantially outweigh the conviction's
 probative value as the court mitigated the
 prejudice by providing a limiting instruction at
 the time the conviction was introduced. Fed. R.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    1

Evid. 404(b).

**[3]**   **Criminal Law**
👉 Sentencing and Punishment

110 Criminal Law
110XXIV Review
110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
110XXIV(E)1 In General
110k1042.3 Sentencing and Punishment
110k1042.3(1) In general

The trial court's refusal to assess a two-level reduction of offense level for acceptance of responsibility did not constitute plain error, during prosecution for possession with intent to distribute methamphetamine; defendant proceeded to trial to challenge his factual guilt, not the constitutionality of a criminal statute or its application to his undisputed conduct. U.S.S.G. § 3E1.1(a).

**[4]**   **Controlled Substances**
👉 Extent of punishment
**Sentencing and Punishment**
👉 Nature, degree or seriousness of offense
**Sentencing and Punishment**
👉 Other Offenses, Charges, Misconduct
**Sentencing and Punishment**
👉 Remorse, acceptance of responsibility, and cooperation

96H Controlled Substances
96HIII Prosecutions
96Hk100 Sentence and Punishment
96Hk100(2) Extent of punishment
350H Sentencing and Punishment
350HI Punishment in General
350HI(D) Factors Related to Offense
350Hk66 Nature, degree or seriousness of offense
350H Sentencing and Punishment
350HI Punishment in General
350HI(E) Factors Related to Offender
350Hk93 Other Offenses, Charges, Misconduct
350Hk94 In general
350H Sentencing and Punishment

350HI Punishment in General
350HI(E) Factors Related to Offender
350Hk114 Remorse, acceptance of responsibility, and cooperation

Defendant's 132-month sentence for two counts of possession with intent to distribute methamphetamine were not substantively unreasonable; defendant's prior conviction triggered the mandatory minimum, raising his guideline range from 57-71 months to 120 months, and when imposing sentence the trial court cited defendant's lack of remorse, the seriousness of the offense, the need for respect of the law, just punishment, deterrence, and defendant's criminal history as factors that supported a 12-month upward variance. 18 U.S.C.A. § 3553(a); 28 U.S.C. § 841(b)(1)(B).

**Attorneys and Law Firms**

***824** Christopher John Bodnar, U.S. Attorney Service - Southern District of Alabama, U.S. Attorney's Office, Mobile, AL, Plaintiff - Appellee

Robert Allen Ratliff, Robert A. Ratliff, PC, Mobile, AL, for Defendant - Appellant

Appeal from the United States District Court for the Southern District of Alabama, D.C. Docket No. 1:18-cr-00039-WS-N-1

Before WILSON, ANDERSON, and HULL, Circuit Judges.

**Opinion**

PER CURIAM:

Charles Raymond Stagner appeals his convictions and 132-month concurrent sentences for possession with intent to distribute methamphetamine. Stagner argues that: (1) the district court erred by denying his motion for a judgment of acquittal because the government did not prove that he intended to distribute methamphetamine; (2) the district court abused its discretion by admitting evidence of his past conviction for conspiracy to manufacture methamphetamine under Fed. R. Evid.

404(b); (3) the district court plainly erred by not assessing a 2-level reduction for acceptance of responsibility; and (4) his 132-month sentences were substantively unreasonable because the district court did not consider his drug addiction and erroneously stated that the mandatory minimum did not account for his prior conviction.


**I.**

We review the denial of a motion for a judgment of acquittal *de novo*, viewing all facts and inferences in the light most favorable to the government. **\*825** *United States v. Holmes*, 814 F.3d 1246, 1250 (11th Cir. 2016). The district court's denial of a motion for a judgment of acquittal will be upheld if a reasonable trier of fact could conclude that the evidence establishes the defendant's guilt beyond a reasonable doubt. *Id.* We will not overturn the jury's verdict if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty. *United States v. Henderson*, 893 F.3d 1338, 1348 (11th Cir. 2018).

[1]To convict a defendant of possession with intent to distribute a controlled substance, the government must prove knowing possession and intent to distribute. *United States v. Williams*, 865 F.3d 1328, 1344 (11th Cir. 2017), *cert. denied*, —— U.S. ——, 138 S. Ct. 1282, 200 L.Ed.2d 476 (2018); *see* 21 U.S.C. § 841(a)(1). Knowledge, possession, and intent can be proven by direct or circumstantial evidence. *United States v. Poole*, 878 F.2d 1389, 1391-92 (11th Cir. 1989). Intent to distribute can be proven circumstantially from the quantity of drugs and the existence of implements, like scales, that are commonly used in connection with the distribution of drugs. *Id.* at 1392.

Here, the district court did not err in denying Stagner's motion for a judgment of acquittal because the evidence presented at trial, including that a confidential informant bought methamphetamine from Stagner, officers searching his home found 15 grams of methamphetamine along with razor blades, scales, and small plastic baggies, and he admitted to selling methamphetamine, was sufficient for a reasonable juror to find that he was guilty beyond a reasonable doubt.


**II.**

We review evidentiary decisions for abuse of discretion. *United States v. Nerey*, 877 F.3d 956, 974 (11th Cir. 2017). However, we review unpreserved evidentiary arguments for plain error. *United States v. Jernigan*, 341

F.3d 1273, 1280 (11th Cir. 2003). Under plain error review, the defendant must show (1) error; (2) that was plain; (3) that affected his substantial rights; and (4) that seriously affected the fairness of the judicial proceedings. *Id.*

[2]Evidence of a past crime is not admissible to prove a person's character to show that on a particular occasion the person acted in accordance with the character. Fed. R. Evid. 404(b)(1). This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Fed. R. Evid. 404(b)(2). A district court may exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403.

To be admissible under Rule 404(b)(2), a prior act (1) must be relevant to an issue other than the defendant's character; (2) must be sufficiently proven to permit a jury determination that the defendant committed that act; (3) must have probative value that is not substantially outweighed by undue prejudice; and (4) must otherwise satisfy Rule 403. *Nerey*, 877 F.3d at 974.

A defendant who enters a not guilty plea makes intent a material issue, which the government may prove by qualifying Rule 404(b) evidence. *United States v. Sterling*, 738 F.3d 228, 238 (11th Cir. 2013). Where the state of mind required for the charged and extrinsic offenses is the same, the first prong of the Rule 404(b) test is satisfied. *Id.* Prior convictions involving the same drug may be probative of intent even if the crimes are not identical. *See* **\*826** *United States v. Smith*, 741 F.3d 1211, 1226 (11th Cir. 2013) (holding that a prior conviction for possession was probative of intent to distribute). A prior conviction involving the same drug is probative even where the conviction is many years old. *See id.* at 1225-26.

Extrinsic evidence of other crimes is inherently prejudicial to the defendant because it may entice the jury to draw the prohibited inference that a defendant previously convicted of a crime likely committed the same crime again. *Sterling*, 738 F.3d at 238. This type of evidence is disfavored because of the possibility for its misuse, especially where the government has a strong case. *Id.* However, a limiting instruction may mitigate unfair prejudice caused by the admission of a prior conviction. *United States v. Edouard*, 485 F.3d 1324, 1346 (11th Cir. 2007). This Court presumes that jurors follow the instructions of the district court. *See United*

*States v. LaFond*, 783 F.3d 1216, 1222 (11th Cir. 2015).

Here, the district court did not abuse its discretion in admitting evidence of Stagner's past conviction for conspiracy to manufacture methamphetamine. First, the past conviction was relevant to prove intent, which Stagner put at issue by pleading not guilty. *See* Fed. R. Evid. 404(b); *Nerey*, 877 F.3d at 974; *Sterling*, 738 F.3d at 238. As to Stagner's argument on this prong of the *Nerey* test, which he raises for the first time on appeal, the district court did not err, plainly or otherwise. It was correct in concluding that the conviction was relevant, without requiring proof of the state of mind required for both crimes, because this Court has held that a past conviction involving the same controlled substance as the charged crime is relevant to prove intent even where the crimes are not identical. *See Smith*, 741 F.3d at 1226. Further, the past conviction, which occurred nine years earlier, was not too remote to have probative value. *See id.* at 1225-26. Next, the conviction met the second prong of the test because the government introduced a certified copy. *Nerey*, 877 F.3d at 974. Finally, although the evidence of the past conviction was prejudicial to Stagner, the district court mitigated that prejudice by providing a limiting instruction at the time the conviction was introduced. *Edouard*, 485 F.3d at 1346; *LaFond*, 783 F.3d at 1222. Thus, the prejudicial effect did not substantially outweigh the conviction's probative value. *See Nerey*, 877 F.3d at 974. Finally, there is no evidence that the introduction of the conviction otherwise created a risk contemplated in Rule 403. *See id.* Accordingly, the district court did not abuse its discretion in admitting evidence of Stagner's prior conviction under Rule 404(b).

III

[3]In reviewing a district court's refusal to grant a reduction for acceptance of responsibility, we review the district court's interpretation of the guidelines *de novo* and its factual findings for clear error. *United States v. Mathews*, 874 F.3d 698, 709 n.7 (11th Cir. 2017). However, where an appellant fails to clearly articulate the grounds for an objection, we apply the plain error standard. *See United States v. Massey*, 443 F.3d 814, 818 (11th Cir. 2006). An error affects a party's substantial rights if it had a substantial influence on the outcome of the case. *United States v. Cruickshank*, 837 F.3d 1182, 1191 (11th Cir. 2016). An error is plain if it contradicts precedent from the Supreme Court or us directly resolving the issue. *Id.*

Under U.S.S.G. § 3E1.1, a defendant's offense level is decreased by two levels if he clearly demonstrates acceptance of responsibility. U.S.S.G. § 3E1.1(a). The

defendant bears the burden of demonstrating **\*827** that he is entitled to a reduction for his acceptance of responsibility. *United States v. Gupta*, 572 F.3d 878, 890 (11th Cir. 2009). The reduction is not intended to apply to a defendant "who puts the government to its burden of proof at trial by denying the essential factual elements of guilt." U.S.S.G. § 3E1.1, comment. (n.2). However, a defendant who goes to trial may be eligible for the reduction if he proceeded to trial to preserve issues not related to factual guilt, such as a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct. *Id.* A defendant is not eligible for an acceptance-of-responsibility reduction if he denies guilt in the face of evidence to the contrary. *United States v. Williams*, 627 F.3d 839, 844 (11th Cir. 2010).

Here, as an initial matter, this claim should be reviewed for plain error because Stagner did not raise it below. *See Massey*, 443 F.3d at 818. On the merits, the district court did not plainly err in denying an acceptance-of-responsibility reduction because Stagner proceeded to trial to challenge his factual guilt. *See* U.S.S.G. § 3E1.1, comment. (n.2). At trial, he contended that the government had not proven his intent to distribute on Count 2 and had not proven possession or intent to distribute on Count 1—challenging his factual guilt, not the constitutionality of the criminal statute or its application to his undisputed conduct. U.S.S.G. § 3E1.1, comment. (n.2). He continued to deny his factual guilt at sentencing, despite the government having provided substantial evidence to the contrary. *Williams*, 627 F.3d at 844. Further, any error was not plain because the court's decision was not contrary to binding precedent directly resolving the issue. *See Cruickshank*, 837 F.3d at 1191. Moreover, even if there were error that was plain, it would not have affected Stagner's substantial rights, because a two-level reduction would not have changed his guideline calculations. *See Cruickshank*, 837 F.3d at 1191. Stagner's calculated guideline range, based on a total offense level of 24 and a criminal history category of II, was 57-71 months. However, Count 2 carried a mandatory minimum of 120 months, making his guideline term 120 months. A two-level acceptance-of-responsibility reduction would have reduced the calculated range to 46-57 months, but would not have affected the ultimate guideline term of 120 months. Thus, any error in calculating Stagner's guideline range would not have changed the outcome of the case. *See Cruickshank*, 837 F.3d at 1191.

IV

We review the reasonableness of a sentence under the deferential abuse-of-discretion standard. *Gall v. United*

*States*, 552 U.S. 38, 41, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). The party challenging the sentence bears the burden of showing the sentence is unreasonable in light of the record and the § 3553(a) factors. *United States v. Tome*, 611 F.3d 1371, 1378 (11th Cir. 2010).

[4]The district court must impose a sentence "sufficient, but not greater than necessary to comply with the purposes" listed in 18 U.S.C. § 3553(a)(2), including the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, and protect the public from the defendant's future criminal conduct. *See* 18 U.S.C. § 3553(a)(2). The court must also consider the nature and circumstances of the offense and the history and characteristics of the defendant. *Id.* § 3553(a)(1).

The weight given to any specific § 3553(a) factor is committed to the sound discretion of the district court. ***828** United States v. Clay*, 483 F.3d 739, 743 (11th Cir. 2007). A court can abuse its discretion when it fails to consider relevant factors that were due significant weight, gives an improper or irrelevant factor significant weight, or commits a clear error of judgment by balancing the proper factors unreasonably. *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (*en banc*). District courts have broad leeway in deciding how much weight to give to prior crimes the defendant has committed. *United States v. Rosales-Bruno*, 789 F.3d 1249, 1261 (11th Cir. 2015) (rejecting defendant's argument that the district court gave unreasonable weight to his criminal history in imposing a 60-month upward variance). The district court may not apply a presumption of reasonableness to the sentencing guideline range and must actually consider the relevant statutory factors. *Nelson v. United States*, 555 U.S. 350, 352, 129 S.Ct. 890, 172 L.Ed.2d 719 (2009). However, the district court need not discuss each individual factor on the record. *Irey*, 612 F.3d at 1194-95. Rather, it is sufficient for the district court to acknowledge that it has considered the defendant's arguments and the § 3553(a) factors. *Id.* We will vacate a sentence only if the district court "committed a clear error

in judgment in weighing the § 3553(a) factors." *Id.* at 1190. If the district court determines that a sentence outside the guideline range is warranted, it must ensure the justification is sufficiently compelling to support the degree of the variance. *Gall*, 552 U.S. at 50, 128 S.Ct. 586.

Here, the district court did not abuse its discretion by imposing substantively unreasonable sentences. As the government concedes, the district court was not correct in stating that the mandatory minimum did not take Stagner's prior conviction into account. His prior conviction triggered the mandatory minimum, raising his guideline range from 57-71 months to 120 months. 28 U.S.C. § 841(b)(1)(B). However, the district court did not support its 12-month upward variance with that consideration alone. In imposing Stagner's sentences, it also cited his lack of remorse, the seriousness of the offense, and the need for respect for the law, just punishment, deterrence, and protection of the public. 18 U.S.C. § 3553(a). Further, the district court acted within its discretion in considering Stagner's criminal history as a factor supporting an upward variance. *See Rosales-Bruno*, 789 F.3d at 1261. The district court's discussion showed that it considered the § 3553(a) factors and found that they justified a 12-month upward variance. *See Irey*, 612 F.3d at 1194-95; *Gall*, 552 U.S. at 50, 128 S.Ct. 586. In addition, because it acknowledged that it considered Stagner's arguments and the § 3553(a) factors, the district court was not required to specifically address his drug addiction. *See Irey*, 612 F.3d at 1194-95. Thus, it cannot be said that the district court committed a clear error of judgment in weighing the § 3553(a) factors. *See Irey*, 612 F.3d at 1190.

**AFFIRMED.**

**All Citations**

782 Fed.Appx. 823

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**H** KeyCite history available

755 Fed.Appx. 926
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S. Ct. of App. 11th Cir.
Rule 36-2.
United States Court of Appeals, Eleventh Circuit.

UNITED STATES of America, Plaintiff-Appellee,
v.
Tonia WILLIAMS, Defendant-Appellant.

No. 17-13503
|
Non-Argument Calendar
|
(November 15, 2018)

**Synopsis**
**Background:** Following guilty plea, defendant was
convicted in the United States District Court for the
Northern District of Georgia, No.
3:16-CR-00003-TCB-RGV-24, of attempting to distribute
methamphetamine and cocaine and sentenced to 61
months' imprisonment. Defendant appealed.

**Holdings:** The Court of Appeals held that:

[1] government's conduct was not sufficiently outrageous
so as to warrant reversal of conviction, and

[2] District Court's automatic application of
supervisory-role enhancement on defendant's sentence
warranted vacatur of sentence.

Affirmed in part, vacated in part, and remanded.

West Headnotes (2)

[1]  **Criminal Law**
 ⚷ Official Action, Inaction, Representation,

Misconduct, or Bad Faith

110 Criminal Law
110II Defenses in General
110k36.5 Official Action, Inaction, Representation,
Misconduct, or Bad Faith
110k36.6 In general

Government's conduct, in creating reverse-sting
operation that targeted low-paid prison guards
who were not engaged in ongoing criminal
activity with the allure of substantial cash
payments for transporting substances guards
believed to be drugs, was not sufficiently
outrageous so as to warrant reversal of
conviction for attempting to distribute
methamphetamine and cocaine; government did
not provide the entire means for the scheme's
operation given that defendant transported drugs
while wearing her guard uniform with the
express understanding that uniform would help
protect the drug deliveries from
law-enforcement interdiction and defendant
furthered the criminal scheme when she put
confidential human source in contact with two
other prison guards who joined the scheme.

[2]  **Criminal Law**
 ⚷ Sentencing and Punishment
**Sentencing and Punishment**
 ⚷ Organizers, leaders, managerial role

110 Criminal Law
110XXIV Review
110XXIV(Q) Harmless and Reversible Error
110k1177.3 Sentencing and Punishment
110k1177.3(1) In general
350H Sentencing and Punishment
350HIV Sentencing Guidelines
350HIV(C) Adjustments
350HIV(C)2 Factors Increasing Offense Level
350Hk752 Organizers, leaders, managerial role

District Court's automatic application of
supervisory-role enhancement on defendant's
sentence for attempting to distribute
methamphetamine and cocaine warranted
vacatur of defendant's sentence; District Court
was required to make determination on
application of the enhancement on a

case-by-case basis in light of considerations such as whether the defendant exercised decision-making authority, the nature of her participation in the offense, whether she claimed a larger share of the fruits of the crime, her degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree or control or authority that she exercised over others. U.S.S.G. § 3B1.1(c).

**Attorneys and Law Firms**

**\*927** John Shantanu Ghose, Jane Elizabeth McBath, Lawrence R. Sommerfeld, U.S. Attorney Service - Northern District of Georgia, U.S. Attorney's Office, Atlanta, GA, for Plaintiff-Appellee

Bingzi Hu, Larry David Wolfe, L. David Wolfe, PC, Atlanta, GA, for Defendant-Appellant

Appeal from the United States District Court for the Northern District of Georgia, D.C. Docket No. 3:16-cr-00003-TCB-RGV-24

Before JORDAN, JILL PRYOR and HULL, Circuit Judges.

**Opinion**

PER CURIAM:

Tonia Williams appeals her conviction for attempting to distribute methamphetamine and cocaine; she also appeals her sentence. She contends that the district court should have dismissed the indictment because the government's conduct in carrying out the reverse sting operation in this case was outrageous and violated her constitutional rights. She also challenges the court's application of a two-level sentencing enhancement based on her supervisory role in the criminal activity. After careful review, we affirm Williams's conviction, vacate her sentence, and remand for resentencing.

**\*928 I. FACTUAL BACKGROUND**

**A. Williams's Criminal Offense**

This case arises out of an FBI investigation into Georgia prison guards who were smuggling contraband into state prisons. The FBI eventually redirected the investigation into guards' conduct occurring outside prisons. The FBI created a reverse sting operation in which a confidential human source ("CHS") posed as a high-level drug trafficker and asked prison guards to assist him in transporting methamphetamine and cocaine to other purported drug traffickers. The guards were told to wear their uniforms during the transactions to protect the drug deals from law enforcement interdiction. The CHS paid the guards for their assistance.

Williams, a corrections officer with the Georgia Department of Corrections, was arrested in the reverse sting operation. Another prison guard, co-defendant Travonne Ferrell, approached Williams about participating in the scheme. Although she initially declined, Williams agreed and assisted the CHS on three occasions in transporting substances that she believed to be methamphetamine and cocaine. For each transaction, Williams wore her guard uniform. She was given the opportunity to back out before each transaction but opted to participate.

In the first transaction, Ferrell and Williams met the CHS in a parking lot in Locust Grove, Georgia. When Ferrell and Williams entered the CHS's vehicle, he told them that they would be delivering three kilograms of methamphetamine and three kilograms of cocaine to Stockbridge, Georgia.[1] The CHS explained that Williams would ride with the CHS and transport the cocaine while Ferrell would follow in his own vehicle and transport the methamphetamine. When they arrived at the parking lot in Stockbridge, Ferrell and Williams placed bags containing the drugs in another vehicle. The CHS paid Williams $1,500 for her assistance.

While driving to Stockbridge, Williams told the CHS that she knew two other prison guards who might want to assist in transporting drugs. Williams later sent the CHS text messages containing the phone numbers for two guards, Phoenicia Minor and Tacowan Fluellen.

In the second transaction, Williams and Minor met the CHS in a parking lot in Locust Grove. The CHS gave Williams a bag containing three kilograms of cocaine and Minor a bag with two kilograms of methamphetamine. The CHS drove to Stockbridge with Minor in his vehicle, while Williams followed in her vehicle. When they arrived at a parking lot in Stockbridge, Williams and Minor placed the bags containing the drugs in another vehicle. This time Williams was paid $3,000.

Williams and Fluellen participated in the third transaction. They met the CHS in a parking lot in Locust Grove. When they entered the CHS's vehicle, he instructed them that they each would transport a bag containing two kilograms of cocaine and one kilogram of methamphetamine. The CHS drove to Stockbridge with Fluellen in the CHS's vehicle, while Williams followed in her vehicle. When they arrived at the parking lot in Stockbridge, Williams and Fluellen placed the bags containing the drugs in another vehicle. The CHS again paid Williams $3,000. This was the last transaction in which Williams participated.

**\*929** The government indicted Williams and more than 20 other prison guards who assisted the CHS in similar drug transactions. A grand jury changed Williams with three counts of attempting to distribute methamphetamine and cocaine, in violation of 21 U.S.C. §§ 841 and 846 and 18 U.S.C. § 2, and three counts of affecting commerce by extortion under color of official rights, in violation of 18 U.S.C. § 1951(a).

Williams moved to dismiss the indictment, claiming that the government engaged in outrageous conduct and violated concepts of fundamental fairness by creating a reverse sting operation that targeted individuals who had not previously engaged in illegal conduct. A magistrate judge recommended that the district court deny her motion. Williams objected to the magistrate judge's recommendation. The district court overruled the objection and denied the motion to dismiss.

After the district court denied her motion to dismiss, Williams pled guilty to one count of attempting to distribute methamphetamine and cocaine. At the plea hearing, the government described how Williams had transported what she believed to be a total of eight kilograms of cocaine and one kilogram of methamphetamine in exchange for cash. The government also explained that Williams was told and believed that her uniformed presence would protect the drug deals by making it less likely that law enforcement officers would search her vehicle if there was a stop. Williams agreed with the government's description of her conduct.

**B. Williams's Sentencing**
After Williams pled guilty, the probation office prepared a presentence investigation report ("PSI"). Based on the drug quantity, the PSI calculated Williams's base offense level as 34. The PSI applied a two-level enhancement based on Williams's role as an "organizer, leader, manager, or supervisor" of the criminal activity. U.S.S.G.

§ 3B1.1(c). The PSI explained that the supervisory role enhancement was warranted because Williams recruited Fluellen to participate in the scheme. After applying an additional two-level enhancement for abusing a position of public trust and a three-level reduction for acceptance of responsibility, the PSI found that Williams's total offense level was 35. The PSI calculated that this total offense level and Williams's criminal history category of I yielded a recommended range under the Sentencing Guidelines of 168-210 months of imprisonment. The PSI noted that a downward departure or variance could be warranted to avoid sentencing disparities with Williams's similarly situated co-defendants who received sentences significantly below their Guidelines ranges.

Before sentencing, Williams objected to, among other things, the PSI's base offense level and the supervisory role enhancement. Regarding the base offense level, she challenged the quantity of drugs that the PSI attributed to her and asserted that under the correct quantity, her base offense level was 32. The government agreed.

Regarding the supervisory role enhancement, Williams argued that, by itself, her recruitment of Fluellen was not a basis for imposing the enhancement and that there was no evidence that she exerted any control, influence, or decision-making authority over the scheme. She also argued that she was entitled to a two-level reduction in her offense level under the Guidelines' "safety valve" provision. *See* U.S.S.G. §§ 2D1.1(b)(17), 5C1.2. But Williams acknowledged that she was eligible for this reduction only if the district court found that she should not receive the two-level supervisory role enhancement. The government argued that the supervisory role **\*930** enhancement was warranted because Williams recruited Fluellen and Minor to the scheme. The government explained that under binding precedent recruiting an accomplice was sufficient to warrant a role enhancement.

At the sentencing hearing, the district court adopted the PSI's unobjected-to findings of facts and conclusions of law. The court found that Williams's base offense level was 32. The district court then considered whether to apply the supervisory role enhancement. To support the enhancement, the government introduced evidence showing that Williams asked Minor to participate in the scheme and connected the CHS with Minor. After considering the parties' arguments, the court indicated that it was not "completely convinced that it is fair" to apply the enhancement, but that binding precedent required it to apply the enhancement. Doc. 819 at 17.[3] The district court stated, "[I]f I were to find that [Williams] was not subject to a role enhancement, I would be reversed." *Id.*

After considering the other adjustments to Williams's offense level, the court found that Williams's total offense level was 33. This offense level combined with her criminal history category of I resulted in a Guidelines range of 135 to 168 months of imprisonment. After hearing arguments and allocution, the court varied downward and sentenced Williams to 61 months' imprisonment. This is Williams's appeal.

## II. STANDARDS OF REVIEW
We review *de novo* a claim that a defendant was denied process of law based upon outrageous conduct by the government. *United States v. Edenfield*, 995 F.2d 197, 200 (11th Cir. 1993). A challenge to the application of the Sentencing Guidelines is a mixed question of law and fact. *United States v. Mandhai*, 375 F.3d 1243, 1247 (11th Cir. 2004). We review the district court's findings of facts for clear error and its application of the Guidelines to those facts *de novo*. *Id.*

## III. ANALYSIS
Williams raises two arguments on appeal. First, she argues that the district court erred in denying her motion to dismiss the indictment. She contends that the district court should have dismissed the charges against her because, in conducting the reverse sting operation, the government engaged in outrageous conduct that violated fundamental principles of due process. Second, she contends that the district court erred when it applied a two-level supervisory role enhancement at sentencing. We consider these arguments in turn.

## A. The District Court Did Not Err in Denying Williams's Motion to Dismiss the Indictment.
[1]Williams argues that the government engaged in outrageous conduct and violated her due process rights when it created a reverse-sting operation that targeted low-paid prison guards, who were not engaged in ongoing criminal activity, with the allure of substantial cash payments for breaking the law. Although the government's conduct here was questionable, we cannot say that it meets the very high standard for outrageous conduct to constitute a due process violation.[3]

**\*931** The Supreme Court has said that "the conduct of law enforcement agents [may be] so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction."

*United States v. Russell*, 411 U.S. 423, 431-32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). The outrageous conduct defense "focuses on the tactics employed by law enforcement officials to obtain a conviction for conduct beyond the defendant's predisposition." *United States v. Sanchez*, 138 F.3d 1410, 1413 (11th Cir. 1998). In considering this defense, we ask whether the government's "methods comport with the Fifth Amendment's guarantee of due process." *Id.* Whether sufficiently outrageous government conduct exists "turns upon the totality of the circumstances with no single factor controlling," but the defense may "only be invoked in the rarest and most outrageous circumstances." *United States v. Haimowitz*, 725 F.2d 1561, 1577 (11th Cir. 1984) (internal quotation marks omitted).

This Court has suggested that the government's conduct would be sufficiently outrageous if the government "instigate[d] the criminal activity, provide[d] the entire means for its execution, and [ran] the entire operation with only meager assistance from the defendant." *United States v. Puett*, 735 F.2d 1331, 1335 (11th Cir. 1984). But, the government argues, that is not what happened here.

After considering the totality of the circumstances, we cannot say that the government's conduct was sufficiently outrageous in this case. There was no evidence that Williams had, prior to meeting the CHS, transported drugs, so we accept that the government instigated the criminal activity by having the CHS pose as a drug dealer who needed assistance moving large quantities of drugs. But this is not a case where the government provided the entire means for the scheme's operation or where the defendant provided only meager assistance. Williams transported drugs for the CHS while wearing her uniform with the express understanding that the uniform would help protect the drug deliveries from law enforcement interdiction. She furthered the criminal scheme when she put the CHS in contact with two other prison guards who joined the scheme, including personally approaching Minor to recruit her.

Williams argues that we should follow the Third Circuit's reasoning in *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), to conclude that the government's conduct in executing the reverse sting operation was so outrageous as to violate due process. In *Twigg*, after pleading guilty to a crime, Robert Kubica agreed to aid the government in apprehending illegal drug traffickers. *Id.* at 375. Kubica approached defendant Henry Neville and proposed that they set up a laboratory to manufacture methamphetamine hydrochloride (speed). *Id.* Over several months, Kubica and Neville made arrangements to create a lab. *Id.* Neville

then pulled into the operation William Twigg, who owed him a debt. *Id.* Neville "assumed primary responsibility for raising capital and arranging for distribution" of the speed, "while Kubica undertook the acquisition of the necessary equipment, raw materials, and a **\*932** production site." *Id.* The government assisted Kubica with his end of the bargain, including by supplying Kubica with the hard-to-obtain chemical that was the key ingredient in manufacturing speed. *Id.* During the process of setting up the lab and making the speed, "Kubica was completely in charge of the entire laboratory," and "[a]ny production assistance provided by Neville and Twigg was minor and at the specific direction of Kubica." *Id.* at 376. After the lab was established, operated for one week, and produced six pounds of speed, Neville and Twigg were arrested. *Id.*

The Third Circuit reversed Neville's and Twigg's convictions, concluding that the government's conduct in organizing this reverse sting operation was outrageous. *Id.* at 381-82. The Third Circuit reached this conclusion after considering several factors. First, the Third Circuit focused on the fact Neville and Twigg were not engaged in any ongoing criminal activity at the time that Kubica approached them, and they did not create the illicit plan. *Id.* at 381. Second, the Third Circuit considered that Kubica, the informant, controlled the operations and furnished all the expertise necessary to build the laboratory. *Id.* at 380-81. Third, the Third Circuit examined the "nature of the crime and the tools available to law enforcement agencies to combat it." *Id.* at 378 n.6. The court explained that the crime at issue, drug manufacturing, was not a fleeting and elusive crime. *Id.* at 378. The court acknowledged that crimes involving the *sale* of illegal drugs, because of their fleeting and elusive nature, could "require more extreme methods of investigation." *Id.*

Since deciding *Twigg*, the Third Circuit has narrowly applied *Twigg*'s reasoning and has never held since that the government engaged in outrageous conduct in executing a reverse sting operation. *See United States v. Fattah*, 858 F.3d 801, 813 (3d Cir. 2017); *United States v. Beverly*, 723 F.2d 11 (3d Cir. 1983). In *Beverly*, an informant introduced defendant Dorrie Adams to Darrell O'Connor (an undercover government agent), telling Adams that O'Connor could help him make money. 723 F.2d at 12. O'Connor offered Adams $3,000 to burn down a building owned by a friend. *Id.* Adams agreed to participate and recruited defendant Lawrence Beverly to help him. *Id.* Beverly told O'Connor that he had never committed arson before but was willing to go along. *Id.* O'Connor brought Adams and Beverly to a service station, bought gasoline, ascertained that Adams had

matches, and drove them to a building owned by the government. *Id.* Adams and Beverly were arrested before burning down the building and convicted of conspiring and attempting to destroy a government building by fire. *Id.*

On appeal, Adams and Beverly, relying on *Twigg*, asserted that the government's conduct was outrageous and deprived them of due process. *Id.* The Third Circuit affirmed their convictions, questioning whether *Twigg* had been correctly decided and whether it remained good law in light of Supreme Court and subsequent Third Circuit precedent. *Id.* at 12-13. The court in *Beverly* explained that the outrageous conduct defense "should be accepted by a court only to curb the most intolerable government conduct." *Id.* at 12 (internal quotation marks omitted). Despite expressing "grave doubts about the propriety" of the government's tactics in using the reverse sting operation, the Third Circuit nonetheless concluded that law enforcement's conduct did not "shock[ ] the conscience." *Id.* at 13.

We decline to apply the reasoning of *Twigg* here. It is true that, as in *Twigg*, the government created a reverse sting operation that targeted individuals, like **\*933** Williams, who were not engaged in criminal behavior before being approached to join the drug transportation scheme. But the important difference here, as we explained above, is that Williams gave more than minor assistance to the scheme when she transported drugs for the CHS, wore her uniform to avoid law enforcement detection, and put the CHS in contact with Minor and Fluellen. As the Third Circuit acknowledged in *Twigg*, "fleeting and elusive crime[s]," like drug dealing, may "require more extreme methods of investigating" in a reverse sting operation. *Twigg*, 588 F.2d at 378. Although troubling, the government's conduct here does not shock the conscience, so we cannot say that it was outrageous enough to amount to a violation of due process. We caution that our decision should not be read "as an approval of the government's conduct" in carrying out this type of reverse sting operation. *Beverly*, 723 F.2d at 13.

**B. The District Court Operated Under a Misunderstanding of the Law in Applying a Two-Level Enhancement for a Supervisory Role.**

[2]Williams also raises a separate challenge to her sentence, arguing that the district court improperly calculated her offense level under the Sentencing Guidelines when it applied a two-level supervisory role enhancement pursuant to U.S.S.G. § 3B1.1(c). Because the district court appears to have erroneously believed that

it was compelled by precedent to apply the enhancement, we vacate Williams's sentence. We remand for resentencing so that the district court may apply the correct legal standard in considering whether to apply the enhancement.

Section 3B1.1 provides for a two-level enhancement in a defendant's offense level if she "was an organizer, leader, manager, or supervisor" of criminal activity. U.S.S.G. § 3B1.1(c). For the enhancement to apply, the defendant must exert "some degree of control, influence, or leadership" in the criminal conspiracy. *United States v. Ndiaye*, 434 F.3d 1270, 1304 (11th Cir. 2006) (internal quotation marks omitted). The commentary to the Guidelines directs a court, in assessing a defendant's role, to consider the following factors: (1) whether she exercised decision making authority, (2) the nature of her participation in the commission of the offense, (3) whether she recruited accomplices, (4) whether she claimed a right to a larger share of the fruits of the crime, (5) her degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority she exercised over others. U.S.S.G. § 3B1.1 cmt. n.4. This multi-factor analysis requires a district court to decide whether, under the totality of the circumstances, the enhancement should apply. *See United States v. Ramirez*, 426 F.3d 1344, 1356 (11th Cir. 2005) (indicating that a district court should weigh the "various factual considerations" set forth in the commentary to the Guidelines to determine whether the enhancement applies on a "case-by-case" basis). There is no requirement that all the considerations have to be present for the enhancement to apply. *Id.*

Because Williams objected to the PSI's application of the supervisory role enhancement, the government bore the burden of proving "by a preponderance of the evidence the facts necessary to support" the enhancement. *United States v. Little*, 864 F.3d 1283, 1290 (11th Cir. 2017) (internal quotation marks omitted); *accord United States v. Martinez*, 584 F.3d 1022, 1027 (11th Cir. 2009). The government introduced evidence showing that Williams personally asked Minor to join the criminal scheme and also provided Minor's and Fluellen's names and phone numbers to **\*934** the CHS. The government's evidence also showed that Williams received a larger payment for the drug transactions that she completed with Minor and Fluellen. There was no evidence, however, that Williams exercised any decision making authority in the criminal scheme, was involved in the planning or organizing of the offense, or had any control or authority over others involved in the scheme.

At the sentencing hearing, the district court concluded that it was bound by precedent to apply the supervisory role enhancement. The court expressed concern about the enhancement, stating that the court was "not completely convinced that it is fair" to apply it. Doc. 819 at 17. The court then explained that it was bound to apply the enhancement: "Let me put it like this: I feel that if I were to find that she was not subject to a role enhancement, I would be reversed." *Id.* These statements indicate that the court was concerned about whether application of the supervisory role enhancement to Williams was appropriate, but believed precedent required it to apply the enhancement because Williams had recruited an accomplice or accomplices to join the scheme. The district court's conclusion was based upon a misunderstanding of the law.

The government argues that the district court properly applied the supervisory role enhancement because this Court previously has affirmed the application of the enhancement when the only evidence of the defendant's supervisory role was recruitment of co-conspirators. But the government's argument fails to address the question at the heart of the district court's reasoning: whether our precedent *compels* a district court to apply the enhancement when the defendant recruited others to join the scheme.

There is another potential flaw in the government's argument: it is less than clear whether our precedent actually permits a district court to apply the enhancement based solely on evidence that the defendant recruited others to join the criminal scheme. In most of the published cases cited by the government, we affirmed the application of the enhancement when the defendant had recruited co-conspirators *and* taken other actions indicating control, influence, or leadership over the organization. *See, e.g., Ndiaye*, 434 F.3d at 1304; *United States v. Njau*, 386 F.3d 1039, 1041 (11th Cir. 2004); *United States v. Perry*, 340 F.3d 1216, 1217-18 (11th Cir. 2003).

The government cites only one published case that even arguably supports its position that the enhancement may be applied based solely on evidence that the defendant recruited accomplices. *See United States v. Thomas*, 446 F.3d 1348, 1355 n.2 (11th Cir. 2006). And it is unclear whether *Thomas* actually addressed this issue. True, we stated in a footnote in *Thomas* that the district court did not err in applying the enhancement because the defendant had recruited others to join the scheme. *Id.* But we also explained, in a separate section of the opinion, that the defendant was as an "organizer or leader" of the conspiracy because he determined the manner by which the crime would be committed and the level of violence

necessary and obtained firearms for use in the crime, in addition to recruiting other participants. *Id.* at 1357.

We need not decide whether our precedent permits a district court to impose the supervisory role enhancement based solely on the fact that the defendant recruited others to join the scheme. This appeal presents a different question: whether the district court erred when it concluded that our precedent *required* it to impose the enhancement.

The district court, in effect, adopted a bright line rule that the enhancement must **\*935** be applied whenever the defendant recruited an accomplice. But the district court did not identify and the parties did not cite any case supporting such a rule. The district court's application of this bright line rule cannot be reconciled with our instructions that a district court should determine whether the enhancement applies on a "case-by-case" basis in light of "various factual considerations" including: whether the defendant exercised decision making authority, the nature of her participation in the offense, whether she claimed a larger share of the fruits of the crime, her degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree or control or authority that she exercised over others. *Ramirez*, 426 F.3d at 1356 (citing U.S.S.G. § 3B1.1 cmt. n.4).

After the district court expressed doubt about whether a supervisory role enhancement should be imposed on Williams, the court's erroneous understanding of the law led it to conclude that it was required to apply the enhancement without considering other factors. We thus vacate Williams's sentence and remand for resentencing so that the district court can determine whether, in light of the proper legal standard, Williams served as "an organizer, leader, manager, or supervisor" of the criminal activity and thus should be subject to a two-level role enhancement. U.S.S.G. § 3B1.1(c).

### IV. CONCLUSION

For the reasons set forth above, we affirm Williams's conviction, vacate her sentence, and remand the case to the district court for resentencing.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

### All Citations

755 Fed.Appx. 926

Footnotes

1   For each of the transactions, the packages the CHS gave Williams contained counterfeit methamphetamine and cocaine. We nonetheless refer to the substances as methamphetamine, cocaine, or drugs for ease of reference.

2   Citations in the form "Doc. #" refer to numbered entries on the district court's docket.

3   The government argues that Williams may not challenge the denial of her motion to dismiss the indictment because she subsequently pled guilty. It is true that entering a guilty plea generally "waives a defendant's right to all non-jurisdictional challenges to a conviction." *United States v. Bonilla*, 579 F.3d 1233, 1240 (11th Cir. 2009). But "[t]here are ... a few exceptions to this rule." *Id.* A defendant's guilty plea "establishes factual guilt" of the charged offense, "and therefore all constitutional violations which are inconsistent with that factual guilt are waived by a guilty plea." *Id.* But a plea of guilty " 'does not waive a claim that judged on its face the charge is one which the [government] may not constitutionally prosecute.' " *Id.* (quoting *Menna v. New York*, 423 U.S. 61, 62 n.2, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975) ). We assume for purposes of this appeal that Williams did not waive her outrageous conduct defense by pleading guilty.

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.